IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Eileen Ahern, Maureen Mastalerz, | ) | |
| Debra Auger, and Lynda Parker, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. NO. 05-117ML |
| | ) | |
| Jim Nicholson, Secretary, | ) | |
| Department of Veterans Affairs, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

Now comes Jim Nicholson, Secretary of the Department of Veterans Affairs, by and through his attorneys, and respectfully requests that the Court enter an order granting the Defendant summary judgment as to each Plaintiff. In support of this motion, Defendant relies upon the Memorandum of Law and Statement of Facts as to Which There Is No Genuine Dispute filed herewith.

Respectfully submitted,

JIM NICHOLSON, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS,

By his attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Richard B. Myrus
RICHARD B. MYRUS
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: richard.myrus@usdoj.gov

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| | ) | |
| Eileen Ahern, Maureen Mastalerz, | ) | |
| Debra Auger, and Lynda Parker, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. NO. 05-117ML |
| | ) | |
| Jim Nicholson, Secretary, | ) | |
| Department of Veterans Affairs, | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT</u>**

JIM NICHOLSON, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS

By his attorneys,

ROBERT CLARK CORRENTE
United States Attorney

<u>/s/ Richard Myrus</u>
RICHARD MYRUS
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: richard.myrus@usdoj.gov

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................ 1

II. FACTS ........................................ 3

A. Background ........................................ 3

B. The CT Department ........................................ 5

C. Contract Technologists ........................................ 9

D. Departure of the Chief Technologist ........................................ 13

E. The Plaintiffs' Complaints about Khatib ........................................ 14

F. Lynda Parker ........................................ 15

G. Debra Auger ........................................ 18

H. Eileen Ahern ........................................ 21

I. Maureen Mastalerz ........................................ 23

III. ARGUMENT ........................................ 25

A. Summary Judgment Standard ........................................ 25

B. Defendant is Entitled to Summary Judgment on Counts I-III in Which Plaintiffs Allege Discrimination in Hiring, Pay, and Promotion ........................................ 26

1. Count I: Plaintiffs Can Point to No Evidence Demonstrating that They Suffered an Adverse Employment Action or that Any Similarly Situated Males Were Treated More Favorably with Respect to Hiring ......... 29

2. Count II: Plaintiffs Can Point to No Evidence that They Suffered an Adverse Employment Action or that Any Similarly Situated Males Were Treated More Favorably with Respect to Pay ........................................ 32

3. Count III: Plaintiffs Have No Evidence that They Suffered an Adverse Employment Action with Respect to Promotions ........................................ 34

C. Defendant Is Entitled to Summary Judgment on Plaintiffs' Claims that

They Suffered Retaliation for Engaging in Protected Activities .............................. 37

1. Lynda Parker .................................................................................. 38

a. CT Cross-Training ................................................................ 39

b. Student Instructor .................................................................. 40

c. Acting Chief Technologist ...................................................... 42

2. Debra Auger ..................................................................................... 42

a. Department Coordinator ........................................................ 44

b. Tours of DIS ......................................................................... 45

c. Role of Angiography ............................................................. 46

d. Change of Schedule ............................................................... 47

e. Relocation of Patients ............................................................ 48

f. Counseling Letters .................................................................. 48

g. Requests for Confirmation of Leave Status ............................. 50

h. Denial of Promotion ............................................................... 52

I. The VA Hospital’s Alleged Inaction ......................................... 53

3. Eileen Ahern ..................................................................................... 54

a. Counseling Letter ................................................................... 56

b. Admonishment ....................................................................... 57

c. Leave Documentation ............................................................ 58

d. Work Assignments ................................................................. 59

4. Maureen Mastalerz ........................................ 60

a. Leave Documentation ........................................ 61

b. Letters Regarding Misconduct ........................................ 62

c. X-Ray Training and Call Schedule ........................................ 64

C. Defendant Is Entitled to Summary Judgment on Plaintiffs' Constructive Discharge Claims ........................................ 64

1. Lynda Parker ........................................ 70

2. Debra Auger ........................................ 72

3. Eileen Ahern ........................................ 75

4. Maureen Mastalerz ........................................ 76

5. Constructive Discharge ........................................ 79

IV. CONCLUSION ........................................ 81

CERTIFICATE OF SERVICE ........................................ 82

## I. INTRODUCTION

This case arises under Title VII of the Civil Rights Act of 1964. The four plaintiffs, Eileen Ahern, Maureen Mastalerz, Debra Auger, and Lynda Parker ("Plaintiffs"), are former radiology technologists at the Department of Veterans Affairs Medical Center in Providence, Rhode Island ("VA Hospital"), who contend that they were discriminated against on the basis of gender and suffered retaliation for engaging in protected activities. The Plaintiffs seek to hold the Department of Veterans Affairs liable for conduct by the Administrative Officer of the Diagnostic Imaging Service ("DIS") that allegedly began in 2003. Plaintiffs' allegations, stripped of their rhetoric, are that the Administrative Officer failed to treat them with sufficient courtesy, attempted to institute changes that impinged upon their autonomy, and paid newly-hired contract workers, both male and female, more than the tenured staff employees. As detailed below, however, no reasonable jury could conclude that the Plaintiffs suffered any adverse employment action that was the result of discriminatory or retaliatory animus.

In their five-count Second Amended Complaint, Plaintiffs allege that they were subjected to disparate treatment with respect to hiring, pay, and promotion. In addition, Plaintiffs allege that Khatib retaliated against them and that two of then were constructively discharged. Defendant is entitled to summary judgment with respect to the Plaintiffs' disparate treatment claims because Plaintiffs have adduced no evidence that they suffered an adverse employment action or that similarly situated males were treated preferentially. Indeed, Plaintiffs concede that Khatib did not treat their male staff counterparts better than he treated the Plaintiffs.

Plaintiffs complain that Khatib hired male contract workers in order to pay them more than Plaintiffs. Unfortunately for Plaintiffs, however, Khatib hired both male and female

contract workers. Moreover, the VA Hospital's Contracting Department, not Khatib, determined the salaries for the contract technologists, and there is no dispute that the contract salaries were at, and in most cases well below, the prevailing rate for contract technologists set by the Federal Supply Schedule.

Plaintiffs also allege that a contract worker, Christopher Stokes, was improperly given the position of Chief Technologist after the departure of the incumbent in June 2004. Plaintiffs, however, have admitted that Khatib, not Stokes, assumed supervisory authority over the technologists when the Chief Technologist left and that Stokes, among others, was merely handling patient flow. Moreover, Plaintiffs, three of whom had already left DIS when Stokes was tasked to address flow control, can point to no evidence that the terms or conditions of their employment were negatively affected as a result of Stokes's role. Thus, as a matter of law, Stokes's assignment did not rise to the level of an adverse employment decision and is not actionable.

Similarly, Plaintiffs' retaliation claims cannot survive summary judgment because these claims are based almost entirely on events that did not constitute adverse employment actions and because Plaintiffs cannot establish that the defendant's explanations for the allegedly improper conduct were pretextual. Rather, Plaintiffs' claims of petty snubs and personality conflicts are a choice example of a situation where "every trivial personnel action that an irritable chip-on-the -shoulder employee did not like" has found its way into a lawsuit. Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996 ).

Last, Plaintiffs' hostile work environment and constructive discharge claims are based on a tangle of perceived slights and objections to Khatib's management decisions that cannot survive summary judgment. For example, Plaintiffs contend that Khatib regularly questioned

them about the performance of their jobs, sought to implement changes such as requiring additional reports, and failed to treat them with sufficient courtesy. Plaintiffs' complaints amount to, at best, a disagreement over Khatib's management style. Unfortunately for Plaintiffs, Khatib's managerial techniques, professional or unprofessional, "are not the focus of the discrimination laws." Lee-Crespo Schering-Plough del Caribe, 354 F.3d 34, 47 (1st Cir. 2003.)

## II. FACTS

In support of this Motion, defendant relies on the facts set forth in the Defendant's Statement of Facts as to Which There Is No Genuine Dispute, the supporting exhibits in the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment, and the declarations submitted herewith. The undisputed facts are detailed below.

### A. Background

In 2003, the Diagnostic Imaging Service at the VA Hospital consisted of five modalities: general x-ray/radiology, ultrasound, CT scan, nuclear medicine, and specials/angiography/interventional. (Ex. 1, at 16:25-17:5; Declaration of Mehrdad Khatib ("Khatib") dated Nov. 13, 2003, at ¶ 4; Ex. 2.)[1] In addition to the technologists, who performed the diagnostic procedures, DIS included several radiologists and a clerical support staff. (Khatib ¶ 4; Ex. 2.)

The technologists in DIS reported to the Chief Technologist, who in turn reported to the Administrative Officer. The Administrative Officer reported to the Chief of the Diagnostic

[1] Exhibits cited in this memorandum are provided in the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment submitted herewith, which includes a table of contents identifying each exhibit by exhibit number and brief description. The Appendix includes cited documents and deposition testimony. Depositions are cited by page and line number, using the following convention: page:line-line. Declarations cited herein are submitted separately and cited to by the name of the declarant.

Imaging Service, who had ultimate responsibility for DIS. (Khatib ¶¶ 5-6; Declaration of Casimira Sta Ines ("Sta Ines") dated Nov. 9, 2007, at ¶ 1.)

The Chief Technologist was responsible for directly supervising the technologists, approving leave requests, authorizing overtime, disciplining technologists, and providing performance reviews. (Khatib at ¶ 7; Ex. 3 at 71:21-72:4; Ex. 1 at 35:10-36:20; Ex. 4 at 117:10-13; Ex. 5 at 94:2-19.) The Administrative Officer was responsible for all facets of DIS's operation, including personnel management, equipment operations, and budgeting. (Khatib ¶ 5; Ex. 2.) With respect to personnel management, the Administrative Officer's role was to address employee performance issues, staffing requirements, and work assignments on a daily basis with the Chief Technologist and to keep the Chief of the Diagnostic Imaging Service fully apprised. (Khatib ¶ 6.) In addition, the Administrative Officer oversaw the day-to-day operations of the service, and it was his responsibility to ensure that DIS provided the best possible patient care as efficiently as possible. (Khatib ¶ 5-6.)

In 2003, the Chief of the Diagnostic Imaging Service was Dr. Casimira Sta Ines, a woman. (Sta Ines ¶ 1.) Mehrdad Khatib became the Administrative Officer in August 2002, and prior to his arrival that position had been vacant for several months. (Khatib ¶ 1.)

In December 2003, DIS employed fourteen staff technologists, two of whom were men. (Ex. 7, at 19:9-20:3; Ex. 2.) In addition, two male staff file clerks worked in DIS. (Id.)

The Chief Technologist was Joan Beaudoin, a long-time VA Hospital employee. (Khatib ¶ 7; Exh. 2.) Beaudoin left DIS in May 2004 on extended leave, at which time Khatib, her immediate superior, assumed her supervisory duties as Chief Technologist. (Ex. 3 at 23:11-17; Khatib ¶ 7.)

**B. <u>The CT Department</u>**

Computer tomograph ("CT") is an imaging method that employs digital geometry processing to generate a three-dimensional image of the internal portions of an object. (Khatib ¶ 9.) CT has become an essential tool in medical diagnostic imaging, and consequently the demand for CT procedures, and the work load for technologists, has increased dramatically in the last ten years. (Ex. 4, at 49:12-15.) In 2003, the VA Hospital's CT Department consisted of two full-time technologists (Mastalerz and Ahern) and one technologist who divided her time between CT Scan and Angiography (Auger). (Ex. 3, at 23:18-24; Ex. 5, at 25:18-25; Khatib ¶ 13.)

Khatib, who had not previously worked in the VA system, sought to boost productivity and alter what he perceived to be a culture of inefficiency plaguing DIS and the CT Department in particular. (Khatib ¶¶ 2, 10.) For example, in 2003, the CT Department routinely closed for preventive maintenance at least one afternoon each month for several hours, during which time patients were not scheduled. (Ex. 5, at 32:11–33:24.) During these preventive maintenance periods, the CT technologists took "extended lunches," and Khatib often had difficulty locating them. (Ex. 3, at 56:10-57-15; <u>see</u> Khatib ¶ 12; Ex. 9 at 26:4-24.) In addition, prior to Khatib's arrival as Administrative Officer, the CT Department's practice was to leave four outpatient slots per day unfilled, ostensibly to allow for the completion of unscheduled emergency cases. (Ex. 5, at 35:2-22.) Khatib, however, viewed this practice as inefficient because these slots often went unused when unscheduled cases did not materialize. (Khatib ¶ 12; Ex. 4, at 44:14-19.)

The CT Department was the only department in DIS that operated on a compressed tour of duty schedule. (Khatib ¶ 13.) Under the compressed tour schedule in the CT Department, each of the technologists worked four, ten-hour days per week from 7:00 a.m. to 5:30 p.m. For

example, during a typical week in 2003, Ahern worked Monday through Thursday, and Mastalerz worked Tuesday through Friday. Auger took Wednesdays off and divided her time during her four days at work between Angiography and CT. The following week, Mastalerz and Ahern typically switched days off, which enabled each of them to have a four-day weekend every other week. (Ex. 7, at 38:3-24; Khatib ¶ 13.)

In Khatib's view, the compressed tour created a number of inefficiencies. (Khatib ¶ 13.) For example, Khatib expressed concern to the Chief Technologist that the CT technologists frequently took sick leave to extend their regular days off. (Ex. 4, at 98:13-19.) When a CT technologist called in sick, the CT Department was left with only one technologist for the entire day, because there were only two technologists scheduled each day. (Khatib ¶¶ 13, 16; Ex. 10; Ex. 11.) In addition, under the compressed schedule, the CT technologists frequently collected overtime beginning at 5:30 p.m. because that was the end of their regularly scheduled shift. The day's cases, however, were often not completed by that time. (Ex. 9, at 74:5-75:7; Ex. 5 at 38 and 66:3-19; Khatib ¶ 14.)

In early 2004, a multi-week backlog in the scheduling of CT scans for outpatients at the VA Hospital had arisen. (Ex. 5, at 159:13-19; Khatib ¶ 15.) Kahtib attributed this backlog in part to the CT staff's compressed schedules, which required that the last outpatient be scheduled by not later than 5:00 p.m. (Ex. 5, at 36:5-10; 38:17-20; and 54:7-19; Khatib ¶ 17). In addition, an audit of pending cases in each DIS modality revealed that the CT Department was also plagued with an alarming number of cases that had been scheduled, but never performed. (Ex. 4, at 40:21-23; 42:1-2; Ex. 11; Ex. 12; Ex. 13; Khatib ¶ 15.)

In response, Khatib ordered a review of thousands of pending CT cases in DIS's computer tracking system, which revealed at least 275 cases that were not duplicates and that

had not been cancelled by the physician involved. (Ex. 14; Ex. 4, at 62:1-65:3; Ex. 15 at PSM00006; Khatib ¶ 18.) Included among these unperformed pending procedures was at least one critical needle biopsy that a physician had ordered to assess the malignancy of a tumor. (Ex. 4, at 64:10-65:3.) To address the critical issue of pending cases, Khatib directed that DIS send lists of nonduplicate pending cases to each relevant physician for verification. (Ex. 16; Khatib ¶ 18.)

In addition to the backlog in the CT Department, Khatib had become seriously concerned about work flow and unreliable reporting in the CT Department. (Khatib ¶ 18.) In early April 2004, for example, Khatib advised the Chief Technologist:

> We continue to receive inaccurate or incomplete data during the morning report. Specifically, [the] Scheduled Request Log is inaccurate and not reflecting what is actually happening in CT. . . . The CT department is not functioning as it should and therefore causing delays in service and inefficiencies.

(Ex. 17.)

To address the problems in the CT Department, Khatib submitted a detailed memorandum to the Chief of the Diagnostic Imaging Service on March 31, 2004. (Ex. 11.) In this memorandum, Khatib proposed that the tour of duty be changed so that each of the three technologists would work a regular eight-hour tour, fives day per week. Under Khatib's initial proposal, these tours would be staggered such that the first technologist would begin work at 7:00. The second technologist would begin at 10:30 a.m, and the third would work from 3:00 p.m. to 11:00 p.m. (Ex. 11, at WMK0030.) The objective of this staggered tour proposal was to ensure that three CT technologists would be available Monday through Friday and that the department's regular hours of operation would be extended. (Ex. 11; Ex. 13) This schedule

would eliminate overtime from 5:30 p.m. to 11:00 p.m. and allow additional cases to be scheduled each afternoon. (Ex. 5 66:1-19; Khatib ¶ 17.)

