**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| Eileen Ahern, Maureen Mastalerz, Debra Auger, and Lynda Parker, Plaintiffs, | ) |
| v. | ) C.A. NO. 05-117ML |
| Jim Nicholson, Secretary, Department of Veterans Affairs, Defendant. | ) |

## DECLARATION OF MEHRDAD KHATIB

I, Mehrdad Khatib, make the following declaration in support of Defendant's Motion for Summary Judgment. Unless otherwise noted, I have personal knowledge of the facts set forth herein.

**Background and Job Responsibilities**

1. In August 2002, I became the Administrative Officer of the Diagnostic Imaging Service at the Veterans Affairs Medical Center in Providence, Rhode Island.

2. Prior to joining the VA Medical Center, I had worked in the diagnostic imaging field for almost twenty years, most recently as a supervisory technologist with Rhode Island MRI Network. I had not worked in the VA system before August 2002.

3. I received an Associate's degree in radiologic technology from Los Angels City College in 1985. I then obtained a B.A. degree from Cal. State Northridge in health science with a minor in environmental and occupation health.

4. As the Administrative Officer of DIS at the VA Medical Center, I was responsible for five subsections, or departments, employing a total of as many as sixteen technologists and a number of support personnel: Diagnostic Radiology (also referred to as "X-ray"), Angiography

(also referred to as Interventional or Specials), Computer Tomography (often referred to as "CT" or "CAT Scan"), Ultrasound, and Nuclear Medicine. I was also responsible for managing specialty treatment for VA patients that was performed at facilities outside the VA Medical Center.

5. As the Administrative Officer of DIS, I had broad responsibility for personnel management, equipment operations, and budgeting. It was my role to address employee performance issues, staffing requirements, and work assignments. I oversaw the day-to-day operations of the Service, and it was my job to ensure that DIS properly provided the technical services that the VA Medical Center required.

6. With respect to personnel management, it was also my role as Administrative Officer to work with the Chief Technologist, who reported to me. In addition, I kept the service chief, Dr. Sta Ines, apprised of employee staffing and performance issues and formulated work assignments to ensure that the Service delivered the best possible care as efficiently as possible.

7. Prior to my arrival, the position of Administrative Officer had been vacant for many months. During that period, Joan Beaudoin, the Chief Technologist, handled some of the responsibilities of the Administrative Officer on a temporary basis. After my arrival, Ms. Beaudoin focused on her role as Chief Technologist. Her supervisory responsibilities included approving leave requests, authorizing overtime, taking disciplinary measures as appropriate, and providing performance reviews. Until Ms. Beaudoin's departure in June 2004, the technologists reported to her, and Ms. Beaudoin reported to me. After Ms. Beaudoin left, I assumed her management responsibilities as Chief Technologist . Among other things, I had supervisory authority to approve requests for leave, issue reprimands and other discipline, authorize

overtime, and evaluate the performance of technologists.

8. In late 2004, I took an extended leave without pay to return to California to tend to my ailing father. I formally resigned my position at the VA Medical Center in 2006. I currently live and work in California.

**CT Scan**

9. Computer tomography, (CT Scan), is an imaging process in which the patient is examined using radiation and computer technology to produce a three-dimensional image. It can be performed with a contrast dye or without.

**Efficiency and Accountability Issues in DIS**

10. In 2002, I was hired as the Administrative Officer of DIS from outside the VA system to improve efficiency and patient care. After several months, it became apparent to me that several departments within the Service had become accustomed to operating with inadequate management supervision and that, as a result of this autonomy, the work quality, accountability and efficiency of these departments was suffering.

11. For example, several clerks in the file room had become entrenched in their positions and resented my efforts to improve efficiency in the department.

12. The technologists in the Angiography and CT Scan departments also had become accustomed to dictating their own work schedules and scheduling CT Scan cases. I frequently had trouble locating these technologists. In addition, they did not keep management adequately informed of workflow in the CT Department, and, in my view, did not always work at peak capacity, despite the high demand for CT services. For example, they were difficult to locate on those days when preventive maintenance was being performed, and they frequently left several

outpatient appointment slots each day unfilled, which I considered highly inefficient.

