**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Eileen Ahern, Maureen Mastalerz, Debra Auger, and Lynda Parker, Plaintiffs, | ) | |
| v. | ) | C.A. NO. 05-117ML |
| Jim Nicholson, Secretary, Department of Veterans Affairs, Defendant. | ) | |

**DEFENDANT'S STATEMENT OF FACTS AS**
**TO WHICH THERE IS NO GENUINE DISPUTE**

**Background**

1. In 2003, the Diagnostic Imaging Service at the VA Hospital consisted of five modalities: general x-ray/radiology, ultrasound, CT scan, nuclear medicine, and specials/angiography/interventional. (Ex. 1, at 16:25-17:5; Declaration of Mehrdad Khatib ("Khatib") dated Nov. 13, 2007, at ¶ 4; Ex. 2.)[1]

2. In addition to the technologists, who performed the diagnostic procedures, DIS included several radiologists and a clerical support staff. (Khatib ¶ 4; Ex. 2.)

3. The technologists in DIS reported to the Chief Technologist, who in turn reported to the Administrative Officer. (Khatib ¶ 4-6.)

4. The Administrative Officer reported to the Chief of the Diagnostic Imaging Service, who had ultimate responsibility for DIS. (Khatib ¶¶ 5-6; Declaration of Casimira Sta

---

[1] The documents and deposition testimony cited herein are provided in the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment, which includes a table of contents identifying each exhibit by exhibit number and description. Supporting declarations are identified by the name of the declarant and submitted separately.

Ines ("Sta Ines") dated Nov. 9, 2007, at ¶ 1.)

5. The Chief Technologist was responsible for directly supervising the technologists, approving leave requests, authorizing overtime, disciplining technologists, and providing performance reviews. (Khatib at ¶ 7; Ex. 3, Deposition of Maureen Mastalerz, at 71:21-72:4; Ex. 1 at 35:10-36:20; Ex. 4, at 117:10-13; Ex. 5, at 94:2-19.)

6. The Administrative Officer was responsible for all facets of DIS's operation, including personnel management, equipment operations, and budgeting. (Khatib ¶ 5; Ex. 2.)

7. With respect to personnel management, the Administrative Officer's role was to address employee performance issues, staffing requirements, and work assignments on a daily basis with the Chief Technologist and to keep the Chief of the Diagnostic Imaging Service fully apprised. (Khatib ¶ 6.) In addition, the Administrative Officer oversaw the day-to-day operations of the service, and it was his responsibility to ensure that DIS provided the best possible patient care as efficiently as possible. (Khatib ¶ 5-6.)

8. In 2003, the Chief of the Diagnostic Imaging Service was Dr. Casimira Sta Ines, a woman. (Sta Ines ¶ 1.)

9. Mehrdad Khatib became the Administrative Officer in August 2002, and prior to his arrival that position had been vacant for several months. (Khatib ¶ 1.)

10. In December 2003, DIS employed fourteen staff technologists, two of whom were men. (Ex. 7, at 19:9-20:3; Ex. 2.) In addition, two male staff file clerks worked in DIS. (Id.)

11. The Chief Technologist was Joan Beaudoin, a long-time VA Hospital employee. (Khatib ¶ 7; Exh. 2.) Beaudoin left DIS in May 2004 on extended leave, at which time Khatib, her immediate superior, assumed her supervisory duties as Chief Technologist. (Ex. 3 at 23:11-

17; Khatib ¶ 7.)

**The CT Department**

12. In 2003, the VA Hospital's Computer Tomography ("CT") Department consisted of two full-time technologists (Mastalerz and Ahern) and one technologist who divided her time between CT Scan and Angiography (Auger). (Ex. 3, at 23:18-24; Ex. 5, at 25:18-25; Khatib ¶ 13.)

13. Khatib, who had not previously worked in the VA system, sought to boost productivity and alter what he perceived to be a culture of inefficiency plaguing DIS and the CT Department in particular. (Khatib ¶¶ 2, 10.)

14. In 2003, the CT Department routinely closed for preventive maintenance at least one afternoon each month for several hours, during which time patients were not scheduled. (Ex. 5, at 32:11–33:24.) During these preventive maintenance periods, the CT technologists took "extended lunches," and Khatib often had difficulty locating them. (Ex. 3, at 56:10-57-15; see Khatib ¶ 12; Ex. 9 at 26:4-24.)

15. In addition, prior to Khatib's arrival as Administrative Officer, the CT Department's practice was to leave four outpatient slots per day unfilled, ostensibly to allow for the completion of unscheduled emergency cases. (Ex. 5, at 35:2-22.) Khatib, however, viewed this practice as inefficient because these slots often went unused when unscheduled cases did not materialize. (Khatib ¶ 12; Ex. 4, at 44:14-19.)

16. The CT Department was the only department in DIS that operated on a compressed tour of duty schedule. (Khatib ¶ 13.)

17. Under the compressed tour schedule in the CT Department, each of the technologists worked four, ten-hour days per week from 7:00 a.m. to 5:30 p.m. For example, during a typical week in 2003, Ahern worked Monday through Thursday, and Mastalerz worked Tuesday through Friday. Auger took Wednesdays off and divided her time during her four days at work between Angiography and CT. The following week, Mastalerz and Ahern typically switched days off, which enabled each of them to have a four-day weekend every other week. (Ex. 7, at 38:3-24; Khatib ¶ 13.)

