# TABLE OF CONTENTS


I INTRODUCTION

II. FACTS

A. The VA's discriminatory hiring and systemic discrimination.

B. Equal Pay and Promotion Discrimination

C. Hostile Work Environment

D. Protected Title VII Activity and Retaliation.

E. Proposed Change in Tour and Backlog were Retaliatory.

F. September 30, 2004 Report on the DIS by the VISN

G. Other Facts of Evidence of Retaliatory Animus.

III. ARGUMENT

A. Summary Judgment Standard

B. Hostile Work Environment Standard

C. Federal Guidelines for Hiring Temporary Employees

D. Constructive Discharge

E. Ahern's EEOC complaint

F. The VA's grievance claim.

G. The VA's Illegal Hiring and use of Temporary Employees in DIS

a. The VA's Hiring of Chris Stokes was illegally motivated and illegally executed

b. The VA can show no emergency that existed in September 2003 that would allow the VA to hire Chris Stokes

c. The VA can not show that it was actively recruiting Federal employees when they hired Chris Stokes.

d. The VA was illegally motivated in hiring more male contract techs than female contract techs.

e. The VA's illegally motivated hiring practices affected the wages of the female Federal employees; male contract techs were promoted and received raises, while female contract techs salaries stagnated along with the Plaintiffs.

f. The VA was illegally motivated by hiring more male contract techs than regular female employees.

g. The VA created systemic discrimination by its hiring decision in DIS.

h. The male contract techs were illegally placed in supervisory or managerial positions over the Plaintiffs, who were female, and were Federal employees

i. The VA's discriminatory hiring practices created a hostile work environment in DIS

j. The Plaintiffs were denied promotion because of the VA's illegal use of temporary employees in management of Federal employees in DIS.

k. The decision to change the tours of duty from the compressed shifts was illegally motivated retaliation only contemplated after the January 2004 meeting that the Plaintiffs had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib.

l. The creation of the backlog as contemplated by the VA was illegally motivated retaliation only contemplated after the January 2004 meeting that the Plaintiffs had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib.

m. The pattern of increased scrutiny of the Plaintiffs work performance by Khatib was illegally motivated retaliation only contemplated after the January 2004 meeting that the Plaintiffs had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib

n. The Plaintiffs were each Constructively Discharged by the VA.

o. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in October 2003 they complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.

p. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in October 2003 they complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.

q. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in January 2004 they complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.

r. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in April 2004 they

complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.

s. Plaintiffs are entitled to Summary Judgment on whether the VA had knowledge of their gender discrimination complaints after the January 2004 meeting with Dr Sta Ines and the resultant Sta Ines memo to Khatib.

VI. CONCLUSION

## I. INTRODUCTION

This case arises out of an EEOC Title VII claim against the Providence VA Medical Center. The Plaintiffs filed EEOC with the Office of Personnel management of the VA regarding discriminatory treatment by their supervisor Mehrdad Khatib.

Each of the Plaintiffs' claims went unheeded, as they had by the VA management when they tried to complain about the discriminatory behavior at the VA. All of the Plaintiffs either received right to sue letters or their claims reached the one hundred and eighty day limit to be able to file this claim in Federal Court.

At issue are the discriminatory hiring and employment practices, which inhibited the Plaintiffs' ability to obtain equal pay and promotion, Hostile Working Environment, Retaliation for Protected Title VII activity that the Plaintiffs endured while employed at the Providence VA in Diagnostic Imaging (DIS).

Each of the Plaintiffs also alleges that as a result of the outrageous behavior by their supervisor Khatib, they have been constructively discharged from the VA.

## II. FACTS

In support of this Motion, Plaintiffs rely on the undisputed facts set forth in the Defendants' Statement of Facts to Which there is no Genuine Dispute, Defendants' supporting exhibits in the Appendix in Support of Defendants Summary Judgment Motion, and the declaration submitted therein, where they are consistent to the Plaintiffs' Statements of Facts as to which there is No Genuine Dispute.

The Plaintiffs also rely on the Plaintiffs' Statement of Facts as to which there is No Genuine Dispute in Support of the Plaintiffs' Objection to the Defendants Summary Judgment Motion and In Support of the Plaintiffs' Summary Judgment Motion, as well

as the Plaintiffs' Appendix of Exhibits in Support of the Plaintiffs' Objection to the Defendants' Summary Judgment Motion and In Support of the Plaintiffs' Summary Judgment Motion

**A. The VA's discriminatory hiring and systemic discrimination.**

Motive can be proven by statistics. Where there is an apparent discrepancy in hiring ratios compared to the normal ratio of an occupation it shows lack of accident in hiring decisions. See*: International Broth. Teamsters v. United States*, 431 US 324 (1977)

Sometime in late 2003, Lynda Parker heard Khatib say: "This is crazy, a department full of women. I want to start hiring male techs." (Parker dep. at 92)

Khatib continuously threatened Parker, Ahern, Auger and Mastalerz jobs by bringing around male employees that he said could do their jobs (Parker dep. at 78)

