**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND**

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,

v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

**APPENDIX OF PLAINTIFFS EXHIBITS IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT FOR SUMMARY JUDGMENT FOR THE PLAINTIFFS**

**VOLUME 1 OF 3**

**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND**

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,
v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

**APPENDIX OF PLAINTIFFS EXHIBITS IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT FOR <u>SUMMARY JUDGMENT FOR THE PLAINTIFFS</u>**

Plaintiffs Exhibits: number and discription

1. February 2, 2004 memo from Sta Ines to Khatib
2. February 9, 2004 Sta Ines memo to Khatib
3. Report of Contact Babagian where Khatib signs for St Ines
4. Babagian note April 21, 2004 witnessing Auger's stress
5. Selected Federal employment regulations
   a. 5 CFR 4.3 Prohibition against securing withdrawal from competition
   b. 5 CFR 300.301 use of Private Sector Temps
   c. 5 CFR 300.502 Coverage
   d. 5 CFR 300.503 Conditions for Using Private Sector Temps
6. March 22, 2005 memo from Shafer to Joslin
7. E-mails and letters of concern about temp Ferreira not following VA policies, August 2004
8. Ferreira hiring email February 8, 2005
9. April 20, 2004 letter from Auger to the union about changing tours of duty

10. Auger June 3, 2004 letter to Sta Ines complaining about removal
11. May 21, 2004 counseling letter from Beaudoin to Ahern
12. March 15, 2004 memo from Khatib to Beaudoin mentioning pending CT exams
13. April 12, 2004 memo from Khatib to Beaudoin
14. August 12, 2004 memo Holt to Khatib
15. April 14, 2004 memo from Holt to Khatib about shift change
16. April 2, 2004 memo from Khatib to Beaudoin about shift change
17. April 14, 2004 memo from Khatib to Beaudoin about backlog
18. June 18, 2004 Admonishment to Ahern signed by Khatib for Beaudoin
19. Reports of contact on October 2004 on Ahern by Allen, Khatib, and Shafer
20. August 19, 2004 memo from Khatib to Holt about on-call techs
21. November 15, 2004 Reprimand from Khatib to Mastalerz
22. April 29, 2004 memo from Cabral to Stokes
23. March 23, 2004 memo from Auger
24. Radiology Today Vol. 5, No. 9, P.24, April 26, 2004
25. Parker Letter of Resignation from September 13, 2004
26. November 3, 2004 Report of Contact
27. Polucha answers to Augers OWCP investigator, December 29, 2005
28. E-mails related to the hiring of contract or temporary employees in DIS
29. Excerpts of temporary employees contracts
30. May 19, 2004 memos from Sta Ines to Providers about no-shows
31. EEOC standard for Protected Activity and Retaliation
32. Dr. Gupta letter to OWCP for Auger

33. Dr. Curran August 26, 2005 report on Auger

34. Social Security Disability Acceptance Notice for Auger

**PLAINTIFFS EXHIBIT 1**

**Department of Veterans Affairs**

# Memorandum

Date: February 2, 2004

From: Chief, Diagnostic Imaging Service (114)

Subj: Second Complaint from Technical Staff

To: Marty Khatib, Administrative Officer (114)

Diagnostic imaging technologists requested to meet with me regarding the stressful working conditions and hostile work environment in DIS. That particular day the technologists felt so stressed out that they all felt like quitting all together.

Issues raised at that meeting:

1. Staffing

a. With Helena leaving, Ann sick with back problems, there were only two techs, Thursday January 22, 2004. That day you pulled a Nuclear Tech to cover X-ray leaving one Nuclear Tech alone in Nuclear, which is a safety, issue because patients are being left alone.

b. Bare minimum staff without any lee way for sick calls/or vacation. Too much overtime due to lack of adequate staffing and tech feel physically exhausted and are forced to come in even when they feel sick because of staff shortage. Techs are complaining of back problems, knees hurting since there is not enough staff to help out with the patients so it also becomes a safety issue.

c. When Clay left last August 15, 2003, you never posted his position and got a contract person, Chris, instead which is cost ineffective since contract tech is paid much more than the staff tech.

d. Not enough techs to cover the students. There should be one tech per student. If the school finds out there will be a big problem and we could lose the school affiliation.

e. They feel you think cross training is the answer and you don't seem realize that you don't have enough techs for that to work. Techs feel your solution for short staffing is like putting temporary bandages – stick this one here and there just for today. Techs go without lunch or breaks but contract person gets his breaks and lunches everyday.

f. Despite Chief Tech's and CT, US techs protest, ~~Marty~~ you assigned scheduling of patients to CT and US techs. This is becoming a problem because CT techs are too busy with their day-to-day schedules and emergencies from ER, ICU and the floors and simply have no time to do the scheduling. Complaints from Pulmonary Service and some providers about the ineffective scheduling is now becoming a problem.

2. Your condescending manner of talking to female techs. You treat male technologist and female technologist differently. They also feel you are threatening and technologists fear retaliation from you. Techs on probation are afraid to speak out or say anything because they fear retaliation.

3. You keep promising to look into getting salaries changed and a tech has offered to do all the work of re-doing all the job descriptions to try to get upgrades up to par with the outside but nothing has been done about this since summer.

