**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND**

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,

v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

**APPENDIX OF PLAINTIFFS EXHIBITS IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT FOR SUMMARY JUDGMENT FOR THE PLAINTIFFS**

**VOLUME 2 OF 3**

**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND**

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,

v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

**APPENDIX OF PLAINTIFFS EXHIBITS IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT FOR SUMMARY JUDGMENT FOR THE PLAINTIFFS**

Plaintiffs Exhibits: number and discription

1. February 2, 2004 memo from Sta Ines to Khatib
2. February 9, 2004 Sta Ines memo to Khatib
3. Report of Contact Babagian where Khatib signs for St Ines
4. Babagian note April 21, 2004 witnessing Auger's stress
5. Selected Federal employment regulations
    a. 5 CFR 4.3 Prohibition against securing withdrawal from competition
    b. 5 CFR 300.301 use of Private Sector Temps
    c. 5 CFR 300.502 Coverage
    d. 5 CFR 300.503 Conditions for Using Private Sector Temps
6. March 22, 2005 memo from Shafer to Joslin
7. E-mails and letters of concern about temp Ferreira not following VA policies, August 2004
8. Ferreira hiring email February 8, 2005
9. April 20, 2004 letter from Auger to the union about changing tours of duty

10. Auger June 3, 2004 letter to Sta Ines complaining about removal
11. May 21, 2004 counseling letter from Beaudoin to Ahern
12. March 15, 2004 memo from Khatib to Beaudoin mentioning pending CT exams
13. April 12, 2004 memo from Khatib to Beaudoin
14. August 12, 2004 memo Holt to Khatib
15. April 14, 2004 memo from Holt to Khatib about shift change
16. April 2, 2004 memo from Khatib to Beaudoin about shift change
17. April 14, 2004 memo from Khatib to Beaudoin about backlog
18. June 18, 2004 Admonishment to Ahern signed by Khatib for Beaudoin
19. Reports of contact on October 2004 on Ahern by Allen, Khatib, and Shafer
20. August 19, 2004 memo from Khatib to Holt about on-call techs
21. November 15, 2004 Reprimand from Khatib to Mastalerz
22. April 29, 2004 memo from Cabral to Stokes
23. March 23, 2004 memo from Auger
24. Radiology Today Vol. 5, No. 9, P.24, April 26, 2004
25. Parker Letter of Resignation from September 13, 2004
26. November 3, 2004 Report of Contact
27. Polucha answers to Augers OWCP investigator, December 29, 2005
28. E-mails related to the hiring of contract or temporary employees in DIS
29. Excerpts of temporary employees contracts
30. May 19, 2004 memos from Sta Ines to Providers about no-shows
31. EEOC standard for Protected Activity and Retaliation
32. Dr. Gupta letter to OWCP for Auger

33. Dr. Curran August 26, 2005 report on Auger

34. Social Security Disability Acceptance Notice for Auger

**PLAINTIFFS EXHIBIT 16**

**Beaudoin, Joan**

**From:** Khatib, Mehrdad
**Sent:** Friday, April 02, 2004 2:12 PM
**To:** Beaudoin, Joan
**Cc:** Sta. Ines, Casimira
**Subject:** RE: 10 hour days

Joan,

I am confused! For sometime, you had indicated that you felt the CT tour should be changed to eight hours. You also indicated that call does not have to be consecutive which resolves the 12 day stretch. You are now indicating that you feel in your judgment the backlog can be resolved with the existing 10 hour tour. Please provide specifics as to how we can resolve the backlog issue with the current schedule and without more overtime. Thank you

Marty

-----Original Message-----
**From:** Beaudoin, Joan
**Sent:** Tuesday, March 23, 2004 8:41 AM
**To:** Khatib, Mehrdad
**Subject:** 10 hour days

Marty, after much consideration, I am in favor of keeping the ten hour days in CT.

1. Utilizing all the appointment slots available will help to reduce the backlog.
2. Call can become very busy on weekends, and without a day off this could mean a 12 day stretch
3. Preventive maintenance done on evenings or weekends will open up more appt. slots.

It is possible to reduce the back log and ensure that CT is fully booked with the present system. However, I will of course support any decision that DIS management decides upon that will utilize our resources and improve patient care.

He told me in beginning that he felt the whole department should be on ten hr days

AH0796

141



AH0796

**PLAINTIFFS EXHIBIT 17**

**Beaudoin, Joan**

| | |
|---|---|
| **m:** | Khatib, Mehrdad |
| **t:** | Wednesday, April 14, 2004 9:02 AM |
| **To:** | Beaudoin, Joan; Khatib, Mehrdad; Shafer, Mark; Sta. Ines, Casimira |
| **Cc:** | Stokes, Christopher; Karmozyn, Tenessa M.; Parker, Lynda |
| **Subject:** | CT Backlog |
| **Importance:** | High |
| **Follow Up Flag:** | Reply to All |
| **Due By:** | Wednesday, April 14, 2004 5:00 PM |
| **Flag Status:** | Flagged |

Joan,

In an effort to ensure coverage in CT, please implement this plan for cross training the technologists effective immediately. I would suggest scheduling non contrast patients for this Saturday and spacing them out (45 minutes apart) so the process is not rushed. All three technologists who are interested (Lynda, Chris and Tenessa) could come in on overtime for an all day training session. You should initiate the training yourself to ensure that you are familiar with the protocols. Please let me know if you have any questions. Thanks

Marty

AH0809

154



AH0809

**PLAINTIFFS EXHIBIT 18**

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

exhibit 14

In Reply Refer To: 650/114

June 18, 2004

Eileen Ahern
Diagnostic Imaging Service (120)
VA Medical Center
Providence, RI 02908

SUBJ: Admonishment

1. You are admonished for the following reasons:

(1) On May 18, 2004 at approximately 11:14am you completed an emergency CAT Scan on Patient R2554 ordered by Dr. Curioso in the Emergency Room. When you completed the procedure, you were aware that your coworker left a voice message with the CAT Scan physician of the day Dr. Shafer who reads the findings of the exam and submits his findings to the physician who ordered the exam. You did not intervene and contact Dr. Shafer personally nor did you contact another Radiologist to report your completion of the emergency CAT Scan. Dr. Curioso called Dr. Sta Ines, Chief, Diagnostic Imaging Service (DIS) approximately one hour after you completed the procedure inquiring as to the results of the exam. Dr. Sta Ines immediately read the exam and provided Dr. Curioso with the results. (a) You are charged with failure to personally contact a Radiologist upon completion of an emergency CAT Scan procedure. (b) You are charged with causing a delay in an emergency CAT Scan being read by a Radiologist.

(2) On May 18, 2004 at approximately 11:45am you completed an emergency CAT Scan on Patient A8848 ordered by the Emergency Room. When you completed the procedure, you were aware that your coworker left a voice mail message with the CAT Scan physician of the day Dr. Shafer. You did not intervene and contact Dr. Shafer personally nor did you contact another Radiologist to report your completion of the emergency CAT Scan. At approximately 1:00pm Dr. Shafer returned to his office and checked his voice mail and found that your coworker had left a message for him explaining that the emergent CAT Scan of the head had been completed. Dr. Shafer then went to the CAT Scan section and discovered the CAT Scan had not been read by a physician. (a) You are charged with failure to personally contact a Radiologist upon completion of an emergency CAT Scan procedure. (b) You are charged with causing a delay in an emergency CAT Scan being read by a Radiologist.

AH1953

(3) On or about May 1, 2004 you began the practice of leaving voice mail messages with the physician of the day, when you or your coworker completed emergency CAT Scan procedures. You are charged with altering service procedures without alerting your supervisor or service chief.

2. A copy of this admonishment will be placed in your Official Personnel Folder. You may, if you wish, make a written reply in explanation of your conduct. If you do, it will also be placed in your Official Personnel Folder.

3. This admonishment may remain in your folder for 2 years or it may be withdrawn and destroyed after 6 month, pending entirely on your future behavior and attitude.

4. This letter may be used in determining an appropriate penalty if further infractions occur. You were previously counseled by letter dated May 21, 2004 for inappropriate behavior.

5. If you believe this admonishment is unjustified, you may appeal the action under the negotiated grievance procedure. Your grievance must be submitted through me not later than seven (7) calendar days after you receive this admonishment. For further information about the negotiated grievance procedure, you may consult John Sylvia, Personnel Management Specialist, of the Human Resources Management Office at extension 3505.