The Chief of Diagnostic Imaging, Dr. Sta Ines, endorsed a modified version of the change to the CT schedule and proposed it to the CT technologists on April 12, 2004. (Ex. 18; Ex. 19; Sta Ines ¶ 7.)

In addition, Khatib attempted to impose tighter reporting controls on the CT Department and directed that all patients be called the day before their scheduled appointment to avoid no-shows. (Ex. 4, at 53:5-7; Khatib ¶¶ 18-19.) Last, Khatib, in consultation with the Chief of Diagnostic Imaging, determined to implement training in CT procedures for all interested technologists and also sought to have the CT technologists trained in radiology procedures. (Ex. 20; Khatib ¶ 19; Sta Ines ¶ 8.)

The Plaintiffs concede that a number of problems were negatively impacting the efficiency of the CT Department and that a constant backlog existed. (Ex. 22, at AH0243, Ex. 21, at AH0032.) Morever, the Plaintiffs acknowledged at the time that the desire to increase efficiency motivated Khatib to change the schedule:

> 13. Marty is trying to keep up with or surpass the productivity of other facilities. This is admirable. However, these facilities also generally have more staff and equipment than our CT department. If he wants us to compete with them he needs to give us the resources we need to do it. Changing our hours isn't the answer; increasing our resources is.

(Ex. 22, at AH0249.) Nonetheless, the CT technologists, Ahern, Mastalerz, and Auger, feverishly opposed the effort to switch the CT Department to a standard five-day-per-week schedule. (Ex. 22 and Ex. 21, at AH0030-32.) The Plaintiffs objected to Khatib's plan for a number of reasons, including: "We will no longer have a day off during the week to take care of personal business so we will now need to take days off to do these things." ( Ex. 22, at

AH0247.) In addition, under Khatib's proposal, Ahern's, Mastalerz's, and Auger's overtime would have been significantly curtailed. (Ex. 5, at 66:12-19; 68:5-11, 70:17-71:2.)

On April 22, 2004, less than ten days after being notified of the plan to modify their work schedules, Plaintiffs and several other staff employees, male and female, sent a seventeen-page memorandum to the VA Hospital administration, complaining at length about Khatib's proposed change to the schedule and his treatment of the staff technologists. (Ex. 21.)

In this memorandum, the authors, including the Plaintiffs, lament, among other things, that Khatib "places unreasonable and unrealistic expectations on all of us, seemingly setting us up to look and feel like failures." ( Ex. 21, at AH0028.) The memorandum also accuses Khatib of being disrespectful of a male doctor, Gregory Babigian, and of treating the male file room clerks "horribly." (Ex. 21, at AH0035.) The memorandum concludes by accusing Kahtib of engaging in workplace "bullying" of the entire staff. ( Ex. 21, at AH0041-42.)

Ultimately, the CT department's compressed tour was not changed with respect to the Plaintiffs. (Ex. 7, at 44:16-20; Sta Ines ¶ 7.) Only after all of them had left did new technologists begin to work regular five-day per week tours. (Ex. 23, at 65:6- 66:3.)

### C. Contract Technologists

Historically, DIS had difficulty hiring experienced technologists because "[t]he VA Hospital has a lower pay scale than the rest of the state . . . ." (Ex. 1, at 14:25-15:1.) In addition, "with the shortage of x-ray, CT, ultrasound and other techs in the country it is hard to hire techs." ( Ex. 21, at AH0041.) Indeed, DIS solicited applications for a GS-647-8 CT technologist in December 2003, which went unfilled. (Ex. 24; Khatib ¶ 22)

In September 2003, DIS experienced an urgent need for technologists. (Ex. 7, at 112:25-113:3; Sta Ines ¶ 3.) This shortage continued into October, and in fact motivated the Chief

Technologist, Joan Beaudoin, to propose to Khatib that DIS hire technologists on a contract basis. (Ex. 4, at 34:12-35:9.)

During Khatib's tenure as Administrative Officer, DIS hired both male and female contract technologists. (Ex. 3, at 103:10-13; Sta Ines ¶ 4; Khatib ¶ 29.) These contract technologists were not federal employees of the VA Hospital and served for temporary terms. (Declaration of Emerson Joslin dated Nov. 9, 2007, at ¶ 4.) The standard contract expressly stated: "Both parties agree that [the contract technologist] is not considered an employee of the **VAMC** for any purpose." (See, e.g., Ex. 25, ¶ 10.) In addition, these contract technologists did not receive any benefits from the VA Hospital, such as health insurance, sick leave, paid vacation, or retirement plan contributions. (Joslin ¶ 4; Ex. 1, at 99:9-13.)

The VA Hospital's Contracting Department set the salaries for the contract technologists that the VA Hospital retained. (Joslin ¶ 5.) The contract technologists came from two sources: staffing agencies on the Federal Supply Schedule, such as Staffing Now, Inc., and open market procurement. (Joslin ¶5.) The Contracting Department assessed the rates established by the staffing agencies on the Federal Supply Schedule and then sought to acquire contract services at the best value obtainable. Specifically, the Contracting Department obtained comparative hourly rates for technologists from Staffing Now, Inc., Cirrus Medical Staffing LLC, and others. (Joslin ¶ 5.)

Beginning in 2003, the VA Hospital hired the following contract technologists:

| DIS Contract Technologists (2003-2005) | | | | |
|---|---|---|---|---|
| | | | | |
| **Name** | **Starting Rate** | **Raises** | | **Time Period** |
| Kim Lebert (F) | $40/hr | | | 3/14/03--6/16/03: then staff |
| Derek Sabourin | $30/hr | | | 3/03-9/03 |
| Scott Gray | $35/hr | | | 10/03-12/04 |
| Christopher Stokes | $30/hr | | | 9/03-12/03 |
| Christopher Stokes | 12/03<br><br>$45/hr | 10/1/04<br><br>$48/hr | 10/1/05<br><br>$50/hr | 12/03-9/06: then staff as of 1/21/07 |
| Suzette Kennett (F) | $30/hr | | | 1/04-5/05: then staff |
| Laurie Goss (F) | $30/hr | | | 6/04-12/05 |
| Clemon Allen | $35/hr | | | 6/04-6/05 |
| Germiniano Bambakakis | $35/hr | | | 7/04-4/05 |
| Charlotte McLaughlin (F) | $40/hr | | | 7/04-12/04 |
| Dayna Gardner (F) | $35/hr | | | 7/04-7/05: then staff |
| Luchino Caparas | $35/hr | 4/1/05<br><br>$40/hr | | 7/04-9/06: then staff |
| Aguinaldo DaCruz | $30/hr | | | 7/04-9/05 |
| Sherrill Hockenberry (F) | $30/hr | | | 1/05-7/05 |
| Gregory Jordan | $38/hr | | | 1/05-1/05: Left after 1 week |
| Shannon Gomez (F) | $30/hr | | | 1/05-8/06 |
| Gabriel Ferrara | $35/hr | | | 4/14/05-/23/04 |
| Timothy Jones | $30/hr | | | 11/05-8/06 |
| *Staffing Now* | $57/hr | | | 12/03-3/05 |
| Gabriel Ferrara | | | | 1/23/03-- 4/14/05 |
| Edgar Medina | | | | 1/23/04-4/23/04 |
| | | | | |
| *Cirrus Medical Staffing* | $70/hr | | | 9/05-12/05 |
| Londa Marks | | | | |

(Joslin ¶ 6.)[2]

The first contract technologist that Khatib and DIS hired was a female nuclear medicine technologist, Kim Lebert, who began working in DIS in March 2003. Like many contract technologists, Lebert subsequently became a staff technologist. (Joslin ¶ 6; Ex. 1, at 43.)

[2] In addition, based on a time sheet from Staffing Now, it appears that Staffing Now provided Charles Clark as a technologist in 2004, but the Contracting Department has been unable to locate any files regarding his employment.

In September 2004, after returning from military deployment, Christopher Stokes, a radiology technologist with more than fifteen years of experience, contacted the VA Hospital seeking a position. Khatib and the Chief of the Diagnostic Imaging Service, Dr. Sta Ines, interviewed Stokes to fill DIS's urgent need for an experienced radiology technologist. (Khatib ¶ 25; Sta. Ines ¶ 4.)

Stokes was hired as a contract technologist on September 15, 2003 for a ninety-day term. (Joslin ¶ 8.) Stokes was paid $30 per hour, and his contract expressly stated that "payments for any leave, including sick leave or vacation time are the responsibility of [Stokes]." (Joslin ¶ 8; Ex. 25, at ¶ 10.) In addition, under the contract, the VA Hospital reserved the right to terminate the contract "for its sole convenience." (Joslin ¶ 8; Ex. 25, at ¶ 13.) In contrast, the Plaintiffs held permanent, career service, staff positions and received full benefits from the VA Hospital. (Ex. 1, at 97:11-13; Ex. 3, at 61:18-61:2.)

As with the other contract technologists that the VA Hospital hired, the Contracting Department approved Stokes's hiring after conducting an analysis of hourly rates from federal supply schedule contractors. (Joslin ¶ 8.) Specifically, the Contracting Department submitted a Request for Quotes (RFQ 650-44-03), and as shown on the September 15, 2003 Abstract, the rates quoted by staffing agencies ranged from $57.36 per hour to $74.75 per hour. (Ex. 27; Joslin ¶ 8.) Stokes was hired at a rate of $30 per hour, well below the prevailing agency rates. (Joslin ¶ 8.)

The VA Hospital subsequently renewed Stokes's contract for nine months on January 1, 2004 at $45 per hour. (Joslin ¶ 9.) In connection with this contract, the Contracting Department conducted another assessment of the hourly rates quoted by various staffing agencies and

determined that Stokes's rate was $20 per hour lower than the lowest agency rate. After two subsequent contract renewals, Stokes became a staff technologist in 2007. (Joslin ¶ 9.)

As noted above, a number of the contract technologists that DIS hired subsequently became staff technologists, including Kim Lebert, Suzette Kennett, Dayna Gardner, and Stokes. (Joslin ¶ 6.) None of the Plaintiffs ever sought to resign her staff position to pursue a contract position. (See, e.g., Ex. 7, at 79:7-17; Ex. 3, at 61:14-21.)

### D. Departure of the Chief Technologist

On June 14, 2004, the Chief Technologist, Joan Beaudoin, left DIS on extended medical leave, but did not resign. (Ex. 29, at AH0412 (24:20-22); Khatib ¶ 27-28.) Following her departure, Khatib, as the Administrative Officer, took over her supervisory responsibilities. (Khatib ¶ 7.) Khatib's assumption of Beaudoin's supervisory responsibilities was consistent with the practice when the Chief Technologist was on leave in DIS under Kahtib's predecessor, Joseph Crisafulli. (Ex. 4, at 104:22-105:11.) Specifically, Khatib assumed responsibility for approving the technologists' annual leave and overtime. (Kahtib ¶ 7; Ex. 1, at 123; Ex. 3, at 23:11-17.) In addition, he handled disciplinary issues, promotions, and performance evaluations, as well as overseeing the operation of DIS. (Khatib ¶ 7.)[3]

Subsequently, Khatib delegated to Stokes the responsibility for coordinating patient flow within DIS, because Khatib considered him an experienced, professional technologist, who had availability to take on this task. (Khatib ¶ 27.) That is, Stokes coordinated the assignment of cases, interfaced with other departments to ensure that their diagnostic imaging needs were being

[3] In June 2004, the most senior technologist in DIS was Raymond Kim and not any of the Plaintiffs. (Ex. 5, at 104:2-20; see 180:22-181:3.)

met, and handled other routine tasks. Stokes had no supervisory authority, reported to Kahtib, and did not receive additional compensation. (Khatib ¶ 27.) In addition, Tenessa Karmozyn, a female staff technologist, also handled the responsibilities for patient flow during this period when she was available. (Kahtib ¶ 27; Ex. 30, at AH3560-61.)

Prior to giving this role to Stokes, Kahtib conferred with the Chief of the Diagnostic Imaging Service and the Human Resources Department and obtained approval to assign these responsibilities to a contract technologist. (Khatib ¶27; Sta Ines ¶ 9; Ex. 31, at AH3790(6:14-10:21).) At the time Khatib tasked Stokes with handling flow control, Mastalerz, Auger, and Ahern had all left DIS on extended medical leave. (Ex. 1, at 116:1-13.)

**E. <u>The Plaintiffs' Complaints about Khatib</u>**

In January 2004, the Plaintiffs and others met with the Chief of the Diagnostic Imaging Service to complain about Khatib's management of the department and his treatment of female employees. (Ex. 7, at 167:21-24.) Subsequently, the Plaintiffs and others sent an April 22, 2004, complaint memorandum to the VA Hospital and an August 20, 2004, letter to the Secretary of Veterans Affairs. (Ex. 82)

On September 30, 2004, an outside review team commissioned by the Department of Veterans Affairs regional authority issued a report of its findings and recommendations regarding the complaints about the situation in DIS. (Ex. 32.) In connection with this review, a team of five individuals from outside the VA Hospital visited that site on September 22, 2004 to conduct interviews. Among other things the report concluded:

> 5. There was no apparent discriminatory behavior on the part of Mr. Khatib. There were male and female employees of varying ages, who either supported him or were nonsupportive. There were allegations that he hired his male friends

on contract, however, these allegations were not substantiated as he had hired three female employees, including contract, per diem, and student employees.

* * * *

> 8. The employees with significant longevity seemed to have grown accustomed to self managing. While there were males and females of various age groups that either endorsed his changes or opposed them, there was clearly a division between the longer-term employees and the newer ones with only one exception. The newer employees saw Mr. Khatib as having “an open door policy” and “cleaning up the department and making people accountable.” They claimed that they were encouraged by the existing technologists to say negative things about Mr. Khatib and would be shunned if they did not support the current staff. However, clearly the newer employees were not invested in the old work structure, such as compressed tours of duty, and realistically had little to lose. There is no question that there is a serious morale issue among the majority of staff.

( Id. at AH0019.)

**F. Lynda Parker**

Plaintiff Lynda Parker began her employment at the VA Hospital in 2001 as a career service GS-5 technologist and worked in the radiology department. (Ex. 1, 8:25-9:24.) In April 2003, on Khatib’s recommendation, Parker was promoted to the position of backup angio/clinical coordinator (GS-7). (Ex. 1, at 140:6-13.) In this position, she worked three days per week in the radiology department and spent two days each week “cross-training” under the tutelage of Auger to become qualified in angiography procedures. (Ex. 9, at 29:14-30:4.) By April 2004, Parker had not completed her angiography cross-training. (Ex. 1, at 34:4-14.) Parker also was responsible for training student radiology interns from the Community College of Rhode Island. (Ex. 1, at 9:11-24.)

As part of the plan to alleviate staffing problems, Kahtib and the Chief of Diagnostic Imaging sought to cross-train interested technologists in CT procedures. (Khatib ¶ 19; Sta Ines ¶ 8.) It was, however, only feasible to fully train one technologist at a time. (Ex. 1, at 150:2-4.)

Khatib informed Parker that she would have an opportunity to receive CT training in due course, but that given her responsibilities as an angiography technologist and her prior commitment to angiography cross-training, she would be trained after Tenessa Karmozyn. Khatib and Dr. Sta Ines selected Karmozyn because she was the only interested radiology technologist not involved in other cross-training. (Khatib ¶30; Ex. 1, at 146:14-21; Ex. 33, at AH3773.)

With respect to Parker's role as student coordinator, Khatib, in his capacity as Administrative Officer, met with Parker and discussed her handling of this important clinical program. (Ex. 1, at 79:12-25.) In addition, in early August 2004, Parker informed CCRI that a hiring freeze was likely to be imposed at the VA Hospital and that such a freeze would negatively impact the clinical training program. (Ex. 34.) Parker took this action without first discussing it with Kahtib. (Khatib ¶ 31.) As a result of Parker's actions, Khatib expressed frustration and questioned her judgment: "I am still confused as to why you would not confirm the information with us before making the presentation to the school, since this would have significant impact on the department and would change the number of students who attend our program?" ( Ex. 34.)

On August 4, 2004, Parker initiated contact with an EEO Counselor about Khatib, and counseling concluded on October 8, 2004. (Ex. 35.) On October 25, 2004, Parker filed a formal Complaint of Discrimination, alleging a hostile work environment, discrimination and retaliation with regard to the denial of training, and constructive discharge. Parker asserted, among other things, that in August 2004 Khatib paged her while she was at lunch, questioned her about role as student coordinator, and failed to place her in charge. (Ex. 36, at AH3510.) In addition, Parker asserted that, beginning on April 15, 2004, Khatib denied her the opportunity to train in angiography procedures and CT scan procedures. (Id. at AH 3510.)