13. The CT Department, which consisted of two full-time technologists and one technologist who divided her time between CT Scan and Angiography, was the only department in DIS that operated on a compressed tour of duty schedule, which in my view was very inefficient. For example, whenever one of these technologists called in sick, which was a frequent occurrence, the CT Scan Department was left with only one technologist for the entire day.

14. Under the compressed tour schedule, there were two technologists on duty each work day from 7:00 a.m to 5:30 p.m., with the first regularly scheduled patient appointment at 7:30 a.m. and the last scheduled at 5:00 p.m. In addition, the CT Department was responsible for handling unscheduled emergency cases whenever they arose. Because there was no technologist on duty after 5:30 p.m., the CT technologists often generated overtime for several hours at the ends of their tours because the day's work was often not completed by 5:30 p.m. In 2003, the CT Technologists collectively earned approximately $32,000 in call-back/overtime. A portion of this overtime was attributable to cases that arose late at night or on the weekends, but a substantial portion was generated in the early evening hours during the week.

15. In addition, in early 2004, there was a lengthy delay of several weeks from the time a doctor ordered a CT Scan to the date on which that study was performed. Moreover, because of this delay and lax procedures for tracking the status of CT Scan orders, a substantial backlog of more than a thousand pending cases, which are cases that had been scheduled but not performed for various reasons, had developed. This problem arose because the technologists were not properly utilizing the VA Hospital's computerized database. Last, I observed that on

many occasions, CT Scan cases were not scheduled on Thursday afternoons, and the CT technologists were often absent from their posts and difficult to locate.

16. The problems in the CT Scan Department were exacerbated by the fact that DIS had only three staff technologists fully trained in CT Scan procedures, Ms. Ahern, Ms. Mastalerz, and Ms. Auger. Therefore on days when one of the two scheduled technologists was absent due to illness or on annual leave, the CT Scan Department was left understaffed.

17. To ameliorate the problems in the CT Department, in early 2004, I proposed a change from the compressed tour of duty schedule to a schedule under which each of the three technologists would work a regular eight-hour tour fives day per week. Under my initial proposal, these tours would be staggered such that the first technologist would begin at 7:00. The second technologist would begin at 10:30 a.m, and the third would work from 3:00 p.m. to 11:00 p.m. This staggered tour schedule would ensure that three technologists would be available Monday through Friday and that the department's regular hours of operation would be extended. This schedule would eliminate substantial overtime after 5:30 p.m. and allow additional cases to be scheduled each day. The Chief of Diagnostic Imaging, Dr. Sta Ines, agreed with my plan to change the compressed schedule, but proposed that initially the third technologist work until 5:30 p.m., rather than 11:00 p.m., in order to make the technologists' transition to a five-day schedule more gradual.

18. In addition, I was seriously concerned that patients were not being tracked accurately and were falling through the cracks. For example, patients often fail, for one reason or another, to appear for their scheduled appointments. In these instances, it is important to reschedule the patient, because a doctor has deemed it necessary for the patient to have a

diagnostic procedure. A no-show patient cannot simply be allowed to fade away. Thus, I directed that no-show patients be rebooked and that patients be contacted the day before their scheduled appointments to confirm the appointment. In addition, rather than cancel the backlog of pending cases wholesale, I directed that the backlog of pending cases be reviewed to determine which of them could be cancelled and which needed follow-up.

19. As part of my effort to increase staffing flexibility and the quality of patient care in DIS, I also sought to implement cross-training of radiology technologists to fill in as CT technologists when needed. I also increased my oversight and instituted more stringent requirements for the technologists to follow with respect to tracking and documentation of the procedures that they completed. For example, in April 2004, after consulting Dr. Sta Ines, we asked that the CT technologists accurately record on a daily basis the procedures that they completed and provide this data to us. In addition, I took a more active role in monitoring patient flow by frequently checking with the CT Department regarding work flow and the status of patients.