18. In Khatib's view, the compressed tour created a number of inefficiencies. (Khatib ¶ 13.)

19. Khatib expressed concern to the Chief Technologist that the CT technologists frequently took sick leave to extend their regular days off. (Ex. 4, at 98:13-19.) When a CT technologist called in sick, the CT Department was left with only one technologist for the entire day, because there were only two technologists scheduled each day. (Khatib ¶¶ 13, 16; Ex. 10; Ex. 11.) In addition, under the compressed schedule, the CT technologists frequently collected overtime beginning at 5:30 p.m. because that was the end of their regularly scheduled shift. The day's cases, however, were often not completed by that time. (Ex. 9, at 74:5-75:7; Ex. 5 at 38 and 66:3-19; Khatib ¶ 14.)

20. In early 2004, a multi-week backlog in the scheduling of CT scans for outpatients at the VA Hospital had arisen. (Ex. 5, at 159:13-19; Khatib ¶ 15.)

21. Khatib attributed this backlog in part to the CT staff's compressed schedules, which required that the last outpatient be scheduled by not later than 5:00 p.m. (Ex. 5, at 36:5-10; 38:17-20; and 54:7-19; Khatib ¶ 17).

22. In early 2004, an audit of pending cases in each DIS modality revealed that the CT

Department was also plagued with an alarming number of pending cases that had been scheduled, but never performed. (Ex. 4, at 40:21-23; 42:1-2; Ex. 11; Ex. 12; Ex. 13; Khatib ¶ 15.)

23. Khatib ordered a review of thousands of pending CT cases in DIS's computer tracking system, which revealed at least 275 cases that were not duplicates and that had not been cancelled by the physician involved. (Ex. 14; Ex. 4, at 62:1-65:3; Ex. 15 at PSM00006; Khatib ¶ 18.) Included among these unperformed pending procedures was at least one critical needle biopsy that a physician had ordered to assess the malignancy of a tumor. (Ex. 4, at 64:10-65:3.)

24. To address the critical issue of pending cases, Khatib directed that DIS send lists of nonduplicate pending cases to each relevant physician for verification. (Ex. 16; Khatib ¶ 18.)

25. In addition to the backlog in the CT Department, Khatib had become seriously concerned about work flow and unreliable reporting in the CT Department. (Ex. 17; Khatib ¶ 18.) In early April 2004, for example, Khatib advised the Chief Technologist:

> We continue to receive inaccurate or incomplete data during the morning report. Specifically, [the] Scheduled Request Log is inaccurate and not reflecting what is actually happening in CT. . . . The CT department is not functioning as it should and therefore causing delays in service and inefficiencies.

(Ex. 17.)

26. To address the problems in the CT Department, Khatib submitted a detailed memorandum to the Chief of the Diagnostic Imaging Service on March 31, 2004. (Ex. 11.)

27. In this memorandum, Khatib proposed that the tour of duty be changed so that each of the three technologists would work a regular eight-hour tour, fives day per week. Under Khatib's initial proposal, these tours would be staggered such that the first technologist would begin work at 7:00. The second technologist would begin at 10:30 a.m, and the third would work from 3:00 p.m. to 11:00 p.m. (Ex. 11, at WMK0030.) The objective of this staggered tour proposal was to ensure that three CT technologists would be available Monday through Friday and that the department's regular hours of operation would be extended. (Ex. 11; Ex. 13) This schedule would eliminate substantial overtime and allow additional cases to be scheduled each afternoon. (Ex. 5 66:1-19; Khatib ¶ 17.)

28. The Chief of Diagnostic Imaging, Dr. Sta Ines, endorsed a modified version of the change to the CT schedule and proposed it to the CT technologists on April 12, 2004. (Ex. 18; Ex. 19; Sta Ines ¶ 7.)

29. In addition, Khatib attempted to impose tighter reporting controls on the CT Department and directed that all patients be called the day before their scheduled appointment to avoid no-shows. (Ex. 4, at 53:5-7; Khatib ¶¶ 18-19.)

30. Khatib, in consultation with the Chief of Diagnostic Imaging, determined to implement training in CT procedures for all interested technologists and also sought to have the CT technologists trained in radiology procedures. (Ex. 20; Khatib ¶ 19; Sta Ines ¶ 8.)

31. In early 2004, a number of problems were negatively impacting the efficiency of the CT Department and a constant backlog existed. (Ex. 22, at AH0243, Ex. 21, at AH0032.)

32. the desire to increase efficiency in the CT Department motivated Khatib to change the technologists' schedule. ( Ex. 22, at AH0249.)

33. The CT technologists, Ahern, Mastalerz, and Auger, opposed the effort to switch the CT Department to a standard five-day-per-week schedule. (Ex. 22 and Ex. 21, at AH0030-32.) They objected to Khatib's plan for a number of reasons, including: "We will no longer have a day off during the week to take care of personal business so we will now need to take days off to do these things." ( Ex. 22, at AH0247.)

34. Under Khatib's proposal, Ahern's, Mastalerz's, and Auger's overtime would have been significantly curtailed. (Ex. 5, at 66:12-19; 68:5-11, 70:17-71:2.)

35. On April 22, 2004, less than ten days after being notified of the plan to modify their work schedules, Plaintiffs and several other staff employees, male and female, sent a seventeen-page memorandum to the VA Hospital administration, complaining at length about Khatib's proposed change to the schedule and his treatment of the staff technologists. (Ex. 21.)