On September 12, 2003 Khatib wanted to hire Chris Stokes, a male, into a supervisory position vacated by another employee, but that position was not posted. (Auger dep. at 110)

Debra Auger pointed out to Khatib that if he had to post that position before filling it, and if he did post it that position, it would have been a promotion for most techs and that the regular techs would have been eligible for that position before an outsider could be hired. (Auger Dep. at 110)

Khatib did not properly requisition the position he hired Chris Stokes to under Federal Policy. He did not have enough time, and could not have shown the need in September 2003 that is contemplated by the Federal Contracting Regulations. (Auger Dep. at 110, Plaintiffs exhibit 5)

Craig Polucha testified under oath that there was no way to determine what positions were being posted in 2003. (Polucha dep. 25-26. Joslins Affidavit states that there was active recruiting in 2003. That in December 2003 there was a job posting (Joslin Affidavit).

Chris Stokes was hired September 15, 2003 as an x-ray/ angio /CT technologist (Def exhibit 26).

When Chris Stokes was hired in September 2003 there were no slots open in CT or angio, however Khatib included those positions in Stokes' contract even though Stokes was not qualified for CT. (Auger dep. at 110) Chris Stokes was not trained in CT when he was hired at the VA but he was hired partially as a CT tech (Mastalerz dep. at 116).

In September 2003, the DIS at the VA had 14 female techs and 2 male techs, or 88% female techs and 12% male techs. (Statistics compiled by using Joslins Affidavit Def. SJ memo as reference.)

The national average for radiology techs as of April 2004 was 70% female and 30% male. (Plaintiffs ex. 24)

Khatib and Marc Shaffer did all the hiring of contract techs, as evidenced by the fact it is only their names that appear on communications to the contracting officer at the VA. (Plaintiffs exhibit 28)

In 2003 and 2004, prior to the April 22, 2004 memo to the VA where the techs complain that male contract techs are treated better than the rest of the staff, Khatib hired 5 males and 2 females, or 71% male and 28% female techs. (Joslin Affidavit)

Overall, the Khatib administration hired 11 male contact techs and 7 female contract techs, or 61% male and 39% female. (Joslin Affidavit Def. SJ memo.) By September of 2004 Khatib had replaced all regular staff with contract techs (Mastalerz dep. at 49).

The greatest gain for female hiring is after the April 22, 2004 meeting between staff and the memo that resulted from that meeting. (Joslin Affidavit)
Khatib didn't start hiring female techs until the discrimination complaints against him. (Auger dep. at 85)

Only 2 females were ever hired in a capacity other than x-ray tech. Only two males were only hired as x-ray techs. (Plaintiffs exhibit 29)

Three males were hired as x-ray tech / angio / CT tech. The three male contract techs hired x-ray tech / angio / CT tech were Chris Stokes, Wes Allen, and Luchiano Capraras. (Plaintiffs exhibit 29)

Khatib hired Gabe Ferreira as a contract tech rather than hire Laurie Crafts as a VA employee (Parker dep. at 139).

**B. Equal Pay and Promotion Discrimination**

Chris Stokes and Luchiano Capraras, both males, received substantial raises while working as contract techs at the VA. (Joslin Affidavit)

Chris Stokes and Luchiano Capraras, both males, were give managerial or supervisory powers over regular employees in contravention of Federal Regulations.(Plaintiffs exhibit 5)

Khatib promoted at least two male contract techs (Parker dep. at 108-120, Plaintiff exhibit 6) Chris Stokes was placed in a supervisory position over Parker,

Masterlez and Auger. (Parker Dep. at 34) Dr. Shafer lobbied for Capraras wage increase at least in part because he was performing supervisory duties. (Plaintiff exhibit 6) Other departments at the VA knew that Chris Stokes was in charge (Parker dep. at 124)..

Khatib's preoccupation with hiring contract techs prevented the VA from improving the pay of regular employees at least by affecting their salary structure. (Auger dep. At 110-112)

**C. Hostile Work Environment**

Khatib treated men differently then women in the DIS (Beaudoin dep. at 99-100). Khatib treated the male techs differently than the female techs. (Parker dep. at 110-113). He micromanaged the female techs, particularly the Plaintiffs, and promoted the male contract techs (Parker dep. at 108-120, Plaintiffs ex.6) Chris Stokes was treated extremely favorably in DIS (Auger dep. 115-116). Beaudoin did not think Chris Stokes was a hard worker (Beaudoin dep. at 100).

Chris Stokes reported directly to Khatib, bypassing his direct supervisor Beaudoin (Beaudoin dep. at 103) Khatib told Auger that she should stop going over his head to complain to Sta Ines (Def Summary Judgment motion p71). But Beaudoin testified that Chris Stokes reported directly over her head to Khatib (Beaudoin dep. at 103).

Khatib was completely hostile and disrespectful to Auger (Auger dep. at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).

Khatib detailed a female x-ray tech in the file room and made her reorganize the file room (Parker dep. at 134).

An October 2003 Plaintiffs meeting with Sta Ines was about how male contract techs were being treated better than female techs (Auger dep. at 87).