4. You said X-ray techs are a dime a dozen which is an insult to the techs and they feel really insulted by this statement.

5. Techs feel that you are putting too much emphasis on the future and not enough on the present. You want to have new CT Scanner, MRI, Pet Scanner, etc. Techs feel you needs to address current multiple issues in the department and get the department in better order first. Your first concern should be to have a solid unified department with adequate staffing rather than risk losing the remaining staff that ~~you~~ we have.

6. They feel you are unreasonable with your expectations of the staff. You used to complain that not enough patients were being done in CT or X-ray. Now you decided to have techs schedule their own patients and do more patients in a day as well. You have unrealistic expectations for all areas considering the current number of staff in each area.

After carefully reviewing the above, please respond to these issues.

CSInes, M.D.

CASIMIRA STA. INES, M.D.

**PLAINTIFFS EXHIBIT 2**

# Department of Veterans Affairs

# Memorandum

**Date:** February 9, 2004

**From:** Chief, Diagnostic Service (114)_

**Subj:** Memorandum dated February 2, 2004

**To:** Marty Khatib, Administrative Officer (114)

**Thru:**

Specialty and Acute Care Service Line Manager (111)
Ghief of Staff (11)
Medical Center Director (00)

On February 2, 2004, you were given a memorandum that although not prepared by me, was reviewed and signed by me. I am forwarding this memorandum as a final document that shall fully retract the February 2, 2004 memorandum in its entirety. In retrospect, I realized that the appropriate method of dealing with the contents of the February 2, 2004 memo was to document the information in the form of a report of contact. If the document that I signed created a perception that the content was deemed factual by me, that was not my intent. No personal response from you is required.

Below, please find a summary of the information allegedly discussed in the meeting that took place with some of the technologists. It should be our (Joan, myself and you) collective responsibility as the management team for DIS to address the accuracy and validity of the issues raised. Issues were:

1. Cross training
2. Existing Vacancies
3. Staff Shortage
4. Scheduling
5. Work Environment
6. Salaries
7. Equipment acquisition
8. Expectations

We will work together to resolve any issues and continue the numerous improvements that have occurred since your arrival. I look forward to your continuing support.

Sincerely,

CASIMIRA STA. INES, M.D.

Automated VA FORM 2105

**PLAINTIFFS EXHIBIT 3**

REPORT OF CONTACT

On February 23, 2004 you informed me that you were involved in a traffic accident and would not be able to come to work for the entire week. I informed you at that time you must bring a letter from your physician justifying your absence from February 23,2004 through February 27, 2004.

On March 1, 2004 you reported to work with discharge instructions from the Emergency Room that is insufficient to justify your one-week absence.

On Friday March5, 2004 you were contacted by telephone and a request was made to you to bring the doctor's letter by Monday March 3, 2004. To date you have failed to produce the necessary documentation that would justify your absence during the week of February 23, 2004 through February 27, 2004. Also, on March 5, 2004 during our telephone conversation, I informed you that you had failed to dictate the Angiography case done on Thursday March 4, 2004. This action has a potential of creating delay in service and care of patient. Your response during the call was to hang up the phone. Also during the same telephone conversation, I informed you that there were numerous studies that were not verified by you. Although you stated you would verify these reports remotely during the weekend, you failed to follow up on the verification of reports on that day.

It has been brought to our attention that on March 8, 2004 you made threatening comments regarding potential "lawsuit" to Dr. Mark Shafer. According to Dr. Shafer he felt threatened and extremely uncomfortable by your behavior.

On March 10,2004 a meeting was attempted in my office with my Administrative Officer. It was noticed that you brought a tape recorder to the meeting intending to tape record the contents of the meeting. Upon our objection to this conduct by you stated that you would terminate the meeting if it could not be taped and that you were advised to tape the meeting by your attorney. You further used inappropriate, threatening and unprofessional remark by pointing and stating to the Administrative Officer to "Shut Up". Moreover, your behavior created a very uncomfortable situation.

Marty Khlin for Dr. Ste. Tres

Chief, Diagnostic Imaging Service Date

AH1747

**PLAINTIFFS EXHIBIT 4**

April 21, 2004

To Whom It May Concern,

I have worked with Debi Auger very closely for 2 ½ years and thus feel confident that I can comment on her personality, character and recent emotional states.

Ms. Auger is of sound character and normally keeps tight control over her emotions, especially in the presence of others, friends and strangers alike. It is hard to imagine the magnitude of her emotional distress to find her crying with all abandon at work. These episodes all have a common etiology – they were preceded by direct or indirect perceived harassment by radiology administration.

Within the past two months I have found Ms. Auger crying in solitude twice and once witnessed her break down sobbing and moaning in such anguish it was difficult not to commiserate . I recall the last episode vividly. She had just been told by a co-worker that radiology administration plans to remove her from Special Procedures to CAT scan and change her hours from 10 hour days to 8 hour shifts. Essentially this changes her whole job and she was very upset.

If I can be of further assistance, don't hesitate to contact me.

Sincerely,

Gregory V. Babigian, M.D.