[signature] for Joan Beaudoin

JOAN BEAUDOIN
Chief, Technologist

I have received the original of this letter.

Employee Refused to sign 6-18-04

Signature Date

AH1954

**PLAINTIFFS EXHIBIT 19**

## REPORT OF CONTACT

1. I was informed on October 13, 2004 via an email dated October 8, 2004 that Eileen Ahern copied documents titled Log of Scheduled Procedures ("logs") for Catscan containing confidential patient information.
2. On October 14, 2004, I interviewed Wes Allen, CT technologist regarding this matter and ascertained the following. Eileen Ahern questioned him on Wednesday, October 6, 2004 as to why he was storing the 'logs" in the department. On October 7, 2004 Wes inquired from Eileen as to why the folder containing the above-mentioned documents was removed from the department. Eileen responded that she took it to copy and would return the originals when done with duplicating the records.
3. On October 9, 2004, Wes noticed that Eileen returned what appears to be the original "logs" back to CT.
4. I asked Wes to confirm whether all the records are actually returned.

10.15.04

Marty Khatib

Report of contact
Date: 10/19/04

People present:

Eileen Ahern
John Cruz
Marty Khatib
Mark Shafer

Eileen was asked by Marty about the Daily CT Log Sheets. Eileen admitted taking the logs and moving them into a "draw" in the CT suite. She stated that she never removed the documents from the department. She stated that she did not copy them and that she only took them to "look" at them.

Eileen also incorrectly stated that these documents were only used by the techs and was only needed for several days. She also stated that the logs were routinely destroyed only after a couple of days. Both these statements were false and these documents were routinely used by management to follow workload. The logs were routinely saved.

She was then asked to clarify why she did not produce the sheets immediately upon when Wes Allen told her that he needed the logs to document his work. She did not directly answer the question of why they were missing for two day but reiterated that she did not remove the documents. She stated that she had just moved the Logs.

When asked directly weather there were copies of the logs she replied that she did not know if there were copies and that she could not remember exactly what she did on October 6th, 7th, and 8th of 2004. She then stated that she could not remember exactly what she did last week.

Faced with a clarification question by Marty, she again stated that she did not know if there were copies of the logs and she could not remember the exact details of that week.

Eileen then exited my office and returned several minutes later stating that she could not continue with the questions without her lawyer.

She then returned to work in Cat Scan.

Mark Shafer, M.D.

REPORT OF CONTACT

1. On October 6, 2004, Wes Allen was questioned by Eileen Ahern as to the whereabouts of the Logs of Scheduled Patients in CT. Wes replied that I am keeping them with the October records pointing to the injector.
2. Eileen asked what for, to which Wes answered they are records for my supervisors.
3. Eileen said that I am going to make copies of these and proceeded to pick them up.
4. Next day on October 7, 2004, the log records were still gone from the department. Wes inquired as to whereabouts of the records to which Eileen replied: I will get them back.
5. Next day on October 8, 2004, Wes noticed that the records were brought back to the box next to the printer. Wes placed the logs in the same spot next to the injector.

Wes Allen

[signature] 10-15-04

**PLAINTIFFS EXHIBIT 20**

**Holt, Tambra**

**From:** Khatib, Mehrdad.
**Sent:** Thursday, August 19, 2004 11:20 AM
**To:** Holt, Tambra; Sylvia, John
**Cc:** Khatib, Mehrdad; Shafer, Mark; Sta. Ines, Casimira
**Subject:** FW: On Call Techs

FYI, please note info below in red as part of our documentation for comparison with other sites. Point is two CT techs are performing 25 to 27 exams per day. I'll get the details of their operation and include this on my response to Tammy's questions.

Marty

-----Original Message-----
**From:** O'Connor, Nancy K
**Sent:** Thursday, August 19, 2004 10:20 AM
**To:** Khatib, Mehrdad
**Subject:** RE: On Call Techs

25-27

-----Original Message-----
**From:** Khatib, Mehrdad
**Sent:** Wednesday, August 18, 2004 5:30 PM
**To:** O'Connor, Nancy K
**Subject:** RE: On Call Techs

curious! How many CT exams per day? Thanks

Marty

-----Original Message-----
**From:** O'Connor, Nancy K
**Sent:** Monday, August 16, 2004 3:01 PM
**To:** Sarosky, Karen; Ferro, Marc; Smith, Carl R. (SPO); McClendon, Sandra P. VHABIL; VHA 115 Radiology Chief Tech/Admins
**Subject:** RE: On Call Techs

In Marion: (Diagnostics)
1 tech 730-4
3 techs 800-430
1 tech 300-1130pm
call rotates with everyone 1130pm-730am
Sat and Sun 24/7
***(CT):***
***1 tech 730-400***
***1 tech 800-430***
***call rotates between the 2...430pm-730 am***
***Sat and Sun 24/7***

-----Original Message-----
**From:** Sarosky, Karen
**Sent:** Monday, August 16, 2004 1:28 PM
**To:** Ferro, Marc; Smith, Carl R. (SPO); McClendon, Sandra P. VHABIL; VHA 115 Radiology Chief Tech/Admins
**Subject:** RE: On Call Techs

Rad dept hours of operation:
7Am - 8pm Mon - Fri on call 8pm - 7am
Sat & Sun - 8am - 4:30pm on call 4:30 pm - 8am
3 shifts
7A - 3:30pm - 1 tech
8-430 - 4 techs

Noon - 8pm - 1 tech

Ct techs on call - 5pm - 7am Mon - Friday
Sat & sun 24/7

-----Original Message-----
**From:** Ferro, Marc
**Sent:** Monday, August 16, 2004 12:45 PM
**To:** Smith, Carl R. (SPO); McClendon, Sandra P. VHABIL; VHA 115 Radiology Chief Tech/Admins
**Subject:** RE: On Call Techs

1 tech on 0000-0800. DRT call covers 1700-0800 "just in case" as well.

-----Original Message-----
**From:** Smith, Carl R. (SPO)
**Sent:** Monday, August 16, 2004 12:39 PM
**To:** McClendon, Sandra P. VHABIL; VHA 115 Radiology Chief Tech/Admins
**Subject:** RE: On Call TEchs

1 on-call tech. No official back-up. I carry a pager 24/7 'just in case'.

Carl Smith
Supervisor
Diagnostic Imaging

-----Original Message-----
**From:** McClendon, Sandra P. VHABIL
**Sent:** Monday, August 16, 2004 7:20 AM
**To:** VHA 115 Radiology Chief Tech/Admins
**Subject:** On Call TEchs
**Importance:** High

Information Needed

We have 2 shifts in x-ray that are only staffed with 1 technologists. During those shifts, we have 1 back-up tech on call. I would like to know how other facilities provide back-up coverage when a shift is staffed with only 1 tech. Do you have no tech on call, 1 tech on call, or first call tech with a second call tech?

Thanks for your input....

**PLAINTIFFS EXHIBIT 21**

exhibit 18

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

November 15, 2004

In Reply Refer To: 650/114

Maureen Mastalerz
Diagnostic Imaging Service (114)
VA Medical Center
Providence, RI 02908

SUBJ: Reprimand

1. You are Reprimand for the following reasons:

(1) On November 3, 2004 at 11:55am you sent an email to your supervisor requesting annual leave on November 4, 2004 from 4:00pm to 5:30pm. Your supervisor never approved your leave request. You never verbally followed up with your supervisor. On November 4, 2004 you left the Medical Center at 4:00pm. (a) You are charged with AWOL (Absent Without Official Leave) for 1.5 hours on November 4, 2004 from 4:00pm to 5:30pm. (b) You are charged with failure to follow proper leave requesting procedures.

2. A copy of this reprimand will be placed in your Official Personnel Folder. You may, if you wish, make a written reply in explanation of your conduct. If you do, it will also be placed in your Official Personnel Folder.

3. This reprimand may remain in your folder for 3 years or it may be withdrawn and destroyed after 2 years, pending entirely on your future behavior and attitude.