Also in August 2004, Parker began seeking new employment, (Ex 1, at 12:2-8; 13:22-14;3; 48:9-13), and in September 2004, having secured a higher paying position and a hiring bonus, Parker resigned her position at the VA Hospital. (Ex. 1, at 153:22-154:4.) Immediately upon her resignation from the VA Hospital, Parker took a full-time position at Women and Infants Hospital, which paid more than her job at the VA Hospital. (Id.) According to Parker she "did not resign form the VA until [she] had another job in place . . . ." (Ex. 1, 12:2-8.)

In her exit interview on September 24, 2004, Parker stated her reasons for quitting: "poor treatment from Marty – unfair conditions – preferential treatment towards contract techs." (Ex. 37, at LDP0062.) With respect to her relationship with Khatib, Parker stated "no communication/treated contract people better than staff." (Id. at LDP0063.) Nowhere in her exit interview statement did Parker state that she was forced to leave her position because of harassment based on her sex or retaliation for engaging in a protected activity. (Id. at 62; Ex. 1, 55:12-22.)

On December 15, 2004, the Department of Veterans Affairs Office of Resolution Management issued a decision, accepting in part and denying in part Parker's complaint. (Ex. 36, at AH3513-14.) The EEO Officer concluded that Parker failed to state a claim for harassment and that Parker failed to establish that she suffered an adverse employment action with respect to her claims that Khatib improperly paged her and questioned her regarding her performance as the student coordinator. (Id. at AH3511-13.) The EEO Officer also determined that several of Parker's allegations were barred because she failed to consult an EEO counselor in a timely manner. (Id.) With respect to Parker's three surviving claims, the Office of Resolution Management conducted an investigation and issued an Investigative Report on April 25, 2005. (Ex. 38.)

On March 18, 2005 the Plaintiffs initiated this lawsuit, and as a result, the Department of Veterans Affairs Office of Employment Discrimination Complaint Adjudication dismissed Parker's EEO complaint on May 5, 2005. (Ex. 89.)

Khatib never demoted Parker, denied her a promotion, suspended her, reduced her salary, refused her leave requests, or negatively evaluated her. (Ex. 1, at 86:9-87:12.) In addition, Khatib never insulted, ridiculed, disparaged or threatened her. (Ex. 1, at 84:5-85:12.)

**G. Debra Auger**

Debra Auger began her employment at the VA Hospital in August 1991 as a staff radiology technologist. (Ex. 7, at 9:4-6.) She became an angiography technologist in July 1993, (Auger 10:16-21), and lead angiography technologist in 2002. (Ex. 7, at 11:23-24.) Subsequently, Auger also assumed responsibilities as a CT technologist. (Ex. 7, at 12.)

Most recently, Auger held the position of lead angiography/CT technologist, which was a grade 8 position. (Ex. 7, 27:19-29:1.) She, Mastalerz, and Ahern, worked a compressed schedule that consisted of four, ten-hour days per week. On this schedule, Auger performed angiography procedures on Tuesdays and Thursdays from 7:30 a.m. to 5:30 p.m. (Ex. 7, at 36:11-38:20.) She performed CT procedures on Mondays and Fridays during those hours. (Id.) She also shared "call" responsibilities for CT scan with Ahern and Mastalerz. [4] In addition to weekends, Auger did not work on Wednesdays. (Ex. 7, at 37.)

In 2003, Auger recorded approximately fourteen hours each week in overtime. (Ex. 7, at 41:20-42:13.) Her total income from overtime in 2003, was at least $15,000. (Id.)

[4] "Call" is an overtime status in which the technologist carries a beeper and is available to perform CT scan procedures during nonworking hours to ensure twenty-four hour availability of services. (Ex. 7, at 12-13.) A technologist on "call" receives ten percent of her hourly overtime rate, if she is not called to the hospital and full overtime if she is called.

On February 20, 2004, Auger received a memorandum from the Chief Technologist rebuking her for her role in improperly photographing two staff members from Roger Williams Medical Center who were visiting DIS on official business. (Ex. 39; Khatib ¶ 33-34.) The actions documented in the memorandum were improper, and she did not dispute the memorandum. (Ex. 40, at AH3398.)

Beginning on June 25, 2004, Auger took two weeks of annual leave and never returned to the VA Hospital. (Ex. 7, at 34:23-35:8.) On July 6, 2004, she submitted an excuse slip from her physician, stating only that she had been evaluated for stress and anxiety disorder and been advised to remain out of work until further evaluation on July 21, 2004. (Ex. 9, at 93; Ex. 41.)

On July 8, 2004, Khatib, who was Auger's direct supervisor at that time, consulted with the Human Resources Department and sent Auger a letter, stating that her doctor's medical note did "not provide sufficient information to approve your request for sick leave." (Ex. 88, Khatib ¶ 35.) The letter further requested that she furnish "acceptable medical documentation that fully illustrates your incapacitation for duty." (Ex. 88, at PDA0172, Khatib ¶ 35.) To assist Auger in providing the documentation necessary, Khatib included a copy of the Standard for Medical Documentation. (Ex. 88, at PDA0173, Khatib ¶ 35; Ex. 23, 52:21-54:10.) Last, the letter stated that Auger would receive provisional leave until July 16, 2004 and noted that if acceptable documentation was not received, the VA hospital would not grant Auger leave and would take appropriate administrative action. (Ex. 88, at PDA0172.)

Auger's physician responded by providing additional documentation, and Auger's request for sick leave was granted without incident. (Ex. 42.)

In the past, DIS had made similar requests for verification of an employee's medical condition. For example, in February 2004, DIS pressed Dr. Gregory Babigian to obtain a letter

from his physician justifying his week-long absence from work on medical leave and rejected the emergency room discharge slip that he had presented. (Khatib ¶ 35.)

Despite being on extended leave and claiming to be unable to return to work, Auger nonetheless applied for several positions at the VA Hospital. In July 2006, the VA Hospital's Human Resources Department rejected her application for a grade 10 position as a lead angiography technologist. As Tammy Holt, a Human Resources specialist, explained to Auger at the time, the reason that the VA Hospital rejected Auger's application was that she lacked the requisite time-in-grade as a grade 9 technologist. (Ex. 44.)

In connection with her current claims, Auger contacted an EEO counselor on August 3, 2004 and subsequently filed a formal complaint on September 17, 2004, which she amended on January 11, 2005.[5] (Ex. 45, at AH2629.) Auger's EEO complaint contained seventy-two claims, seventy of which the Department of Veterans Affairs Office of Resolution Management dismissed in a December 30, 2004 procedural decision. (Ex. 45.) Subsequently, on March 23, 2005, the Office of Resolution Management issued a final agency decision dismissing Auger's EEO complaint after Auger filed the instant civil action. (Ex. 47.)[6]

Auger is still employed by the VA Hospital and is on leave without pay. (Ex. 7, at 35.) Khatib never denied Auger any benefits or reduced her work responsibilities. (Ex. 7, at 93:9-11; 94:12-15.) In addition, Auger never received any negative evaluations. (Ex. 7, at 94:16-20.) Moreover, Khatib never threatened Auger, and he never insulted or disparaged Auger based on

[5] In 2000, Auger, Mastalerz, and Ahern filed an EEO complaint against Bruce Foster, who was the Chief Technologist in DIS at the time. (Ex. 46, at AH3061 (6:15-7:15).) Bruce Foster subsequently left the VA Hospital, and Auger, Mastalerz, and Ahern settled their complaint in July 2001. (Id.)

[6] Auger also filed a worker's compensation claim, asserting that she was disabled as a result of Khatib's treatment. This claim was denied on May 26, 2005. (Ex. 48.)

her gender. (Ex. 7, at 186:23-187:12; 119:7-20; 158:12-24.) In short, Khatib never altered Auger's employment while she was at the VA Hospital. (Ex. 7, at 94:23-95:2.)

### H. Eileen Ahern

Ahern began working at the VA Hospital in 1988. (Ex. 5, at 19.) She held the position of x-ray technologist for approximately nine years and then became a CT technologist. ( Ex. 5, at 20.) Upon becoming a CT technologist, she worked with Joan Beaudoin, who was also a CT technologist at the time. (Ex. 5, at 23:6-8.) Following Beaudoin's promotion to Chief Technologist, Eileen Mastalerz became a CT technologist. (Ex. 5, at 26:1-9.)

Ahern was never denied leave or any promotion to which she was entitled while at the VA Hospital, and she was never terminated. (Ex. 5, at 119:6-15.) In addition, Khatib never threatened, insulted, or used profanities with Ahern. (Ex. 5, at 109:20-110:9; 189:24-190:13.)

On May 21, 2004, Ahern received a letter of counseling from the Chief Technologist, Beaudoin, regarding her treatment of two patients. The letter accurately described that Ahern encouraged a patient to complain about a delay that Ahern blamed on DIS policies, and the letter also chronicled how she initially refused to perform a CT procedure on another patient who did not have an appointment. (Ex. 49, Ex. 5, at168:23-169:4.) The letter did not become part of Ahern's personnel file, and the Chief Technologist concluded the letter by noting, "I have full confidence that you will address these issues and resolve them without future reoccurrence." (Ex. 49; see Declaration of Tambra Holt dated Nov. 13, 2007, at ¶ 5.)

On June 18, 2004, Ahern received a letter of admonishment from Khatib for her mishandling of two emergency CT scan procedures. (Ex. 50.) Specifically, Ahern and her colleague, Mastalerz, failed to immediately contact the radiologist on duty after completing the two emergency CT procedures ("wet readings") and instead left the radiologist voice mails. (Id.)

Ahern's conduct, which came to light after an emergency room physician became concerned about the delay, compromised patient safety and was unacceptable. (Ex. 4, at 33:11-20; see Ex. 7, at 70:22-71:4; Sta Ines ¶ 14; Khatib ¶ 37; Ex. 51.) In issuing this admonishment, Khatib consulted with the Human Resources Department. (Khatib ¶ 37.)

On June 29, 2004, Ahern took extended medical leave from DIS, (Ex. 5, at 226:9-12), and the next day, Ahern went to the beach with her friends. (Ex. 5, at 226:13-20.) Ahern subsequently returned from leave on October 5, 2004, and, like her colleague Mastalerz, was temporarily assigned to complete radiology training. This training lasted less than two weeks, at which point Ahern returned to the CT Department. (Ex. 5, at 179:15-180:3; Ex. 3, at 93:17-94:7.)

On August 3, 2004, Ahern initiated contact with an EEO counselor, and on September 14, 2004, she filed a complaint of discrimination alleging conduct through June 18, 2004 that purportedly gave rise to a hostile work environment. (See Ex. 52 (summarizing procedural history).) The Office of Resolution Management dismissed all of Ahern's claims as untimely because she failed to contact an EEO counselor within forty-five days of the alleged events. (Ex. 52.)

Because Ahern did not return to DIS until October 5, 2004, the CT Department's on-call schedule had already been set for that month. (Ex. 5, at 118:7-21; see Ex. 4, at 159:24-160:12 (call schedule typically filled out "a year in advance"); Khatib ¶ 38.) Ahern, however, was returned to the on-call schedule beginning in November. ( Khatib ¶ 38; Ex. 5, at 119:2-5.)

Ahern again took leave from DIS in November 2004. Ahern has not resigned from the VA Hospital and remains on leave without pay. (Ex. 5, at 122:17-21.)

**I. Maureen Mastalerz**

Mastalerz joined the VA Hospital in May 1992, as a staff radiology technician. (Ex. 3, at 10:13-15; 12:8-10.) She became a CT technologist in approximately 2001. (Ex. 3, at 13:16-21.) Her last position at the VA Hospital was as a Grade 8 technologist. (Ex. 3, at 15:25-16:2.)

On June 21, 2004, Mastalerz, like Ahern, received a letter of admonishment for her improper conduct in connection with leaving voice mail messages for a radiologist about emergency CT scan procedures that required review. (Ex. 53.)

Mastalerz took extended medical leave on July 2, 2004. (Ex. 54.) On September 26, 2004, she sent the VA Hospital a letter dated September 15 from her physician, stating that Mastalerz condition "had improved" and that she was able to return to work. (Ex. 55.) Following this letter, the VA Hospital's Human Resources Department requested confirmation of her full recovery. (Ex. 3, at 160:2-161:10.)

On September 30, 2004, Mastalerz sent a letter indicating that she desired to return to work, but also noting, "I believe that under the Family Medical Leave Act you must make Reasonable Accommodations for me." (Ex. 55.) Mastalerz's counsel subsequently contacted the VA Hospital about this issue, and she returned to work on October 4, 2004. (Ex. 3, at163:18-21.) Thus, one business day elapsed between the time Mastalerz sent her letter and the day she returned to work.

On November 15, 2004, Mastalerz received a letter of reprimand, the second lowest level of discipline, for being absent without permission on the afternoon of November 4, 2004. (Ex. 56.) Specifically, on November 3, 2004, Mastalerz sent Khatib an e-mail stating that she intended to take annual leave because she wanted to depart work an hour and a half early the following day. (Ex. 57.) Mastalerz did not indicate that she had an emergency, and she never

received permission as required to take leave. (Ex. 3, at 178:15-179:8; 179:16-180:5; Khatib ¶ 40.)

Khatib conferred with his supervisor, Dr. Sta Ines, as well as with John Sylvia of the Human Resources Department in determining the appropriate sanction for Mastalerz. (Khatib ¶40; Ex. 58, at AH1520-21.) Consistent with VA Hospital discipline policy, Mastalerz received a letter of reprimand, but no suspension, loss of pay or other adverse action for leaving her job without proper permission. (See id.; Ex. 59.)

Mastalerz resigned from the VA Hospital on January 3, 2005. (Ex. 60.) Prior to her resignation, Mastalerz had secured a part time, per diem position as a technologist at Women and Infants Hospital. (Ex. 3, at 40:10-15.)

In her January 3, 2005 Record of Exit Interview, Mastalerz stated the reason for her resignation:

> [Khatib] treated the contract techs with more courtesy and respect than his VA employees. He would not listen to any ideas about improving the CT schedule and scheduling patients. He had his favorites. If you disagreed with him, he would get you back. He was a micromanager.

(Ex. 60, at AH1580.) In addition, during her exit interview with the Human Resources Department, Mastalerz noted that she resigned because DIS was eliminating many of the "perks" of working at the VA Hospital, including afternoons off as a result of patient scheduling. (Ex. 61.)

Khatib never insulted, ridiculed, or threatened Mastalerz. (Ex. 3, at 103:22-25; 104:6-16.) In addition, Khatib never terminated or demoted Mastalerz, and he never reduced her responsibilities at the VA Hospital. (Ex. 3, at 100:19-24; 103:14-21.)

Mastalerz initially contacted an EEO counselor on August 4, 2004, and on September 17, 2004, she filed a formal complaint (No. 200G-0650-2004103774). (Ex. 15, at PSM00021-22.) In her EEO complaint, Mastalerz asserted that she was subjected to specific acts of discrimination and a hostile work environment, and she cited events occurring between September 2003 and May 26, 2004. (Ex. 63.) On December 21, 2004, Mastalerz provided additional documentation to the Department of Veterans Affairs Office of Resolution Management and filed a second formal EEO complaint on February 17, 2005 (No. 200H-0650-2005100871). (See Ex. 65, at AH0914.)

On December 22, 2004, the Office of Resolution Management dismissed Mastalerz's September 17, 2004, complaint because of Mastalerz's failure to contact the EEO counselor within forty-five days of the alleged discriminatory action. (Ex. 65, at AH0916.) Mastalerz's subsequent complaint was procedurally dismissed by the Office of Employment Discrimination Complaint Adjudication in light of the instant litigation. (Ex. 90.)

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56( c). Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue of fact for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(internal quotations omitted).

The nonmoving party may not rest upon mere allegations or denials of the movant's pleading, "but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." De Novellis v. Shala, 124 F.3d 298, 306 (1st Cir. 1997). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Moreover, summary judgment is appropriate '[e]ven in cases where elusive concepts such as motive or intent are at issue, . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994).

### B. Defendant Is Entitled to Summary Judgment on Counts I-III in Which Plaintiffs Allege Discrimination in Hiring, Pay, and Promotion.

Where, as here, there is no direct evidence of any discrimination, Title VII claims are analyzed under the rubric set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).[7] See, e.g., Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). The employee bears the initial burden of raising an inference of discrimination by making a prima facie showing of the elements of her discrimination case. McDonnell

[7] "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption. As our precedent illustrates, direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Schoenfeld .v Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).

Douglas, 411 U.S. at 802-805. If the employee is unable to demonstrate the elements of her prima facie case, the case is over, and judgment should enter for the defendant.