20. Ms. Auger, Ms. Ahern, Ms. Mastalerz, and to a somewhat lesser extent Ms. Parker were very resistant to my efforts to change the culture in DIS. At almost every turn, and particularly with respect to the compressed tour of duty, Ms Auger, Ms. Ahern, and Ms. Mastalerz fought my efforts and challenged my authority.

**Contract Technologists**

21. In 2003, the DIS facilities underwent a substantial renovation, which was disruptive. In addition, beginning in approximately September 2003 DIS, and the X-ray department in particular, was understaffed due to a number of departures and in need of

additional trained technologists. Therefore, I requested and received approval from the administration through Dr. Sta Ines, to hire contract technologists to fill the Service's urgent needs on a temporary basis.

22. The salaries offered by the VA Hospital were below the rates offered by area hospitals, which made it difficult to attract experienced technologists to join the staff as career employees. Indeed, DIS solicited applications for a technologist position in early 2004, which went unfilled.

23. Contract technologists, unlike their staff counterparts, were temporary, hourly workers, who earned no vacation time and received neither health insurance nor retirement benefits from the VA. In order to attract these workers, the VA Medical Center paid them a flat hourly rate that was consistent with regional standards. In most cases the VA contracted directly with these technologists and paid them substantially less than the rates set by the Staffing Now and the Cirrus employment agencies, which sometimes furnished these technologists. I had no authority to set the salaries of these contract workers, and this was handled by the VA Hospital's Contracting Department.

24. In 2003, while I was the Administrative Officer, DIS hired a number of contract technologists, including Kim Lebert, a female nuclear medicine technologist in early 2003. Dr. Sta Ines interviewed each of these employees before they were hired.

25. Chris Stokes was an experienced technologist, who was qualified in X-ray and Angiography procedures. He had worked at Rhode Island Hospital and subsequently for a private radiology services provider. In 2003, after returning from military duty overseas, Mr. Stokes contacted me and expressed interest in a position. Prior to this contact, I had never met

Mr. Stokes.

26. I and Dr. Sta Ines interviewed Mr. Stokes for a position in September 2003.

27. In approximately June 2004, after the Chief Technologist, Ms. Beaudoin, took extended leave, I filled the management role of Chief Technologist. After consulting Human Resources and Dr. Sta Ines for approval, I delegated to Mr. Stokes some of the responsibility for coordinating patient flow within the service, because he was a very experienced , professional technologist, who had availability to serve in this capacity. That is, Mr. Stokes often coordinated the assignment of cases, interfaced with other departments regarding their needs, and handled other routine daily tasks. Mr. Stokes had no supervisory authority to approve leave requests, conduct performance evaluations, approve overtime, or discipline technologists. He did not receive any additional compensation for this role. During this period, Tanessa Karmozyn, a staff radiology technologist, also handled patient flow issues in DIS when she had availability to do so.

28. I did not, nor could I have, given Mr. Stokes the Chief Technologist position, which Ms. Beaudoin technically continued to hold at that time, although she was on extended leave. There was no requirement that, in the absence of the Chief Technologist, only the most senior staff technologist would be responsible for patient flow or should be appointed temporary Chief Technologist.

29. In 2004, DIS hired a number of additional contract technologists, including Suzette Kennett , Laurie Goss, Charlotte McLaughlin and Dayna Gardner. In addition to these female contract technologists, DIS also hired several male contract technologists. As with the contract technologists that were hired in 2003, the Contracting Department set the rates of these

technologists hired in 2004.