36. In this memorandum, the authors, complain, among other things, that Khatib "places unreasonable and unrealistic expectations on all of us, seemingly setting us up to look and feel like failures." ( Ex. 21, at AH0028.) The memorandum also accuses Khatib of being disrespectful of a male doctor, Gregory Babigian, and of treating the male file room clerks "horribly." (Ex. 21, at AH0035.) The memorandum concludes by accusing Kahtib of engaging in workplace "bullying" of the entire staff. ( Ex. 21, at AH0041-42.)

37. Ultimately, the CT department's compressed tour was not changed with respect to the Plaintiffs. (Ex. 7, at 44:16-20; Sta Ines ¶ 7.) Only after all of them had left did new

technologists begin to work regular five-day per week tours. (Ex. 23, at 65:6- 66:3.)

**Contract Technologists**

38. Historically, DIS had difficulty hiring experienced technologists because "[t]he VA Hospital has a lower pay scale than the rest of the state . . . ." (Ex. 1, at 14:25-15:1.) In addition, "with the shortage of x-ray, CT, ultrasound and other techs in the country it is hard to hire techs." ( Ex. 21, at AH0041.)

39. DIS solicited applications for a GS-647-8 CT technologist in December 2003-January 2004, which went unfilled. (Ex. 24; Khatib ¶ 22)

40. In September 2003, DIS experienced an urgent need for technologists. (Ex. 7, at 112:25-113:3; Sta Ines ¶ 3.) This shortage continued into October, and in fact motivated the Chief Technologist, Joan Beaudoin, to propose to Khatib that DIS hire technologists on a contract basis. (Ex. 4, at 34:12-35:9.)

41. During Khatib's tenure as Administrative Officer, DIS hired both male and female contract technologists. (Ex. 3, at 103:10-13; Sta Ines ¶ 4; Khatib ¶ 29.)

42. The contract technologists were not federal employees of the VA Hospital and served for temporary terms. (Declaration of Emerson Joslin dated Nov. 9, 2007, at ¶ 4.)

43. The standard contract expressly stated: "Both parties agree that [the contract technologist] is not considered an employee of the **VAMC** for any purpose." (See, e.g., Ex. 25, ¶ 10.) In addition, these contract technologists did not receive any benefits from the VA Hospital, such as health insurance, sick leave, paid vacation, or retirement plan contributions. (Joslin ¶ 4; Ex. 1, at 99:9-13.)

44. The VA Hospital's Contracting Department set the salaries for the contract

technologists that the VA Hospital retained. (Joslin ¶ 5.)

45. The contract technologists came from two sources: staffing agencies on the Federal Supply Schedule, such as Staffing Now, Inc., and open market procurement. (Joslin ¶5.)

46. The Contracting Department assessed the rates established by the staffing agencies on the Federal Supply Schedule and then sought to acquire contract services at the best value obtainable. Specifically, the Contracting Department obtained comparative hourly rates for technologists from Staffing Now, Inc., Cirrus Medical Staffing LLC, and others. (Joslin ¶ 5.)

47. Beginning in 2003, the VA Hospital hired the following contract technologists:

| DIS Contract Technologists (2003-2005) | | | | |
|---|---|---|---|---|
| | | | | |
| **Name** | **Starting Rate** | **Raises** | | **Time Period** |
| Kim Lebert (F) | $40/hr | | | 3/14/03--6/16/03: then staff |
| Derek Sabourin | $30/hr | | | 3/03-9/03 |
| Scott Gray | $35/hr | | | 10/03-12/04 |
| Christopher Stokes | $30/hr | | | 9/03-12/03 |
| Christopher Stokes | 12/03 $45/hr | 10/1/04 $48/hr | 10/1/05 $50/hr | 12/03-9/06: then staff as of 1/21/07 |
| Suzette Kennett (F) | $30/hr | | | 1/04-5/05: then staff |
| Laurie Goss (F) | $30/hr | | | 6/04-12/05 |
| Clemon Allen | $35/hr | | | 6/04-6/05 |
| Germiniano Bambakakis | $35/hr | | | 7/04-4/05 |
| Charlotte McLaughlin (F) | $40/hr | | | 7/04-12/04 |
| Dayna Gardner (F) | $35/hr | | | 7/04-7/05: then staff |
| Luchino Caparas | $35/hr | 4/1/05 $40/hr | | 7/04-9/06: then staff |
| Aguinaldo DaCruz | $30/hr | | | 7/04-9/05 |
| Sherrill Hockenberry (F) | $30/hr | | | 1/05-7/05 |
| Gregory Jordan | $38/hr | | | 1/05-1/05: Left after 1 week |
| Shannon Gomez (F) | $30/hr | | | 1/05-8/06 |
| Gabriel Ferrara | $35/hr | | | 4/14/05-/23/04 |
| Timothy Jones | $30/hr | | | 11/05-8/06 |
| *Staffing Now* | $57/hr | | | 12/03-3/05 |
| Gabriel Ferrara | | | | 1/23/03-- 4/14/05 |
| Edgar Medina | | | | 1/23/04-4/23/04 |
| | | | | |
| *Cirrus Medical Staffing* | $70/hr | | | 9/05-12/05 |
| Londa Marks | | | | |

(Joslin ¶ 6.)