A January 22, 2004 meeting with Sta Ines was about the disparate gender bias toward males that was prevalent in the DIS under Khatib. (Def Ex. 21)

The April 22, 2004 memo included a complaint that Khatib treated male contract techs better than the female techs. (Def. Ex. 21)

Marc Schafer helped Khatib retaliate against the Plaintiffs (Ahern dep. 110-112). Schafer was as cruel to the Plaintiffs as Khatib (Ahern dep. at 113).

Mastalerz went out on stress leave because of the stress caused by Khatib in DIS (Mastalerz dep. at 37-38).

Ahern went out on stress leave because of the environment that was created by Khatib in DIS (Ahern dep. at 198).

Auger went on stress leave because of the hostile working environment in DIS. (Auger Dep. at Plaintiffs exhibits 32,33, 34) Auger is on Social Security Disability because of the hostile working environment in DIS (Plaintiffs exhibit 32, 33, 34)

Khatib trained Chris Stokes in CT before Lynda Parker (Parker dep. at 149). Wes Allan told Lynda Parker that Khatib was not going to train her for CT (Parker dep. at 146). Lynda Parker was displace by Stokes (Plaintiffs exhibit 5)

**D. Protected Title VII Activity and Retaliation.**

In October 2003 Plaintiffs demanded a meeting with Sta Ines about how male contract techs were being treated better than female techs (Auger dep. at 87).

Complaints to superiors about disparate gender treatment are specifically protected behavior under Title VII. The October 2003 meeting with Sta Ines was protected activity under Title VII (Plaintiffs exhibit 31)

On January 22, 2004, the Plaintiffs were among others who met in Dr. Sta Ines' office. One of the subjects of that meeting was the disparate gender bias toward males that was prevalent in the DIS under Khatib. (Def. ex. 21)

Khatib physically broke up that January 22, 2004 meeting. (Parker dep. at 108)

Complaints to superiors about disparate gender treatment are specifically protected behavior under Title VII. The January 2004 meeting with Sta Ines was protected activity under Title VII (Plaintiffs exhibit 31)

Dr. Sta Ines knew that Khatib harassed the Plaintiffs. (Parker Dep. at 52, Plaintiffs exhibit 1)

On February 2, 2004, Dr. Sta Ines wrote a memo to Khatib, stating, among other things, that the staff had complained about the way he favored males above females, and that the staff felt threatened by Khatib and were afraid of retaliation by him. (Plaintiffs exhibit 1)

The February 2, 2004 memo had a directive from Sta Ines for Khatib to review the document and answer the charges. (Plaintiffs exhibit 1) Khatib was extremely angry about the February 2, 2004 memo that Dr. Sta Ines gave Khatib (Auger dep at 165-166). Khatib yelled at her about the memo (Auger dep. at 166). He said he was going to bring it to human resources (Auger dep. at 166). A week later Sta Ines rescinded the memo (Plaintiffs exhibit 2)

Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker dep. at 61-62)

**E. Proposed Change in Tour and Backlog were Retaliatory.**

Prior to March 2004, Khatib had stated to Joan Beaudoin that he thought all employees in DIS should be on the ten-hour work schedule. (Plaintiffs exhibit 16)

Khatib did not mention the change in tour from ten hours to eight hours until he had been managing the VA for almost two years. The first mention of the backlog is March 2004. (Def exhibit 13) Khatib did not mention changing shifts from ten hours to eight hours shifts until March 2004 after the February 2, 2004 Sta Ines memo. (Def. Ex. 13) Khatib had to know that the only people that would be affected by the change in tours from ten-hour days to eight-hour days were Ahern, Auger, and Mastalerz.

Khatib managed DIS for almost two years before he "discovered" the backlog. (Khatib affidavit Def. SJ Memo, Def. Exhibit 32) Khatib "discovered" the backlog after he was pressed by VA management to give a rationale for his desire to change the tour of duties for the Plaintiffs after the February 2, 2004 Sta Ines memo. (Plaintiffs exhibit Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin dep. at 65).

The backlog consisted of duplicate exams, deceased patients and no shows. (Beaudoin dep. at 43, Plaintiffs exhibit 30) Khatib forbade Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz dep. at 110). Eventually, Khatib paid Chris Stokes overtime to delete the duplicates from the backlog. (Def. exhibit 14).

Khatib's hiring of Chris Stokes instead of a regular employee for overtime to delete duplicates from the backlog was illegal decision making, in contravention of Federal Regulations. (Plaintiffs exhibit 5(c))

By June of 2004 there was not a significant backlog. The Plaintiffs presented the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern dep. at 158). Polucha, Chief of Human Resources, acknowledged that there was not a significant issue with regard to OT in CT (Polucha dep. 68-69)

**F. September 30, 2004 Report on the DIS by the VISN**

The point of the September 30, 2004 Report by the VISN was to whitewash the hostile work environment in DIS. The Report found it's villain and they said it was Dr. Sta Ines who didn't provide Khatib with enough managerial guidance. Dr. Sta Ines is a woman. (Def ex.33)

In the timeline, the report never mentioned the protected activity of October 2003 and January 2004, or the February 2, 2004 memo to Khatib from Sta Ines before it mentions the March 2004 intention to change the CT tours of duty. (Def. exhibit 33)

Ignored on the timeline of events is that on February 2, 2004, Dr. Sta Inez sent a memo with a subject of "second complaint from technical staff" to Khatib saying among other things:

1. That when Clay left last 8/15/2003 Khatib never posted his position and got a contract person, Chris, instead which is cost ineffective since contract tech is paid much more that the staff tech.
2. Complaining about Khatib's condescending manner of talking to female techs. They said Khatib treated male techs and female techs differently. They also felt

Khatib was threatening and they feared retaliation. Techs on probation were afraid to speak out or say anything because they feared retaliation.