**PLAINTIFFS EXHIBIT 5**

# § 5 CFR 4.3

## Code of Federal Regulations

**TITLE 5--ADMINISTRATIVE PERSONNEL**

**PART 4--PROHIBITED PRACTICES (RULE IV)**

**5 CFR 4.3 Prohibition against securing withdrawal from competition.**

---

**5 CFR 4.3 Prohibition against securing withdrawal from competition.**

CHAPTER I--OFFICE OF PERSONNEL MANAGEMENT

No person shall influence another person to withdraw from competition for any position in the competitive service for the purpose of either improving or injuring the prospects of any applicant for appointment.

[28 FR 10024, Sept. 14, 1963, as amended at 45 FR 4337, Jan. 22, 1980]

---

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

exhibit 1

**§ 5 CFR 300.501**

**Code of Federal Regulations**

**TITLE 5--ADMINISTRATIVE PERSONNEL**

**CHAPTER I--OFFICE OF PERSONNEL MANAGEMENT**

**5 CFR 300.501 Definitions.**

**5 CFR 300.501 Definitions.**

PART 300--EMPLOYMENT (GENERAL)

Subpart E--Use of Private Sector Temporaries

For purposes of this subpart:

(a) A temporary help service firm is a private sector entity which quickly provides other organizations with specific services performed by its pool of employees, possessing the appropriate work skills, for brief or intermittent periods. The firm is the legally responsible employer and maintains that relationship during the time its employees are assigned to a client. The firm, not the client organization, recruits, tests, hires, trains, assigns, pays, provides benefits and leave to, and as necessary, addresses performance problems, disciplines, and terminates its employees. Among other employer obligations, the firm is responsible for payroll deductions and payment of income taxes, social security (FICA), unemployment insurance, and workers' compensation, and shall provide required liability insurance and bonding.

(b) Private sector temporaries or outside temporaries are those employees of a temporary help service firm who are supervised and paid by that firm and whom that firm assigns to various client organizations who have contracted for the temporary use of their skills when required.

(c) Parental and family responsibilities are defined in OPM issuances and include situations such as absence for pregnancy, childbirth, child care, and care for elderly or infirm parents or other dependents.

(d) A Federal supervisor of Federal employees is defined in 5 U.S.C. 7103(a)(10) as an individual employed by an agency having authority in the interest of the agency to hire, direct, assign, promote, reward, transfer, furlough, layoff, recall, suspend, discipline, or remove employees, to adjust their grievances, or to effectively recommend such action, if the exercise of the authority is not merely routine or clerical in nature but requires the consistent exercise of independent judgment * * *

(e) A critical need is a sudden or unexpected occurrence; an emergency; a pressing necessity; or an exigency. Such occasions are characterized by additional work or deadlines required by statute, Executive order, court order, regulation, or formal directive from the head of an agency or subordinate official authorized to take final action on behalf of the agency head. A recurring, cyclical peak workload, by itself, is not a critical need.

(f) A local commuting area is defined in part 351 of this chapter.

[54 FR 3766, Jan. 25, 1989, as amended at 66 FR 66710, Dec. 27, 2001]

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database

§ 5 CFR 300.502

Code of Federal Regulations

TITLE 5--ADMINISTRATIVE PERSONNEL

PART 300--EMPLOYMENT (GENERAL)

5 CFR 300.502 Coverage.

# 5 CFR 300.502 Coverage.

CHAPTER I--OFFICE OF PERSONNEL MANAGEMENT

Subpart E--Use of Private Sector Temporaries

(a) These regulations apply to the competitive service and to Schedules A and B in the excepted service.

(b) Agencies may not use temporary help services for the Senior Executive Service or for the work of managerial or supervisory positions.

[61 FR 19510, May 2, 1996]

---

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

§ 5 CFR 300.503

**Code of Federal Regulations**

**TITLE 5--ADMINISTRATIVE PERSONNEL**

**CHAPTER I--OFFICE OF PERSONNEL MANAGEMENT**

**5 CFR 300.503 Conditions for using private sector temporaries.**

---

**5 CFR 300.503 Conditions for using private sector temporaries.**

PART 300--EMPLOYMENT (GENERAL)

Subpart E--Use of Private Sector Temporaries

An agency may enter into a contract or other procurement arrangement with a temporary help service firm for the brief or intermittent use of the skills of private sector temporaries, when required, and may call for those services, subject to these conditions:

(a) One of the following short-term situations exists--

(1) An employee is absent for a temporary period because of a personal need including emergency, accident, illness, parental or family responsibilities, or mandatory jury service, but not including vacations or other circumstances which are not shown to be compelling in the judgment of the agency, or

(2) An agency must carry out work for a temporary period which cannot be delayed in the judgment of the agency because of a critical need.

(b) The need cannot be met with current employees or through the direct appointment of temporary employees within the time available by the date, and for the duration of time, help is needed. At minimum, this should include an agency determination that there are no qualified candidates on the applicant supply file and on the reemployment priority list (both of which must provide preference for veterans), and no qualified disabled veterans with a compensable service-connected disability of 30 percent or more under 5 U.S.C. 3112, who are immediately available for temporary appointment of the duration required, and that employees cannot be reassigned or detailed without causing undue delay in their regular work. In instances where a need is foreseeable, as when approval of employee absence is requested well in advance, an agency may have sufficient time to follow the temporary appointment recruiting requirements, including veterans' preference found in 5 CFR part 316 to determine whether qualified candidates are available by the date needed and for the length of service required.