4. This letter may be used in determining an appropriate penalty if further infractions occur. You were previously counseled by letter dated May 21, 2004 for inappropriate behavior. On June 17, 2004 you received an admonishment for failing to personally contact a Radiologist upon completion of an emergency CAT Scan procedure and for causing a delay in an emergency CAT Scan being read by a Radiologist and for altering service procedures without altering your supervisor or service chief.

5. If you believe this reprimand is unjustified, you may appeal the action under the negotiated grievance procedure. Your grievance must be submitted through me no later than seven (7) calendar days after you receive this reprimand. For further information about the negotiated grievance procedure, you may consult John Sylvia, Human Resources Specialist, of the Human Resources Management Office at extension 3505.

[signature]

MEHRDAD KHATIB
Administrative Officer, Diagnostic Imaging Service

I have received the original of this letter.

Employee Refused to sign 11-16-04

Signature Date

**Mastalerz, Maureen**

**From:** Mastalerz, Maureen
**Sent:** Wednesday, November 03, 2004 11:55 AM
**To:** Khatib, Mehrdad
**Cc:** Robinson, Elaine
**Subject:** 11/4/04 using al

Marty

I need to leave at 4:00pm tomorrow so I will be using 1.5 hrs of annual leave thank you, Maureen

11/19/04

Re: reprimand for being awol

I feel that this is reprisal for taking stress leave during the summer and for the EEO suit against Mr. Khatib.

Since I came back to work 10/04/04, he has me come to Dr Sta Ines's office every week, complaining about the things I have done or the things I haven't done. I do not like speaking to Mr. Khatib. I feel intimidated, nervous and anxious when I am around him.

On 11/4/04, I sent Mr. Khatib an e-mail on outlook telling him I had to leave early the next day. I would be using 1.5 hours of annual time. I also put a leave request into the computer. I checked outlook the next day 11/5/04 and Mr. Khatib had read my e-mail.
I also told Eileen, my co-worker that I would be leaving and I checked the ct schedule. There was one patient scheduled at 4:30 pm. I asked Brittney to go to ct at around 4:00pm as I had to leave early. I left a 4:05pm. Mr. Khatib came looking for me at 4:10pm. If he did not read the e-mail, how did he know to look for me at 4:10pm? I've also noticed since that day, Mr. Khatib has been coming down to ct around in the late afternoon. I believe this is to establish a pattern that he always comes to see what's Happening. I believe Mr. Khatib knew I was leaving from reading the e-mail and set me up for this awol reprimand. Again, why was I not given a verbal reprimand or warning?? Why do I have all these letters in my file and yet have never received a verbal warning on anything I have done??

The policies that Mr. Khatib is always referring to are murky and very vague and not even in writing. How can I follow a policy that I was never told about?? He changes the policies to suit his purposes. I can never ask questions about a policy to better understand it if I don't know it or I've never signed to say I understood it.

Another complaint I would like to see straightened out is this. Mr. Khatib comes into the ct room while I am with patients starting and IV or explaining the exam and starts talking about lunches or who's on call or what time is call in front of the patient. I believe I've received a counseling letter for discussing department issues in front of patients. Why doesn't Mr. Khatib receive a counseling letter for this?? He will probably be verbally counseled, a choice I was never given. Just another letter in my file to go up the ladder to terminate me.

MM

**PLAINTIFFS EXHIBIT 22**

MailMan message for AUGER,DEBRA A. RADIOLOGY SERVICE
Printed at PROVIDENCE.MED.VA.GOV 04/30/04@06:21
Subj: Dicom Fix [#17510860] 04/29/04@10:23 5 lines
From: CABRAL,JOHN 2 of 2 responses read. In 'IN' basket. Page 1

---

Chris Can you please fix DICOM entries???

I am shutting down the Incoming listeners at 12:30 I need Dicom Fix to be sqeaky clean.
Did Marty inform you guys to keep a log for later transmission?

1) STOKES,CHRISTOPHER 04/29/04@10:59 2 lines

dicom is all set, marty didnt mention anything about a log, what kind of a log?

2) CABRAL,JOHN 04/29/04@11:22 7 lines

we are shutting down the listeners for a brief time to switch over gateways. at that time you will not be able to pull patient information or push images. You need to keep track and then push them approx 30 minutes later. This goes for CT and Ultrasound
I will forward this message to concern parties
Thanks for brining this to my attention Chris
We will get everyone on the same page

Local Message-ID: 17510860@PROVIDENCE.MED.VA.GOV Priority! (12 recipients)

This message was addressed as follows:

AHERN,EILEEN
AUGER,DEBRA A.
CABRAL,JOHN
COHEN,RONALD H
KAGAN,SHARON A.
KHATIB,MEHRDAD
MASTALERZ,MAUREEN
RUSCH,ORTWIN
SHAFER,mark r
STA INES,CASIMIRA C.
STOKES,CHRISTOPHER

**PLAINTIFFS EXHIBIT 23**

MailMan message for AUGER,DEBRA A. RADIOLOGY SERVICE
Printed at PROVIDENCE.MED.VA.GOV 04/20/04@19:37
Subj: CT schedule [#17342545] 03/23/04@07:28 7 lines
From: AUGER,DEBRA A. In 'CT' basket. Page 1

---

On Thursday, March 11th Dr Sta Ines met with Joan, Eileen and myself. We discussed the backlog of CT appointments. During this meeting and again the following day, Dr Sta Ines told us our tour of duty and schedule would not be changed.

It was agreed that once everyone returned from vacation we would get together to come up with ideas to help, then meet with Dr Sta Ines again.

PLAINTIFFS EXHIBIT 24

Radiology Today
The Magazine of Distinction in Radiology

Advertising | Job Bank | Gift Shop | Subscribe | Buyers' Guide

Home
Cover Story
Table of Contents
E-Newsletter
Article Archive
Editorial Calendar
Datebook
Writers' Guidelines
Orgs/Links
Opinion Polls
Reprints
Forum
Search




For other articles and previous issues click here

April 26, 2004

## Business Sense & Social Justice

By Sonia Elabd

Vol. 5 No. 9 p. 24

"It's important from a healthcare system standpoint for institutions to be closer in diversity to the patient population they serve," says Sal Martino, EdD, executive vice president of the American Society of Radiologic Technologists (ASRT). "In the past, radiologic technologists [RTs] were mostly female and white, and although that has changed in the last 10 to 15 years, the profession is still more than 70% female."

**PLAINTIFFS EXHIBIT 25**

# Letter of Resignation

**Dear Dr. Sta Ines,**

It is with great sorrow that I am hereby tendering my resignation to you. Although there is much to say, I believe the reasons leading to this decision are known by you, and I will therefore leave them unsaid at this time.

I appreciate having had the opportunity of being a member of the Providence VAMC, for the past 3 years. I enjoyed working in DIS under you. I am grateful for all the opportunities that were extended to me during my employment. I am giving 2 weeks notice and my last day of work will be September 24, 2004.

Regretfully,

Lynda Parker RT(R) 9-13-04

Lynda Parker RT(R) 09-13-2004



AH2083

**PLAINTIFFS EXHIBIT 26**

**REPORT OF CONTACT**

Wednesday, November 03, 2004

1. Meeting was held with Eileen Ahern, Maureen Mastalerz, John Cruz (union), Marty Khatib, Dr. Sta. Ines and Dr. Shafer to discuss CT call schedule.
2. Discussion was held regarding the cost effectiveness of having staff cover the CT call versus contract employees.
3. The best method of covering the current CT call schedule is to have the CT technologists rotate their call every other week.
4. In order to accommodate the CT technologists, after discussion this Friday was selected as a start date. The CT technologists stated that they did not want to start sooner but the opportunity was offered to them. CT technologists will cover each other for the days that they are off.
5. Discussion pursued regarding the extended operating hours. The following statements were made by Eileen Ahern:
   a. "There are no patients after 5:30pm"
   b. Eileen states that she can't work on Friday as she has "plans" which leaves Maureen by herself in CT as Debbie Auger is still out on sick leave.

Marty Khatib

Dr. Mark Shafer. MD

Dr. Sta. Ines, MD

**PLAINTIFFS EXHIBIT 27**

Exhibit 12

File Number: 012026862
HR24-O-H

## CERTIFICATION

In the matter of the federal employees' compensation claim of DEBRA A. AUGER, case file number 012026862, the employing agency has received and reviewed a copy of the transcript of the hearing held in that claim and offers the attached comments/additional materials for consideration by the hearing representative.