If the employee makes the requisite prima facie showing, it is presumed that the employer engaged in impermissible discrimination, and the burden of production shifts to the defendant. St. Mary's Honor Center, 509 U.S. at 507; Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993). The employer must then articulate a legitimate nondiscriminatory reason for the challenged conduct. Burdine, 450 U.S. at 255-256; Woods, 30 F.3d at 260. If the employer articulates a legitimate nondiscriminatory reason for its actions, the presumption established by the prima facie showing "drops out of the picture." St. Mary's Honor Center, 509 U.S. at 507; Udo, 54 F.3d at 12. At that stage, to avoid summary judgment, the plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for the conduct at issue is a pretext, and (2) that the true reason is discriminatory. Udo, 54 F. 3d at 13.

With respect to Plaintiffs' allegations of disparate treatment in hiring, pay and promotion, (Ex. 64, at Counts I-III), Plaintiffs can only satisfy their prima facie burden by demonstrating that: (1) they belong to a protected class; (2) they were qualified for the position; (3) they suffered an adverse employment action; and (4) similarly situated individuals outside of the protected class were treated more favorably. See St. Mary's Honor Center, 509 U.S. at 507-08.

"Adverse action" is a term of art under federal employment statutes. In the discrimination context, an employee is subjected to an adverse action when she suffers some personal loss or harm with respect to "a term, condition, or privilege of employment." Randlett v. Shalala, 118 F.3d 857, 861-62 (1st Cir. 1997); see Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996); Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir. 1991); Harlston v.

McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). An adverse employment action need not rise to the level of a discharge to be actionable. Connell, 924 F.2d at 1179. It must, however, at a minimum, impair or potentially impair the plaintiff's employment in some cognizable manner. Nelson v. Upsala College, 51 F.3d 383, 387 (3d Cir. 1995).

The Plaintiffs must demonstrate a cognizable injury of some kind. "While it is true that [an] 'adverse employment action' need not always be discharge, demotion, or failure to promote'. . . not every unpleasant matter. . . creates a cause of action." Alba v. Upjohn Co., Inc., 1997 WL 136334, at *5 (D. Mass. Feb. 21 1997); Montandon v. Farmland Industries, Inc., 116 F.3d 355, 359 (8th Cir. 1997) ( "Not everything that makes an employee unhappy is an actionable adverse action."). As the First Circuit held in Blackie:

> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

Blackie, 75 F.3d at 725.

Determining whether a particular action is materially adverse requires a case-by-case inquiry. Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 49 (1st Cir. 1999). The question of whether the employer took a materially adverse employment action must be judged on an objective basis. Suarez v. Pueblo Intern., Inc., 229 F.3d 49, 55-56 (1st Cir. 2000); Blackie, 75 F.3d at 726; Doe v. DeKalb County School Dist., 145 F.3d 1441, 1448-49 (11th Cir. 1998). As the First Circuit stated in Blackie:

> Workplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act does not elevate that act or omission to the level of a materially adverse employment

action.

Blackie, 75 F.3d at 725.

With respect to Plaintiffs' allegations of discrimination in hiring, pay and promotion, defendant is entitled to judgment as a matter of law because the Plaintiffs cannot make the requisite showing (1) that they suffered an adverse employment, (2) that similarly situated male technologists were treated preferentially, or (3) that the defendant's explanation for hiring contract technologists was a pretext to mask discrimination.[8]

**1. Count I: Plaintiffs Can Point to No Evidence Demonstrating that They Suffered an Adverse Employment Action or that Any Similarly Situated Males Were Treated More Favorably with Respect to Hiring.**

In Count I of their Complaint, the Plaintiffs allege only that Khatib discriminated against them "when he decided that he was going to hire more males than females because he liked working with males better, and then hired males." (Ex. 64, at ¶ 29. ) Count I is insupportable because Plaintiffs cannot demonstrate that Khatib's alleged hiring of males (whether he liked them better or not) constituted an adverse employment action with respect to any of the Plaintiffs. Each of the Plaintiffs was already employed as a technologist at the VA Hospital at the time Khatib engaged in the hiring about which Plaintiffs complain, and none of the Plaintiffs allege that she was ever denied employment or promotion as a result of Khatib's hiring practices.

[8]As a threshold matter, Plaintiffs' claims are barred because the Plaintiffs submitted a "formal grievance" to the VA Hospital and Local Union 1322 in the form of their April 22, 2004 memorandum and thereby irrevocably elected to pursue any discrimination claims through the negotiated grievance procedures of their collective bargaining agreement. (Ex. 21 ); see 5 U.S.C. 7121(d); 29 C.F.R. §1614.301(a); American Federation of Government Employees, Local 2052 v. Reno, 992 F.2d. 331, 332 (D.C. Cir. 1993); Johnson v. Peterson, 992 F.2d 397, 399, (D.C. Cir. 1993) (citing Vinieratos v. U.S., 939 F.2d 762, 768 (9th Cir. 1991); Rosell v. Wood, 357 F. Supp.2d 123, 128-31 (D. C. 2004).

Auger, for example, admitted that she was not discriminated against as a result of Khatib's hiring of men.

Q. You don't claim that Mr. Khatib hired a man for a position that you wanted, though; right?

A. Correct.

(Ex. 9, at 51:7-10.)

Indeed, the basis for Plaintiffs' allegation in Count I of the second Amended Complaint appears to be that Khatib should have hired or promoted several women who are not parties to this litigation for positions in which the Plaintiffs had no interest. For example, Plaintiffs assert that Khatib should have hired Laurie Crafts, a student intern and nonparty, for an entry-level position as an x-ray technologist. (Ex. 5, at 79:16-23; Ex. 66, at 0068.) None of the Plaintiffs, however, had any interest in that position, and therefore they cannot rely on Khatib's filling of the position as an act that harmed them. For example, Auger testified:

Q. Your position is that Mr. Khatib should have hired Laurie Craft but didn't; right?

A. Yes.

Q. Laurie Craft wasn't seeking a position that you wanted, though; right?

A. No, she was seeking a diagnostic X-ray tech position.

(Ex. 9, at 50:8-14 .)

And Ahern testified:

Q: None of the plaintiffs in this case were interested in the entry level position that Ms.Crafts was seeking, correct?

A: Correct.

(Ex. 5, at 89:9-11.)

In addition, in their Second Amended Complaint, Plaintiffs allege that on September 12, 2003, "Khatib attempted to hire a male technician at a grade that would have been a promotion without going through the process of updating a position description and then posting a position so that the Plaintiffs could have applied for that position." (Ex. 64, at ¶ 12.) This allegation is specious because all of the Plaintiffs have admitted that they held senior GS-8 or GS-7 positions and had no interest in the position at issue on September 12, 2003. For example, Auger testified:

> Q. That Grade 6 position isn't a position
> that you were interested in filling yourself,
> correct?
>
> A. Correct.
>
> Q. So the incident on September 12th had no
> effect on you one way or the other, correct?
>
> A. Except for him getting furious at me and
> argumentative in his typical hostile behavior. I
> mean the position itself and him filling that
> position meant nothing to me one way or the other.

(Ex. 7, at 108: 1-21 (emphasis added).)

Furthermore DIS's female chief, Dr. Sta Ines, not Khatib, made the final decisions regarding hiring, (Sta Ines ¶ 3.), and DIS hired both male and female technologists. (Joslin 6; Khatib ¶ 29.) Thus, Plaintiffs' allegation that Khatib discriminated against them by hiring males is without merit.[9]

---

[9] Count I also claims that Khatib liked working with males better than Plaintiffs, but Plaintiffs can offer no support for this claim. (See Ex. 5, at 79:22-80:3.)

**2. Count II: Plaintiffs Can Point to No Evidence that They Suffered an Adverse Employment Action or that Any Similarly Situated Males Were Treated More Favorably with Respect to Pay.**

Plaintiffs allege that "Khatib discriminated against [them] by paying male employees more than female employees for the same job." (Ex. 64, at ¶ 30.) More specifically, however, Plaintiffs' complaint is that contract technologists, male and female, were paid more, not that similarly situated male staff technologists were paid more. (Ex. 3, at 27:9-12; 62:2-12.) Plaintiffs cannot meet their prima facie burden because: (1) the contract technologist positions were not comparable to the Plaintiffs' staff technologist positions; (2) the VA Hospital hired male and female contract technologists; and (3) the VA Hospital paid the contract technologists salaries that the Contracting Department set based on a competitive analysis of staffing agency rates.

First, there is no dispute that the Plaintiffs all were tenured, government employees, who received benefits from the VA Hospital such as health insurance, sick leave, paid vacation, and retirement plan contributions. (Ex. 1, at 97:11-13; Ex. 3, 61:18-61:2.) In contrast, the contract technologists were temporary workers who were not employed by the VA Hospital and who did not receive any benefits from the VA Hospital. (Joslin ¶ 4; Ex. 1, at 97:11-13; 99:9-13; Mastalerz 61:18-61:2.) Thus, the contract technologists and the Plaintiffs were not similarly situated. See Peele v. County Mut. Ins. Co., 288 F.3d 319, 326 (7th Cir. 2002) ( similarly situated employee must be similar "in all material respects"); McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001) (a valid comparison between employees can only be made if they shared "sufficient employment characteristics . . . so that they could be considered similarly situated.").

Consistent with the fact that the contract technologist positions were not comparable to the Plaintiffs' staff positions, the Plaintiffs never sought to relinquish their government positions to become contract technologists and thus cannot claim to have suffered any adverse employment action as a result of the hiring of contract technologists. For example, Auger confirmed that she would not have accepted a contract technologist position for $45/hr, which is the rate that Stokes was paid under the December 2003 contract, and Ahern found the idea of becoming a contract technologist "ludicrous." (Ex. 5, at 101:8-14; Ex. 7, at 79-80, 114; see Ex. 1, at 60; Ex. 3, at 61:6-10)

Second, DIS hired both female and male contract technologists, beginning in 2003 to fill the urgent needs of the Service on a temporary basis. (Joslin ¶¶ 4-6; Khatib ¶¶ 21-24 and 29; Ex. 5, at 86:16-24.) Specifically, DIS hired Kim Lebert, Suzette Kennett, Laurie Goss, and Charlotte McLaughlin as nuclear medicine and radiology contract technologists. (Joslin ¶¶4-6.) In addition, Dayna Gardner, a woman, was hired as a contract technologist in July 2004 and worked in the CT Department. (Khatib ¶29.) Moreover, Plaintiffs do not dispute that Gardner was paid a higher hourly rate than they were. (Ex. 3, at 27:9-11.)

Third, Plaintiffs acknowledge that it was standard in the field to pay temporary technologists more than tenured staff technologists. For example, Mastalerz explained that per-diem workers at Women and Infants Hospital were paid more than staff technologists there:

> Per diems get paid more than a regular staff tech because you don't get benefits, you don't get paid holidays, or health coverage or anything else. So to compensate I believe for that, per diem people get paid more.

(Ex. 3, at 42:20-25.)

Moreover, there is no dispute that the VA Hospital's Contracting Department, rather than Khatib, set the hourly rate for each proposed contract technologist based on a competitive analysis of market rates. (Joslin ¶¶ 5-7; see, e.g., Ex. 27.) Indeed, Mastalerz acknowledged that it was reasonable for contract workers at the VA Hospital to be paid a higher gross hourly rate than staff technologists: "you would think they would get paid more because they don't get any benefits." (Ex. 3, at 49:22-24; see 102:24-103:13.)

"It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: discrimination.'" Mesnick, 950 F.2d at 824. Here, Plaintiffs can adduce no evidence to suggest that the VA Hospital's explanation for the salaries that the contract technologists received was a pretext to hide intentional discrimination.

### 3. Count III: Plaintiffs Have No Evidence that They Suffered an Adverse Employment Action with Respect to Promotions.

Plaintiffs allege that Khatib discriminated against them "by placing Chris in charge over them" and "by hiring Chris into a position that all the Plaintiffs would be qualified for . . . ."[10] (Ex. 64, at ¶¶31-32.) According to Plaintiffs, Khatib promoted Stokes to Chief Technologist after Joan Beaudoin left that position vacant in June 2004. (Id.; Ex. 5, at 90:13-17.) Plaintiffs now concede, however, that Beaudoin did not resign, but rather took leave beginning in June 2004. (Ex. 1, at 116:1-5.) Thus, Plaintiffs acknowledge that Stokes could not have been promoted to the position of Chief Technologist. (Ex. 1, at 115:190-22; Ahern 98:23-99:8.) In any event, the evidence of record illustrates that Stokes did not acquire the supervisory authority

[10] "Chris" is a reference to Christopher Stokes. (Ex. 5, at 89:25.)

of the Chief Technologist, but was only assigned to handle patient flow in DIS. (Khatib ¶27; Sta Ines ¶ 9.)

According to Parker, for example, Khatib, (not Stokes), took over the supervisory responsibilities of the Chief Technologist after Beaudoin's departure on leave: "Marty took that aspect of it when Joan went out. He just had Chris [Stokes] doing the other things. Reprimanding, and stuff like that, Marty took care of." (Ex. 1, at 123:21-23; Khaitb ¶ 27.) Mastalerz confirmed that Khatib, not Stokes, assumed the supervisory responsibilities of the absent Chief Technologist:

> Q: After the point at which Ms. Beaudoin left
> the Diagnostic Imaging Service, did Mr. Khatib
> assume her responsibilities, in addition to his
> previously held responsibilities?
>
> A. I'm not sure. Yes. You would go to him
> with any problems because there was really no one else.

(Ex. 3, at 23:11-17.)

In addition, Parker conceded that Stokes was not the only technologist handling patient flow in DIS after Beaudoin departed. In a submission to the EEO investigator, Parker, herself, admitted that Tenessa Karmozyn, a female radiology technologist, shared responsibilities with Stokes in August 2004: "[Khatib] has Tenessa and Chris take turns carrying the phone and overseeing things. . . If you ask who is in charge he will say he is but he is having them do it . . ." (Ex. 30, at AH3560 (ellipsis in original).) Thus, given Parker's own assertion that Karmozyn, a woman, was sharing responsibilities with Stokes, Plaintiffs cannot show any discriminatory animus on Khatib's part.

Plaintiffs' claim also fails because they concede that they were not entitled to become acting Chief Technologist (or to handle flow control) in Beaudoin's absence. Therefore,

Plaintiffs cannot demonstrate either that they suffered an adverse employment action or that Khatib's reasons for taking over as the Chief Technologist and choosing Stokes to handle some of the responsibilities for flow control were a pretext for discrimination.

First, Parker testified that at the time Khatib assigned Stokes additional responsibilities, Auger, Ahern, and Mastalerz were already on extended leave and could not have been given his role. (Ex. 1, at 116:1-13.) Second, Ahern admitted that Plaintiffs had no entitlement to the position of acting Chief Technologist and that Ray Kim, the most senior staff technologist, should have been appointed. (Ex. 5, at 104:2-20; see 97:8-14; 180:22-181:3.)

Third, Plaintiffs do not contend that being assigned the role of temporary Chief Technologist would have resulted in more pay, a promotion, or any other actionable benefit. (Ex. 3, at 74:23-75:2) According to Beaudoin (the departed Chief Technologist), a staff technologist would not have been paid more for temporarily handling the duties of the Chief Technologist. (Ex. 4, at 157:21-42.) To the extent that Plaintiffs may be able to identify some speculative, de minimis benefits, such evidence is insufficient to support a claim of discrimination. Blackie, 75 F.3d at 725. Absent specific evidence that they suffered any harm to their future employment prospects, Plaintiffs cannot show that they were subjected to an adverse job action. See Belgasem v. Water Pik Tech., 457 F. Supp.2d 1205, 1215 (D. Col. 2006).

Last, Khatib, in consultation with the Human Resources Department, designated Stokes to handle patient flow in DIS during a portion of Beaudoin's absence because he considered Stokes to be highly professional and experienced. (Khatib ¶ 27; Ex. 31, at AH3790 (6:14-10:21).) Thus, in addition to his regular responsibilities, Stokes was tasked with coordinating the assignment of cases, responding to inquiries from hospital personnel, and other routine daily tasks, but Khatib retained all supervisory authority. (Khatib ¶ 27.) Plaintiffs concede that

Stokes had more than fifteen years of experience and was well qualified to handle patient flow control. (Ex. 1, at 125:22-126:1; see Khatib 27; Sta Ines ¶ 4.)

### C. Defendant Is Entitled to Summary Judgment on Plaintiffs' Claims that They Suffered Retaliation for Engaging in Protected Activity.