**Lynda Parker**

30. Lynda Parker and two other technologists expressed interest in cross-training to become qualified in CT procedures. Initially, I asked Joan Beaudoin to conduct introductory training for those interested, but this training never took place as far as I know. Subsequently, after conferring with the chief of DIS, it was determined that Tanessa Karmozyn, an x-ray technologist, would be trained first because of her availability and that Lynda Parker would receive CT training after Karmozyn. Parker was already in the midst of angiography cross-training. Given her role in the Angiography department and the difficulty in cross-training more than one person in CT procedures at a time, it made sense that Parker be trained after Karmozyn. I informed Ms. Parker that she would receive CT cross-training after Ms. Karmozyn.

31. Ms. Parker was responsible for coordinating DIS's training program for interns from the Community College of Rhode Island. On a number of occasions in 2004, I met with her to review her performance as part of my oversight responsibilities as Administrative Officer. In addition, in early August 2004, Ms. Parker improperly informed CCRI that a hiring freeze was likely to be imposed at the VA Hospital and that such a freeze would hurt the clinical training program. Ms. Parker never conferred with me on this issue before raising it with the school. Her action in this regard led me to question her judgment.

**Debra Auger**

32. During the renovation of DIS, Debra Auger acted as the department coordinator for several months from approximately June 2003 to January 2004. This was an unofficial, temporary role that included no additional pay or benefits. She was not removed from this

position, and no one replaced her. Rather, after the renovation was substantially complete, there was no longer a need for this role to be filled.

33. In February 2004, two angiography technologists from Roger Williams Hospital, one o f whom was a former employee of the VA Hospital, visited DIS on official business. I never suggested that these, or any other technologists, were going to replace any of the staff technologists.

34. While these two technologists were in DIS, Ms. Auger rushed over and took pictures of them without obtaining their permission. As a result, the Chief Technologist wrote a report of contact regarding Ms. Auger's actions because they were inappropriate.

35. In July 2004, Ms. Auger submitted an excuse slip from her doctor stating that she would be out of work for an extended period, but providing no documentation for her absence. At this point, the Chief Technologist was on leave, and I was the supervisor responsible for reviewing her leave request. Ms. Auger's medical condition was not obvious, and I was concerned that she might be manipulating the leave system because she had already been on annual leave for several weeks and had not returned. After consulting with John Sylvia, a specialist in the Human Resources Department, I sent Ms. Auger a letter asking her to provide additional medical documentation. I also provided her with the Standard for Medical Documentation, which I received from Human Resources.

36. In the past, DIS had made similar requests for verification of an employee's medical condition. For example, in February 2004, Dr. Babigian informed me and Dr. Sta. Ines that he had been involved in an accident that would require his absence from work for a week. In response, we pressed him for a letter from his physician justifying his condition, and rejected

as inadequate the emergency room discharge instructions that he presented.

**Eileen Ahern**

37. On June 18, 2004, after conferring with Alan Korelenko of the Human Resources Department and Dr. Sta Ines, I issued Ms. Ahern a letter of admonishment for the mishandling of two emergency CT scan procedures. Specifically, Ahern and her colleague, Ms. Mastalerz, failed to immediately contact the radiologist on duty after completing the two emergency CT procedures and instead left the radiologist voice mails. I became aware of this problem after an emergency room physician contacted Dr. Sta Ines seeking the results of one of these emergency CT scans. In addition, Dr. Shafer, the radiologist involved, complained to me about this episode. Ahern's conduct compromised patient safety and was unacceptable.

38. Ms. Ahern returned from extended medical leave in early October 2004. By the time that she returned, the on-call schedule for that month had already been set. She was, however, assigned to the on-call schedule for November 2004.

**Maureen Mastalerz**

39. As with Ms. Ahern, I conferred with the Human Resources Department before issuing Ms. Mastalerz a letter of admonishment regarding her leaving of voice mails about wet readings for the radiologist on duty.

40. On the afternoon of November 15, 2004, Ms. Mastalerz was absent from work without obtaining permission. I consulted Dr. Sta Ines and the Human Resources Department regarding the appropriate response to Ms. Mastalerz's unauthorized absence and it was determined that she should receive a letter or reprimand.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed the 13 day of November 2007

MEHRDAD KHATIB