48. The first contract technologist that Khatib and DIS hired was a female nuclear medicine technologist, Kim Lebert, who began working in DIS in March 2003.

49. Like many contract technologists, Lebert subsequently became a staff technologist. (Joslin ¶ 6; Ex. 1, at 43.)

50. In September 2004, after returning from military deployment, Christopher Stokes, a radiology technologist with more than fifteen years of experience, contacted the VA Hospital seeking a position.

51. Khatib and the Chief of the Diagnostic Imaging Service, Dr. Sta Ines, interviewed Stokes to fill DIS's urgent need for an experienced radiology technologist. (Khatib ¶ 25; Sta. Ines ¶ 4.)

52. Stokes was hired as a contract technologist on September 15, 2003 for a ninety-day term. (Joslin ¶ 8.)

53. Stokes was paid $30 per hour, and his contract expressly stated that "payments for any leave, including sick leave or vacation time are the responsibility of [Stokes]." (Joslin ¶ 8; Ex. 25, at ¶ 10.) In addition, under the contract, the VA Hospital reserved the right to terminate the contract "for its sole convenience." (Joslin ¶ 8; Ex. 25, at ¶ 13.)

54. The Plaintiffs held permanent, career service, staff positions and received full benefits from the VA Hospital. (Ex. 1, at 97:11-13; Ex. 3, at 61:18-61:2.)

55. As with the other contract technologists that the VA Hospital hired, the Contracting Department approved Stokes's hiring after conducting an analysis of hourly rates from federal supply schedule contractors. (Joslin ¶ 8.)

56. Specifically, the Contracting Department submitted a Request for Quotes (RFQ 650-44-03), and as shown on the September 15, 2003 Abstract, the rates quoted by staffing agencies ranged from $57.36 per hour to $74.75 per hour. (Ex. 27; Joslin ¶ 8.)

57. Stokes was hired at a day-shift rate of $30 per hour, well below the prevailing agency rates. (Joslin ¶ 8.)

58. The VA Hospital subsequently renewed Stokes's contract for nine months on January 1, 2004 at $45 per hour. (Joslin ¶ 9.) In connection with this contract, the Contracting Department conducted another assessment of the hourly rates quoted by various staffing agencies and determined that Stokes's rate was $20 per hour lower than the lowest agency rate. After two subsequent contract renewals, Stokes became a staff technologist in 2007. (Joslin ¶ 9.)

59. A number of the contract technologists that DIS hired subsequently became staff technologists, including Kim Lebert, Suzette Kennett, Dayna Gardner, and Stokes. (Joslin ¶ 6.)

60. None of the Plaintiffs ever sought to resign her staff position to pursue a contract position. (See, e.g., Ex. 7, at 79:7-17; Ex. 3, at 61:14-21.)

**Departure of the Chief Technologist**

61. On June 14, 2004, the Chief Technologist, Joan Beaudoin, left DIS on extended medical leave, but did not resign. (Ex. 29, at AH0412 (24:20-22); Khatib ¶ 27-28.)

62. Following her departure, Khatib, as the Administrative Officer, took over her supervisory responsibilities. (Khatib ¶ 7.)

63. Khatib's assumption of Beaudoin's supervisory responsibilities was consistent with the practice when the Chief Technologist was on leave in DIS under Kahtib's predecessor, Joseph Crisafulli. (Ex. 4, at 104:22-105:11.)

64. Specifically, Khatib assumed responsibility for approving the technologists' annual leave and overtime. (Kahtib ¶ 7; Ex. 1, at 123; Ex. 3, at 23:11-17.) In addition, he handled disciplinary issues, promotions, approval of time cards, and performance evaluations, as well as overseeing the operation of DIS. (Khatib ¶ 7.)

65. Subsequently, Khatib delegated to Stokes the responsibility for coordinating

patient flow within DIS, because Khatib considered him an experienced, professional technologist, who had availability to take on this task. (Khatib ¶ 27.)

66. Stokes coordinated the assignment of cases, interfaced with other departments to ensure that their diagnostic imaging needs were being met, and handled other routine tasks. Stokes had no supervisory authority, reported to Kahtib, and did not receive additional compensation. (Khatib ¶ 27.)

67. In addition, Tenessa Karmozyn, a female staff technologist, also handled the responsibilities for patient flow during this period when she was available. (Kahtib ¶ 27; Ex. 30, at AH3560-61.)

68. Prior to giving this role to Stokes, Kahtib conferred with the Chief of the Diagnostic Imaging Service and the Human Resources Department and obtained approval to assign these responsibilities to a contract technologist. (Khatib ¶27; Sta Ines ¶ 9; Ex. 31, at AH3790(6:14-10:21).)

69. At the time Khatib tasked Stokes with handling flow control, Mastalerz, Auger, and Ahern had all left DIS on extended medical leave. (Ex. 1, at 116:1-13.) In June 2004, the most senior technologist in DIS was Raymond Kim and not any of the Plaintiffs. (Ex. 5, at 104:2-20; <u>see</u> 180:22-181:3.)

**<u>The Plaintiffs' Complaints about Khatib</u>**

70. In January 2004, the Plaintiffs and others met with the Chief of the Diagnostic Imaging Service to complain about Khatib's management of the department and his treatment of female employees. (Ex. 7, at 167:21-24.)