3. Khatib's promise to get salaries raised for regular techs had been ignored by him.

Nor did the VA believe that Khatib was a good manager. The report stated that Khatib demonstrated a lack of awareness of his responsibility for the current staff unrest. The report stated Khatibs ineffective leadership and management skills have resulted in dissatisfaction among the staff. (Def. Ex. 33)

The report noted that Khatib was the cause of divisiveness in the DIS but lacked the insight to remedy it (Id.) The report recommended that Khatib receive management training and a mentor. (Id.) The report recommended that the staff receive outside counseling.(Id.)

The recommendations of the September 30, 2004 DIS report for the VA to help Khatib be a better manager were never implemented by the Providence VA (Polucha dep. 49-51)

**<u>G. Other Facts of Evidence of Retaliatory Animus.</u>**

Khatib harassed Parker on a day-to-day basis (Parker dep. at 61). Khatib and Stokes purposely altered patient flow to make Lynda Parkers job difficult (Parker dep. at 117). Khatib undermined Parker by humiliating her in front of her students and trying to send her students to do things that were not appropriate at their level of education (Parker dep. at 129).

Khatib's denial of Lynda Parker's cross training in CT and angio was an illegally motivated decision. Lynda Parker was pulled out of angio and CT and placed on the

floor for x-ray duty while Chris Stokes was trained for CT. This is against federal regulation for a contact tech to displace a regular employee.

Chris Stokes was placed in charge of Lynda Parker and although the VA denies that he had supervisory duties, Lynda Parker was present when a personnel from IRM interacted with Chris Stokes and stated "Marty told me to come see you Chris, that you're in charge now because Joan is out." (Parker dep. at 124) Lynda Parker was more qualified to act as Chief Tech because of her seniority and the fact that she was a regular VA employee. Chris Stokes should not have been managing regular employees. The VA knew this and it is pretext about whether Chris Stokes was in charge or not. Evidence that Khatib and Mark Schaefer intended to place Stokes in charge with managerial duties in contravention of Federal regulation is Mark Schaefer's Tuesday March 22, 2005 memo to Bob Joslyn requesting a raise for contract tech Lucino Capris because Capris was performing supervisory duties – again in contravention of federal regulation. (Plaintiffs ex. 5, 6)

Lynda Parker testified that she received an increased amount of scrutiny at her workplace particularly with regard to her function as an x-ray student supervisor. Khatib told her that Chris Stokes was a student instructor at Rhode Island Hospital. Thereafter, Khatib would continually harass Lynda Parker about what she was doing with the students.

It was stressful for Lynda Parker because Khatib would belittle her in front of the students and would go behind her back and assign the students to duties that Lynda did not believe they were ready for.

Lynda Parker could not even take a bathroom break without Khatib demanding where she had been or paging her overhead.

Meanwhile, his scrutiny of the male contract techs was non-existent. (Plaintiffs exhibits 7,8)

Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin dep. at 40). Khatib targeted the sick leave of Ahern and Mastalerz despite lax enforcement otherwise in DIS (Beaudoin dep. at 98-99).

Mastalerz was called into the office every week and harassed about her job performance. (Mastalerz dep. at 39) Mastalerz was called into the office with Khatib and Schaefer weekly for eight weeks and berated about her job performance. (Mastalerz dep. at 172). Khatib made Mastalerz worked 10 hour shifts without relief for lunch or breaks (Mastalerz dep. at 39) When Mastalerz came back from stress leave, Khatib would not put her back in CT and would not let her take call (Mastalerz dep. at 41). When Mastalerz came back from stress leave, Khatib staffed CT with contract techs while Mastalerz was sent to x-ray (Mastalerz dep. at 41).

Mastalerz wrote a report of contact against Marc Schaefer because he was making fun of the size of a patient's penis in front of her (Mastalerz dep. at 171).

When Ahern came back from stress leave, Khatib would not put her back in CT and would not let her take call (Ahern dep. at 178-180) When Ahern came back from stress leave, Khatib staffed CT with contract techs while Ahern was sent to x-ray (Ahern dep. at 178-180).

Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin dep. at 26-27). 82. Ahern was physically threatened by Khatib, and

believed that Khatib was going to strike her but she moved before he did (Ahern dep. at 189) Ahern, Auger and Mastalerz were reprimanded for leaving telephone messages to the call Radiologist was deliberate retaliation against them by Schaefer and Khatib (Ahern dep. 115-116).