(c) These services shall not be used:

(1) In lieu of the regular recruitment and hiring procedures under the civil service laws for permanent appointment in the competitive civil service, or

(2) To displace a Federal employee.

(3) To circumvent controls on employment levels.

(4) In lieu of appointing a surplus or displaced Federal employee as required by 5 CFR part 330, subpart F (Agency Career Transition Assistance Plan for Displaced Employees) and subpart G

(Interagency Career Transition Assistance Plan for Displaced Employees.)

[54 FR 3766, Jan. 25, 1989, as amended at 61 FR 19510, May 2, 1996; 66 FR 66710, Dec. 27, 2001]

---

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

**PLAINTIFFS EXHIBIT 6**

**Joslin, Emerson (Bob)**

**From:** Shafer, Mark
**Sent:** Tuesday, March 22, 2005 5:06 PM
**To:** Joslin, Emerson (Bob)
**Subject:** increase in pay for Luchino Capras

Luchino Caparas has been an invaluable member of the staff. He is the true leader among the technical staff. I have been able to give him multiple roles in the department including:

Daily overseeing general radiology staffing. NOT ALLOWED TO SUPERVISE STAFF ONLY & VOLUNTEERS
Verification of proper processing of images and cases in general radiology. — FUNCTION
Daily review of the incomplete list to assure that images are delivered to the radiologists in a timely manner. — FUNCTION
Trained in Bone density and he is ready to lead that clinic. FUNCTION
Accepted the responsibility of point of contract for the department in "off-hours" — NOT ALLOWED
Keeps the overall schedule of the technical staff. —
Represents the department in the construction committee for the new CT scanner. FUNCTION

He was the manager of a Radiology departments ~~while~~ in the Navy. This experience has given him the skill to step up and into the roles vacated by the absent Chief Technologist and to some extent the role of AO.

His initial pay level at $35/hr is just above the rate I would give a new graduate. His level of skills and his proven value to this department makes me seek an adjustment to his pay scale to $45/hr. This would recognize his accomplishments in the department and would appropriately re-inverse him for his level of work.
Involved

Mark Shafer,
Associate Chief, DIS

FUNCTIONAL INCREASE

$40 only

**Joslin, Emerson (Bob)**

**From:** Shafer, Mark
**Sent:** Tuesday, March 22, 2005 5:06 PM
**To:** Joslin, Emerson (Bob)
**Subject:** increase in pay for Luchino Capras

Luchino Caparas has been an invaluable member of the staff. He is the true leader among the technical staff. I have been able to give him multiple roles in the department including:

Daily overseeing general radiology staffing.
Verification of proper processing of images and cases in general radiology.
Daily review of the incomplete list to assure that images are delivered to the radiologists in a timely manner.
Trained in Bone density and he is ready to lead that clinic.
Accepted the responsibility of point of contract for the department in "off-hours"
Keeps the overall schedule of the technical staff.
Represents the department in the construction committee for the new CT scanner.

He was the manager of a Radiology departments while in the Navy. This experience has given him the skill to step up and into the roles vacated by the absent Chief Technologist and to some extent the role of AO.

His initial pay level at $35/hr is just above the rate I would give a new graduate. His level of skills and his proven value to this department makes me seek an adjustment to his pay scale to $45/hr. This would recognize his accomplishments in the department and would appropriately re-inverse him for his level of work.

Mark Shafer,
Associate Chief, DIS

**PLAINTIFFS EXHIBIT 7**

**Laborde, Jane**

**From:** Yanish, Joseph
**Sent:** Thursday, August 05, 2004 6:00 PM
**To:** Laborde, Jane; Gunn, James M.; Joslin, Emerson (Bob)
**Subject:** RE: Staffing now FYI

Jane,

VA Police confirmed that Mr. Ferrara received his ID this afternoon.

After discussing this with Jim Gunn, I want to be careful to emphasize that DIS management did not orient this employee sufficiently. A letter is still a good idea, but I want to make sure the tone does not point the finger at Staffing Now as being solely responsible. I can work with you to word the letter appropriately if Jim Gunn agrees.

Thanks for your prompt assistance today.

Joe

-----Original Message-----
**From:** Yanish, Joseph
**Sent:** Thursday, August 05, 2004 3:19 PM
**To:** Laborde, Jane; Gunn, James M.
**Cc:** Erickson MD, Allan; Sta. Ines, Casimira; Khatib, Mehrdad; Smith, Joseph R. Bedford VAMC; Joslin, Emerson (Bob)
**Subject:** RE: Staffing now FYI

Jim/Jane,

On Friday July 9, 2004 I found a computer terminal in DIS logged on to Gabriel Ferrara. I asked other staff in DIS who he was and I was told he was a contract radiologic technologist, but he was not on duty. He apparently had left the terminal on, open to his e-mail account, when he finished his shift on July 8, 2004. This is in violation of our hospital policy on information security.

When I was in DIS again a week later, I encountered Mr. Ferrara and I had a conversation with him as well as his supervisor (Mr. Mehrdad Khatib) about the importance of computer security and that he should never leave a terminal logged on to his e-mail account. During that meeting, I noticed he was not wearing a photo identification badge. All staff that treat patients, including contract staff, are required to wear a photo identification badge.