By my signature below, I certify that I have concurrently forwarded a complete copy of this submission directly to the claimant's representative, or to the claimant, as appropriate.

DATE: DECEMBER 29, 2005

NAME: for CRAIG S. POLUCHA

SIGNATURE: Tamika S Holt

TITLE: CHIEF HUMAN RESOURCES MANAGEMENT SERVICE

AGENCY NAME: PROVIDENCE VA MEDICAL CENTER

AGENCY ADDRESS: 830 CHALKSTONE AVE., PROVIDENCE, R.I. 02908

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

December 29, 2005

In Reply Refer To:
(05)

Mr. Jay Mariani, Hearing Representative
U.S. Department of Labor
Office of Workers' Compensation Programs
PO Box 8300 District 50
London, KY 40742-8300

Subj: File Number – 012026862, DOI – 06/24/2004

Dear Mr. Mariani:

We are in receipt of the hearing transcript of November 22, 2005, on the above subject matter case which we received on December 19, 2005. Thank you for the opportunity to provide the following comments that are pertinent in this matter. We reiterate our arguments made in our response to your office dated February 15, 2005. (Copy attached).

Additionally we offer these following comments regarding the November 22, 2005, Transcript of OWCP proceedings:

Page 7, lines 22-25: - "She hasn't received any benefits from the VA. And her - - you know, her pension and those things have been denied her."

Benefits due Ms. Auger have never been denied. Ms. Auger can apply for Disability Retirement through the Human Resources Processing Section, Monday through Friday from 7:00 a.m. to 4:30 p.m. Ms. Auger was also provided with VA Policy Memorandum, 05-32, Leave System. This was noted in the letter to Ms. Auger dated November 2, 2004. (Copies attached). Ms. Auger is not eligible for Voluntary Retirement at this time.

Page 14, lines 12-17: – "It should be noted for the record that there are - - there were four other people that were forced out emotionally by Mr. Khatib, all women in this same department and all because of the way they were treated by Mr. Khatib."

The above statement is untrue. Ms. Auger has not provided any evidence to support her allegations.

Page 16, lines 1-6: – "The male angio techs from Roger Williams, a hospital which is right across the street, to threaten my job. One of those techs was formerly employed by the VA and had been terminated. We had an EEO complaint against him. Marty supposedly knew all about that, kept telling me since I started working there that he knew all about the "Bruce" thing."

The above statement is untrue and is unrelated to Ms. Auger's current OWCP allegations. The individual referenced as "Bruce" was appropriately at the Providence VA Medical Center (PVAMC) in his capacity as a Radiologist Technician at Roger Williams General Hospital.

Page 16, lines 13-14: - "I knew that he (Mr. Khabit) was threatening me and my job and he knew that I knew that?"

The above statement is untrue. Additionally, Mr. Khatib was not employed at the PVAMC at the time "Bruce" was employed. Ms. Auger has presented no evidence that Mr. Khatib ever threatened her or her position.

Page 17, lines 20-22: - "And he [Mr. Khatib] also knew that this person was not supposed to be at the VA. Is that correct? A. Yes."
Page 18, lines 6-9: - "And then subsequently, you learned that he was spoken to by the VA about having him [Bruce] there. Is that correct? A. Yes, by Lisa Shaverian, the VA attorney."

The above statements are untrue. Neither Bruce nor any individual is barred from entering the VA for appropriate business, treatment or visitation. Ms. Lisa Shamirian has confirmed that Bruce was appropriately doing business at the PVAMC on the day in question.

Page 20, lines 22-25: - "And talking about Dr. Sta Ines, isn't it true, Debbie, that she also expressed concerns about the way she was treated by Mr. Khatib? Isn't that true? A. She did."

The above statement is untrue. Ms. Auger offers no evidence to support her allegation. Additionally, even if the statement were true (which VA denies), the allegation is unrelated to Ms. Auger's OWCP claim.

Page 27, lines 21-23: - "Now, can you describe a conversation you had with Mr. Khatib about Chris Stokes and his being hired at the VA?" and all of page 28.

Mr. Christopher Stokes was hired under contract (along with other individuals when the department experienced staffing shortages) in order to meet the demands of timely patient care services to veterans.

The hiring of contractors or intermittent employees does not require the approval of Agency staff. Hiring of contract staff is not governed by Merit Promotion regulations. Thus, Ms. Auger's statements are incorrect.

Page 34, lines 13-19: - "You had noted in some of your statements that you had filed grievances. A. Yes. Q. And I believe also an EEO complaint? A. Yes. Q. Have they been settled yet? A. The grievances never were even addressed."

The union after assessing the grievance chose not to pursue the complaint.

Page 35, lines 8-13: - "The EEO complaint, was that ever settled? A. No. They never did anything... Q. It's still in the process?"

As Ms. Auger's representative is well aware her EEO complaint is pending in U.S. District Court/District of Rhode Island.

Page 39, lines 1-9: - "Regarding your medical evidence? Ms. Auger: No, that he would take administrative action with me if I did not return to duty. And he subsequently sent me a letter after there was a big to-do about it. The claims examiner called the hospital to ignore the letter, that they were not aware that I had a pending claim with the Department of Labor."

Ms. Auger went out on sick leave June 20, 2004. VA Policy Memorandum 05-32, "Leave System," is designed to assist our employees on a fair and uniform basis with requests for annual leave and LWOP (Leave Without Pay) and sick leave for scheduled medical appointments and considered in the light of current or anticipated workloads and in accordance with the provisions of the union agreement for employees covered by a negotiated agreement. Employees are responsible for submitting accurate statements about their absences and furnishing acceptable medical certificates when required. (See attached Policy 05-32, Leave System). Ms. Auger did not file an OWCP (Office of Workers' Compensation Program) claim until August 15, 2004, approximately 2 months later. Ms. Auger had several avenues at her disposal for assistance with her alleged injury. Dr. Sta Ines, her Service Chief, Employee Health, the union and/or the agency's OWCP Coordinator could have all been contacted for guidance with respect to filing her claim.

The medical information was only provided by Ms. Auger after her claim was submitted.

Please note the (4) attached correspondence (dated Aug. 2, 2004 and Aug. 5, 2004 from Dr. Sta Ines; Nov. 2, 2004 and Nov. 12, 2004 from Mr. Khatib) to Ms. Auger providing her with assistance and guidance due to her absence from work that began on June 20, 2004. Ms. Auger did not file a workers' compensation claim for an alleged on-the-job injury until August 15, 2004. The attached letters are not hostile but may be sympathetic.

In summary Ms. Auger offers no new evidence to support her appeal.

Thank you for the opportunity to provide comments. Should you require additional information or clarification, I can be reached at (401) 273-7100, extension 3508.

Sincerely,

Yvonne S. Holt

for Craig S. Polucha
Chief, HRMS

Enclosures

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

In Reply Refer To:

February 18, 2005

Office of Workers' Compensation Programs
P.O. Box 8300 – Region 1
London, KY 40742-8300
Attention: Jerry Smith

Dear Mr. Smith

Subj: Debra Auger OWCP Claim #012026862

1. This letter is in response to your written request of November 5, 2004 and in response to our discussion with Mr. Jerry Smith on February 15, 2005.

2. It is the Agency's position in this matter that we do not concur with the employee's allegations and the following information serves as supportive evidence.

**BACKGROUND**

Several (4 including the claimant) dissatisfied employees in the Diagnostic Imaging Service (DIS) authored a memorandum to the Chief of DIS dated April 22, 2004, and a letter to the Secretary of Veterans Affairs dated August 20, 2004, containing numerous complaints about Operations Manager, Mehrdad (Marty) Khatib. Allegations included: staffing issues; patient safety issues; condescending and disrespectful treatment of the females in the department; discriminatory treatment of women; poor communication with staff; falsification of government documents; and creation of a hostile work environment. To address their concerns, the dissatisfied technologists met with members of Diagnostic Imaging Service management, including the Chief Technologist and the Chief, Diagnostic Imaging Service. However, the technologists felt that their concerns were not addressed and remained unresolved. The Network Director was subsequently contacted and initiated an administrative review of the matter.