Title VII provides in part that:

> it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The First Circuit has identified the three elements a plaintiff must prove to establish a prima facie case of retaliation:

1. the employee engaged in conduct that Title VII protects;
2. the employee suffered an adverse employment action; and
3. the adverse action is causally connected to the protected activity.

Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005; Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir.1998).

In Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006), the Supreme Court refined the analysis for evaluating claims of adverse employment actions. In White, the Court held that in the context of a retaliation claim, an "adverse action" is one that would be "materially adverse to a reasonable employee or job applicant." White, 126 S. Ct. at 2415. The Court noted that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces injury or harm," and ruled that an employer's actions are "materially adverse" only if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at

2414-15. Whether or not a particular employer action is materially adverse "will often depend upon the particular circumstances," but the Court noted that "petty slights, minor annoyances, and simple lack of manners" will not generally deter employees from complaining about discrimination. Id. at 2415. "Title VII does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that take place at work and that all employees experience." Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 619 (8th Cir. 2007).

Here, the Plaintiffs cannot demonstrate that a reasonable worker would have been dissuaded from engaging in protected activity by the actions upon which Plaintiffs rely. Plaintiffs also cannot demonstrate the requisite causation or refute defendant's legitimate nondiscriminatory reasons for the actions at issue. Moreover, to the extent Plaintiffs assert that Khatib's alleged retaliatory conduct created a hostile work environment, Plaintiffs rely on exactly the type of petty slights and annoyances that are not actionable, and their claims fail.

**1. Lynda Parker**

Parker admits that she never suffered any demotion, loss in pay or benefits, reduction in responsibilities, or change in job title as a result of any action by Khatib. (Ex. 1, at 136-37.) Instead, Parker alleges that because of the Plaintiffs' April 22, 2004 letter, Khatib took the following adverse employment actions against her in August 2004: (1) denying her the opportunity to train in CT scan procedures; (2) questioning her capabilities with respect to training student interns from the Community College of Rhode Island ("CCRI"); and (3) assigning Stokes to assist him after the departure of the Chief Technologist. (Id. 144:11-145:15.)

**a. CT Cross-Training**

As a threshold matter, Parker was not denied the opportunity for all cross-training. In 2003, Khatib promoted Parker from radiology technologist to angiography technologist/training coordinator. By June 2004, Parker had been cross-training for many months in angiography procedures, but had not yet completed the angiography training. (Ex. 1, at 140:10-142:17.) Parker now contends that in addition to this angiography cross-training, she also should have been selected for additional cross-training in CT scan, despite the fact that she was an angiography technologist. (Ex. 64, at ¶ 21.)

Parker acknowledges that three technologists had expressed interest in CT cross-training and that it was only feasible for one to be trained at a time. (Ex. 1, at 150.) Parker also admits that Khatib clearly informed her that she would have an opportunity to receive CT training in due course, but that given her responsibilities as an angiography technologist and her prior commitment to angiography cross-training, she would be trained after Karmozyn, who was the only interested radiology technologist not involved in other cross-training.[11] (Ex. 1, at 146; Khatib ¶ 30.) In addition, Khatib's superior, Dr. Sta Ines, confirmed during the EEO investigation that "[a]lthough Ms. Parker was interested in cross-training in CT, she was already cross-training in Angio. I do remember telling her at that time that she will get her turn in CT cross-training." (Ex. 33; Sta Ines ¶ 8.)

As Parker acknowledged at her deposition, by August 2004 she was many months into her angiography training and had begun to perform angiography procedures under the

[11] Parker asserts that another technologist, Wes Allen, informed her in August 2004, that "Marty said he was not going to train me." (Ex. 1, at 146.) Allen's hearsay statement is innocuous and entirely consistent with Khatib's undisputed statement to Parker that she would not receive CT scan training until after Karmozyn completed her training.

supervision of a doctor, following the departure of the certified angiography technologist, Debra Auger. (Ex. 1, at 142.) The evidence demonstrates that Parker was not denied the opportunity to cross-train in CT scan procedures, but because her primary responsibility was angiography, her additional cross-training was deferred.

Parker is unable to establish that the delay in her cross-training rendered her unqualified for a specific promotion or constituted a material adverse employment action in any regard. See Belgasem, 457 F. Supp.2d at 1215; Lilie v. Chartwells, 2007 WL 951900, at *7 (N.D. Ill. Mar. 26 2007) ("Like the plaintiffs in Malacara and Williams, Lilie did in fact receive substantial training."). Last, she cannot rebut the defendant's explanation for the training sequence or demonstrate that her CT cross-training was deferred because of her participation a protected activity.

**b. Student Instructor**

Parker's assertion that Khatib retaliated against her by questioning her about the way in which she was discharging her student instructor duties fails because Parker is unable to identify any actionable employment consequence that resulted from Khatib's involvement in the CCRI training program. At her deposition, Parker conceded that Khatib did nothing more than question her about her work performance:

> As far as the students were concerned, he wanted me to explain to him exactly how things were run and was questioning what I was doing with them and why, and trying to send them to do things that were not appropriate for them at their stage of their education, and questioning me why I wouldn't allow it. Undermining me in front of the students, I should say. Daily things.

(Ex 1, at 129:11-18.)

In response to further questioning, Parker confirmed that Khatib simply questioned her about her handling of the clinical program.

Q: The only retaliation that Khatib took against you was to deny you the opportunity to cross-train in CT, is that correct?

A: He didn't allow me to be in charge, either, and he also was questioning my capabilities of training students, where I was going with that and if the school was happy with me. It wasn't just the CAT scan thing.

(Ex 1, at 145:3-10.)

Parker cannot dispute that it was well within the ambit of Khatib's responsibilities as the Administrative Officer of DIS to inquire into her performance as the CCRI clinical training instructor. Indeed, in early August 2004, Parker invited Kahtib's scrutiny when, without authorization, she informed CCRI that a hiring freeze was likely to be imposed at the VA Hospital and that such a freeze would negatively impact the clinical training program. (Ex. 34; Khatib ¶ 31.) As a result of Parker's actions, Khatib expressed frustration and questioned her judgment: "I am still confused as to why you would not confirm the information with us before making the presentation to the school, since this would have significant impact on the department and would change the number of students who attend our program?" (Ex. 34.)

Any harm to Parker was at most trivial and fails to meet the significant harm standard set forth in White, 126 S. Ct. at 2414-15.

**c. Acting Chief Technologist**

Parker contends that Khatib retaliated against her by promoting Stokes to the position of acting Chief Technologist. As discussed above, however, Stokes never held any supervisory authority and was responsible only for overseeing patient flow in DIS. Thus, Parker cannot establish that she suffered any adverse consequence from not being assigned to handle patient flow control – an unofficial, temporary role that included no additional compensation. (Khatib ¶ 27.)

**2. Debra Auger**

Auger's allegations are difficult to parse, but she appears to allege that she suffered both retaliatory harassment and several specific acts of retaliation.[12] As a threshold matter, a number of Auger's allegations are barred by her failure to exhaust her administrative remedies. Velazquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000). Auger admits that she did not consult an EEO counselor until August 3, 2004, although she was aware of the obligation to do so within forty-five days of a retaliatory/discriminatory event. (Ex. 66, at 115.) Indeed, Auger admits in her interrogatory responses that "[m]ore than 45 days passed from the onset of incidents to the first contact with an EEO counselor." (Ex. 66, at 115.)

Auger now seeks to excuse her delay by claiming, not that there was a continuing violation or that she was unaware of the 45-day requirement, but only that she raised her claims with the VA Hospital management previously and was awaiting a response. (Ex 66, at 115.) However, Auger's complaints to the VA Hospital do not create a basis for equitable tolling of the 45-day time limit for contacting an EEO counselor. Leeds v. Potter, 2007 WL 2859767, at *3 (6th Cir. Oct. 3, 2007) (employer's promise to take action on plaintiff's allegations did not justify plaintiff's failure to comply with 45-day period); Carter v. Dep't of Veterans Affairs, 228 Fed. Appx. 399 (5th Cir. 2007) (employee's attempt to informally resolve alleged discrimination with management did not toll 45-day period). Indeed, Auger previously admitted during the EEO process that her claims are untimely. (Ex. 68, at AH2654 ("I do understand that these claims are untimely.")). Thus, Auger is barred from alleging any specific acts of retaliation that occurred prior to June 19, 2004. See National R.R. v. Morgan, 536 U.S. 101, 113 (2002) ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts

[12] Plaintffs' allegations regarding harassment are addressed below in section II.C.

alleged in timely filed charges").

Summary judgment also is appropriate because the specific acts that Auger relies upon do not constitute adverse employment actions, and she cannot identify the requisite causal connection between her protected EEO activity and the allegedly retaliatory conduct. Auger, for example, alleges that the following acts constituted retaliation:

a. Khatib removed her from the temporary, unofficial position of department coordinator in January 2004;

b. Khatib gave two male angiography technologists from Roger Williams Hospital a tour of DIS in February 2004;

c. Khatib considered diminishing her role as an angiography technologist by having her perform additional CT procedures and radiology procedures in March-April 2004;

d. Khatib proposed to change her schedule from a four-day per week compressed tour to the same five-day per week schedule that all of the other modalities in DIS followed in March 2004;

e. Khatib moved her patients to another waiting area without telling her in May 2004;

f. the Chief Technologist, Joan Beaudoin, censured her by issuing two counseling letters;

g. Khatib improperly communicated with her after she left DIS on medical leave by requesting supporting documentation from her physician beginning in August 2004;

h. the VA Hospital denied her application for promotion to a new position while she was on leave without pay and purportedly unable to return to work; and

I. the VA Hospital did not respond promptly to her complaints, because she was involved in an EEO action in 2000.

(Ex. 69; Ex. 66, at 41; Ex. 7, at 50:24-51:23; 88:5-89:5.)

**a. Department Coordinator**

Auger claims that Khatib retaliated against her by removing her from the role of department coordinator. (Ex. 66, at 41.) Auger's claim fails because department coordinator was a temporary, unpaid assignment that reached its natural end.

> Q. That was a one-time temporary role to
> help, as you said, during the renovations that were
> being done at the VA, right?
>
> A. Yes.

(Ex. 7, at 91:8-11; see 89:13-15.) In fact, Auger herself described department coordinator as "a non-existent position." (Ex. 70.) Again, under White, retaliatory actions must be material, producing significant rather than trivial harm. Devin v. Schwan's Home Service, Inc., 491 F.3d 778, 786 (8th Cir. 2007). Auger simply cannot establish that the expiration of this nebulous role constituted an adverse employment action.

Moreover, Auger's related allegation that Khatib improperly declined to provide her with a letter regarding her role as temporary, unofficial department coordinator is baseless. (Ex. 7, at 88-89; Ex. 66 at 52.) In a March 23, 2004 email, Auger acknowledged that Khatib, in consultation with the Human Resources Department, acted appropriately when he suggested that she could submit an update to her personnel file if she desired:

> I understand that this was a non-existent position. The duties I assumed from June to January were, as you put it, managerial, therefore I assumed you could have submitted a letter or other form of documentation of the valuable experience I gained during this time. I did not realize you were prohibited from doing so. Thank you for considering my request.

( Ex. 70.)

**b. Tours of DIS**

Auger contends that Khatib retaliated against her by giving two technologists from Roger Williams Medical Center a tour of DIS in February 2004. (Ex. 69, at PSD0006.) Auger, however, is unable to identify any way in which the visit by these technologists materially affected her employment. Auger's only contention is that she subjectively perceived the mere presence of one of these individuals, Bruce Foster (a former DIS employee), as a veiled threat to her job.

Q. Your subjective perception of the
situation was that Khatib was bringing Bruce around
as a veiled threat that Khatib was going to give
your job to Bruce, is that accurate?

A. I think he wanted me to know that I was on
his shit list and here's his buddy Bruce, and I
think he wanted me to feel threatened that my job
was in jeopardy.

Q. But just so we're clear, he never actually
threatened –

A. No –

Q. -- to replace you with Bruce?

A. -- he never threatened I'm going to fire
you and hire Bruce.

(Ex. 7, at 119:7-20.) Auger also concedes that Bruce Foster had previously resigned his position at the VA Hospital and posed no threat to her job whatsoever. (Ex. 7, at 119:21-120:18.)

**c. Role in Angiography**

Auger cannot prevail on her claim that Khatib retaliated by reducing her role in angiography. (See Ex. 9, at PSD0008.) Auger concedes that neither her salary nor her benefits were ever diminished. (Ex. 7, at 83:11-24.) Moreover, at her deposition Auger admitted that,

in fact, her duties as an angiography technologist never changed; at all times prior to her departure, Auger remained the lead angiography technologist and continued to split her time between angiography and CT.

> Q. Mr. Khatib never actually altered your employment while you were still at the VA Hospital, correct?
>
> A. Correct. He just told me that's what he was doing.

(Ex. 7, at 94:3 -95:2; 126:16-18; see Ex. 9, at 45.)

Even if it were true that Khatib planned to remove Auger from the Angiography Department, Khatib's plan resulted in no materially adverse consequence or objectively tangible harm and is not actionable. Valles-Hall v. Center for Nonprofit Advancement, 481 F. Supp.2d 118, 144-45 (D.D.C. 2007) ("Plaintiff does not assert that Johnson carried through with her alleged threat of termination and her mere threat in and of itself is not an adverse employment action."). The speciousness of Auger's retaliation claim regarding her role as an Angiography technologist is laid bare by the fact that, according to her, Khatib intended to replace her as lead angiography technologist with Parker, her co-plaintiff in this case, who also signed the April 22 letter that allegedly caused Khatib to retaliate. (Ex. 7, at 93:17-94:11.) Plainly, Parker was engaged in the same activities as Auger, and therefore Auger cannot make the requisite showing at this stage that Khatib's unrealized plan to replace her with her co-plaintiff Parker was retaliatory.

**d. Change of Schedule**

Auger and her co-plaintiffs allege that Khatib's proposal to change the CT Department's schedule from a compressed tour to a regular tour was retaliatory. (Ex. 66, at 85.) The bottom

line, however, is that the Plaintiffs thwarted Khatib's plan while they were at the VA Hospital. (Ex. 7, at 44:16-13.) The CT Department schedule did not change. (Sta Ines ¶ 7.) The Plaintiffs suffered no employment action at all in this regard and certainly no adverse employment action under Title VII.

In addition, Plaintiffs cannot meet their burden at the summary judgment stage to show that Khatib's explanation for his proposal, even if the proposal had been implemented, was a pretext for retaliation. Khatib determined that the CT Department suffered from a backlog of pending cases and a delay in scheduling new cases in early 2004. (Kahtib ¶¶13-17; Ex. 11.) Moreover, Khatib identified that the compressed schedule generated substantial overtime and that no other department in DIS was operating on a compressed schedule. (Id.) Khatib provided extensive analysis and support for his proposed change, and Dr. Sta Ines, his superior, endorsed his proposal. (Ex. 11; Ex. 19; Sta Ines ¶ 7.) Indeed, Plaintiffs do not dispute that Khatib was motivated by a desire to improve the CT Department. Auger testified:

> Q. Mr. Khatib's views about the best way to make the CT department more efficient included switching from the compressed tour to the five-day-a-week staggered tour, is that right?
>
> A. Yes.

(Ex. 7, at 156:19-23.)

Auger and her co-plaintiffs simply cannot establish that Khatib's reasoned plan, with which the Chief of the Diagnostic Imaging Service agreed, to change their schedule constituted retaliation, particularly given that the plan never came to fruition. "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased with an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment

action." Blackie, 75 F.3d at 725.

**e. Relocation of Patients**

Auger asserts that Khatib retaliated against her in May 2004 when he "moved her patients to another waiting area without telling her." (Ex. 69, at PSD0009.) Even if true, this one-time minor annoyance cannot give rise to a claim under Title VII. See White, 126 S. Ct. 2415.

Auger concedes that she has no basis to claim that Khatib, rather than someone else, moved her patients and certainly no basis to maintain that Khatib did so for a retaliatory purpose. (Ex. 7, at 129:17-130:11.) Moreover, far from constituting an adverse employment action, this event, according to Auger herself was "just another episode of, you know, inconsideration" by Khatib. (Ex. 7, at 130:11-12.)