71. Subsequently, the Plaintiffs and others sent an April 22, 2004, complaint

memorandum to the VA Hospital and an August 20, 2004, letter to the Secretary of Veterans Affairs. (Ex. 21 and Ex. 82)

72. The April 22, 2004 memorandum constituted a formal union grievance under the Plaintiffs' collective bargaining agreement. (Ex. 21, at AH0027.)

73. On September 30, 2004, in response to the Plaintiffs' complaints, an outside review team commissioned by the Department of Veterans Affairs regional authority issued a report of its findings and recommendations regarding the situation in DIS. (Ex. 32.)

74. In connection with this review, a team of five individuals from outside the VA Hospital visited that site on September 22, 2004 to conduct interviews. (Ex. 32.)

75. Among other things the report concluded:

> 5. There was no apparent discriminatory behavior on the part of Mr. Khatib. There were male and female employees of varying ages, who either supported him or were nonsupportive. There were allegations that he hired his male friends on contract, however, these allegations were not substantiated as he had hired three female employees, including contract, per diem, and student employees.
>
> * * * *
>
> 8. The employees with significant longevity seemed to have grown accustomed to self managing. While there were males and females of various age groups that either endorsed his changes or opposed them, there was clearly a division between the longer-term employees and the newer ones with only one exception. The newer employees saw Mr. Khatib as having "an open door policy" and "cleaning up the department and making people accountable." They claimed that they were encouraged by the existing technologists to say negative things about Mr. Khatib and would be shunned if they did not support the current staff. However, clearly the newer employees were not invested in the old work structure, such as compressed tours of duty, and realistically had little to lose. There is no question that there is a serious morale issue among the majority of staff.

( Id. at AH0019.)

**Lynda Parker**

76. Plaintiff Lynda Parker began her employment at the VA Hospital in 2001 as a career service GS-5 technologist and worked in the radiology department. (Ex. 1, 8:25-9:24.)

77. In April 2003, on Khatib's recommendation, Parker was promoted to the position of backup angio/clinical coordinator (GS-7). (Ex. 1, at 140:6-13.) In this position, she worked three days per week in the radiology department and spent two days each week "cross-training" under the tutelage of Auger to become qualified in angiography procedures. (Ex. 9, at 29:14-30:4.)

78. By April 2004, Parker had not completed her angiography cross-training. (Ex. 1, at 34:4-14.)

79. Parker also was responsible for training student radiology interns from the Community College of Rhode Island. (Ex. 1, at 9:11-24.)

80. As part of the plan to alleviate staffing problems, Kahtib and the Chief of Diagnostic Imaging sought to cross-train interested technologists in CT procedures. (Khatib ¶ 19; Sta Ines ¶ 8.) It was, however, only feasible to fully train one technologist at a time. (Ex. 1, at 150:2-4.)

81. Khatib informed Parker that she would have an opportunity to receive CT training in due course, but that given her responsibilities as an angiography technologist and her prior commitment to angiography cross-training, she would be trained after Tenessa Karmozyn. (Khatib ¶30; Ex. 1, at 146:14-21; Ex. 33, at AH3773.)

82. Khatib and Dr. Sta Ines selected Karmozyn because she was the only interested radiology technologist not involved in other cross-training. (Khatib ¶30; Ex. 1, at 146:14-21;

Ex. 33, at AH3773.)

83. With respect to Parker's role as student coordinator, Khatib, in his capacity as Administrative Officer, met with Parker and discussed her handling of this important clinical program. (Ex. 1, at 79:12-25.)

84. In early August 2004, Parker informed CCRI that a hiring freeze was likely to be imposed at the VA Hospital and that such a freeze would negatively impact the clinical training program. (Ex. 34.)

85. Parker took this action without first discussing it with Kahtib. (Khatib ¶ 31.) As a result of Parker's actions, Khatib expressed frustration and questioned her judgment: "I am still confused as to why you would not confirm the information with us before making the presentation to the school, since this would have significant impact on the department and would change the number of students who attend our program?" ( Ex. 34.)

86. On August 4, 2004, Parker initiated contact with an EEO Counselor about Khatib, and counseling concluded on October 8, 2004. (Ex. 35.) On October 25, 2004, Parker filed a formal Complaint of Discrimination, alleging a hostile work environment, discrimination and retaliation with regard to the denial of training, and constructive discharge. Parker asserted, among other things, that in August 2004 Khatib paged her while she was at lunch, questioned her about role as student coordinator, and failed to place her in charge. (Ex. 36, at AH3509.) In addition, Parker asserted that, beginning on April 15, 2004, Khatib denied her the opportunity to train in angiography procedures and CT scan procedures. (Id. at AH 3510.)

87. Also in August 2004, Parker began seeking new employment, (Ex 1, at 12:2-8; 13:22-14;3; 48:9-13).

88. In September 2004, having secured a higher paying position and a hiring bonus, Parker resigned her position at the VA Hospital. (Ex. 1, at 153:22-154:4.)

89. Immediately upon her resignation from the VA Hospital, Parker took a full-time position at Women and Infants Hospital, which paid more than her job at the VA Hospital. (Id.) According to Parker she "did not resign form the VA until [she] had another job in place . . . ." (Ex. 1, 12:2-8.)

90. In her exit interview on September 24, 2004, Parker stated her reasons for quitting: "poor treatment from Marty – unfair conditions – preferential treatment towards contract techs." (Ex. 37, at 0062.) With respect to her relationship with Khatib, Parker stated "no communication/treated contract people better than staff." (Id. at 0063.)