Ahern believed that Khatib was creating a paper trail in order to terminate her. (Ahern dep. at 120) Ahern was disciplined for patient advocacy (Ahern dep. at 120). 87. While Ahern was on stress leave Khatib threatened to take administrative action against her (Def exhibit 82).

Prior to February 2004 Auger had never received discipline at the VA (Auger dep. at 66). Auger was disciplined in February 2004 for taking pictures of Bruce Foster (Auger dep. at 65).

The Bruce Foster incident occurred right after the February 2, 2004 Sta Ines memo to Khatib. (Plaintiffs ex.1) Bruce Foster was a former employee of the VA. He had been terminated from the Providence VA purportedly for falsifying records. The circumstance behind his falsifying records was that he was having a sexual relationship with a female tech at the VA hospital. In order to cover up the time they spent fornicating, he forged her name on x-ray slips to create a paper trail to account for her time. Auger, Beaudoin, Ahern, and Masterlez, among others, filed an EEO complaint against Bruce Foster for sexually hostile work environment in 2000.

The EEOC case was settled with a settlement agreement. The Plaintiffs believed the settlement agreement included that fact that Bruce Foster was not supposed to be on VA property.

In February of 2004 Khatib, who must have known Foster previously, often mused to Beaudoin and Auger about what Bruce's ideas were about the VA DIS. On or about February 19, 2004 Khatib escorted Bruce Foster and another tech from Roger Williams Medical Center around DIS at the VA. Auger reported this event to Dr. Sta Inez who said she would look into it. A few days later Khatib again escorted Bruce Foster through DIS. At that time Auger took a picture of Bruce Foster in order to prove that he had been there. Auger received a reprimand from Joan Beaudoin for taking that picture without the permission of Bruce Foster. The reprimand was initiated by Khatib and like many of the reprimands and admonishments after February 2004 was coerced by Khatib to issue the adverse action. Khatib even went so far as to write up admonishments and reprimands and make Beaudoin sign them. At least once he didn't bother to have her sign a reprimand but, instead, signed for her. (Plaintiffs ex. 18, 27) Some of these events which Khatib coerced Beaudoin into issuing reprimands to the Plaintiffs occurred when Beaudoin was not present in the hospital at the time. (Plaintiffs ex.11)

Khatib made Beaudoin discipline Auger. (Auger dep. at 65) Also, at Khatib's insistence Beaudoin disciplined Auger for an incident that she was not present for and never did (Auger dep. at 67)

Khatib removed Auger from her position as lead Angio tech and assigned her to CT five days a week (Auger dep. at 93) While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89).

## III. ARGUMENT

**A. Summary Judgment Standard**

The standard of review for summary judgment is cited in *Torres-Negron v. Merck & Co*., 052307 FED1, 06-1260, at 3 (1st Cir. 2007) Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court's order granting summary judgment is reviewed de novo, looking at the record in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor. See *Redriquez v. Smithkline Beecham*, 224 F .3d 1,4 (1st Cir. 2000). Nevertheless, the non-moving party may not rest merely upon the allegations or denials in its pleading. See *Santago-Ramos v. Centennial P.R. Wireless Corp.,* 217 R .3d 46, 53 (1st Cir. 2000). Instead, the non-moving party "must set forth specific facts showing that a genuine issue 'of material fact exists as to each issue upon which she would bear the ultimate burden of proof at trial.'" See id. (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)). The evidence presented by the non-moving party may not be conclusory allegations, improbably inferences, [or] unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co*., 896 F .2d 5,8 (1st Cir. 1990).

**B. Title VII – Hostile Work Environment Law**

The Law of Hostile Work Environment is cited in *Torres-Negron v. Merck & Co.,* 052307 FED1, 06-1260, at 3,4 (1st Cir. 2007) Title VII of the Civil Right Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Syst*., Inc., 510 U.S. 17, 21 (1993) To succeed in a hostile workplace environment claim, Plaintiffs must show: (1) that they are members of a protected class; (2) that they were subjected to unwelcome harassment; (3) that the harassment was based on their membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of their employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *O'Rourke v. City of Providence,* 235 F .3d 713, 728 (1st Cir. 2001) (citing *Faragher v. city of Boca Raton,* 524 U.S. 775, 787-89 (1998).

Each of the Plaintiffs in this case have shown: (1) that they were members of a protected class; that is, they are all woman who engaged in Title VII protected activity; (2) each of the Plaintiffs have demonstrated that they were harassed and retaliated on an almost daily basis since October 2003, but particularly after February 2, 2004; (3) the