I have called Mr. Ferrara 3 times over the past 3 weeks to inquire about the status of his badge. Each time he has claimed that no one is at the police office when he has gone there. I explained to him that he would not be allowed to work at this facility until he secured a photo ID badge and I immediately contacted A&MMS (James Gunn and Jane LaBorde).

I believe a letter should go to the manager of his company, Staffing Now, about these incidents. I have asked Dr. Sta Ines and Mr. Khatib to make sure this individual receives his ID badge today, and to make sure he does not treat patients here again until he does so.

Thank you. Please let me know if you need any further information.

-----Original Message-----
**From:** Laborde, Jane
**Sent:** Thursday, August 05, 2004 2:48 PM
**To:** Yanish, Joseph
**Subject:** Staffing now FYI

Pete Bienvenue is no longer the manager at this company.
The new rep. is Moira Hagan.

Jane LaBorde
Contract Specialist
( 401) 457-3033 FAX ( 401) 457-3079
830 Chalkstone Ave
Providence, RI 02908-4799

DEPARTMENT OF VETERANS AFFAIRS
Veterans Affairs Medical Center
830 Chalkstone Avenue
Providence, RI 02908-4799

August 5, 2004

Staffing Now Inc
MS Moira Hogan
699 Boylston Street
Boston, MA 02116

Subj: V650P-3751 Gabriel Ferrara

Dear MS Hogan,

This letter is to inform you that Gabriel Ferrara has violated a JCAHO requirement that medical staff must wear identification when treating patients.. Three times Mr. Ferrara has been approached about the mandatory requirement to wear a VA nametag during work hours. To this date he is noncompliant. On another occasion, Mr. Ferrara was logged onto the medical center computer and left work without logging off. This is a violation of VA hospital information security policy.

This is unacceptable under our contract and needs to be immediately corrected. Failure to correct this can result in Mr. Ferrara's termination from the contract. Please ensure that Mr. Ferrara complies with our mandatory policies.

If you have any questions please contact me at (401) 457-3033.

Sincerely,

Jane LaBorde
Contracting Officer

**PLAINTIFFS EXHIBIT 8**

**Joslin, Emerson (Bob)**

**From:** Moira Hagan [mhagan@staffingnow.com]
**Sent:** Tuesday, February 08, 2005 3:21 PM
**To:** emerson.joslin@med.va.gov
**Cc:** Stephanie Hanna

Hello Bob,

It was a pleasure to speak with you. I am so happy to hear that after almost a year, Gabe is finding a permanent home. After the March 31, 2005 contract expires with Staffing Now, please feel free to hire Gabe Ferrara at no additional cost to the VA Hospital. If there is anything I can do in the meantime to make this transition easier for yourself, please feel free to contact me.

Thanks again,

*Moira Hagan*
Branch Manager
Staffing Now
699 Boylston Street
One Exeter Plaza
Boston, MA 02116
617-451-5900
mhagan@staffingnow.com

**PLAINTIFFS EXHIBIT 9**

Date: April 20, 2004

From: Debi Auger, RT(R)(CV)(CT)

Subj: Change of Compressed Work Schedule Grievance

To: Union 1322

To Whom It May Concern:

I am submitting this letter as documentation of formal grievance due to the attempt of Diagnostic Imaging Administration to change my tour of duty from a compressed work schedule of 10 hour days to an 8 hour per day tour of duty.

Once compressed work schedules have been established, the agency must negotiate over a determination not to continue that schedule. Compressed work schedules cannot be unilaterally terminated under the management rights provisions. The termination of these schedules must be negotiated. The determination to remove me from a compressed work schedule was not negotiated with the Union.

Also, by the Federal Employees Flexible and Compressed Work Schedules Act of 1982, Federal and Compressed Work Schedules Law indicates that the agency is expected to consider a less drastic alternative to termination of compressed work schedules. I do not feel alternatives have been considered because any ideas I attempted to put forward to help the problem causing management to make this decision were not seriously considered or implemented.

I would also like it taken into consideration that I made the decision to accept my position based on a specific set of circumstances: that the job was first shift hours, my tour of duty was 7:00am – 5:30pm with designated day(s) off, and I was responsible to cover on-call hours along with the other two CT technologists. The changes that DIS is attempting to make are life-altering and completely change the terms under which I accepted this position.

Sincerely,

Debi Auger, RT(R)(CV)(CT)

Gave to Steve Fiorv
23 Apr 04

**PLAINTIFFS EXHIBIT 10**

Date: June 3, 2004

From: Debi Auger, RT(R)(CV)(CT)

Subj: Grievance of Position Description Change

To: Casimira Stalnes, MD

Dr. Stalnes,

I am submitting this letter to you as documentation and grievance notification due to the fact that the DIS Administrator, Mehrdad Khatib, has made statements noting his intention to change my job. It is unclear at this point whether he will be formally or informally making these changes. However, being that the end result will be the same, I am unhappy with his intentions and wish to grieve this issue.

We had a discussion on February 19, 2004 about my concern that Mr. Khatib intended to change my job and the reasons I was so concerned. This issue came up again on April 13, 2004 after Eileen had a meeting with DIS Management about the CT schedules. She informed me that during that meeting Mr. Khatib told her he intends to put me in CT 5 days per week (once the CT tours of duty are changed). I did not pursue a grievance at that time because the information would have likely been considered hearsay.