The Diagnostic Imaging Service has an authorized ceiling of 25.6 FTEE with an on-board strength in July 2004 of 21.9 FTEE. 1.6 FTEE vacancies were in Diagnostic Imaging Section in which claimant was assigned. However vacancies were offset by contract staff. (Organizational Chart attached, Tab1)

**TIMELINE OF EVENTS**

| Date | Action |
|---|---|
| December 2000 | Compressed tours established for CT Scan Technologists (four 10 hour shifts per week plus call). |
| March 2004 | DIS begins discussions with CT Technologists about returning to standard 8-hour tours of duty, five days per week for improved scheduling of patients. |
| April 12, 2004 | Meeting held with Ms. Auger and Ms. Masterlerz regarding proposed change of shift schedule. |
| April 13, 2004 | Meeting held with Ms. Ahern regarding proposed change of shift schedule. |
| April 22, 2004 | CT Technologists send memo to Chief, DIS regarding opposition to the shift-change and alleging a variety of inappropriate actions on the part of Diagnostic Imaging Service Management. |
| May 11, 2004 | **Contrary to Ms. Auger's OWCP statement that VA was not responsive to the April 22 memo.** DIS Management, HR, and Local 1322 meet to discuss the April 22, 2004 memo. At the meeting, the issue of the compressed work schedule was discussed at length. |
| June 14, 2004 | Chief Technologist, Joan Beaudoin, leaves on sick leave. |
| June 23, 2004 | **Contrary to Ms. Auger's OWCP statement that VA was not responsive to the April 22, 2004 memo. DIS Management, HR, Local 1322 and CT Technologists** meet to discuss the compressed work schedule. The discussions failed to result in a resolution. (See **attached 7/15/04 HR letter, Tab 2)** |
| June 24, 2004 | Debra Auger leaves on annual leave and subsequently files OWCP claim retroactive to this date. |
| June 29, 2004 | CT Scan Technologist, Eileen Ahern, leaves on sick leave. |
| July 7, 2004 | CT Scan Technologist, Maureen Mastalerz, leaves on sick leave. |
| July 9, 2004 | CT Scan Technologist, Debra Auger, puts in for sick leave (was on AL). |
| July 15, 2004 | Memorandum sent to Union from HR indicating management will |

be proceeding with action for consideration of an impasse with the Federal Labor Relations Authority on the abolishment of the compressed work schedule.

August 20, 2004 — The claimant and several other Diagnostic Imaging Service employees signed and sent a letter to the Secretary of Veterans Affairs, which included a copy of the April 22, 2004 memorandum. During this period DIS has maintained appropriate staffing levels for CT examinations through the use of contract staff.

September 22, 2004 — Contrary to Ms. Auger's OWCP statement that the agency was not responsive to the claimant's April 22, 2004 memo, a review team was assigned to review employee allegations. Members of the team were from outside the facility including an HR Officer from the Manchester, NH VAMC; the acting Deputy Network Director, Veterans Integrated Service Network (VISN 1) from Bedford, MA; Acting, Chief, Radiology Service, VA Boston Health Care System; Program Manager, VISN 1, Consolidated Laboratory, VA Boston Health Care System; and a Health Systems Administration trainee. The following individuals were interviewed on September 22, 2004:

Vincent Ng, Medical Center Director
Allan Erickson, MD, Chief of Staff
Satish C. Sharma, MD, LSM for Specialty and Acute Care
Tambra L. Holt, Acting, Chief, Human Resources
Craig S. Polucha, Chief, Human Resources (newly appointed)
Joan Beaudoin, Chief, Diagnostic Radiologic Technologist
Mehrdad Khatib, Administrative Officer, Diagnostic Imaging Service
Casimira Sta Ines, MD, Chief, Diagnostic Imaging Service
Fifteen (15) Diagnostic Imaging Service Employees (in two groups), including claimant.

Below are summaries of some of the more pertinent conclusions reached by the review team:

1. Based on testimony and review of documents, there was no apparent evidence of patient safety violations, quality of care issues or falsification of government documents as alleged.

2. There was no apparent discriminatory behavior on the part of Mr. Khatib. There were male and female employees, of varying ages, who either supported him or were non-supportive. There were allegations that he

hired his male friends on contract, however, these allegations were not substantiated as he had hired three female employees, including contract, per diem, and student employees.

3. The employees with significant longevity in this department seemed to have grown accustomed to self managing. While there were males and females of various age groups that either endorsed his changes or opposed them, there was clearly a division between the longer-term employees and the newer ones with only one exception. The newer employees saw Mr. Khatib as having "an open door policy" and "cleaning up the department and making people accountable." They claimed that they were encouraged by the existing technologists to say negative things about Mr. Khatib and would be shunned if they did not support the current staff.

4. A variety of active and on-going grievances, EEO complaints, and workers' compensation filings have been initiated. These administrative processes appear to be appropriate vehicles for solving these matters. Although a group of employees remain disgruntled due to changes to their working conditions, there does not appear to be evidence of violations of law, rule, regulation or discriminatory practices.

December 30, 2004 VA Office of Resolution Management (ORM) dismisses **70 out of 72** of claimant's discrimination allegations. Some claims were dismissed based on claimant's failure to show how she was aggrieved and therefore she had failed to "state a claim." Other claims were dismissed as Ms. Auger failed to demonstrate any harm or action taken against her, and therefore she failed to "state a claim." ORM also dismissed the majority of the remaining claims consisting of incidents regarding work assignments and working conditions and an additional 5 incidents cited after July 9, 2004 regarding leave. ORM determined that the complainant failed to "state a claim of harassment" because the incidents, even when viewed collectively, were not severe or pervasive enough to create a hostile or an abusive working environment. Therefore, the allegations of hostile work environment were dismissed for her failure to "state a claim." The two remaining claims involved correspondence requesting additional medical information required to support her request for sick leave and Family Medical Leave. Claimant added an additional claim to her ORM case which is unrelated to the OWCP claims and is currently pending at this time.

ORM dismissed Ms. Auger's remaining claims relating to working conditions as Ms. Auger failed to demonstrate that she suffered a diminution of pay or benefits, did not suffer an actionable injury and does not appear to have suffered objectively tangible

harm. Therefore, these claims were dismissed for her failure to "state a claim." All of Ms. Auger's ORM allegations parallel her OWCP allegations.

In summary, it is our position in this matter that the event that triggers Ms. Auger's claim and that of the others is management's legitimate proposal to change the compressed work schedules of the three employees (2 CT Technologists and 1 Angiography Technologist) assigned to the CT Scan Department of the Diagnostic Imaging Service. Management's three business reasons for doing so are centered on our need to ensure that patient care needs are addressed in a timely manner. The proposal was intended to address decreased productivity in that section, reduce the amount of overtime costs incurred by that section ($32,000 in 2003), and increase efficiency by allowing the facility to extend operating hours to meet patient care needs and improve turnaround time for CT reports.

The current configuration of the tour of duty for the claimant and two other staff members does not allow for the CT section to schedule more than two staff members on any given day and does not allow any staggering of the schedule to provide for evening hours without the incursion of overtime expenses. This leaves the department susceptible to being short staffed when there are any sick days, vacations, or family care issues. Over time, this has resulted in the wait times for patients who require non-urgent studies to swell to approximately six weeks. The community standard is one week. The failure to meet community standard was mainly due to the fact that given the current schedule of these employees, there was a limited number of appointments available during the employees 10-hour shift. Changing the shift would give the Medical Center greater flexibility and allow for an estimated increase of 10-15% in productivity in that department.

It should be noted that the proposed change in the schedule has not been implemented as of this date due to the need to meet the requirements of the normal labor-management negotiation process and that no changes were made at any time to the claimant's schedule prior to the time she went out on her OWCP claim. Management made its proposal to the union and as of this date the union has failed to respond with a counter proposal other than the employees' refusal to do it.

The current contract staff and any other staff that may be hired will not be offered the compressed work schedule.

It is our position that the proposed change was a legitimate management response to improving patient care in the department and such proposed changes are part of the ordinary business activity of the industry. This is a hospital, and our focus is doing everything possible to provide the best level of patient care possible. Management makes those determinations. Proposing changes to employees' schedules in order to accomplish that is a normal business practice. No jobs were being abolished, no pay reductions were being affected, and no significant changes were being proposed. Most importantly neither the union, nor the claimant ever submitted a counter proposal concerning this issue other than they "refused" to do it and have used multiple avenues in which to further the

position they have taken. Her other claims are without merit. At no time did Ms. Auger suffer a diminution of pay, benefits, status, nor did she suffer any actionable injury or tangible harm as validated in the several other forums Ms. Auger has filed the same claims; i.e. service meetings; independent region review team; Office of Resolution Management and union grievance process.