**f. Counseling Letters**

Auger asserts that she received two counseling letters that constituted retaliation by Khatib. (Ex. 7, 65:1-24.; 67:3-18.) First, according to Auger, in February 2004, she received a memorandum for impermissibly taking photographs of two technologists from Roger Williams Hospital, whom she believed were improperly visiting DIS. (Ex. 39.) This counseling memorandum was not a formal disciplinary action, did not become part of Auger's personnel file, resulted in no loss of pay or benefits for Auger, and therefore does not constitute an adverse employment action because it would not have dissuaded a reasonable worker from pursuing EEO activity. (Holt ¶ 5.); see White, 126 S. Ct. at 2415; Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007) (in the discrimination context, holding that a "reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse"). More importantly,

Auger previously stated in connection with her EEO complaint on this issue that "I agree that my behavior was unprofessional and did not dispute the letter." (Ex. 40, at AH3398.) Auger reiterated at her deposition that she "acted inappropriately," (Ex. 7, 66:15-17), and cannot show now that the purpose of the informal memorandum was retaliatory.

Second, Auger contends that she was retaliated against when she received a report of contact on May 19, 2004. (Ex. 71.) At issue was an episode involving Mastalerz's decision to leave a staff radiologist a voice mail message that Mastalerz had completed an emergency procedure, rather than advising the radiologist directly. (Ex. 7, at 67:3-24.) The report of contact regarding Auger was issued by Joan Beaudoin (not Khatib) and plainly was not disciplinary in nature:

> Deb denied any knowledge of this procedure. She also stated that this practice never occurred when she was present in CT and she would not follow this procedure.

(Ex. 71.)

Pursuant to VA Hospital policy, a report of contact does not constitute a form of discipline. (Holt ¶ 5.) Moreover, at her deposition, Auger conceded that the report of contact did not become part of her official personnel file and that she suffered no adverse consequence as a result of the report of contact. (Ex. 7, 69:19-70:17.)

**g. <u>Requests for Confirmation of Leave Status</u>**

In July 2004, Auger took sick leave from DIS and then took additional leave under the Family and Medical Leave Act prior to filing a worker's compensation claim. Auger claims that she "received multiple letters from Khatib threatening her with administrative action if she did not comply with submitting more documentation for leave while Plaintiff was out on leave for emotional distress." (Ex. 69, at PSD0010.) Auger, however, cannot sustain her allegation that

the correspondence in July and August from Khatib regarding her extended absence amounted to an adverse employment action or was in any way improper.

Auger concedes that Khatib never denied her leave (or any other employment benefit), but simply asked for documentation of her medical status. In addition, Auger can cite no employees whom Khatib treated differently with respect to documentation of leave status. (See Ex. 9, at 92:20-25.) Indeed, in the past, DIS had made requests for verification of an employee's medical condition. For example, in February 2004, DIS pressed Dr. Babigian to obtain a letter from his physician justifying his week-long absence from work on medical leave and rejected his conclusory discharge slip from the emergency room.[13] (Khatib ¶¶ 35-36.)

Moreover, Khatib made his requests after consulting with Human Resources, and they were consistent with VA Hospital policy and practice, regarding leave in excess of three days. (Khatib ¶ 35; Ex. 88.) As Craig Polucha of the Human Resources Department explained, the Standard for Medical Documentation that Khatib sent Auger on July 8, 2004 had been created by Human Resources and was derived from the Federal Personnel Manual. (Ex. 23, at 53:17-54:10.) John Sylvia, a Human Resources specialist, also explained under oath to the EEO Investigator in connection with Auger's EEO complaint that there was nothing unusual about Khatib's requests for information regarding Auger's condition. (Ex. 72, at AH3166 (6:7-7:16.) Indeed, Mastalerz received an almost identical letter and acknowledged at her deposition that the letter was not objectionable. (Ex. 73; Ex. 3, 156:6-16.)

---

[13] Auger asserts that in 2003 she was not asked to provide additional documentation when she was absent from work after injuring her fingers. (Ex. 9, at 91:4-20.) However, Joan Beaudoin, not Khatib was her supervisor in 2003, and there was no uncertainty as to the nature of her condition in that instance.

In response to Khatib's July 8, 2004, letter granting provisional leave and requesting additional documentation, Auger provided the information Khatib requested, and her medical leave was approved without incident.[14] (Ex. 42.) Subsequently, on August 5, 2004, when Auger's sick leave had expired, Khatib wrote to her again and provisionally granted her leave without pay under the Family Medical Leave Act. (Ex. 74.) In this letter, Khatib requested that Auger complete and return to him the standard Department of Labor documentation that he enclosed with his letter. (Id.) Auger's physician submitted the required documentation, ( Ex. 75), and once again Auger's leave was approved without incident. In short, Khatib never denied Auger leave, and no reasonable finder of fact could conclude that his letters would dissuade a employee from pursuing her EEO claims or that the letters were motivated by retaliatory animus. See Valles-Hall, 481 F. Supp.2d at 144-45.

**h. Denial of Promotion**

According to Auger, in July 2006, the VA Hospital unfairly rejected her application for a grade 10 position as a lead angiography technologist. As a threshold matter, the Social Security Administration determined that Auger was fully disabled as a result of a psychological condition, and she has been collecting benefits since October 2005. (Ex. 7, at 58:15-17.) Moreover, Auger has taken the position in this litigation that she is unable to return to work since her departure. (Ex. 7, 35:20-36:10.) Therefore, her motive in applying for this new position in 2006 is unclear at best.

Regardless, however, of whether Auger had a good-faith basis for her July 2006 application to the VA Hospital, her retaliation claim fails. Auger cannot establish that denial of

[14] According to Auger, her letter bears the incorrect date (August 5, 2004) and was in fact sent on July 15, 2004. (Ex. 9, at 100:10-24.)

this application constituted an adverse employment action given her assertion that she was unable to return to work. Moreover, she can offer no evidence that her participation in a protected activity caused her to be rejected for the position. Indeed, Auger admitted at her deposition that the reason she was rejected was simple: "I mean in my opinion in a nutshell they're saying I'm not qualified; I'm saying I am." (Ex. 7, at 54:9-11.) Last, Auger has no evidence that the position at issue was given to someone who was not engaged in EEO activity. (Ex. 7, at 56:14-16.)

As Tammy Holt of the Human Resources Department explained to Auger at the time, the reason that Auger was rejected was that she lacked the requisite time in grade as a grade 9 employee. (Ex. 44.) Although Auger offers a muddled theory that the VA Hospital should have exercised its discretion to credit her with more time in grade, (Ex. 7, at 56:17-58:14), Auger is unable to identify any VA Hospital employee who was treated differently than she was, and she falls far short of presenting evidence upon which a jury could find that Holt's explanation was pretextual. Indeed, Auger conceded that

Holt's basis for concluding that Auger did not meet the requirements of the position was valid:

> Q. As a technical matter, though,
> Ms. Holt's remarks that you didn't have
> sufficient time in grade, they were
> technically accurate; right?
>
> A. Time and grade technically.

(Ex. 9, at 16:18-22.)

Moreover, Auger acknowledges that she never raised with the VA Hospital her concern that she should have been credited with extra time in grade:

> Q. Did you articulate to them that you
> believe that you have the time in grade to be -- for

a GS-9?

A. No.

(Ex. 7, at 54:15-18; see Ex. 9, at 17:13-16.)

## I. The VA Hospital's Alleged Inaction

According to Auger, the VA Hospital did not respond to the Plaintiffs' complaints about Khatib because she, Mastalerz, and Ahern had filed an unrelated EEO complaint in 2000, which was resolved in 2001. (Ex. 69, at PSD0004.) Auger's claim fails initially because the record is clear that the defendant did take steps to respond to Plaintiffs' complaints. For example, the Veterans Integrated Service Network 1, the VA Hospital's supervisory authority, conducted an extensive evaluation of DIS in September 2004 in response to Plaintiffs' allegations. (Ex. 32.) In addition, prior to that, Dr. Sta Ines, the Chief of the Diagnostic Imaging Service, met with the Plaintiffs and others as a group to hear their complaints on several occasions. Subsequently, she sought to conduct meetings with each of the individual Plaintiffs following their April 22, 2004 letter, but was unable to do so because three of them took extended sick leave within weeks of each other, beginning in June 2004. (Sta Ines ¶ 13 ; Ex. 76.)

Not only is Auger incorrect in her assertion that the VA Hospital did not respond to her complaints, but she cannot show that any alleged failure to respond on the part of the VA Hospital was causally related to her prior EEO activity in 2000. Moreover, the extended period of time between the prior EEO activity and the events now at issue militates strongly against a finding of causation. See Stewart v. Independent School Dist. No. 196, 481 F. 3d 1034, 1044 (8th Cir. 2007.) Although the First Circuit has held that a one-month period between protected activity and the adverse action is short enough to generate an inference of causation, Calero-

Cerezo v. US Dept of Justice, 355 F.3d 6, 26 (1st Cir. 2004), it has recognized that periods of three and four months are too long to establish a causal connection based on temporal proximity alone. Id, citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992). Here, more than two years elapsed between Auger's prior EEO activity and her complaints in this matter, and therefore Auger cannot establish a causal connection based on temporal proximity.

**3. Eileen Ahern**

As a procedural matter, Ahern's claims are barred by her failure to comply with the requirement that she contact an EEO counselor within forty-five days of the alleged events. See Velazquez-Rivera, 234 F.3d at 794; Roman-Martinez v. Runyon, 100 F.3d 213, 219 (1st Cir. 1996); 29 C.F.R. § 1614.105 (a). The latest discriminatory conduct alleged in Ahern's EEO complaint is the June 18, 2004 letter of admonishment, (Ex. 77, at AH2390),which is more than forty-five days prior to her August 3, 2004 contact with an EEO counselor. (Ex. 78.) Ahern cannot dispute that she had notice of the requirement to consult a counselor within forty-five days or that she failed to comply with this requirement, and therefore she cannot demonstrate a legitimate basis for tolling the requirement of 29 C.F.R. § 1614.105 (a).

Ahern also concedes that she was never terminated, suspended, denied a promotion, demoted or refused leave. (Ex. 5, 117:6-20; 119:6-20.) With four exceptions discussed in detail below, Ahern's retaliation claim is based on a litany of trivial affronts to which Khatib allegedly subjected her. None of these minor incidents, however, constitutes a retaliatory adverse

employment action under Title VII.[15] For example, Ahern cites the following petty slight as a discrete retaliatory action by Khatib:

> G. On 1/27/2004, I passed Khatib in the corridor; he said "How is it going?" I said ok and kept walking. He raised his voice and said "Excuse me; come back here when I talk to you. I asked you how your day was going." I was startled and taken aback by his manner and the tone and loudness of his voice. I told him "ok" he continued, "it should be, because yesterday you asked me for help and today I got you help."

(Ex. 79, at PSE00006.) Not surprisingly, Ahern cannot identify any specific change in her employment status associated with this episode, which she describes as a "little thing." (See Ex. 5, at 139:10-16.)

Ahern also alleges that Khatib retaliated against her and Mastalerz by directing that they "only put one [technologist's] name on each CT exam," rather than two. (Ex. 79, at PSE0008.) Ahern, however, admitted at her deposition that Khatib's proposed change to this procedure, referred to as "case editing," was never implemented. (Ex. 5, at 56:4-15.) Indeed, Ahern conceded that, although she found Khatib's efforts annoying, she and Mastalerz never changed their practice of listing two technologists and never suffered any adverse consequences. (Ex. 5, at 156:16-157: 3.)

With regard to case editing, Ahern also agreed that Khatib was motivated to change the process because he was concerned about performance metrics and not because of any retaliatory animus.

> Q: When you say "with the computer," do you mean tracking –
>
> A: Yes. He just cared about how it looked on the computer, how many exams and stuff like that. He wasn't thinking how we thought, like the two of us had done it,

---

[15] The events that Ahern cites also do not give rise to a hostile work environment, as discussed below in the section of this memorandum addressing that issue.

> the two of us should have our name on it for the record. That's why we disagreed. He was coming from a completely different place.

(Ex. 5, at 154:10-19) (Emphasis added).

As a final example of Ahern's reliance on petty events that do not approach the level of an adverse employment action, Ahern alleges that Khatib retaliated against her on May 17, 2004 when he told "Joan [Beaudoin] to speak to us about our schedule." (Ex. 79, at PSE00010.) At her deposition, when asked to explain the basis of this allegation, Ahern acknowledged "[i]ts so petty, its ridiculous." (Ex. 5, at 162: 25-163:20.)

**a. Counseling Letter**

Ahern contends that on May 21, 2004, she received a letter of counseling from the Chief Technologist, Beaudoin, regarding her treatment of two patients. (Ex. 79, at PSE00011.) The letter describes that Ahern encouraged a patient to complain about a delay that Ahern blamed on Khatib's policies. (Ex. 49.) In addition the letter chronicles that Ahern initially refused to perform a CT procedure on an elderly patient who did not have an appointment. (Id.) The Chief Technologist concludes the letter by noting, "I have full confidence that you will address these issues and resolve them without future reoccurrence." (Id.)

As a preliminary matter, Ahern is barred from relying on this alleged act of retaliation, and all others that predate June 19, 2004 because Ahern did not contact an EEO counselor until August 3, 2004. (Ex. 78.); see Velazquez-Rivera, 234 F.3d at 794; 29 C.F.R. § 1614.105. Moreover, although Ahern asserts that this letter was retaliatory, Ahern cannot establish that she suffered any actionable adverse consequence as a result of the letter. There is no evidence that the letter became part of her official personnel file or that she suffered any administrative action

that would dissuade a reasonable employee from engaging in EEO activities . (Holt ¶ 5.) In addition, Ahern cannot dispute that the substance of the letter was accurate.

**b. Admonishment**

On June 18, 2004, Ahern received a letter of admonishment from Khatib for her mishandling of two CT scan procedures. (Ex. 50.) Specifically, Ahern and her colleague, Mastalerz, failed to immediately contact the radiologist on duty after completing two emergency CT procedures ("wet readings") and instead left the radiologist voice mails. (Id.) With respect to the issue of wet readings, there is no dispute that Ahern acted improperly and was deserving of an admonishment. The Chief Technologist, Beaudoin, and the Chief of the Diagnostic Imaging Service, Dr. Sta Ines, both confirmed that Ahern's conduct compromised patient safety and was unacceptable. For example, Beaudoin testified as follows.

> Q: All right. Let me just make sure that question came out right. Is it appropriate for a technologist to leave a voice mail for a radiologist regarding a wet reading?
>
> A: No.
>
> Q: The reason it's inappropriate to leave a voice mail regarding a wet reading is because these are emergent studies involving situations where time is critical, right?
>
> A: Yes.

(Ex. 4, at 33:11-20; see Sta Ines ¶ 14.) Even Ahern's co-plaintiff, Auger, testified that she, Auger, had never engaged in the practice of leaving voice mails regarding emergency CT procedures. (Ex. 7, 70:22-71:4.) Moreover, in issuing this admonishment, Khatib consulted with the Human Resources Department. (Khatib ¶ 37). Thus, Ahern can point to no evidence that Khatib's reason for disciplining Ahern – patient safety – was a pretext for retaliation.

**c. Leave Documentation**

Ahern, like Auger, took extended medical leave in June 2004. In support of this medical leave, Ahern submitted a cursory note from her physician stating only: "Out of work 6/25/04 - 8/12/04." (Ex. 80.) Ahern asserts that Khatib improperly sent her "a letter threatening administrative action if I did not sent [sic] in acceptable medical documentation" on July 8, 2004. (Ex. 79, at PSE00011; see Ex. 81.) This letter, like the letter that Khatib sent to Auger, sought corroboration of Ahern's basis for taking extended sick leave and provisionally granted this leave pending receipt of Ahern's response. (Ex. 81.) No reasonable jury could conclude that the letter, which includes guidance regarding the documentation necessary, constituted an adverse employment action. See White, 126 S. Ct. At 2415; Valles-Hall, 481 F. Supp.2d at 144-45. Moreover, Ahern does not dispute that she submitted additional documentation, and that her leave was then granted. (Ex. 5, 177:12-178:1.)

**d. Work Assignments**

According to Ahern, Khatib retaliated against her when she returned from medical leave on October 5, 2004, by failing to restore her to the position of lead CT technologist, requiring that she complete a week of radiology training, and not immediately assigning her to the "call" schedule. (Ex. 79, at PSE0011.) First, at her deposition, Ahern admitted that "lead CT technologist" was not in fact a formal position, or even an informal position:

> Q: Okay. When were you -- what is lead CT tech?
>
> A. It's -- it's really nothing. It's just -- if anyone has a problem, they would come to you and you would be the one to take care of it.
>
> Q. It's not a formal position, right?

A. No. Not really. You do the supplies.
It's just more of a responsibility than anything
else. Not that you get paid for it.

(Ex. 5, at 179:1-9.) Ahern cannot establish that this minor modification to her role in the CT Department upon her return from extended medical leave amounted to, or contributed to, an adverse employment action. See Clegg, 2007 WL 2296414, at *5.