91. Nowhere in her exit interview statement did Parker state that she was forced to leave her position because of harassment based on her sex or retaliation for engaging in a protected activity. (Id. at 62; Ex. 1, 55:12-22.)

92. On December 15, 2004, the Department of Veterans Affairs Office of Resolution Management issued a decision, accepting in part and denying in part Parker's complaint. (Ex. 36, at AH3513-14.) The EEO Officer concluded that Parker failed to state a claim for harassment and that Parker failed to establish that she suffered an adverse employment action with respect to her claims that Khatib improperly paged her and questioned her regarding her performance as the student coordinator. (Id. at AH3511-13.) The EEO Officer also determined that several of Parker's allegations were barred because she failed to consult an EEO counselor in a timely manner. (Id.) With respect to Parker's three surviving claims, the Office of Resolution

Management conducted an investigation and issued an Investigative Report on April 25, 2005. (Ex. 38.)

93. On March 18, 2005 the Plaintiffs initiated this lawsuit, and as a result, the Department of Veterans Affairs Office of Employment Discrimination Complaint Adjudication dismissed Parker's EEO complaint on May 5, 2005. (Ex. 89.)

94. Khatib never demoted Parker, denied her a promotion, suspended her, reduced her salary, refused her leave requests, or negatively evaluated her. (Ex. 1, at 86:9-87:12.)

95. Khatib never insulted, ridiculed, disparaged or threatened her. (Ex. 1, at 84:5-85:12.)

**Debra Auger**

96. Debra Auger began her employment at the VA Hospital in August 1991 as a staff radiology technologist. (Ex. 7, at 9:4-6.) She became an angiography technologist in July 1993, (Auger 10:16-21), and lead angiography technologist in 2002. (Ex. 7, at 11:23-24.) Subsequently, Auger also assumed responsibilities as a CT technologist. (Ex. 7, at 12.)

97. Most recently, Auger held the position of lead angiography/CT technologist, which was a grade 8 position. (Ex. 7, 27:19-29:1.)

98. She, Mastalerz, and Ahern, worked a compressed schedule that consisted of four, ten-hour days per week. On this schedule, Auger performed angiography procedures on Tuesdays and Thursdays from 7:30 a.m. to 5:30 p.m. (Ex. 7, at 36:11-38:20.) She performed CT procedures on Mondays and Fridays during those hours. (Id.) She also shared "call" responsibilities for CT scan with Ahern and Mastalerz. In addition to weekends, Auger did not work on Wednesdays. (Ex. 7, at 37.)

99. In 2003, Auger recorded approximately fourteen hours each week in overtime. (Ex. 7, at 41:20-42:13.) Her total income from overtime in 2003, was at least $15,000. (Id.)

100. On February 20, 2004, Auger received a memorandum from the Chief Technologist rebuking her for her role in improperly photographing two staff members from Roger Williams Medical Center who were visiting DIS on official business. (Ex. 39; Khatib ¶ 33-34.)

101. The actions documented in the February 20, 2004, memorandum were improper, and Auger did not dispute the memorandum. (Ex. 40, at AH3398.)

102. Beginning on June 25, 2004, Auger took two weeks of annual leave and never returned to the VA Hospital. (Ex. 7, at 34:23-35:8.)

103. On July 6, 2004, she submitted an excuse slip from her physician, stating only that

she had been evaluated for stress and anxiety disorder and been advised to remain out of work until further evaluation on July 21, 2004. (Ex. 9, at 93; Ex. 41.)

104. Khatib, who was Auger's direct supervisor at that time, consulted with the Human Resources Department and sent Auger a letter on July 8, 2004, stating that her doctor's medical note did "not provide sufficient information to approve your request for sick leave." ( Ex. 88,

Khatib ¶ 35.) The letter further requested that she furnish "acceptable medical documentation that fully illustrates your incapacitation for duty." (Ex. 88, at PDA0172, Khatib ¶ 35.)

105. To assist Auger in providing the documentation necessary, Khatib included a copy of the approved Standard for Medical Documentation. (Ex. 88, at PDA0173, Khatib ¶ 35; Ex. 23, 52:21-54:10.)

106. The July 8, 2004 letter stated that Auger would receive provisional leave until July 16, 2004 and noted that if acceptable documentation was not received, the VA hospital would not grant Auger leave and would take appropriate administrative action. (Ex. 88, at PDA0172.)

107. Auger's physician responded by providing additional documentation, and Auger's request for sick leave was granted without incident. (Ex. 42.)

108. In the past, DIS had made similar requests for verification of an employee's medical condition. For example, in February 2004, DIS pressed Dr. Gregory Babigian to obtain documentation from his physician justifying his week-long absence from work on medical leave and rejected the cursory emergency room discharge slip that he had presented. (Khatib ¶ 35.)

109. Despite being on extended leave and claiming to be unable to return to work, Auger nonetheless applied for several positions at the VA Hospital.

110. In July 2006, the VA Hospital's Human Resources Department rejected her application for a grade 10 position as a lead angiography technologist. As Tambra Holt, a Human Resources Specialist, explained to Auger at the time, the reason that the VA Hospital rejected Auger's application was that she lacked the requisite time-in-grade as a grade 9 technologist. (Ex. 44.)