fact that the Plaintiffs were singled out and systematically retaliated against by Shafer and Khatib after the February 2, 2004 Sta Ines memo, and soon after thereof shows that they were discriminated against because they were members of a protected class; (4) Their accounts of daily and weekly harassment and the evidence of mounting disciplinary action by the VA a pervasive and severely hostile working environment. The Plaintiffs were afraid to go to work each day because of the threatening behavior of Shafer and Khatib. It was both subjectively and objectively hostile as seven women ended up leaving the VA because of Khatib. (Beaudoin, DaCosta, Orsini, and the Plaintiffs.) (For all practical purposes it can be said that Ahern and Auger, while not yet terminated from the VA, and who linger in some type of VA limbo, probably until the result of this case, have been constructively discharged as well as Mastalerz and Parker.) Auger said that Khatib had, in ameeting, thrown down a notebook and beckoned her to fight. Orsini testified in her deposition that Khatib had almost hit her, and on that day she had had enough of his hostility and abusive ways and left the VA that very day. Ahern testified in her deposition that she believed one time that Khatib was going to strike her. He stood nose to nose with her, and had she not moved, she believed he would have hit her. Each female tech deponent talked about Khatibs hostile and threatening demeanor toward woman, as opposed to his jovial attitude toward the male contract techs. Those physical incidents are on top of the campaign of progressive discipline that Khatib initiated toward the Plaintiffs. The Plaintiffs quite reasonably perceived this behavior to be outrageously discriminatory and threatening.; (6) the VA clearly knew about the complaints and the discriminatory behavior and tried to cover it up with the September 30, 2004 VISN memo.

Although a few isolated incidents of gender animus does not establish a pervasively hostile work environment, see Herrera, 474 F.3d at 680, the pervasiveness of the hostility "is quintessentially a question of fact" and thus particularly unsuited for resolution on a motion for judgment as a matter of law, see O'Shea v. Yellow Tech. Servc., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999) (quotation omitted) (noting that summary judgment should seldom be used in employment discrimination cases).

**C. Constructive Discharge**

Constructive discharge is found where the employees' resignation was a reasonable and forseeable response to the employer's illegal conduct. *Calhoun v. Acme Cleveland Corp.* 798 F.2d 559, 561,562 (1st Cir. 1986)

Clearly the Plaintiffs decision to leave the VA (and that includes the permanent stress leaves of Ahern and Auger) is a reasonable and foreseeable consequence of the Khatib discriminatory behaviors listed in this memorandum that had been ratified by the VA.

**D. Ahern's EEOC complaint**

The EEOC that dismissed Ahern's complaint is actually the VA itself. It discounted out-of –hand Ahern's contention that the Providence VA held out Ben Werthan to be an EEOC counselor and held instead that Ahern had constructive knowledge of how to contact an EEOC counselor because they imputed constructive knowledge to her because of posters in the VA and the fact that she had previously in 2000 filed an EEOC complaint. The VA EEOC in effect held her previous EEOC activity against her, and meanwhile she was at the time of her filing a formal complaint the victim of ongoing hostile environment harassment. The VA's EEOC decision to dismiss her complaint was arbitrary and capricious and without substantial evidence on the record to substantiate the Agency decision. The VA should not be allowed to dismiss her claim without looking at the substantive illegal action on the VA's part especially considering that the discriminatory behavior was continuing on September 22, 2004. (Plaintiffs exhibit 26)

Ahern's complaints of violation will not necessarily be time barred if the claims establish a hostile environment claim, as long as all the acts are part of the same unlawful employer practice *National Railroad Passenger Corp. v. Morgan,* 531 U.S. 101, 113 (2002). (FN 3 suggests the following multifactor test from the 5th Circuit: (1) Whether the alleged acts involve the same type of discrimination; (2) whether the incidents are recurring or independent and isolated events; and (3) whether the earlier acts have sufficient permanency to trigger the employers' awareness of and duty to challenge the alleged action.)

**F. The VA's grievance claim.**

The VA argues that the April 22, 2004 memorandum to Dr. Sta Ines constitutes a formal grievance that would be an absolute bar to this litigation. The memo was in fact submitted to the union to be considered as a grievance.

The Collective Bargaining Agreement between The VA and the union states " In the event that an employee has a grievance, it shall be presented orally to their immediate supervisor within seven (7) calendar days of the act or occurrences that give rise to the grievance. ***It must be clearly identified as a Step 1 grievance or it will not be recognized as a grievance under the procedure.*** [Emphasis added] Agreement Between Veterans Administration Medical Center, Providence, RI and Local Union 1322, Laborers International Union of North America, AFL-CIO, Nonprofessional Unit; Article VIII, page 6. Arthur Jordan, Union President testified in his deposition that the union never filed a formal grievance on this issue, but that an informal process ensued as a result. (Jordan dep.)

**G. The VA's Illegal Hiring and use of Temporary Employees in DIS**

5 CFR 4.3 states that "No person shall influence another person to withdraw from competition for any position in the competitive service for the purpose of either improving or injuring the prospects of any applicant for appointment."

5 CFR 300.501 establishes that Federal Temporary Employees should be (1) used for brief or intermittent periods, (2) trained by the Temp agency, not the Federal agency, (3) used only for the temporary use of their skills when necessary, and (4) used only when there is a critical need. A critical need is defined as "a sudden or unexpected

occurrence, emergency, a pressing necessity, an exigency. A recurring cyclical peak workload, by itself, is not a critical need.