During our meeting in Human Resources today about the proposed changes to the CT tours of duty, Mr. Khatib made statements confirming my belief that he intends to change my job. He explained as part of the discussion of the changes in CT that he intends to take me out of Angio and have Lynda Parker cover this area. It appears that he intends to do this on a regular and quite possibly permanent basis. After he made these statements, I told him that now he was looking at changing my whole job and he cannot just do that. I am sure you recall this exchange as you were present for this meeting along with Alan Korolenko, John (from HR), Arthur Jordan, Anna Rounds, John Cruz, Mr. Khatib and myself.

My position is a combination of CT Technologist and Lead Angio/Interventional Technologist. The amount of time I spend performing duties in CT makes CT grade-determining for my PD. Angio has been considered a lesser grade job (even though other Lead Angio Technologists are a grade 9). Because I function as the Lead Angio/ Interventional Technologist and have complete responsibility for coordination of patient care for this section, this has always been considered my primary responsibility. I am board certified in both modalities. As you know, I am not currently in CT full-time due to the fact that I do not wish to give up my career in Angio/Interventional. I have had two

opportunities to change my career to be a full-time CT Technologist here and did not wish to do so. I still do not wish to do so.

I resent the fact that Mr. Khatib seems to feel he can make decisions about my career with no regard to the impact it will have on myself or my patients. I have spent many years working in Angio and I do an excellent job in that area, routinely going above and beyond what is required. I enjoy the Angio/Interventional work I do and do not wish to give up this part of my career. Also, there is noone fully trained or ready in any way to take over my work in this area and coordinate care for these patients.

You and I have worked together over the years since my current job was created in order to utilize my abilities in the best interests of our patients. We have worked hard to ensure coordination of quality patient care in this area and to make this easily accessible to clinicians. I hope that we can resolve this issue without the need to pursue further action.

Debi Auger, RT(R)(CV)(CT)

Debi Auger, RT(R)(CV)(CT)

cc: Arthur Jordan
Union 1322

**PLAINTIFFS EXHIBIT 11**

AUG. 5. 2004 3:20PM

Department of
Veterans Affairs

# Memorandum

DEFENDANT'S EXHIBIT NO. 64 FOR IDENTIFICATION DATE: 8-1-07 RPTR:

PENGAD 800-631-6989

Date: May 21, 2004

From: Chief Technologist (114)

Subj: Counseling Letter

To: Eileen Ahern (114)

On May 18, 2004, several incidents occurred. In one case, Mr. Florio indicated to Mr. Khatib that you encouraged him to complain to DIS management and the patient advocate. You stated to the patient that management's booking policy was the cause of the delay of CT appointments.

On the same date, Mr. Larkin reported to the front desk with no scheduled appointment. Although this was a scheduling error you responded to the scheduling clerk that you could not do the exam because you already had a 4:30 appointment and not to send him back to you. You did not contact me first to determine if the scheduling issue could be resolved. As it turned out, the patient's scan was completed.

In the case of Mr. Florio, your discussion with patients concerning internal hospital issues was inappropriate. In the case of Mr. Larkin, I would have expected you to accommodate him on your own as you have in the past. However, even if you did believe this was problematic, you should have contacted me to help resolve the issue. Although I recognize that CT is very busy, this type of communication with patients could impact negatively on patients, the department and the medical center.

As I have indicated to you in the past, I am available to assist you in resolving issues. If I am not here, Mr. Khatib and Dr. Sta. Ines are available.

Should incidents like this reoccur appropriate administrative action would be taken. However, I have full confidence that you will address these issues and resolve them without future reoccurrence.

Joan Beaudoin

JOAN BEAUDOIN, RTR

Joan was NOT in the Hospital the day this Happened.

VA FORM MAR 1989 2105

AH2419

C2

**PLAINTIFFS EXHIBIT 12**

**Beaudoin, Joan**

---

**From:** Khatib, Mehrdad
**Sent:** Monday, March 15, 2004 8:16 AM
**To:** Beaudoin, Joan; Khatib, Mehrdad; Shafer, Mark; Sta. Ines, Casimira
**Subject:** CT Backlog

Joan,

We need to prepare a report regarding the pending exams. As you know, I have been asking for the number of pending exams for each modality for our morning report. You have consistently provided what appears to be an under count of the actual pending exams. My understanding is that you were counting actual slips and not utilizing the electronic pending exams option.

Once I discovered that such an option was available, we came up on the extensive list of actual pending studies that are waiting to be seen. If I am leaving any details out please add to the above information, otherwise I will include the above text in my report.

Also, I have spoken with Elaine Robinson regarding the need to get the CT scheduling process in order and to do so quickly. I am surprised that you delegated the task to Eileen after it was decided that this should be overseen by you directly. Please ensure that Elaine has the information she needs to get the CT schedule in order.

Also, Mahdi has contacted me and as we were very pleased with his performance while he was here, I have asked him to start today and assist Elaine in researching the CT backlog. Please let me know if you have any questions. Thanks

Marty

---

pending exams according to requests.