We respectfully request that OWCP deny Ms. Auger's claim in its entirety.

If you have any questions or comments, I can be reached at 401-273-7100 extension 3506.

Respectfully,

Craig S. Polucha
Chief, Human Resources Management Service

Attachments: Organizational Chart
HR letter dated July 15, 2004

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

Letters

In Reply Refer To:
650/HIMS

August 2, 2004

Debra Auger
195 Cherry Hill Avenue
Woonsocket, RI 02895

Dear Ms. Auger:

This is to confirm the conversation between your mother and John Sylvia in Human Resources regarding the letter you received dated August 5, 2004. Your request for an extension to provide the medical documentation and the Family Medical Leave form has been extended to August 20, 2004.

Sincerely,

CASIMIRA STA INES
Chief, Diagnostic Imaging Service

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

August 5, 2004

In Reply Refer To: 650/114

Ms. Debra Auger
195 Cherry Hill Avenue
Woonsocket, RI 02895

Dear: Ms. Auger

Your Annual Leave and Sick Leave will be exhausted on August 5, 2004.

You have indicated you wish to be continued on Leave Without Pay (LWOP). We will grant LWOP if requested under Family Medial Leave Act (FMLA).

Attached please find FMLA form. Leave under FMLA will be provisionally granted until receipt of your request. Please be advised that your request must be received no later than COB August 13, 2004. Please contact me if you have any questions.

Sincerely,

MEHRDAD KHATIB
Administrative Officer, Diagnostic Imaging Service

CASIMIRA STA. INES, MD
Chief, Diagnostic Imaging Service

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

In Reply Refer To:

650/114

November 2, 2004

Debra Auger
195 Cherry Hill Avenue
Woonsocket, RI 02895

Dear Ms. Auger:

I am writing you as a reminder that your Family Medical Leave expires on November 12, 2004. Under the Family Medical Leave Act (FMLA) you are entitled to twelve weeks of leave under FMLA during any twelve month period. Therefore, it is expected that you will return to duty on November 15, 2004. If you are cleared for duty, please ensure you provide medical documentation that clearly indicates that you are able to perform the functions of your position, upon your return to duty. If you are unable to return to duty after November 12, 2004, appropriate administrative action maybe taken.

If you are believe you have a medical condition that will continue for a duration of at least one year, you may want to consider applying for disability retirement. If you would like to discuss this matter you may do so by contacting Diane Major at 401-273-7100 extension 2374.

If you would like to request reasonable accommodation, I have attached the Policy Memorandum, which explains how to apply for the program.

If you have any questions, concerning these issues, please contact me at (401) 273-7100 extension 3417

Sincerely,

MEHRDAD KHATIB
Administrative Officer, Diagnostic Imaging Service

Enclosure

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

November 12, 2004

In Reply Refer To: 650/114

Debra Auger
195 Cherry Hill Avenue
Woonsocket, RI 02895

Dear Ms. Auger:

I am writing you regarding a previous letter to you dated November 2, 2004. You may disregard that letter as we were not aware that your Workers' Compensation claim was still pending with the department of labor. You will remain on a leave without pay status until your Workers' Compensation claim is adjudicated or your are able to return to work, whichever occurs first.

If you have any questions concerning this issue please contact me at (401) 273-7100 extension 3417.

Sincerely,

Mehrdad Khatib, BS, RT (R)
Administrative Officer, Imaging

I witnessed that the above letter was sent on 11/12/04 @ 14:08.

MD
Mark Shafer

VA MEDICAL CENTER
PROVIDENCE, RHODE ISLAND

POLICY MEMORANDUM 05- 32
August 6, 2003
(05)

# LEAVE SYSTEM

## 1. PURPOSE

To establish the medical center leave policy for General Schedule, Federal Wage System and Non-appropriated Funds employees and nurses, nurse anesthetists and physician assistants of Title 38. For information covering physicians, dentists, podiatrists and optometrists, please refer to Policy Memorandum 05-25, Duty and Leave - Title 38.

## 2. POLICY

a. The leave program will be administered on a fair and uniform basis with requests for annual leave and LWOP (leave without pay) and sick leave for scheduled medical appointments considered in the light of current or anticipated workloads and in accordance with the provisions of the union agreement for employees covered by a negotiated agreement.

b. An employee shall not engage in any outside employment during any part of the time while on sick leave or LWOP in lieu of sick leave.

## 3. DEFINITIONS

a. Annual Leave: Annual leave is used primarily for vacation periods, but also may be used for brief periods of absence for personal matters. All requests for annual leave will be made in advance.

b. Sick Leave: Sick leave may be granted for sickness, injury, pregnancy, adoption and confinement, and for medical, dental or optical treatments. Within limits, it may be granted to employees for such issues as family care and bereavement (see j. - Family Friendly Leave). When a member of the employee's immediate family is afflicted with a contagious disease and requires the personal care and attendance of the employee, or through exposure, the presence of the employee at work would jeopardize the health of others, sick leave may be granted for the period of isolation, as required by health authorities.

c. Leave Without Pay: Leave without pay is an approved temporary non-pay status and absence from duty. Approval of LWOP (leave without pay) is a matter of administrative discretion.

d. AWOL (Absence Without Leave): An employee absent without authorization will be charged AWOL and will not be paid for that period. Such unexcused absence may also result in disciplinary action. The reason for a charge to AWOL status must be documented and filed with the time and attendance report and the employee so notified.

e. Military Leave: Military leave is leave of absence with pay which must be granted to employees (other than intermittent or temporary employees appointed for less than one year) who are members of the National Guard or a Reserve component of the Armed Forces and who present properly completed orders.

f. Court Leave: Court leave is authorized absence without charge to leave or loss of pay for jury duty or to appear as a witness in a nonofficial capacity on behalf of a State or local government.

g. Leave for Maternity/Paternity Reasons: Maternity leave may consist of sick leave, annual leave and leave without pay.

h. Excused Authorized Absences: On occasion, employees are authorized to engage in activities which take them away from their place of duty without loss of pay and without charge to leave.

i. Family and Medical Leave: Provides employees up to 12 administrative workweeks of pay or unpaid leave for family and serious medical needs such as:

(1) The birth of a son or daughter of the employee and the care of a son or daughter;

(2) The placement of a son or daughter with the employee for adoption or foster care;

(3) The care of a spouse, son, daughter or parent of the employee, if such spouse, son, daughter or parent has a serious health condition; or

(4) A serious health condition of the employee that makes the employee unable to perform the essential functions of his/her position. A serious health condition is defined as an illness, injury, impairment, physical or mental condition that involves:

(a) inpatient care in a hospital, hospice or residential medical care facility; or

(b) continuing treatment by a health care provider.

(5) Both the father and mother are each entitled to 12 workweeks of unpaid leave for a birth, adoption or foster care, or for the care of a son or daughter with a serious health condition.

To qualify, an employee must have completed 12 months of service (not required to be 12 recent or consecutive months) or, if a temporary or intermittent appointment, 1250 hours of service in the previous 12 months. The employee should submit completed Form WH-380 (Attachment B - available in HRMS) 30 days in advance (unless circumstances warrant a lesser notice period) to apply for leave. (Please refer to Tips for Supervisors #24 for more details.)

j. Family Friendly Leave: Permits employees to use sick leave to provide care for a family member as a result of illness, injury, pregnancy, childbirth, medical examination or treatment, to make funeral arrangements necessitated by the death of a family member, to attend the funeral of a family member and for purposes relating to the adoption of a child. It can also be utilized to care for a family member with a serious health condition (up to 12 weeks). The medical documentation requirements are the same as those under Family and Medical Leave Act. (Please refer to Tips for Supervisors #40 for more details.) Employees are also provided seven days of paid administrative leave each calendar year when serving as bone marrow or organ donors.

k. Leave for Parental and Family Responsibilities: Employees may also be granted up to 24 hours each year of LWOP (Leave Without Pay) for school and early childhood education activities, routine family medical purposes, and to care for elderly relatives' health or care needs.