Second, no jury could conclude that her brief stint in the x-ray department for training was in any way improper. At her deposition, Ahern acknowledged that her x-ray training lasted less than two weeks. (Ex. 5, at 179:15-180:3.) Moreover, her co-plaintiff, Mastalerz, who also returned from extended leave at approximately the same time, agreed that it was reasonable for them to have had a period of x-ray training at that point. (Ex. 3, at 93:17-94:7.)

Last, Ahern's complaint about not being immediately reassigned to the on-call schedule upon her return from extended leave is unfounded. Ahern cannot dispute that she returned on October 5, 2004, and that the on-call schedule for that month had already been assigned. (Ex. 5, 118:7-21; see Beaudoin 159:24-160-12 (call schedule typically filled out "a year in advance".) Moreover, she was promptly returned to the on-call schedule beginning in November. (See Khatib ¶ 38; Ex. 5, at 119:2-5.)

**4. Maureen Mastalerz**

As a preliminary matter, Mastalerz too failed to comply with the requirement that she contact an EEO counselor within forty-five days of the allegedly improper conduct by Khatib. Specifically, in her September 17, 2004, EEO complaint, the date of the latest conduct that Mastalerz identified was May 26, 2004. (Ex. 63, at 0969.) This was more than forty-five days before Mastalerz contacted her EEO counselor on August 4, 2004, as the Office of Resolution Management noted in dismissing her complaint. (Ex. 65.) On February 17, 2005, Mastalerz

subsequently filed a second EEO complaint alleging that she suffered retaliation in November 2004. (See Ex. 65, at AH0916 (summarizing alleged incidents in November 2004.) Because Mastalerz has no credible explanation for her failure to comply with the time requirements of 29 C.F.R. § 1614.105 (a) in connection with her first EEO complaint, Mastalerz's current allegations in this litigation, other than those pertaining to events in November 2004, should be dismissed. See Velazquez-Rivera, 234 F.3d at 794; Roman-Martinez, 100 F.3d at 219.

In any event, Khatib never terminated , suspended, or demoted Mastalerz, and he never reduced her responsibilities at the VA Hospital. (Ex. 3, at 100:19-24; 103:14-21.) As with her co-plaintiffs, Mastalerz cites a litany of perceived slights as specific acts of retaliation. (Ex. 15, at 04-09.) For example, Mastalerz alleges that Khatib "slammed a binder on the table during a staff meeting," (Id. at PSM00007), but even if true, this trifle does not constitute a retaliatory adverse employment action that would dissuade a reasonable employee from pursuing protected activity. See White, 126 S. Ct. at 2415. Similarly, Mastalerz identifies a verbal exchange with Khatib stemming from his failure to thank her for training a contract technologist. (Ex. 15, at 08.) Again, however, Mastalerz simply cannot establish that this trivial conduct rose to the level of actionable retaliation, either alone or in combination with Mastalerz's other allegations. (Ex. 3, at 150:5-20.)

Mastalerz also contends that Khatib took several specific retaliatory employment actions against her. She asserts that Khatib retaliated against her by requiring corroboration from her physician in connection with her extended medical leave in June 2004 and by impeding her subsequent return to work. (Ex. 3, at 83:10-85:8.) Last, Mastalerz apparently contends that, in retaliation for her protected activities, she received several disciplinary letters from Khatib and was not returned immediately to the on-call schedule when she returned from sick leave.

**a. <u>Leave Documentation</u>**

Like Auger and Ahern, Mastalerz took extended medical leave. Mastalerz began her medical leave in early July 2004. (Ex. 54.) On July 8, 2004, Khatib sent her a letter requesting medical documentation, the propriety of which Mastalerz conceded at her deposition. (Ex. 3, at 156:6-25.) Mastalerz, however, now contends that the VA Hospital did not allow her to return from leave in September as promptly as she desired. (Ex. 3, at 158:18-161:17.) Specifically, Mastalerz claims that on September 26, 2004, she sent the VA Hospital a letter dated September 15, 2004 from her physician, stating that Mastalerz condition "had improved" and that she was able to return to work. (Ex. 55.) Following this letter, the VA Hospital's Human Resources Department requested confirmation of her full recovery. (Ex. 3, at 160:2-161:10.)

On September 30, 2004, Mastalerz sent a letter indicating that she desired to return to work, but also noting, "I believe that under the Family Medical Leave Act you must make Reasonable Accommodations for me." (Ex. 55.) This letter, as Mastalerz now concedes, suggested that Mastalerz was not fully recovered and that modifications to her job responsibilities would be necessary to accommodate her medical condition. (Ex. 3, 163:1-10.) Mastalerz counsel subsequently contacted the VA Hospital about this issue, and she returned to work on October 4, 2004. (Ex. 3, at 163:18-21.) Thus, only a very brief period elapsed between the time Mastalerz sent her September 30, 2004, letter and the day she returned to work. Moreover, in light of Mastalerz's extended absence, her doctor's statement that her condition had only "improved," and her demand for an accommodation from the VA Hospital, Mastalerz cannot show that the VA Hospital's request for confirmation of her full medical clearance was unreasonable or a pretext for retaliation. (<u>See</u> Ex 23, at 58:15-24 (noting that Human Resources Department would expect full resolution of an employee's medical issue.)

**b. Letters Regarding Misconduct**

Mastalerz alleges that she received a counseling letter on May 21, 2004, an admonishment on June 21, 2004, and a reprimand on November 15, 2004, in retaliation for her participation in protected activities. The counseling letter addresses Mastalerz's mishandling of two patients, and the admonishment addresses her leaving of voice mail messages for a radiologist regarding two emergency procedures. (Ex. 83.) Mastalerz is time barred from raising the counseling letter and the admonishment because more than forty-five days elapsed prior to August 4, 2004, when Mastalerz contacted her EEO counselor. (Ex. 84); see Velazquez-Rivera, 234 F.3d at 794; 29 C.F.R. § 1614.105 (a). In addition, Mastalerz has no evidence that these letters amounted to an adverse employment action or that the VA Hospital's explanations for these letter was a pretext for retaliation. First, there is no evidence that the counseling letter was unwarranted or became part of Mastalerz's official personnel folder. (Holt ¶ 5.) Second, as to the letter of admonishment, Auger, Beaudoin, and Dr. Sta Ines each have acknowledged that leaving a voice mail message regarding a "wet reading" was improper, nonstandard, and compromised patient safety. (Ex. 4, at 33:11-20; see Sta Ines ¶ 14; Ex. 7, at 70:22-71:4.) Moreover, Khatib conferred with the Human Resources Department before issuing this letter. (Khatib ¶ 39.)

Third, Mastalerz received a reprimand, the second lowest form of discipline, for being absent without permission. (Ex. 56.) Specifically, on November 3, 2004, Mastalerz sent Khatib an e-mail stating that she intended to take annual leave because she wanted to depart work an hour and a half early the following the day. (Ex. 57.) Mastalerz did not indicate that she had an emergency, and she never received permission to take leave as required. (Ex. 3, at 178:15-179:24; 180:3-5.) Indeed, although Mastalerz knew that she was required to obtain permission

from her supervisor, Khatib, she intentionally chose not to, because "I didn't want to talk to Mr. Khatib." (Ex. 3, at 179:19-20.)

Furthermore, Khatib conferred with his supervisor, Dr. Sta Ines, as well as with John Sylvia of the Human Resources Department in determining the appropriate sanction for Mastalerz. (Khatib ¶ 40; Ex. 58, at AH1520-21; Holt ¶ 6.) Consistent with VA Hospital policy, Mastalerz received a letter of reprimand, but no suspension, loss of pay or other adverse action for leaving her job without proper permission. (See id.) Because Mastalerz has no evidence that Khatib issued her a reprimand in retaliation for her protected activities and because she cannot establish that Khatib's explanation for the letter was pretextual, defendant is entitled to summary judgment on this issue.

**c. X-Ray Training and Call Schedule**

Mastalerz, like Ahern, contends that Khatib retaliated against her by requiring that she complete x-ray training upon her return from leave and by not immediately restoring her to the on-call schedule. (Ex. 15, at PSM0008.) Mastalerz, however, acknowledges that Khatib's objective was to have as many technologists trained in as many modalities as possible and, consistent with that policy, it was reasonable for her to have received x-ray training. (Ex. 3, at 93:8-94:7.) Moreover, Mastalerz cannot establish that her temporary, two-week x-ray training would have dissuaded a reasonable employee from pursuing her EEO activities.

With respect to her on-call status, Mastalerz agrees that by the time she returned from medical leave on October 4, 2004, the "call" schedule had already been set for October. (Ex. 3, 163:18-24.) Moreover, she acknowledges that Khatib explained this to her at the time. (Ex. 3, at 41:6-7.) Last, Mastalerz cannot dispute that she was returned to the call schedule beginning with

the first week of November. (Ex. 85.) In short, Mastalerz cannot establish that the explanation she received for being added to the on-call schedule in November was a pretext for retaliation.

**D. Defendant Is Entitled to Summary Judgment on Plaintiffs' Constructive Discharge Claims.**

Plaintiffs allege that Khatib created a hostile work environment and that Mastalerz and Ahern were constructively discharged. (Ex. 64, at ¶ 34.) A hostile work environment exists in violation of Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment." See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted). Name calling and gruff behavior do not rise to the level of "severe pervasive conduct," that is required for a hostile work environment claim.[16] Burlington Indus., Inc. V. Ellerth, 524 U.S. 742, 754 (1998).

To be actionable, harassment must be based on the complaining person's sex or protected activity. The Supreme Court has outlined the test a plaintiff must meet to succeed in a hostile work environment claim: (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's

[16] By April 2004, according to Auger, Khatib's conduct had created a situation that was "absolutely horrible." (Ex. 7, at 167:7.) Indeed, by that point, the Plaintiffs had sent their April 22, 2004, memorandum, alleging harassment. (Ex. 21.) And, according to Auger, the Plaintiffs had told Dr. Sta Ines that they were contemplating an EEO action. (Ex. 7, at 167:10-22.) Plaintiffs, however, waited months until August 2004 before contacting an EEO counselor. Plaintiffs had an obligation in April 2004, to pursue their EEO claims promptly or lose them. Because Plaintiffs unjustifiably delayed, they are precluded from relying on a continuing violation theory, and their harassment claims should be restricted to alleged conduct that occurred within forty-five days of the time that they contacted the EEO counselor pursuant to 29 C.F.R. §1614.105. See Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 612 (1st Cir. 2000).

employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998); Harris, 510 U.S. at 20-23; Meritor, 477 U.S. at 65-73; see also; Thomas v. iStar Financial, Inc., 438 F. Supp.2d 348, 365 (S.D.N.Y. 2006) (hostile work environment may constitute an adverse employment action in the context of a retaliation claim).

Several factors should be considered in evaluating a hostile work environment claim: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See Faragher, 524 U.S. at 787-88. Moreover, the hostile work environment standard must be kept "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788.

Plaintiffs allege that Khatib harassed them. (Ex. 64, ¶ 34.) The Plaintiffs, however, concede that Khatib never made any obscene or insulting comments, verbally threatened them or ridiculed them because of their sex (or for any other reason). (See Ex. 1, at 132:19-133:8; Ex. 7, at 158:12-21; Ex. 5, at 109:20-110:9; Ex. 3, at 104:6-16.) Moreover, they acknowledge that he never touched them improperly, physically threatened them, or humiliated them based on their sex. (See Ex. 1, at 84:5-85:23, 132:19-133:8; Ex. 7, at 186-87; Ex. 5, at 109:20-110:9.) Although difficult to untangle, Plaintiffs' allegations of harassment rest on the claim that with respect to the staff technologists, male and female alike, Khatib was a nit-picking, micromanager. Mastalerz explained that the essence of the Plaintiffs' conflict with Khatib was a power struggle: "He wanted to be just in charge. He wanted to control everything about -- you

know, when -- before Mr. Khatib, CT was a pretty independent, you know, you do your patients." (Ex. 3, at 53:20-25.)

Plaintiffs's allegations are fatally flawed because Plaintiffs have admitted that Khatib's alleged misconduct was the product of neither gender nor retaliatory animus, but of his effort to assume control and his preference for contract technologists over staff technologists. According to Mastalerz: "I was a VA employee, and he treated all the contract techs, men and women, better than he treated the VA employees." (Ex. 3, at 38:23-25 (emphasis added).)

Plaintiffs are undeterred by their own admissions that Khatib mistreated their male staff co-workers and that his allegedly harassing conduct consisted, at most, of rudeness and managerial decisions with which they disagreed. According to the Parker, for example, Khatib was a bully to almost all staff employees (Ex. 1, at 81:25-82:5), not just females. Indeed, Parker conceded that Khatib treated male staff workers very badly and that he treated female contract workers well. (Ex. 1, at 74:6-9, 90:3-12; Ex. 21, at AH0035 (asserting that Khatib "degraded" male workers and treated them "horribly").) Mastalerz also acknowledged that Khatib's alleged mistreatment was not limited to female employees:

Q. So Marty did treat men in DIS horribly,
right?

A. Yes. But that was only one department and
there were all males in that department. That was
only one part of DIS.

(Ex. 3, at 109:4-8.)

Ultimately, Plaintiffs conceded that Khatib treated them no worse than he treated their male staff counterparts:

Q: – is it fair to say, in your view, that Marty Khatib discriminated against the staff,

both male and female?

A: Okay, yes, that's fair to say.

(Ex. 1, at 74:6-9.)

Not only do the Plaintiffs concede that Khatib treated their male staff counterparts the same way that he treated them, Plaintiffs rely on inane conduct as evidence of what they perceive to be "harassment" by Khatib:

1 May 2003

> Debi and Lynda had an Angio section meeting with Khatib (1st and last one). Khatib showed more interest and curiosity in the male Angio techs at RWMC (the hospital across the street) than in his own 2 female Angio techs. He began asking too many questions and putting too much focus on the male techs at RWMC. Debi took offense and told him he didn't need any Angio techs because he has two of them and that Bruce can't work here anyway. . . .

(Ex. 66, at 51.)

15 March 04

> Joan called at Khatib's request from Morning Report and told Debi "I need more information about the case you're doing." then proceeded to ask all the things he wanted to know.

(Ex. 66, at 43.)

29 April 04

> Khatib calling CT about ER patient – seems to think that we are incompetent. Asking if patient is on our schedule yet, what he is scheduled for, what time he is scheduled, etc.

(Id. at 57.)

Defendant is entitled to summary judgment because the Plaintiffs rely on petty grievances that do not, by any objective standard, approach the threshold required to establish that a hostile work environment existed. Plaintiffs cannot cite any offensive acts or utterances

by Khatib that would demonstrate that the work place was so permeated with discriminatory or retaliatory animus as to affect the terms and conditions of employment or dissuade an employee from engaging in protected activity. In fact, in many instances the Plaintiffs admit that the acts upon which they rely were not motivated by discriminatory or retaliatory animus, but were the product of Khatib's gruff manner or simply reflected administrative decisions with which the Plaintiffs disagreed.

Plaintiffs' discomfort with Khatib's management decisions cannot support a hostile work environment claim under Title VII. Moreover, Title VII "does not set forth a general civility code for the American workplace." White, 126 S. Ct. at 2415. Accordingly, "nasty looks" and "angry silences," without more, are not materially adverse actions. Id. at 2415; see, e.g., Griffin v. Potter, 356 F.3d 824, 829-30 (7th Cir. 2004) (plaintiff's allegations that supervisor made unpleasant comments, gave additional work and unfair discipline were not actionable); Swanson v. Gen. Serv. Admin., 110 F.3d 1180, 1185-86 (5th Cir. 1997) (supervisor's hostile and unpleasant working relationship with plaintiff was not actionable); Beverley v. 1115 Health & Benefits Fund, 420 F. Supp.2d 47, 59-60 (E.D.N.Y 2005) (supervisor who acted unprofessionally and micromanaged staff did not retaliate against plaintiff). Nor can Plaintiffs base their claims on personality conflicts or minor criticism. See Higgins v. Gonzales, No. 06-2556, 2007 WL 817505, at * 10 (8th Cir. Mar. 20, 2007) (plaintiff "cannot make her claims based on personality conflicts, bad manners, or petty slights and snubs"); Gomez v. Laidlaw Transit, Inc., 455 F. Supp.2d 81, 89-90 (D. Conn. 2006) ("Plaintiff has not shown that [her supervisor's] criticizing her work, standing over her, not letting her leave, or leaving her a stack of papers, or her comment about being sick and tired of plaintiff's being sick, were anything

more than minor annoyances."); Wyse v. Summers, 100 F. Supp.2d 69, 77 (D. Mass. 2000) (counseling letter was not an adverse action).