111. In connection with her current claims, Auger contacted an EEO counselor on August 3, 2004 and subsequently filed a formal complaint on September 17, 2004, which she amended on January 11, 2005.[2] (Ex. 45, at AH2629.)

112. Auger's EEO complaint contained seventy-two claims, seventy of which the Department of Veterans Affairs Office of Resolution Management dismissed in a December 30, 2004 procedural decision. (Ex. 45.) Subsequently, on March 23, 2005, the Office of Resolution Management issued a final agency decision dismissing Auger's EEO complaint after Auger filed the instant civil action. (Ex. 47.)[3]

113. Auger is still employed by the VA Hospital and is on leave without pay. (Ex. 7, at 35.)

114. Khatib never denied Auger any benefits or reduced her work responsibilities. (Ex. 7, at 93:9-11; 94:12-15.)

115. In addition, Auger never received any negative evaluations or suspensions. (Ex. 7, at 94:16-20.)

116. Moreover, Khatib never threatened Auger, and he never insulted or disparaged Auger based on her gender. (Ex. 7, at 186:23-187:12; 119:7-20; 158:12-24.)

117. Khatib never altered Auger's employment while she was at the VA Hospital. (Ex.

---

[2] In 2000, Auger, Mastalerz, and Ahern filed an EEO complaint against Bruce Foster, who was the Chief Technologist in DIS at the time. (Ex. 46, at AH3061 (6:15-7:15).) Bruce Foster subsequently left the VA Hospital, and Auger, Mastalerz, and Ahern settled their complaint in July 2001. (Id.)

[3] Auger also filed a worker's compensation claim, asserting that she was disabled as a result of Khatib's treatment. This claim was denied on May 26, 2005. (Ex. 48.)

7, at 94:23-95:2.)

**<u>Eileen Ahern</u>**

118. Ahern began working at the VA Hospital in 1988. (Ex. 5, at 19.) She held the position of x-ray technologist for approximately nine years and then became a CT technologist. ( Ex. 5, at 20.)

119. Upon becoming a CT technologist, she worked with Joan Beaudoin, who was also a CT technologist at the time. (Ex. 5, at 23:6-8.) Following Beaudoin's promotion to Chief Technologist, Eileen Mastalerz became a CT technologist. (Ex. 5, at 26:1-9.)

120. Ahern was never denied leave or any promotion to which she was entitled while at

the VA Hospital, and she was never terminated or suspended. (Ex. 5, at 119:6-15.)

121. Khatib never threatened, insulted, or used profanities with Ahern. (Ex. 5, at 109:20-110:9; 189:24-190:13.)

122. On May 21, 2004, Ahern received a letter of counseling from the Chief Technologist, Beaudoin, regarding her treatment of two patients. The letter accurately described that Ahern encouraged a patient to complain about a delay that Ahern blamed on DIS policies, and the letter also chronicled how she initially refused to perform a CT procedure on another patient who did not have an appointment. (Ex. 49, Ex. 5, at168:23-169:4.)

123. The letter did not become part of Ahern's personnel file, and the Chief Technologist concluded the letter by noting, "I have full confidence that you will address these issues and resolve them without future reoccurrence." (Ex. 49; <u>see</u> Declaration of Tambra Holt dated Nov. 13, 2007, at ¶ 5.)

124. On June 18, 2004, Ahern received a letter of admonishment from Khatib for her mishandling of two emergency CT scan procedures. (Ex. 50.) Specifically, Ahern and her colleague, Mastalerz, failed to immediately contact the radiologist on duty after completing the two emergency CT procedures ("wet readings") and instead left the radiologist voice mail messages. (Id.)

125. Ahern's conduct, which came to light after an emergency room physician became concerned about the delay, compromised patient safety and was unacceptable. (Ex. 4, at 33:11-20; see Ex. 7, at 70:22-71:4; Sta Ines ¶ 14; Khatib ¶ 37; Ex. 51.)

126. In issuing the admonishment, Khatib consulted with the Human Resources Department. (Khatib ¶ 37.)

127. On June 29, 2004, Ahern took extended medical leave from DIS, (Ex. 5, at 226:9-12), and the next day, Ahern went to the beach with her friends. (Ex. 5, at 226:13-20.)

128. On August 3, 2004, Ahern initiated contact with an EEO counselor, and on September 14, 2004, she filed a complaint of discrimination alleging conduct through June 18, 2004 that purportedly gave rise to a hostile work environment. (See Ex. 52 (summarizing procedural history).) The Office of Resolution Management dismissed all of Ahern's claims as untimely because she failed to contact an EEO counselor within forty-five days of the alleged events. (Ex. 52.)

129. Ahern subsequently returned from leave on October 5, 2004, and, like her colleague Mastalerz, was temporarily assigned to complete radiology training. This training lasted less than two weeks, at which point Ahern returned to the CT Department. (Ex. 5, at 179:15-180:3; Ex. 3, at 93:17-94:7.)

130. Because Ahern did not return to DIS until October 5, 2004, the CT Department's on-call schedule had already been set for that month. (Ex. 5, at 118:7-21; see Ex. 4, at 159:24-160:12 (call schedule typically filled out "a year in advance"); Khatib ¶ 38.) Ahern, however, was returned to the on-call schedule beginning in November. ( Khatib ¶ 38; Ex. 5, at 119:2-5.)