5 CFR 300.502 states that Agencies may not use temporary help for the work of managerial or supervisory positions.

CFR 300.503 states in part that Temporary Employees may only be used when one of the following short term situations exist (1) an employee is absent for a short period of time for emergency, but that does not include vacations or other circumstances which are not shown to be compelling in the judgment of the agency, or the agency must carry out work for a temporary period which in the judgment of the agency cannot be delayed because of a critical need. In any case Temporary employees may not be used (1) in lieu of regular recruitment and hiring procedures under the civil service laws for permanent employees in the competitive civil service, (2) to displace a Federal employee, or (3) to circumvent controls on employment levels.

**a. The VA's Hiring of Chris Stokes was illegally motivated and illegally executed**

The VA hired Chris Stokes on Khatibs whim. (Auger dep. at 110) Khatib wanted more men in the DIS (Parker dep. at 92) The VA did not have enough time, or show the need in September 2003 to hire Chris Stokes under Federal hiring regulations. (Plaintiffs ex. 5) Chris Stokes was illegally hired, and he was hired, at least in part, because he was male.

**b. The VA can show no emergency that existed in September 2003 that would allow the VA to hire Chris Stokes**

The VA cannot supply any memorandum that shows that there was a critical need to hire Stokes in September 2003. (Plaintiffs ex. 28.) There was no job posted or active recruiting, according to Joslin until December 2003. (Joslin Affidavit) Chris Stokes was hired in September 2003 on Khatibs whim.

**c. The VA can not show that it was actively recruiting Federal employees when they hired Chris Stokes.**

There was no job posted or active recruiting, according to Joslin until December 2003. (Joslin Affidavit) Chris Stokes was hired in September 2003 on Khatibs whim.

**d. The VA was illegally motivated in hiring more male contract techs than female contract techs.**

In September 2003, the DIS at the VA had 14 female techs and 2 male techs, or 88% female techs and 12% male techs. (Statistics compiled by using Joslins Affidavit Def. SJ memo as reference.) Khatib's illegally motivated hiring helped create a hostile work environment which drove out seven women: Beaudoin, Dacosta, Orsini, and the Plaintiffs.

**e. The VA's illegally motivated hiring practices affected the wages of the female Federal employees; male contract techs were promoted and received raises, while female contract techs salaries stagnated along with the Plaintiffs.**

Khatibs preoccupation with staffing the DIS overwhelmingly with males by hiring mostly male contract techs precluded both his recruiting Federal employees, and getting a fair wage for the Plaintffs. Khatibs illegally motivated hiring practice effectively stagnated the wages of female employees, both contract females and Federal employees, while at least two of the contract techs received substantial hourly raises.

**f. The VA was illegally motivated by hiring more male contract techs than regular female employees.**

Eileen Ahern testified that when she returned in September 2004 from strees leave ther were no regular employees left, only contract techs. That would mean that the DIS had changed from 88% more female in 2003 to 61% male in one year. The hiring of predominantly male contract tech can't be accidental.

**g. The VA created systemic discrimination by its hiring decision in DIS.**

The change in mostly female Federal employees to mostly male employees through the use of hiring male contract techs is not accidental. In April 2004 the profession was 70% female. In DIS it was somewhere around 61% male. The decision to hire the male Gabe Ferreira as a contract tech over Laurie Crafts into a permanent Federal position was not accidental, but demonstrative of the VA's gender animus. Crafts was actually more experienced for the VA since she had trained there. Khatib denied there was an open position for her but hired Ferreira instead.

**h. The male contract techs were illegally placed in supervisory or managerial positions over the Plaintiffs, who were female, and were Federal employees**

The VA admits in its Statement of facts that Stokes was doing some managerial functions. Other departments at the VA knew he was in charge. Shafer also admits in a memo that he had another male contract tech doing supervisory functions. These actions were knowingly done, and in contravention of Federal regulation.

**i.The VA's discriminatory hiring practices created a hostile work environment in DIS**

Khatib not only hired more male contract techs, but put them in supervisory capacities over the Plaintiffs, who are all female. Khatib and Stokes purposely altered Lynda Parkers work flow to make her look bad.

**j. The Plaintiffs were denied promotion because of the VA's illegal use of temporary employees in management of Federal employees in DIS.**

There was no room for promotion in Khatibs DIS for the Plaintiffs because Khatib did not post any supervisory positions while he effectively staffed those positions with contract techs. Each of the Plaintiffs were ready, willing, and able to assume the duties that Stokes was performing, and each should have been assigned to those duties under Federal regulation, before Stokes.

**k. The decision to change the tours of duty from the compressed shifts was illegally motivated retaliation only contemplated after the January 2004 meeting that the Plaintiffs had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib.**

Khatib had been managing DIS for almost two years before he came up with the idea to change the shifts of Ahern, Auger, and Mastalerz. He proposed the change in tours after disclosing to Beaudoin that he wanted everyone in DIS to be on compressed tours, and after the February 2, 2004 memo from Sta ines.