Not pending requests in computer

AH0777

122



AH0777

PLAINTIFFS EXHIBIT 13

**Beaudoin, Joan**

| | |
|---|---|
| **From:** | Khatib, Mehrdad |
| | Monday, April 12, 2004 11:36 AM |
| | Beaudoin, Joan; Khatib, Mehrdad; Shafer, Mark; Sta. Ines, Casimira |
| **Cc:** | Stokes, Christopher; Karmozyn, Tenessa M. |
| **Subject:** | CT back log |
| **Follow Up Flag:** | Reply to All |
| **Due By:** | Monday, April 12, 2004 5:00 PM |
| **Flag Status:** | Flagged |

EP/10

Joan,

Please confirm today that the CT back log project is being followed through by identifying the existing patients. Chantal should be booking the cases for 2004 to the current date. My suggestion is that the team who is assigned with the research (Tenessa and Chris) work on this from 4pm to 8 pm daily for one month starting immediately. Also, they can cover the OR alternatively if there are cases and this should be confirmed today. You can also announce the extra hours to other technologists who are interested in the extra OR hours, however, this should be confirmed by close of business today.

Moreover, We must start an aggressive cross training program of all interested technologists into CT. I will make the announcement and will include you on the email.

Finally, Chris thinks he can bump his leave back for two weeks which will give us the four weeks we need to get through identifying all the CTs from 2000. Also, please ensure that you are current on the status of all patients who are scheduled, cancelled, rescheduled or pending on the CT requests. This is vital in our effort to catch up. Please let me know if you have any questions. Thanks

...rty

AH0807



152

AH0807

**PLAINTIFFS EXHIBIT 14**

exhibit 16

**Holt, Tambra**

**From:** Holt, Tambra
**Sent:** Thursday, August 12, 2004 3:57 PM
**To:** Khatib, Mehrdad
**Cc:** Sylvia, John
**Subject:** RE: CT TOUR CHANGE

Marty, I reviewed the information you sent us regarding the tour change. Our request to change the tour of duty needs to establish that the schedule causes an adverse agency impact based upon the totality of the evidence presented. As a result, we need to provide specific data regarding impact. Can you provide the specific data:

1. How many exams do we perform per year with the existing schedule?

2. How many exams could we perform with the staggered shifts?

3. How does the existing schedule adversely impact the agency? Any financial impact on the agency, patients, etc?

4. What about specific data regarding delays in providing care? Is there a backlog in scheduling exams? If so, what is the number? Are we not meeting VISN/VA performance standards? If so, what are the statistics?

5. Do you know the number of exams that were being scheduled when the Compressed Work schedule was first implemented? What is the number of exams now and anticipated number of exams in the years to come based upon are continuing enrollment of veterans?

6. How will the change in schedule specifically benefit the patients, agency, coverage, etc?

7. The cost of overtime for this year is only $3,200 compared to last year's $32,240. Why the change?

Specific data will help us enhance our chances of the board ruling in our favor.

I will be on annual leave next week but if you can respond by the 20th, I will review it when I get back. I will then contact Joel Arnold and Lisa Shamirian for their input and advice. After their review, we will then forward it to the Federal Service Impasse Panel.

> -----Original Message-----
> **From:** Khatib, Mehrdad
> **Sent:** Wednesday, July 28, 2004 11:35 AM
> **To:** Holt, Tambra; Sylvia, John
> **Subject:** CT TOUR CHANGE
>
> Attached please find the tour change justification draft. Please let me know if you have any questions. Thank you.
>
> Marty
>
> << File: CT Tour Justification.doc >>

1. How many exams do we perform per year with the existing schedule?

Per our Workload report for Fiscal year 2003, 5203 CT exams were performed.

2. How many exams could we perform with the staggered shifts?

At a minimum, the new staggered shift with 8-hour tours can increase the volume by 10-15%. This is now a documented fact using our current data that is acquired since the contract technologists started.

3. How does the existing schedule adversely impact the agency? Any financial impact on the agency, patients, etc?

- Existing schedule causes delay in service to inpatients, as the operating hours are too short. Causes delay in our turnaround time of reports to providers, as patients' CT exams are not completed in a timely manner. This applies to inpatients and outpatients.
- There are frequent incidences of overtime as the operating hours are complete by 5:30 p.m.
- Staff ends up working alone on many occasions due to vacations; sick calls and family care events. Working alone causes additional fatigue to the employee and increases delays to the patients and the operation, as one person is unable to maintain the same level of efficiency.

4. What about specific data regarding delays in providing care? Is there a backlog in scheduling exams? If so, what is the number? Are we not meeting VISN/VA performance standards? If so, what are the statistics?

- The delays can be traced to inpatients that are discharged prior to completing their CT exams and this is documented on numerous occasions (Note: Documentation available)
- Outpatient backlog can be traced directly to the short operating hours as it has been documented to as much as six weeks. (Note: Documentation available)
- Note: VISN performance standard with respect to wait times must be inquired further

5. Do you know the number of exams that were being scheduled when the Compressed Work schedule was first implemented? **DO WE KNOW WHEN COMPRESSED TOUR STARTED? I CAN RUN A REPORT TO ANSWER THIS QUESTION.**

   a. What is the number of exams now and anticipated number of exams in the years to come based upon are continuing enrollment of veterans?