## 4. MEMBERSHIP

None.

## 5. PROCEDURES

The procedures for applying for leave are shown in the attached Leave Charts (Attachment A). Leave requests requiring approval at a level higher than the Service Chief must be forwarded through channels in a timely manner; that is, prior to the absence. The minimum charge for any type of leave is 15 minutes.

## 6. RESPONSIBILITY

a. The Chief, Human Resources Management Service or designee is responsible for interpreting leave policies and regulations for operating officials.

b. Service Chiefs and other designated supervisory officials are responsible, as authorized, for administering the leave including ensuring employees do not forfeit annual leave at the end of the leave year and excused absence policies and regulations for employees under their supervision. Service Chiefs are also responsible to maintain records as requested of an employee's use of family and medical leave and sick leave under the Family Friendly Act. Associate Chiefs of Staff have the same authority and responsibility as Service Chiefs.

c. Employees are responsible for:

(1) planning their leave within current policies to ensure annual leave is not forfeited at the end of the leave year and for observing leave and excused absence regulations which affect

them. Employees requesting advanced leave are responsible to request only as much annual leave as that which will be accrued in the remainder of the leave year; and

(2) requesting their leave from supervisor and receiving supervisory approval for such leave when incapacitated for duty. Generally, the supervisor should be contacted at the beginning of the tour-of-duty. Specific reporting requirements may be established for individual employees by their supervisor on a case-by-case basis,

(3) giving management their leave requests with as much notice as possible and taking only the amount of leave that is necessary to manage the circumstances that prompted the need for leave, and

(4) submitting accurate statements about absences and furnishing acceptable medical certificates when required.

7. **REFERENCES**

5 C.F.C. Part 630
VA Handbook 5011 dated April 15, 2002

8. **RESCISSIONS**

Policy Memorandum 05-32, Leave System, dated August 7, 2000.

**VINCENT NG**
**Medical Center Director**

**Attachments: A - Leave Chart**
**B - Form WH-380**

**DISTRIBUTION: D**

**PLAINTIFFS EXHIBIT 28**

**Cantwell, Patrick**

*

**From:** Khatib, Mehrdad
**Sent:** Monday, December 22, 2003 10:25 AM
**To:** Jarest, Roland (Jake)
**Cc:** Penkala, Lynn; Sta. Ines, Casimira; Gunn, James M.; Cantwell, Patrick; Erickson MD, Allan; McMahon, Louise
**Subject:** Ultrasound Tech

**Importance:** High

Jake,

Our only regular staff ultrasound technologist just informed me that she will be taking a medical leave and will tell us specifically how long by tomorrow when she confirms her surgery date. As she is the only tech who performs ultrasounds, we need to secure additional technologists to pick up the work load. The workload includes inpatient and outpatients.

I just spoke with a local staffing company and will have myself and Patrick meet with them this afternoon to confirm rate, hours and availability etc. They are quoting us $66.34 per hour. In talking with Patrick, we could do month to month contract so that we can terminate them as soon as she is back. The total estimated cost should be initially $66.34 dollars per hour x 40 hours per week x 4 weeks= $10,614.40 per month. Please call me if you have any questions. Thanks

Marty

**Department of Veterans Affairs**

# Memorandum

**Date:** May 24, 2004

**From:** Marty Khatib, DIS (114)

**Subj:** Request for contract X-Ray Technologist

**To:** Alan Korolenko, Chairperson, ERMC
Roland Jarest, CFO
Lynn Penkala, Budget Analyst
Kathleen Boyle, Budget Assistant

Funding Request:
1. FCP: 7928- Part time Radiology Tech Contract
2. Amount Requested: $13680 for the remainder of FY04

Please Note: This is a request for authorization without additional resources as there is sufficient funds available in the FCP to absorb this additional expense.

3. Effective Date: 06/01/04

Justification:

- Part time Radiology Technologist, Ms. Shannon Seifert submitted her resignation effective 05/31/04. I am requesting a part-time contract employee to fill this behind this vacancy on a temporary basis until an alternative solution to hire temporary, term, or full time is completed.

- In order to maintain the existing level of patient care services (24 hours/week) the cost is calculated as follows:

Cost of Contract:
Pay Periods 06.01.04 to 9.30.04 19 weeks
Hours/Pay Period: 24
Contract Rate/HR: $30
Total Cost of Contract: $13,680

Projected FY 04 Salary Savings:
Pay Periods 06/01/04 to 09/30/04 19 weeks
Total VA Employee Cost/pay period $ 7235
Total Salary Savings $ (6445)

Total Funding Request: $ 13680

- Delay in activating contract services for a part time diagnostic radiology technologist will seriously affect the Medical Center's ability to provide appropriate and timely patient care. This position provides second and third shift coverage for ER, inpatients and outpatients.

- We will advise ERMC once a staff employee is selected and contracted services are no longer required to return unused funding. Thank you for your consideration.

Automated VA FORM 2105

6/16/04 *



**Joslin, Emerson (Bob)**

**From:** Khatib, Mehrdad
**Sent:** Wednesday, June 16, 2004 10:58 AM
**To:** Joslin, Emerson (Bob)
**Cc:** Jarest, Roland (Jake); Gunn, James M.
**Subject:** RE: Renewal of X-Ray techs

Thanks for following up and yes please renew both.

ISSUE ONE:

Also, Heads Up! I spoke with Mr. Ng and Dr. Erickson this morning about an opportunity to recruit a technologist from Walter Reed Medical Center on contract. Given our circumstances with some of our current staff ( sick leave issues, attendance and vacations), they agree that it's a good idea to bring him in especially at $35 dollars per hour. ( normal rate is $57 to $75). Start date should be July 1, 2004. 40 hours per week for 90 days. Dr. Sharma has been informed and is on board.

Bob, I'll get you all of his information today.

Jake, Question is that we have the funding within the fund control point. Do I still need submit to ERMC?

ISSUE TWO:

The older Nuclear Medicine camera is out of commission. Mr. Ng suggested looking into emergency funding. I have requested a quote from Philips and will forward it to you as soon as I get it. We should still proceed with the Navy camera but only as a backup to the new one. The volume of Nuclear Medicine has increase 30% for this fiscal year which is probably why the older camera couldn't handle the load. Please let me know if you have any questions. Thanks

Marty

-----Original Message-----
**From:** Joslin, Emerson (Bob)
**Sent:** Wednesday, June 16, 2004 9:41 AM
**To:** Khatib, Mehrdad
**Cc:** Jarest, Roland (Jake); Gunn, James M.
**Subject:** Renewal of X-Ray techs
**Importance:** High

Marty,
Scott Gray and Suzette Kennette renewal. Both of their contracts expire 6/30/04. Do you want them renewed?

*Bob Joslin, Contract Specialist* (90C)
VA Medical Center
830 Chalkstone Blvd
Providence, RI 02908
Phone (401) 457-3032
FAX (401) 457-3079

7/6/04

**Joslin, Emerson (Bob)** Gray

**From:** Penkala, Lynn
**Sent:** Tuesday, July 06, 2004 1:49 PM
**To:** Joslin, Emerson (Bob)
**Subject:** FW: DIS COVERAGE

It's a go.

-----Original Message-----
**From:** Jarest, Roland (Jake)
**Sent:** Tuesday, July 06, 2004 1:48 PM
**To:** Khatib, Mehrdad
**Cc:** McMahon, Louise; VHAPRO ERMC; Penkala, Lynn
**Subject:** RE: DIS COVERAGE

I have recently enough concurrences to have this request approved.

Lynn,
Please initiate transfer...

-----Original Message-----
**From:** Khatib, Mehrdad
**Sent:** Tuesday, July 06, 2004 1:29 PM
**To:** Jarest, Roland (Jake)
**Subject:** RE: DIS COVERAGE

We do fee base or direct contract if we can locate qualified individuals ourselves. I think OT (occupational therapy) should not be mentioned and probably a typo from the old sample template that went out for ERMC requests. Thanks

Marty

-----Original Message-----
**From:** Jarest, Roland (Jake)
**Sent:** Tuesday, July 06, 2004 12:25 PM
**To:** Khatib, Mehrdad
**Subject:** FW: DIS COVERAGE

Marty,
Can you provide answers to Louise's questions?