**1. Linda Parker**

At her deposition, Parker contended that Kahtib's treatment of her and her co-plaintiffs was objectionable simply because he had a poor management style and engaged in nit-picking. (Ex. 1, at 91:4-92:3.) Nit picking, however, cannot support a hostile work environment claim. See Griffin , 356 F.3d at 829-30.

When asked at her deposition to list the actions that Parker considered to be harassment by Khatib, Parker identified events that a reasonable fact finder could only conclude constituted, at most, minor workplace slights, such as Khatib's "overhead paging" of the Plaintiffs; requiring her to "sign in and out when [she] went to lunch or even to the bathroom;" questioning her about her running of the student intern program; and failing to introduce her properly to colleagues. (Ex. 1, at 130-31.) Moreover, she conceded that Khatib's efforts to run a tight ship had no effect at all on the Plaintiffs' ability to do their jobs.

> Q: How did the micromanaging that Mr. Khatib did of you affect your work? Or let me ask another question. Did it make it unpleasant?
>
> A: Made it stressful, sometimes unpleasant.
>
> Q: Anything else?
>
> A: No.

(Ex. 1, at 111:18-112:8.)

> Q: Did the requirement from Mr. Khatib that you sign in and out make it more difficult for you to do your job or did it just bother you that he was micromanaging you?
>
> A: It bothered me that he was micromanaging me.

Q: Is that also true with respect to wanting to know your whereabouts all the time? Is it true that didn't make it harder for you to do your work?

A: It didn't make it harder to do my work. It was just uncalled for.

Q: . . . . In your view, it was "uncalled for" for Mr. Khatib to be overhead paging you. It didn't make it difficult for you to do your work; right?

A: Correct.

(Ex. 1, at 131:16-132:5.)

Parker also cited additional instances of what she considered to be harassment. Specifically, Parker contends that Khatib interrupted a staff meeting in January 2004, interfered with her efforts to complete her angiography training, and assigned Stokes to be acting Chief Technologist in August 2004.[17] Considered together, these events do not approach the level required to establish a hostile work environment. Moreover, although Parker makes much of her angiography training, she conceded at her deposition that Khatib never refused to allow her to complete this training, (Ex. 1, at 140:10-21), and had a legitimate staffing reason for giving her assignments that took her way her from her training.

Q: The reason that you weren't allowed to go to angio for your cross-training on the dates that you've listed in supplemental Interrogatory No. 11 was because the department was short-staffed because Helena Dacosta was assigned to the file room; is that right?

A: Correct.

(Ex. 1, at 135:7-20.)

Parker also admitted that she had no basis to conclude that Khatib's actions regarding her angiography training were motivated by any improper animus: "He obviously was trying to upset people. I don't know if it was because we were female or not, but he was obviously trying to." (Ex. 1, at 135:21-136:6.) Parker's inability to identify any discriminatory or retaliatory

[17] Plaintiffs' allegations regarding Stokes role in DIS are addressed in section II.B.3.

animus as a cause for Khatib's alleged actions dooms her claim. Patton v. Indianapolis Public School Board, 276 F.3d 334, 339 (7th Cir. 2002) (purely personal conduct not actionable).

**2. Debra Auger**

Auger endeavors to portray herself as a victim, but her deposition testimony and interrogatory responses reveal that she, in particular, was locked in a struggle with Khatib, her superior, for control of the Angiography Department. Her allegations are a melange of petty complaints about Khatib's lack of courtesy and accusations that he mismanaged DIS. At her deposition, Auger betrayed the Plaintiffs' disdain for their supervisor Khatib, which was at the core of their conflict:

> he was completely incompetent and they hired a completely incompetent manager. He wasn't running the department well. He was making decisions about areas in the department where he had no experience, no expertise.

(Ex. 7, at 175:4-8.)

Given Plaintiffs' unconcealed disdain for Khatib, it is little wonder that a tense atmosphere existed in DIS. Nonetheless, as Auger acknowledged, Khatib tried to reach a detente with her and made clear to her that the real problem was Auger's resistance to his efforts to assume more control over DIS.

> He told me that -- he said, "Do you think I'm out to get you?" I said, "Yes, I do."
>
> He said, "Debi, I've been here for two years." He said, "If I was out to get you, you'd know it. There would be no mistake."
>
> In my mind there was no mistake. And he continued to berate me. The issue came up about training techs on the angio equipment. He didn't even tell me about it. I found out on an e-mail with the rest of the staff.

> I told him that I didn't appreciate it. Why didn't you talk to me about it? He told me that I was obstructive and territorial, that he wasn't obligated to talk to me about anything. . . . I had 15 years of angio experience, he had zero, and he was being completely disrespectful of that.
>
> He started talking to me about Dr. Greg, Dr. Babigian who was the interventional radiologist and his smoke breaks and different things about angio that he didn't like and the flow, and at one point he said to me, "I'm not going anywhere so we need to start fresh."
>
> * * * *
>
> He told me that I played games and didn't shoot straight and until I stopped that, he wasn't going to talk to me about anything. He said that Dr. Sta. Ines and the previous administration have given you way too much power and control. Again, we were referring to interventional. And he told me that that was going to change.

(Auger 190:19-192:7 (emphasis added).) Tellingly, it was this exchange between Auger and Khatib that Auger cites as the most serious example of "harassment" she suffered. (Ex. 7, at 188:7-192:7.)

Although Auger contends that Khatib sought to drive her out of the department, she admits that she has no proof, circumstantial or otherwise, to support her paranoid claims.

> Q. [Khatib] was making a point that -- he was trying to make a point to you that he wasn't out to get you; right?
>
> A. In my opinion? No. That's what he said. But his -- again, his mannerisms, his tone. I will never contend that Mr. Khatib is stupid. He could get his point across and give you no proof, if you will. He knew that I knew he was out to get me and there was no mistake about it.

(Ex. 9, at 67:11-20.)

No jury could reasonably conclude that Khatib's actions would give rise to a hostile work environment or were motivated by any improper animus. For example, as evidence of a hostile work environment, Auger cites the following inane episode on February 5, 2005: "Khatib was very rude to Debi in the hall in front of people passing by when asking to see the Morning Report sheet she was working on." (Ex. 66, at 53.) Moreover, Auger, herself, has admitted that Khatib never succeeded in intimidating her and that her harassment claims are based on factors such as Khatib's tone of voice.

> Q. Did he intimidate you, Mr. Khatib?
>
> A. He tried to.
>
> Q. What did he do to intimidate you?
>
> A. It was his tone. He had this tone that he would use and it was -- like I said, the threats weren't blatant. For instance, there was a day that, you know, he didn't tell me he was going to hit me but I could just feel that when he had to walk away from me, he was mad enough to hit me. I don't think he would have done it in the department, I don't know, but you just -- you can just tell.
>
> Q. He didn't say I'm going to hit you?
>
> A. No. He walked away from me.

(Ex. 7, at 183:24-184:6.)

Auger also contends that Khatib harassed her by, among other things, frequently checking on her work performance and her whereabouts, requiring that she correctly complete daily reports, giving tours of the department to male technologists from area hospitals, questioning her about her lack of progress in training Parker as an angiography technologist, and rebooking no-show patients. (See, e.g., Ex. 66, at 0063-73.) Again, Auger's claims relate to Khatib's supervisory management decisions and his efforts to gain firm control of DIS, rather

than any actionable harassment. See Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003) (harder work assignment not actionable).

**3. Eileen Ahern**

Khatib never threatened, insulted, or yelled at Ahern. (Ex. 5, at 109:20-110:9; 189:24-190:13.) As discussed above, the conduct that Ahern alleges gave rise to a hostile work environment amounts to nothing more than petty slights and conflicts between Kahtib and the Plaintiffs over the proper operation of DIS.[18] For example, Ahern apparently contends that the following constituted harassment.

> B. Khatib was more interested in what male techs who worked at Roger Williams Medical Center had to say about how the Department worked. He had male techs come over, including Bruce Foster, and had telephone contact with them instead of relying on Joan Beaudoin and the other Plaintiffs who had been at the VA for years.

(Ex. 79, at PSE00022.) When asked to explain why she considered Khatib's interaction with these technologists to be a problem, Ahern expressed animosity toward Bruce Foster, but could not explain how Khatib's alleged interest in what these individuals had to say constituted harassment. (Ex. 5, at 130:25-132:9.)

In addition, Ahern asserts that Khatib's blunt management style created a hostile work environment. For example, Ahern claims that the following statement that Khatib purportedly made regarding the backlog in scheduling CT procedures constituted harassment: "If you do not come up with a solution, Management would and when ever Administration gets involved it

[18] As noted above, Ahern inexcusably failed to comply with the requirement that she notify an EEO counselor within forty-five days of the most recent allegedly improper event. Therefore, her current allegations of harassment should be dismissed. See Velazquez-Rivera, 234 F.3d at 794.

usually is not in your best interests." (Ex. 79, at PSE0025.) This statement, however, cannot possibly rise to the level of actionable harassment.

Considered together, the conduct that Ahern alleges does not, by any objective standard, amount to a hostile work environment, and defendant is entitled to judgment as a matter of law.

**4. Maureen Mastalerz**

Mastalerz acknowledges that Khatib never insulted, ridiculed, or threatened her.[19] (Ex. 3, at 103:22-25; 104:6-16.) As with the other plaintiffs, the gravamen of Mastalerz's harassment claim is that Khatib was a poor manager, who treated contract technologists better than the staff technologists. For example, Mastalerz contends that Khatib harassed her when he "eliminated house and er slots from the schedule" and directed the CT technologists to "'slide in' any extra patients." (Ex. 15, at PSM0016.) Mastalerz, however, acknowledged at her deposition that Khatib had a legitimate business reason for this scheduling change, albeit one with which she disagreed.

> Q. What Khatib did was eliminate those open slots in the schedule and scheduled into those previously open spots outpatient appointments; is that right?
>
> A. Yeah, probably two.
>
> Q. So you can understand from an efficiency perspective why he would want to do that, even if you disagree, right?
>
> A. Yeah, I guess. But it -- it's -- I think it's poor management.

(Ex. 3, at 131:2-11.)

[19] Mastalerz, like Ahern, unjustifiably failed to raise her allegations of harassment with an EEO counselor in a timely manner. Therefore, Mastalerz is precluded from asserting those allegations now. See Velazquez-Rivera, 234 F.3d at 794; Roman-Martinez, 100 F.3d at 219.

Mastalerz also revealed that the friction between Khatib and the Plaintiffs was, at its core, the result of Plaintiffs' resentment over Khatib's efforts to exert his supervisory authority:

> Q: When you said he was a micromanager, what do you mean?
>
> A. Well, a micromanager – he would want to control all aspects of -- for example, the CT schedule. . . .
>
> He was just always changing things. He wanted to be just in charge. He wanted to control everything about -- you know, when -- before Mr. Khatib, CT was a pretty independent, you know, you do your patients. . . .

(Ex. 3, at 52:25-53:25.)

In addition to relying on the same workplace slights raised by the other plaintiffs (and discussed above), Mastalerz also cites several additional instances of alleged misconduct, none of which is sufficient to salvage her claim. Specifically, Mastalerz contends that Khatib harassed her in the course of a discussion over the backlog of pending CT cases by rhetorically asking her how she would feel if her father's medical treatment were to be delayed because of the backlog. (Ex. 3, 104:24-106:20.) While Khatib's personalization of the issue may have been distasteful to Mastalerz, it reflects nothing more than Khatib's intense desire to improve patient care, and no jury could conclude that it constituted actionable harassment.

Mastalerz also asserts that she "was called into Dr. Shafer's office with Khatib every week and questioned about iv injections." (Ex. 15, at PSM0018.) Mastalerz, however, concedes that her weekly meetings with Khatib were addressed exclusively to her work-related performance issues.

> Q. All of the discussions that you had when

you were called into Dr. Shafer's office on a weekly basis were related to work performance, right?

A. Uh-hum. Yes.

(Ex. 3, at 115:15-18.) Again, no jury could conclude that these meetings contributed to a hostile work environment.

Last, Mastalerz asserts that after she returned from leave, she was "constantly left alone" and denied assistance. (Ex. 15, at PSM0018.) Mastalerz, however, admitted at her deposition that her allegation was inaccurate.

Q. All right. Now, in Paragraph Q of your supplemental response, Interrogatory No. 2, you say, "When I did get back, I was constantly left alone." That's not entirely accurate; is that right?

A. Yes. It is not entirely accurate. It just felt like I was entirely along [sic].

Q. And, in fact, when you asked for help, Mr. Khatib would come to the department to confirm what the situation was, right?

A. Uh-hum, yes.

Q. And on at least one occasion, he sent Brittany to help you when you needed it, correct?

A. I guess. I would have to see when she did come.

(Ex. 3, at 168:15-169:3.)

Defendant is entitled to summary judgment because no objective observer could conclude that a hostile work environment existed in DIS as a result of Kahtib's alleged discriminatory or retaliatory animus.

**5. Constructive Discharge**

To establish a claim of constructive discharge in the First Circuit, a plaintiff must demonstrate that the conditions of employment "had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Suarez, 229 F.3d at 54. Accord Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000) (plaintiff must prove that employer imposed "intolerable" working conditions). The test is one of objective reasonableness and cannot be met by the employee's subjective beliefs, no matter how sincerely held. Suarez, 229 F.3d at 54.

Plaintiffs allege "the constructive discharge of two of the Plaintiffs." (Ex. 64, at ¶28.) Specifically, Plaintiffs contend that Parker and Mastalerz, the only two to resign, were constructively discharged as a result of Khatib's harassment. (Ex. 3, 86:11-23.) Neither Parker nor Mastalerz, however, can raise a genuine issue of fact on this point, and therefore defendant is entitled to summary judgment.

Parker concedes that she began searching for a new position well before resigning and that the position she secured paid more than her VA Hospital position. (Ex. 1, at 12:2-8; 13:22-14:3; 48:9-13). This admission is fatal to Parker's claim because the acceptance of another job at the time of her resignation demonstrates that she was not compelled to resign her employment at the VA Hospital as a result of Khatib's harassment. See Taylor v. Fed. Deposit Ins. Corp.,132 F.3d 753, 766 (D.C. Cir. 1997) ("A constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign. It does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive.").

Mastalerz's claim fails because she does not assert that her work environment was so unbearable as to force her to resign. Rather, she contends that she left peremptorily because she thought that Khatib was planning to fire her. She has adduced no evidence, however, that Khatib ever suspended her, threatened to fire her, or even intimated that he intended to do so. Moreover, Mastalerz admits that the episode that caused her to leave had nothing to do with any threats or harassment, but concerned an instance in which she felt shortchanged with respect to overtime. According to Mastalerz,

> [a]nd then when -- the kicker of why I really left was because I was on call for the weekend, I got called in, and both Mr. Khatib and Dr. Shafer and Brittany -- Brittany was covering x-ray hours, but I was the CT tech on call.
>
> * * * *
>
> Then, when I questioned Dr. Shafer, Dr. Shafer said, oh, we were going to call you in after we called for the patient, which you don't do that. You get everything ready for the patient, especially an ICU patient. They're on a respirator. You try to get them done as quickly as possible, so you get them in and out.
>
> So if they were going to call me in after they called for the patient, the patient would have been on the table while they were waiting for me. I think that was a lie that he told me, and that was the straw that broke the camel's back, actually, was that.

(Ex. 3, 88:5-89:21.)

Based on this admission, no jury could conclude that Mastalerz quit because conditions were so intolerable as to compel a reasonable person to resign.

## IV. CONCLUSION

WHEREFORE, Defendant respectfully requests that the Court enter summary judgment in its favor with respect to each of the Plaintiffs.

Respectfully submitted,
JIM NICHOLSON, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS

By his attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Richard Myrus
RICHARD MYRUS
Assistant U.S. Attorney
United States Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email:richard.myrus@usdoj.gov

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 14th day of November, 2007, I caused to be electronically filed the within Defendant's Motion for Summary Judgment and supporting Memorandum, with the Clerk of the United States District Court for the District of Rhode Island, using the CM/ECF System. The following participant has received notice electronically:

Thomas Folcarelli, Esq.
55 Bradford Street, Suite 203
Providence, RI 02903
tfolc8@cox.net

I further certify that the Exhibits to Defendant's Memorandum in Support of Motion for Summary Judgment are being hand-delivered to the United States District Court and a copy by regular mail, postage prepaid, sent to:

Thomas Folcarelli, Esq.
55 Bradford Street, Suite 203
Providence, RI 02903

/s/ Richard B. Myrus
RICHARD B. MYRUS
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: richard.myrus@usdoj.gov

.