131. Ahern again took leave from DIS in November 2004. Ahern has not resigned from the VA Hospital and remains on leave without pay. (Ex. 5, at 122:17-21.)

**Maureen Mastalerz**

132. Mastalerz joined the VA Hospital in May 1992, as a staff radiology technician. (Ex. 3, at 10:13-15; 12:8-10.) She became a CT technologist in approximately 2001. (Ex. 3, at 13:16-21.) Her last position at the VA Hospital was as a Grade 8 technologist. (Ex. 3, at 15:25-16:2.)

133. On June 21, 2004, Mastalerz, like Ahern, received a letter of admonishment for her improper conduct in connection with leaving voice mail messages for a radiologist about emergency CT scan procedures that required review. (Ex. 53.)

134. Mastalerz took extended medical leave on July 2, 2004. (Ex. 54.)

135. On September 26, 2004, she sent the VA Hospital a letter dated September 15 from her physician, stating that Mastalerz condition "had improved" and that she was able to return to work. (Ex. 55.)

136. Following this letter, the VA Hospital's Human Resources Department requested confirmation of her full recovery. (Ex. 3, at 160:2-161:10.)

137. On September 30, 2004, Mastalerz sent a letter indicating that she desired to return to work, but also noting, "I believe that under the Family Medical Leave Act you must

make Reasonable Accommodations for me." (Ex. 55.)

138. Mastalerz's counsel subsequently contacted the VA Hospital about this issue, and she returned to work on October 4, 2004. (Ex. 3, at163:18-21.)

139. On November 15, 2004, Mastalerz received a letter of reprimand, the second lowest level of discipline, for being absent without permission. (Ex. 56.) Specifically, on November 3, 2004, Mastalerz sent Khatib an e-mail stating that she intended to take annual leave because she wanted to depart work an hour and a half early the following day. (Ex. 57.)

140. Mastalerz did not indicate that she had an emergency, and she never received permission as required to take leave on November 4, 2004. (Ex. 3, at 178:15-179:8; 179:16-180:5; Khatib ¶ 40.)

141. Khatib conferred with his supervisor, Dr. Sta Ines, as well as with John Sylvia of the Human Resources Department in determining the appropriate sanction for Mastalerz. (Khatib ¶40; Ex. 58, at AH1520-21.)

142. Consistent with VA Hospital discipline policy, Mastalerz received a letter of reprimand, but no suspension, loss of pay or other adverse action for leaving her job without proper permission. (See id.; Ex. 59.)

143. Mastalerz resigned from the VA Hospital on January 3, 2005. (Ex. 60.)

144. Prior to her resignation, Mastalerz had secured a part time, per diem position as a technologist at Women and Infants Hospital. (Ex. 3, at 40:10-15.)

145. In her January 3, 2005 Record of Exit Interview, Mastalerz stated the reason for her resignation:

> [Khatib] treated the contract techs with more courtesy and respect than his VA employees. He would not listen to any ideas about improving

> the CT schedule and scheduling patients. He had his favorites. If you disagreed with him, he would get you back. He was a micromanager.

(Ex. 60, at 80.)

146. In addition, during her exit interview with the Human Resources Department, Mastalerz noted that she resigned because DIS was eliminating many of the "perks" of working at the VA Hospital, including afternoons off as a result of patient scheduling. (Ex. 61.)

147. Khatib never insulted, ridiculed, or threatened Mastalerz. (Ex. 3, at 103:22-25; 104:6-16.) In addition, Khatib never terminated, suspended, or demoted Mastalerz, and he never reduced her responsibilities at the VA Hospital. (Ex. 3, at 100:19-24; 103:14-21.)

148. Mastalerz initially contacted an EEO counselor on August 4, 2004, and on September 17, 2004, she filed a formal complaint (No. 200G-0650-2004103774). (Ex. 15, at PSM00021-22.) In her EEO complaint, Mastalerz asserted that she was subjected to specific acts of discrimination and a hostile work environment, and she cited events occurring between September 2003 and May 26, 2004. (Ex. 63.)

149. On December 21, 2004, Mastalerz provided additional documentation to the Department of Veterans Affairs Office of Resolution Management and filed a second formal EEO complaint on February 17, 2005 (No. 200H-0650-2005100871). (See Ex. 65, at AH0914.)

150. On December 22, 2004, the Office of Resolution Management dismissed Mastalerz's September 17, 2004, complaint because of Mastalerz's failure to contact the EEO counselor within forty-five days of the alleged discriminatory action. (Ex. 65, at AH0916.) Mastalerz's subsequent complaint was procedurally dismissed by the Office of Employment

Discrimination Complaint Adjudication in light of the instant litigation. (Ex. 90.)

Respectfully submitted,

JIM NICHOLSON, SECRETARY
DEPARTMENT OF VETERANS AFFAIRS

By his attorney,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Richard B. Myrus
RICHARD B. MYRUS
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: richard.myrus@usdoj.gov

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 14th day of November, 2007, I caused to be electronically filed the within Defendant's Statement of Facts as to Which There is No Genuine Dispute with the Clerk of the United States District Court for the District of Rhode Island, using the CM/ECF System. The following participant has received notice electronically:

Thomas Folcarelli, Esq.
55 Bradford Street, Suite 203
Providence, RI 02903
tfolc8@cox.net

/s/ Richard B. Myrus
RICHARD B. MYRUS
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: richard.myrus@usdoj.gov