**l. The creation of the backlog as contemplated by the VA was illegally motivated retaliation only contemplated after the January 2004 meeting that the Plaintiffs had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib.**

Khatib had been managing DIS for almost two years before he came up with the backlog. Khatib was always trying to make himself look good at the expense of others. He created the backlog partially to make himself look good, and partially as pretext for why he needed to change the tours of duty for the plaintiffs. He discovered the backlog only after the February 2, 2004 memo from Sta Ines.

**m. The pattern of increased scrutiny of the Plaintiffs work performance by Khatib was illegally motivated retaliation only contemplated after the January 2004 meeting that the Plaintiffs had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib**

Prior to February 2, 2004, each of the Plaintiffs had never received any disciplinary action from the VA. After February 2004, all the Plaintiffs were either harassed by Khatib and Shafer either daily or weekly. Ahern, Auger, and Mastalerz all received some type of formal discipline after February 2004. All were initiated by Khatib, and some were administered by Beaudoin, a woman, because Khatib coerced her to do so. Beaudoin herself was harassed daily by Khatib and or Shafer.

**n. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in October 2003 they complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.**

The Plaintiffs October 2003 meeting with Sta Ines where the Plaintiffs, among other female techs complained of gender discrimination, is clearly documented, and the VA does not deny that it took place. The Sta Ines memo of February 2004, and the April 22, 2004 memos both memorialize the occurrence of this event. It is *prima fascia* protected activity under Title VII.

**o. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in January 2004 they complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.**

The Plaintiffs January 2004 meeting with Sta Ines where the Plaintiffs, among other female techs complained of gender discrimination, is clearly documented, and the VA does not deny that it took place. The Sta Ines memo of February 2004, and the April 22, 2004 memos both memorialize the occurrence of this event. It is *prima fascia* protected activity under Title VII.

**p. Plaintiffs are entitled to Summary Judgment on whether they engaged in protected activity under Title VII when in April 2004 they complained to Dr. Sta Ines that they were being discriminated against on the bases of gender.**

The Plaintiffs April 22, 2004 memo to Sta Ines where the Plaintiffs, among other female techs complained of gender discrimination, is clearly documented, and the VA cannot deny that it took place. It is *prima fascia* protected activity under Title VII.

**q. Plaintiffs are entitled to Summary Judgment on whether the VA had knowledge of their gender discrimination complaints after the January 2004 meeting with Dr Sta Ines and the resultant Sta Ines memo to Khatib.**

In October 2003 Plaintiffs demanded a meeting with Sta Ines about how male contract techs were being treated better than female techs (Auger dep. at 87).

Complaints to superiors about disparate gender treatment are specifically protected behavior under Title VII. The October 2003 meeting with Sta Ines was protected activity under Title VII (Plaintiffs exhibit 31)

On January 22, 2004, the Plaintiffs were among others who met in Dr. Sta Ines' office. One of the subjects of that meeting was the disparate gender bias toward males that was prevalent in the DIS under Khatib. (Def. ex. 21)

Khatib physically broke up that January 22, 2004 meeting. (Parker dep. at 108)

Complaints to superiors about disparate gender treatment are specifically protected behavior under Title VII. The January 2004 meeting with Sta Ines was protected activity under Title VII (Plaintiffs exhibit 31)

Dr. Sta Ines knew that Khatib harassed the Plaintiffs. (Parker Dep. at 52, Plaintiffs exhibit 1)

On February 2, 2004, Dr. Sta Ines wrote a memo to Khatib, stating, among other things, that the staff had complained about the way he favored males above females, and that the staff felt threatened by Khatib and were afraid of retaliation by him. (Plaintiffs exhibit 1)

The February 2, 2004 memo had a directive from Sta Ines for Khatib to review the document and answer the charges. (Plaintiffs exhibit 1) Khatib was extremely angry about the February 2, 2004 memo that Dr. Sta Ines gave Khatib (Auger dep at 165-166). Khatib yelled at her about the memo (Auger dep. at 166). He said he was going to bring it to human resources (Auger dep. at 166). A week later Sta Ines rescinded the memo (Plaintiffs exhibit 2)

**VI. CONCLUSION**

The Plaintiff believes that the above Law, statements and facts are sufficient to show that there are many issues that cannot be decided by Summary Judgment but that must be decided by the arbiter of fact.

The Plaintiffs also believe that they have presented issues of their own that lend themselves to Summary Judgment in their favor.

For the reasons herein stated the Plaintiffs pray that this Honorable Court Deny the Defendants Motion and grant the Motion of the Plaintiffs.

Respectfully Submitted,
Plaintiffs
By Their Attorney,

/S/ Thomas E. Folcarelli
Thomas E. Folcarelli #6393
Attorney for the Plaintiff
55 Bradford Street, Suite 203
Providence, RI 02903
401.521.1828
Fax: 401.274.2480

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on this 7th Day of January, 2008, I caused a true copy of the within Assented-To Motion for Extension of Time to Answer the Defendant's Motion for Summary Judgment to be electronically filed with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System. The following participant has been noticed electronically:

Robert Clarke Corrente
United States Attorney; and:
Richard M. Myrus, Esq.
Assistant U.S. Attorney
Attorney for the Defendant
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
richard.myrus@usdoj.gov

/S/ Thomas E. Folcarelli