***FY04 Year to date data indicates that we have already surpassed the fiscal 2003 workload at 5543 CT exams between Oct 2003 and August 13, 2004. Clearly with a significant increase in volume, our only option is to extend our operating hours through staggering of shifts which will require all three technologists here every day, five days a week. If volume increases at this rate, which we fully expect it will because of addition of a faster CT unit this December, we should reach the 6000 CT exams or a 20% increase from last fiscal year, by end of this fiscal year.***

6. How will the change in schedule specifically benefit the patients, agency, coverage, etc?

Patients will have better access and lesser wait times due to the extended operating hours, which will create additional appointment slots each day.

- There will be less call back, standby and overtime charged to the agency as the department will be staffed later into the evening especially between the hours of 6pm and 8pm when emergency calls are most frequent.
- The response time to the emergencies will increase, as the CT personnel will be here until 8pm versus having to travel to the Medical Center, thus a quicker turnaround time of reports to the emergency room will result.
- Workflow will become more efficient as there will always be at least two technologists available and attending to patients for most of the day versus the frequent risk of having only one technologist available during sick calls, vacations and family care periods.

7. The cost of overtime for this year is only $3,200 compared to last year's $32,240. Why the change?

I am recalculating the OT for this fiscal year, as the previous number was unusually low. I will provide it ASAP.

**PLAINTIFFS EXHIBIT 15**

## Polucha, Craig

| | |
|---|---|
| **From:** | Khatib, Mehrdad |
| **Sent:** | Thursday, April 14, 2005 1:01 PM |
| **To:** | Lima, Cassandra |
| **Cc:** | Burney, William; Polucha, Craig; Holt, Tambra; Shafer, Mark |
| **Subject:** | CT tour change Justification |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| **Attachments:** | CT Tour Justification II.doc |

Dear All,

Below please find answers to the questions posed by Bill Burney that we have finally had an opportunity to respond to.

- The overtime figure for 2004 shows $3200. Should this be $32,000? In FY 03 it was over $33,000. If it dropped to $3200 for 04, what are the reasons and how does this affect your proposal?
- ***RESPONSE: Data is only available from payroll due to extended leave status of the CT staff. Diane Vincent will provide this information via email to all.***

- What is the current number of available CT exam slots with the 10 hour shifts? How many slots will be available using your proposed staggered 8 hour shift schedule?
- ***RESPONSE: There are 40 (15 minute slots. Note: Basic appointment is a 15 minute slot. Some exams may require more than one 15 minute slot based on the protocol, i.e. with contrast etc.) The new model of extended operating hours will provide 50 (15 minute slots). Note: Given the current volume, this number of appointment slots is required if we are to avoid a backlog of CT appointments, delay in timely access and service to a critical modality and overtime.***

- How did we complete all the exams that occurred after 5:30 p.m. during July, August and September --- overtime, call-backs, contract employees???
  ***RESPONSE:*** ***For the months of August, September and October 2004, there were a total of 154 Catscan exams performed after 5:30pm. Significant numbers of these patients were emergency cases. Specifically, 38 CT exams were performed on an emergency basis while 37 CT exams were on inpatients and 79 CT exams were performed on outpatients. For additional details please see page 2 of the attached draft.***

- If we claim to be a 24/7 CT operation, how is it staffed? How many exams do we do or do we get requests for after 8:00 p. m. and on the weekends? How are these covered?
- ***RESPONSE: Current cut off for an appointment is 5p.m. The new***

***extended operating hours would allow a cut off of 8pm for the last appointment. Key issue is that there are significant requests between the hours of 5pm and 8pm that cannot be covered without overtime, call and typical delays associated with such processes. Specifically, the technologist must either return from home to perform the exam or stay late and work overtime. Moreover, the radiologists leave at 4:30 pm which will cause additional delay in the reporting of the results. Extended operating hours for the radiologists consistent with the CT schedule through staggered tours is highly recommended.***

- What has changed (workload?) in the past year or so that makes the 10 hour shifts no longer acceptable? Were they ever effective? Why or why not?
- ***RESPONSE: They were probably never effective. High volume, 24/7 CT operations require CT techs to be present in the form of 8 hour tours that are staggered and are 5 days a week with call coverage for the nights and weekends. Given our current volume which has increased significantly (please see draft for details), coupled with the need to have sufficient appointment slots to avoid a back log in CT and a timely response to inpatient and emergency cases, above mentioned format is required.***

- How are we dealing with the possible leave abuse practices that you imply?
- ***RESPONSE: Unfortunately, I believe our attempt to take appropriate action including oversight and accountability in the CT section led to the sick out by the Chief Technologist and the CT Technologists.***

- How will emergency leave affect the proposed plan? What happens if the early or late tech calls in sick? How is this different than the situation created with the current 10 hour shifts?
- ***RESPONSE: In the event that the 7am CT technologist is sick, the cross trained X-ray technologist can step in and perform the necessary exam until the later CT technologist arrives. This question raises an important point and highlights the significance of cross training the x-ray technologists within the department which is currently under way.***

- I think if you include a little more information regarding the number of requests for CT scans, the average waiting time, the current and projected backlog, the number of available slots for exams, etc. and compare the current schedule with your proposal, it should become apparent why the change is necessary for patient care purposes.

Please let me know if you have additional questions. Thank you.

Marty