-----Original Message-----
**From:** McMahon, Louise
**Sent:** Tuesday, July 06, 2004 12:18 PM
**To:** Jarest, Roland (Jake); VHAPRO ERMC
**Subject:** RE: DIS COVERAGE

I recommend approval :however, has anyone thought about advertising for our own "fee basis" staff as this sounds like it could be somewhat long term?

Also, why is OT referenced in this and the workload reflects OT consults?

-----Original Message-----
**From:** Jarest, Roland (Jake)
**Sent:** Tuesday, July 06, 2004 11:27 AM
**To:** VHAPRO ERMC
**Subject:** FW: DIS COVERAGE
**Importance:** High

7/6/04 *

**Joslin, Emerson (Bob)**

**From:** Yanish, Joseph
**Sent:** Tuesday, July 06, 2004 10:22 AM
**To:** Khatib, Mehrdad; Jarest, Roland (Jake); Penkala, Lynn; Sharma MD, Satish; Gunn, James M.; Joslin, Emerson (Bob); Laborde, Jane
**Cc:** Erickson MD, Allan; Sta. Ines, Casimira; Holt, Tambra
**Subject:** RE: DIS COVERAGE

This request for resources is critical to maintaining quality patient care. This needs to be expedited, and if ERMC requires additional information or any other specific formatting of the request we should move on that quickly.

The other key element here requires coordination with Human Resources to resolve issues with.current employees. .

-----Original Message-----
**From:** Khatib, Mehrdad
**Sent:** Monday, July 05, 2004 6:10 PM
**To:** Jarest, Roland (Jake); Penkala, Lynn; Sharma MD, Satish; Gunn, James M.; Joslin, Emerson (Bob); Laborde, Jane; Yanish, Joseph; Khatib, Mehrdad
**Cc:** Erickson MD, Allan; Sta. Ines, Casimira
**Subject:** DIS COVERAGE

Presently, DIS is faced with the following staffing challenges:

1. Chief Technologist has been out for 3 weeks and may be out for an extended period of time. Further clarification is due on July 12, 2004.

2. CT technologist has been out for one week and is not expected back for approximately six more weeks or longer.

3. One Xray Technologist resigned last week.

4. Numerous summer vacations and days off have been previously approved by the chief technologist, however coverage was not provided and those shifts will need to be addressed.

Attached please find ERMC request to hire two contract technologists on temporary basis to maintain our present level of operations. In order to expedite the time consuming process of recruiting, orientation and training, your electronic concurrence is appreciated. Please let me know if you have any questions. Thank you.

Marty

<< File: ERMC JULY 2004.doc >>

**Laborde, Jane**

**From:** Yanish, Joseph
**Sent:** Tuesday, July 06, 2004 10:22 AM
**To:** Khatib, Mehrdad; Jarest, Roland (Jake); Penkala, Lynn; Sharma MD, Satish; Gunn, James M.; Joslin, Emerson (Bob); Laborde, Jane
**Cc:** Erickson MD, Allan; Sta. Ines, Casimira; Holt, Tambra
**Subject:** RE: DIS COVERAGE

This request for resources is critical to maintaining quality patient care. This needs to be expedited; and if ERMC requires additional information or any other specific formatting of the request we should move on that quickly.

The other key element here requires coordination with Human Resources to resolve issues with current employees.

-----Original Message-----
**From:** Khatib, Mehrdad
**Sent:** Monday, July 05, 2004 6:10 PM
**To:** Jarest, Roland (Jake); Penkala, Lynn; Sharma MD, Satish; Gunn, James M.; Joslin, Emerson (Bob); Laborde, Jane; Yanish, Joseph; Khatib, Mehrdad
**Cc:** Erickson MD, Allan; Sta. Ines, Casimira
**Subject:** DIS COVERAGE

Presently, DIS is faced with the following staffing challenges:

1. Chief Technologist has been out for 3 weeks and may be out for an extended period of time. Further clarification is due on July 12, 2004.

2. CT technologist has been out for one week and is not expected back for approximately six more weeks or longer.

3. One Xray Technologist resigned last week.

4. Numerous summer vacations and days off have been previously approved by the chief technologist, however coverage was not provided and those shifts will need to be addressed.

Attached please find ERMC request to hire two contract technologists on temporary basis to maintain our present level of operations. In order to expedite the time consuming process of recruiting, orientation and training, your electronic concurrence is appreciated. Please let me know if you have any questions. Thank you.

Marty

<< File: ERMC JULY 2004.doc >>

**Laborde, Jane**

---

**From:** Khatib, Mehrdad
**Sent:** Tuesday, June 29, 2004 8:15 AM
**To:** Jarest, Roland (Jake); Joslin, Emerson (Bob); Laborde, Jane
**Cc:** Gunn, James M.; Penkala, Lynn; Boyle, Kathleen
**Subject:** RE: Renewal of X-Ray techs

Thanks Jake,

Confirming that Mr. Wes Alan, x-ray technologist will start July 1, 2004 for 90 days with an option of 90 more days. I will work with contracting to complete the necessary paperwork. Thank you.

Marty

-----Original Message-----
**From:** Jarest, Roland (Jake)
**Sent:** Wednesday, June 16, 2004 2:53 PM
**To:** Khatib, Mehrdad; Joslin, Emerson (Bob)
**Cc:** Gunn, James M.; Penkala, Lynn; Boyle, Kathleen
**Subject:** RE: Renewal of X-Ray techs

If you have funding then I will just make a note at ERMC regarding this contract.

Jim,
Are these the types of contracts that go the CEB?

-----Original Message-----
**From:** Khatib, Mehrdad
**Sent:** Wednesday, June 16, 2004 10:58 AM
**To:** Joslin, Emerson (Bob)
**Cc:** Jarest, Roland (Jake); Gunn, James M.
**Subject:** RE: Renewal of X-Ray techs

Thanks for following up and yes please renew both.

ISSUE ONE:

Also, Heads Up! I spoke with Mr. Ng and Dr. Erickson this morning about an opportunity to recruit a technologist from Walter Reed Medical Center on contract. Given our circumstances with some of our current staff ( sick leave issues, attendance and vacations), they agree that it's a good idea to bring him in especially at $35 dollars per hour. ( normal rate is $57 to $75). Start date should be July 1, 2004. 40 hours per week for 90 days. Dr. Sharma has been informed and is on board.

Bob, I'll get you all of his information today.

Jake, Question is that we have the funding within the fund control point. Do I still need submit to ERMC?

ISSUE TWO:

The older Nuclear Medicine camera is out of commission. Mr. Ng suggested looking into emergency funding. I have requested a quote from Philips and will forward it to you as soon as I get it. We should still proceed with the Navy camera but only as a backup to the new one. The

**Laborde, Jane**

**From:** Joslin, Emerson (Bob)
**Sent:** Monday, December 20, 2004 1:47 PM
**To:** Laborde, Jane
**Subject:** FW: Temporary X-Ray techs

Please do SF30's for these techs due to shortage of techs and ongoing evaluation of interview packages?
Thanks

*Bob Joslin, Contract Specialist* (90C)
VA Medical Center
830 Chalkstone Blvd
Providence, RI 02908
Phone (401) 457-3032
FAX (401) 457-3079

-----Original Message-----
**From:** Shafer, Mark
**Sent:** Monday, December 20, 2004 1:44 PM
**To:** Joslin, Emerson (Bob)
**Subject:** RE: Temporary X-Ray techs

Please renew all the contracts.

Thanks,
Mark

-----Original Message-----
**From:** Joslin, Emerson (Bob)
**Sent:** Monday, December 20, 2004 1:35 PM
**To:** Sta. Ines, Casimira; Shafer, Mark
**Subject:** Temporary X-Ray techs

Which of these technicians do you want renewed for 3 months? Their current contracts expire 12/31/04.

AGUINALDO DACRUZ
GERMINIANO BAMBAKAKIS
CLEMON ALLEN
LUCHINO CAPARAS
DAYNA GARDNER
SCOTT GRAY
LAURIE GOSS
SUZETTE KENNETT
CHARLOTTE MCLAUGHLIN

Thanks,

*Bob Joslin, Contract Specialist* (90C)
VA Medical Center
830 Chalkstone Blvd
Providence, RI 02908
Phone (401) 457-3032

12/21/2004