**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND**

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,

v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

**APPENDIX OF PLAINTIFFS EXHIBITS IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT FOR SUMMARY JUDGMENT FOR THE PLAINTIFFS**

**VOLUME 3 OF 3**

# IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,

v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

## APPENDIX OF PLAINTIFFS EXHIBITS IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT FOR SUMMARY JUDGMENT FOR THE PLAINTIFFS

Plaintiffs Exhibits: number and discription

1. February 2, 2004 memo from Sta Ines to Khatib
2. February 9, 2004 Sta Ines memo to Khatib
3. Report of Contact Babagian where Khatib signs for St Ines
4. Babagian note April 21, 2004 witnessing Auger's stress
5. Selected Federal employment regulations
    a. 5 CFR 4.3 Prohibition against securing withdrawal from competition
    b. 5 CFR 300.301 use of Private Sector Temps
    c. 5 CFR 300.502 Coverage
    d. 5 CFR 300.503 Conditions for Using Private Sector Temps
6. March 22, 2005 memo from Shafer to Joslin
7. E-mails and letters of concern about temp Ferreira not following VA policies, August 2004
8. Ferreira hiring email February 8, 2005
9. April 20, 2004 letter from Auger to the union about changing tours of duty

10. Auger June 3, 2004 letter to Sta Ines complaining about removal
11. May 21, 2004 counseling letter from Beaudoin to Ahern
12. March 15, 2004 memo from Khatib to Beaudoin mentioning pending CT exams
13. April 12, 2004 memo from Khatib to Beaudoin
14. August 12, 2004 memo Holt to Khatib
15. April 14, 2004 memo from Holt to Khatib about shift change
16. April 2, 2004 memo from Khatib to Beaudoin about shift change
17. April 14, 2004 memo from Khatib to Beaudoin about backlog
18. June 18, 2004 Admonishment to Ahern signed by Khatib for Beaudoin
19. Reports of contact on October 2004 on Ahern by Allen, Khatib, and Shafer
20. August 19, 2004 memo from Khatib to Holt about on-call techs
21. November 15, 2004 Reprimand from Khatib to Mastalerz
22. April 29, 2004 memo from Cabral to Stokes
23. March 23, 2004 memo from Auger
24. Radiology Today Vol. 5, No. 9, P.24, April 26, 2004
25. Parker Letter of Resignation from September 13, 2004
26. November 3, 2004 Report of Contact
27. Polucha answers to Augers OWCP investigator, December 29, 2005
28. E-mails related to the hiring of contract or temporary employees in DIS
29. Excerpts of temporary employees contracts
30. May 19, 2004 memos from Sta Ines to Providers about no-shows
31. EEOC standard for Protected Activity and Retaliation
32. Dr. Gupta letter to OWCP for Auger

33. Dr. Curran August 26, 2005 report on Auger

34. Social Security Disability Acceptance Notice for Auger

# PLAINTIFFS EXHIBIT 29

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

## X-RAY/ULTRASOUND/CT TECHNOLOGIST

**CONTRACT NUMBER V650P-3690**

This agreement made on March 3, 2003 between:

| | | |
|---|---|---|
| **Derek Sabourin**<br>REDACTED | & | **VA Medical Center**<br>**830 Chalkstone Ave.**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Derek Sabourin** (hereinafter-called **DS**) shall provide X-ray/US/CT Technologist services up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   March 5, 2003 through June 5, 2003, with an option to extend for up to (90) ninety days.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray/US/CT Technologist

   Serves as staff X-ray/US/CT Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. X-ray/US/CT Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

# X-RAY TECHNOLOGIST

**CONTRACT NUMBER V650P-3692**

This agreement made on March 14, 2003 between:

| | | |
|---|---|---|
| **Kim M. LeBert**<br>REDACTED | & | **VA Medical Center**<br>**830 Chalkstone**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Kim Lebert** (hereinafter-called **KL**) shall provide X-ray/ Technologist services and perform nuclear medicine studies up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from March 14, 2003 through June 30, 2003, with an option to extend for up to (90) ninety days.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist

   Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

# X-RAY/ULTRASOUND TECHNOLOGIST

**CONTRACT NUMBER V650P-3739**

This agreement made on October 14, 2003 between:

| | | |
|---|---|---|
| **SCOTT GRAY**<br>REDACTED | **&** | **VA MEDICAL CENTER**<br>**830 CHALKSTONE**<br>**PROVIDENCE, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **SCOTT GRAY** (hereinafter-called (SG) shall provide X-ray/Ultrasound Technologist services up to forty (40) hours per week on an "as needed" basis at The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from October 14 2003 through March 31, 2004, with an option to extend for up to (90) ninety days.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray/Ultrasound Technologist

   Serves as staff X-ray/Ultrasound Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray/Ultrasound Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

**CONTINUATION SHEET:**

**<u>CONTRACTOR</u>: <u>CHRISTOPHER STOKES</u>**

## <u>X-RAY/ANGIO/CT TECHNOLOGIST SERVICES</u>

**Contractor** shall provide *<u>X-Ray/Angio/CT Technologist</u>* services listed below to veterans of VA Medical Center, Providence, RI, all in accordance with the attached terms and conditions.

**Contract Period**: January 1, 2004 through September 30, 2004, with two option year renewals.

**<u>BASE YEAR 1/1/04-9/30/04:</u>**

Provide the services of a X-Ray/Angio/CT Technologist on a full time basis, eight (8) hours per day, Monday through Friday at the following hourly rates:

| | |
|---|---|
| Up to forty (40) hours for any shift: | $45.00 |
| Overtime-over forty (40) hours: | $60.00 |
| Federal Holidays: | $60.00 |

**<u>OPTION YEAR ONE 10/1/04-9/30/05:</u>**

Provide the services of a X-Ray/Angio/CT Technologist on a full time basis, eight (8) hours per day, Monday through Friday at the following hourly rates:

| | |
|---|---|
| Up to forty (40) hours for any shift: | $48.00 |
| Overtime-over forty (40) hours: | $65.00 |
| Federal Holidays: | $65.00 |

**<u>OPTION YEAR TWO 10/1/05-9/30/06:</u>**

Provide the services of a X-Ray/Angio/CT Technologist on a full time basis, eight (8) hours per day, Monday through Friday at the following hourly rates:

| | |
|---|---|
| Up to forty (40) hours for any shift: | $50.00 |
| Overtime-over forty (40) hours: | $68.00 |
| Federal Holidays: | $68.00 |

CHRISTOPHER STOKES

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

# X-RAY TECHNOLOGIST

**CONTRACT NUMBER V650P-3757**

This agreement made on January 22, 2004 between:

| | | |
|---|---|---|
| **Suzette F. Kennett**<br>REDACTED | **&** | **VA Medical Center**<br>**830 Chalkstone**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Suzette Kennett** (hereinafter-called SK) shall provide X-ray/ Technologist services up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from January 22, 2004 through April 25, 2004, with an option to extend for up to (90) ninety days.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist

   Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

# X-RAY TECHNOLOGIST

**CONTRACT NUMBER V650P-3765**

This agreement made on June 4, 2004 between:

| | | |
|---|---|---|
| **Laurie M. Goss** [redacted] | & | **VA Medical Center**<br>**830 Chalkstone**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Laurie M. Goss** (hereinafter-called **LG**) shall provide X-ray/ Technologist services up to twenty-four hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from June 4, 2004 through September 30, 2004.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist

   Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

6. **QUALIFICATIONS:**

V650P-3781

**CONTINUATION SHEET:**

## CONTRACTOR: ____________________

## X-RAY/ANGIO/CT TECHOLOLGIST SERVICES

**Contractor** shall provide X-Ray/CT Technologist services listed below to veterans of VA Medical Center, Providence, RI, all in accordance with the attached terms and conditions.

**Contract Period:** July 19, 2004 through Octber 29, 2004

**DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

**Dayna Gardner** (hereinafter called DG ) shall perform X-Ray/CT Technologist services listed below at VA Medical Center, Providence, RI (hereinafter called **VAMC**), all in accordance with the requirements of the contract.

1. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist/CT Technologist

   **DG** serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. **DG** shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual. Also, **DG** must have a minimum of two years experience as a Radiological Technologist.

2. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

3. **WORK HOURS:**

   The services covered by this contract shall be furnished on normal work hours from 8:00 AM to 4:30 PM. **DG** may be called upon to work beyond these normal hours.

V650P-3784

**CONTINUATION SHEET:**

## CONTRACTOR: ____________

## X-RAY/ANGIO/CT TECHOLOLGIST SERVICES

**Contractor** shall provide X-Ray/CT Technologist services listed below to veterans of VA Medical Center, Providence, RI, all in accordance with the attached terms and conditions.

**Contract Period:** July 19, 2004 through Octber 29, 2004

### DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

**Aguinaldo Da Cruz** (hereinafter called **ADC** ) shall perform X-Ray/CT Technologist services listed below at VA Medical Center, Providence, RI (hereinafter called **VAMC**), all in accordance with the requirements of the contract.

1. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist/CT Technologist

   **ADC** serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. **ADC** shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual. Also, **ADC** must have a minimum of two years experience as a Radiological Technologist.

2. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

3. **WORK HOURS:**

   The services covered by this contract shall be furnished on normal work hours from 8:00 AM to 4:30 PM. **ADC** may be called upon to work beyond these normal hours.

V650P-3782

**CONTINUATION SHEET:**

**CONTRACTOR:** ____________________

## X-RAY/ANGIO/CT TECHOLOLGIST SERVICES

**Contractor** shall provide X-Ray/CT Technologist services listed below to veterans of VA Medical Center, Providence, RI, all in accordance with the attached terms and conditions.

**Contract Period:** July 19, 2004 through Octber 29, 2004

**DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

**Luchino Caparas** (hereinafter called LC ) shall perform X-Ray/CT Technologist services listed below at VA Medical Center, Providence, RI (hereinafter called **VAMC**), all in accordance with the requirements of the contract.

1. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist/CT Technologist

   **LC** serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. **LC** shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual. Also, **LC** must have a minimum of two years experience as a Radiological Technologist.

2. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

3. **WORK HOURS:**

   The services covered by this contract shall be furnished on normal work hours from 8:00 AM to 4:30 PM. **LC** may be called upon to work beyond these normal hours.

V650P-2773

CONTINUATION SHEET:

**CONTRACTOR:** **CLEMON W. ALLEN**

## X-RAY/ANGIO/CT TECHOLOLGIST SERVICES

**Contractor** shall provide X-Ray/Angio/CT Technologist services listed below to veterans of VA Medical Center, Providence, RI, all in accordance with the attached terms and conditions.

**Contract Period:** June 29, 2004 through September 30, 2004 with a 90 day option (October 1,2004 through December 31,2004).

**DESCRIPTION/SPECIFICATIONS/WORK STATEMENT**

**Clemon W. Allen** (hereinafter called **CA** ) shall perform X-Ray/Angio/CT Technologist services listed below at VA Medical Center, Providence, RI (hereinafter called **VAMC**), all in accordance with the requirements of the contract.

1. **DUTIES AND RESPONSIBILITIES:**

STATEMENT OF WORK
X-ray Technologist/Angio/CT Technologist

**CA** serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. **CA** shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual. Also, **CA** must have a minimum of two years experience as a Radiological Technologist.

2. **SHIFT SCHEDULE:**

The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

3. **WORK HOURS:**

The services covered by this contract shall be furnished on normal work hours from 8:00 AM to 4:30 PM. **CA** may be called upon to work beyond these normal hours.



DVA0052

DEPARTMENT OF VETERANS AFFAIRS
MEDICAL CENTER
PROVIDENCE, RHODE ISLAND

# X-RAY TECHNOLOGIST

**CONTRACT NUMBER V650P-3950**

This agreement made on January 18, 2005 between:

| | | |
|---|---|---|
| **Shannon Gomez**<br>REDACTED | & | **VA Medical Center**<br>**830 Chalkstone**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Shannon Gomez** (hereinafter-called SG) shall provide X-ray/ Technologist services up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from January 18, 2005 through April 18, 2005, with an option to extend for up to (90) ninety days for each extension.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist

   Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

# X-RAY TECHNOLOGIST

**CONTRACT NUMBER V650P-3952**

This agreement made on January 27, 2005 between:

| | | |
|---|---|---|
| **Sherrill D. Hockenberry** [redacted] | & | **VA Medical Center**<br>**830 Chalkstone**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Sherrill Hockenberry** (hereinafter-called **SH**) shall provide X-ray/ Technologist services up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from January 27, 2005 through April 27, 2005, with extension options for up to (90) ninety days.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist

   Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

**DEPARTMENT OF VETERANS AFFAIRS**
**MEDICAL CENTER**
**PROVIDENCE, RHODE ISLAND**

# X-RAY TECHNOLOGIST

**CONTRACT NUMBER V650P-3958**

This agreement made on April 14, 2005 between:

| | | |
|---|---|---|
| **Gabriel Ferrara**<br>**100 Wingate Ave**<br>**Warwick, RI 02888** | **&** | **VA Medical Center**<br>**830 Chalkstone**<br>**Providence, RI 02908** |

1. **PURPOSE OF AGREEMENT:**

   The purpose of this formal agreement is to have an interim contract whereby **Gabriel Ferrara** (hereinafter-called **GF**) shall provide X-ray/ Technologist services up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

   The contract period will be from April 14, 2005 through July 15, 2005, with extension options for up to (90) ninety days.

3. **DUTIES AND RESPONSIBILITIES:**

   STATEMENT OF WORK
   X-ray Technologist

   Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

   The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

   None under this contract. Contract may be modified to include "on call" by agreement of both parties at a standard or negotiated rate per hour.

# X-RAY TECHNOLOGIST

1. **PURPOSE OF AGREEMENT:**

The purpose of this formal agreement is to have an interim contract whereby **Timothy Jones** (hereinafter called **TJ**) shall provide X-ray/ Technologist services up to forty hours per week to The **VA MEDICAL CENTER**, Providence, Rhode Island (hereinafter called **VAMC**).

2. **CONTRACT PERIOD:**

The contract period will be from November 2, 2005 through January 31, 2006.

3. **DUTIES AND RESPONSIBILITIES:**

STATEMENT OF WORK
X-ray Technologist

Serves as staff X-ray Technologist to perform a variety of radiological examinations, which will be of diagnostic quality and conform to the VA Medical standards. The X-ray Technologist shall follow the routine views and protocols of each procedure, as describe in VA's policy and procedure manual.

4. **SHIFT SCHEDULE:**

The needs of this Medical Center can be met by allowing flexible shift schedules. By agreement of both parties, shift schedules may be changed anytime during the course of this contract. The VA's Administrative Officer, Diagnostic Imaging Service or his/her designate is responsible for scheduling all services under this contract.

5. **ON CALL SCHEDULE:**

There is an on-call option under this contract. Contract may be modified to include "on call" by agreement of both parties at $3.00 rate per hour.

6. **QUALIFICATIONS:**

The X-ray Technologist under this contract must have a current certificate issued by The American Registry of Radiologic Technologists (ARRT) demonstrating qualifications to perform the work. Also, must have a minimum of two years experience as a Radiologic Technologist.

PLAINTIFFS EXHIBIT 30

**Department of Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers - Kamenetsky

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

? Responses to requests from providers

B

JONES,EDWIN L JR -5897 CT HEAD W/O CONT Kamenetsky 1-May-03

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers – Anderson

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C.S.Ines, M.D.
CASIMIRA STA. INES, M.D.

| | | | |
|---|---|---|---|
| RYAN,RAYMOND S -6063 | CT LOWER EXTREMITY W/O C | Anderson, Mel | 21-Mar-03 |
| PHAIAH,WAYNE N -9921 | CT GUIDANCE FOR NEEDLE B | Anderson, Mel | 22-Aug-03 |
| MCDONALD,JAMES F -6257 | CT HEAD W&WO CONT | Anderson, Mel | 28-Feb-03 |
| HARTL,HERIBERT JR -3056 | CT HEAD W/O CONT | Anderson, Mel | 3-Mar-03 |
| BENOIT,EVERETT J -1464 | CT ABDOMEN\PELVIS W/CONT | Anderson, Mel | 14-Nov-02 |

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers Ukil

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

P. 1

| | | |
|---|---|---|
| TROIA,SARA M -1675 | CT HEAD W/O CONT | Weil |
| MALO,CHARLES P JR -5266 | CT LUMBAR SPINE W/O CONT | Weil |
| GAUTIERI,LOUIS S -1229 | CT ABDOMEN W/ORAL CONTRA | Weil |
| DEFUSCO,RAYMOND T -7042 | CT CHEST WITH CONTRAST I | Weil |
| FERRANCE,EDWIN C -1303 | CT ABDOMEN W/ORAL CONTRA | Weil |
| CULOTTA,ARTHUR G -0708 | CT CHEST W/O CONTRAST | Weil |
| ADDISON,THEODORE W -6984 | CT NECK SOFT TISSUE W/CO | Weil |
| HARMON,JOHN T -8308 | CT CHEST WITH CONTRAST I | Weil |
| FORTIER,ALBERT G -2789 | CT ABDOMEN W&W/O CONT | Weil |
| PAWLITSCHEK,ROBERT -6023 | CT CHEST WITH CONTRAST I | Weil |
| GIORGIO,ALBERT L -1786 | CT CHEST W/O CONTRAST | Weil |

21-Mar-03
22-May-03
4-Mar-03
28-Oct-03
13-Feb-03
21-Feb-03
1-Apr-03
8-Apr-03
2-Jun-03
14-Oct-03
21-Apr-03

#1

DORTONA,VINCENT W -8857 CT HEAD W/IV CONT OPS-M-PRIMARY 12-Aug-03

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers Sakhar

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

F1

| | | | |
|---|---|---|---|
| LONEY,DAVID J -3885 | CT LOWER EXTREMITY W/O C | Takhar | 15-Jul-03 |
| GOMES,NAPOLEON F -3867 | CT HEAD W/O CONT | Takhar | 5-Feb-03 |
| JACKVONY,GEORGE L -1704 | CT ABDOMEN\PELVIS W/CONT | Takhar | 17-Apr-03 |
| SACCOCCIO,JOHN PAUL -5778 | CT ABDOMEN W/ORAL CONTRA | Takhar | 9-Jun-03 |
| SANTOS,ANTONIO J -3441 | CT ABDOMEN W/O CONT | Takhar | 24-Jan-03 |

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers -Sternberg

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

F1

RATHBUN,RONALD E -0368
GRADY,WAYNE J -3737
PLANTE,DAVID G -3309

CT HEAD W/O CONT
CT ABDOMEN W/ORAL CONTRA
CT GUIDANCE FOR NEEDLE B

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers - Smkowski

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

F1

| | | | |
|---|---|---|---|
| BOUCHARD,RAYMOND C -3392 | CT CERVICAL SPINE W/O CO | Simkowski | 29-Jul-03 |
| DUNN,JOHN L -0860 | CT CHEST W/O CONTRAST | Simkowski | 22-Jul-03 |
| SANTOS,EUGENE ANTHO -2296 | CT GUIDANCE FOR NEEDLE B | Simkowski | 8-Oct-03 |
| ROSE,RUDOLPH -7600 | CT CHEST W/O CONTRAST | Simkowski | 10-Jun-03 |

F1

BROWN,JOHN D -9120 CT CHEST WITH CONTRAST I Simkowski 6-Oct-03

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers - Lai

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

F1

| | | | |
|---|---|---|---|
| ARIN,EDWARD J -8755 | ABDOMINAL CT | lai | 20-Mar-03 |
| ARDELLA,STEPHEN A -8256 | CT ABDOMEN\PELVIS W/CONT | Lai | 7-Apr-03 |

**Department of**
**Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers - Baolien

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.
CASIMIRA STA. INES, M.D.

F/

| | | | |
|---|---|---|---|
| BOYCE,RICHARD A -0296 | CT ABDOMEN\PELVIS W/CONT | Bastien | 7-Jun-03 |
| BOYCE,RICHARD A -0296 | CT ABDOMEN W/O CONT | Bastien | 8-Jun-03 |
| GREENE,EDWARD O SR -1873 | CTA PULMONARY ANGIOGRAP | Bastien | 26-Jun-03 |
| JOHNSON,SAM H -0080 | CT ABDOMEN\PELVIS W/CONT | Bastien | 15-Jul-03 |
| BOYCE,RICHARD A -0296 | CT ABDOMEN\PELVIS W/CONT | Bastien | 29-Sep-03 |
| COLAFRANCESCO,ARMAN -5866 | CT HEAD W/O CONT | Bastien | 9-Jun-03 |
| BOYCE,RICHARD A -0296 | CT ABDOMEN\PELVIS W/CONT | Bastien | 21-Oct-03 |
| SCHREMMER,HAROLD -2651 | CT HEAD W/O CONT | Bastien | 6-Feb-03 |
| OTIS,WALTER A JR -5381 | CT ABDOMEN\PELVIS W/CONT | Bastien | 25-Nov-03 |
| INSANA,PETER J -0784 | CT ABDOMEN\PELVIS W/CONT | Bastien | 17-Nov-03 |
| LABONTE,ADRIAN -5522 | CT CHEST W/O CONTRAST | Bastien | 18-Apr-03 |

**Department of Veterans Affairs**

# Memorandum

**Date:** May 19, 2004

**From:** Chief, Diagnostic Imaging Service (114)

**Subj.** Pending Cat Scans

**To:** Providers - Austerlitz

Dear Provider:

In an effort to address CAT Scan procedures that are waiting to be completed within our system, a list of patients whose CT Scan order is still in the pending status has been compiled. Please review the attached list and return the list to Marty Khatib and identify by placing a check mark next to those patients whom you decide should still be scheduled for their procedure. Kindly cancel those patients whom you feel CT procedure is no longer warranted. Your assistance with this matter is greatly appreciated.

C S Ines, M.D.

CASIMIRA STA. INES, M.D.

F1

| | | | |
|---|---|---|---|
| MASSE,ANDRE A -0137 | ABDOMINAL CT | Austerlitz | 25-Mar-03 |
| KING,WILLIAM C JR -2945 | CT CHEST W/O CONTRAST | Austerlitz | 10-Jun-03 |

**PLAINTIFFS EXHIBIT 31**

# Retaliation

An employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing discrimination. The same laws that prohibit discrimination based on race, color, sex, religion, national origin, age, and disability, as well as wage differences between men and women performing substantially equal work, also prohibit retaliation against individuals who oppose unlawful discrimination or participate in an employment discrimination proceeding.

In addition to the protections against retaliation that are included in all of the laws enforced by EEOC, the Americans with Disabilities Act (ADA) also protects individuals from coercion, intimidation, threat, harassment, or interference in their exercise of their own rights or their encouragement of someone else's exercise of rights granted by the ADA.

There are three main terms that are used to describe retaliation. Retaliation occurs when an employer, employment agency, or labor organization takes an **adverse action** against a **covered individual** because he or she engaged in a **protected activity**. These three terms are described below.

### Adverse Action

An adverse action is an action taken to try to keep someone from opposing a discriminatory practice, or from participating in an employment discrimination proceeding. Examples of adverse actions include:

- employment actions such as termination, refusal to hire, and denial of promotion,
- other actions affecting employment such as threats, unjustified negative evaluations, unjustified negative references, or increased surveillance, and
- any other action such as an assault or unfounded civil or criminal charges that are likely to deter reasonable people from pursuing their rights.

Adverse actions do not include petty slights and annoyances, such as stray negative comments in an otherwise positive or neutral evaluation, "snubbing" a colleague, or negative comments that are justified by an employee's poor work performance or history.

Even if the prior protected activity alleged wrongdoing by a different employer, retaliatory adverse actions are unlawful. For example, it is unlawful for a worker's current employer to retaliate against him for pursuing an EEO charge against a former employer.

Of course, employees are not excused from continuing to perform their jobs or follow their company's legitimate workplace rules just because they have filed a complaint with the EEOC or opposed discrimination.

For more information about adverse actions, see EEOC's Compliance Manual Section 8, Chapter II, Part D.

### Covered Individuals

Covered individuals are people who have opposed unlawful practices, participated in proceedings, or requested accommodations related to employment discrimination based on race, color, sex, religion, national origin, age, or disability. Individuals who have a close association with someone who has engaged in such protected activity also are covered individuals. For example, it is illegal to terminate an employee because his spouse participated in employment discrimination

litigation.

Individuals who have brought attention to violations of law other than employment discrimination are NOT covered individuals for purposes of anti-discrimination retaliation laws. For example,"whistleblowers" who raise ethical, financial, or other concerns unrelated to employment discrimination are not protected by the EEOC enforced laws.

## Protected Activity

Protected activity includes:

**Opposition to a practice believed to be unlawful discrimination**

Opposition is informing an employer that you believe that he/she is engaging in prohibited discrimination. Opposition is protected from retaliation as long as it is based on a reasonable, good-faith belief that the complained of practice violates anti-discrimination law; and the manner of the opposition is reasonable.

Examples of protected opposition include:

- Complaining to anyone about alleged discrimination against oneself or others;
- Threatening to file a charge of discrimination;
- Picketing in opposition to discrimination; or
- Refusing to obey an order reasonably believed to be discriminatory.

Examples of activities that are NOT protected opposition include:

- Actions that interfere with job performance so as to render the employee ineffective; or
- Unlawful activities such as acts or threats of violence.

**Participation in an employment discrimination proceeding.**

Participation means taking part in an employment discrimination proceeding. Participation is protected activity even if the proceeding involved claims that ultimately were found to be invalid. Examples of participation include:

- Filing a charge of employment discrimination;
- Cooperating with an internal investigation of alleged discriminatory practices; or
- Serving as a witness in an EEO investigation or litigation.

A protected activity can also include requesting a reasonable accommodation based on religion or disability.

For more information about Protected Activities, see EEOC's Compliance Manual, Section 8, Chapter

D. ADVERSE ACTION

1. General Types of Adverse Actions

The most obvious types of retaliation are denial of promotion, refusal to hire, denial of job benefits, demotion, suspension, and discharge. Other types of adverse actions include threats, reprimands, negative evaluations, harassment, or other adverse treatment.

Suspending or limiting access to an internal grievance procedure also constitutes an "adverse action." For example, in EEOC v. Board of Governors of State Colleges & Universities\29, a university's collective bargaining agreement provided for a specific internal grievance procedure leading to arbitration. The agreement further provided that this procedure could be terminated if the employee sought resolution in any other forum, such as the EEOC. The Seventh Circuit ruled that termination of the grievance process constituted an adverse employment action in violation of the anti-retaliation clause of the ADEA\30.

2. Adverse Actions Can Occur After the Employment Relationship Between the Charging Party and Respondent Has Ended

In Robinson v. Shell Oil Company,\31 the Supreme Court unanimously held that Title VII prohibits respondents from retaliating against former employees as well as current employees for participating in any proceedin under Title VII or opposing any practice made unlawful by that Act. The plaintiff in Robinson alleged that his former employer gave him a negativ job reference in retaliation for his having filed an EEOC charge against it. Some courts previously had held that former employees could not challenge retaliation that occurred after their employment had ended because Title VII, the ADEA, and the EPA prohibit retaliation against "an employee."\32 However, the Supreme Court stated that coverage of post-employment retaliation is more consistent with the broader context o the statute and with the statutory purpose of maintaining unfettered access to the statute's remedial mechanisms. The Court's holding applies to each of the statutes enforced by the EEOC because of the similar language and common purpose of the anti-retaliation provisions.

Examples of post-employment retaliation include actions that are designed to interfere with the individual's prospects for employment, suc as giving an unjustified negative job reference, refusing to provide a jo reference, and informing an individual's prospective employer about the individual's protected activity.\33 However, a negative job reference about an individual who engaged in protected activity does not constitute unlawful retaliation unless the reference was based on a retaliatory motive. The truthfulness of the information in the reference may serve a a defense unless there is proof of pretext, such as evidence that the former employer routinely declines to offer information about its former employees' job performance and violated that policy with regard to an

individual who engaged in protected activity. See Section 8-II E. below.

Retaliatory acts designed to interfere with an individual's prospects for employment are unlawful regardless of whether they cause a prospective employer to refrain from hiring the individual\34. As the Third Circuit stated, "an employer who retaliates cannot escape liability merely because the retaliation falls short of its intended result."\35 However, the fact that the reference did not affect the individual's job prospects may affect the relief that is due.

3. Adverse Actions Need Not Qualify as "Ultimate Employment Actions" or Materially Affect the Terms or Conditions of Employment to Constitute Retaliation

Some courts have held that the retaliation provisions apply only t retaliation that takes the form of ultimate employment actions\36. Other have construed the provisions more broadly, but have required that the action materially affect the terms, conditions, or privileges of employment.\37

The Commission disagrees with those decisions and concludes that such constructions are unduly restrictive. The statutory retaliation clauses prohibit any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others fro engaging in protected activity. Of course, petty slights and trivial annoyances are not actionable, as they are not likely to deter protected activity. More significant retaliatory treatment, however, can be challenged regardless of the level of harm. As the Ninth Circuit has stated, the degree of harm suffered by the individual "goes to the issue of damages, not liability."\38

----------------------------

Example 1 - CP filed a charge alleging that he was racially harassed by his supervisor and co-workers. After learning about the charge, CP's manager asked two employees to keep CP under surveillance and report back about his activities. The surveillance constitutes an "adverse action" that is likely to deter protected activity, and is unlawful if it wa conducted because of CP's protected activity.

Example 2 - CP filed a charge alleging that she was denied a promotion because of her gender. One week later, her supervisor invited a few employees out to lunch. CP believe that the reason he excluded her was because of her EEOC charge. Even if the supervisor chose not to invite CP because of her charge, this would not constitute unlawful retaliation because it is not reasonably likely to deter protected activity.

Example 3 - Same as Example 2, except that CP's supervisor

invites all employees in CP's unit to regular weekly lunches The supervisor excluded CP from these lunches after she filed the sex discrimination charge. If CP was excluded because of her charge, this would constitute unlawful retaliation since it could reasonably deter CP or others fro: engaging in protected activity.

----------------------------

The Commission's position is based on statutory language and polic considerations. The anti-retaliation provisions are exceptionally broad. They make it unlawful "to discriminate" against an individual because of his or her protected activity. This is in contrast to the general anti-discrimination provisions which make it unlawful to discriminate wit respect to an individual's "terms, conditions, or privileges of employment." The retaliation provisions set no qualifiers on the term "t discriminate," and therefore prohibit any discrimination that is reasonably likely to deter protected activity\39. They do not restrict the actions that can be challenged to those that affect the terms and conditions of employment\40. Thus, a violation will be found if an employer retaliates against a worker for engaging in protected activity through threats\41, harassment in or out of the workplace, or any other adverse treatment that is reasonably likely to deter protected activity by that individual or other employees.\42

This broad view of coverage accords with the primary purpose of th anti-retaliation provisions, which is to "[m]aintain[] unfettered access to statutory remedial mechanisms."\43 Regardless of the degree or quality of harm to the particular complainant, retaliation harms the public interest by deterring others from filing a charge\44. An interpretation of Title VII that permits some forms of retaliation to go unpunished woul undermine the effectiveness of the EEO statutes and conflict with the language and purpose of the anti-retaliation provisions.

**PLAINTIFFS EXHIBIT 32**

**RAJEEV GUPTA, M. D.**
*Internal Medicine*
1376 Broncos Highway
Oakland, Rhode Island 02858
(401) 567-0300

To Whom It May Concern

Debra was seen in my office on multiple occasion due to stress related Anxiety & Depressive Mood disorder caused by Diagnostic Imaging Administrative Officer at her work place. She was presented with signs & symptoms initially on Feb. 20th, 04. She was suffering from Anxiety, Insomnia and exacerbation of Migraine headaches. She was prescribed Lexapro and ended up in ER due to intolerance on Feb. 22nd, 04. On Feb. 25th, she was seen as follow up & advised to take LOA which she declined out of fear of losing her job. She continued to work in stressful enviorement & came to see me on May 5th due to worsening of symptoms, stress, not able sleep & panic anxiety attacks. She declined LOA again. She was given prescription meds She was seen as follow up on May 12th & suggested to take LOA & out Pt. counseling. On July 7th she was seen and started on new prescription & advised to go for counseling & message left with Sue Morin (Counseler). She was also advised to go on LOA due to worsening symptoms. She was seen on July 21st as follow up & LOA extended until 8/10/04. Her meds was adjusted. She was seen on Aug 10th & 25th as follow up and further medication increased. She continued with counselling

**RAJEEV GUPTA, M. D.**
*Internal Medicine*
1376 Broncos Highway
Oakland, Rhode Island 02858

(401) 567-0300

As I discussed with Pt's counseller (Sue Morin), Debra's symptoms to recover fully is only possible when the situation and cause of adjustment disorder is rectified. and prognosis of recovery depends on it.

If you have any further question & concern You can call me.

[signature]

RAJEEV GUPTA, M.D.
1376 BRONCOS HWY.
[illegible] RI 02[illegible]

PLAINTIFFS EXHIBIT 33

Claimant: Debra Auger
SSN: 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
DOB: 05/31/71
DDS Examiner: Deborah Cannon (Unit BS)
Date of Evaluation: 08/26/05

August 26, 2005

James P. Curran, Ph.D.
Plaza Psychology & Psychiatry
68 Cumberland Street, Suite 102
Woonsocket, Rhode Island 02895

The claimant is a 34-year-old Caucasian female referred by Rhode Island Disability Determination Services for a mental status evaluation. She was accompanied by her father, Leo Fontaine. On the referral, the claimant alleges depression, anxiety and memory difficulties. The claimant is not currently on any public support and not on Disability. She did apply for Worker's Compensation but it was denied and she is appealing it. She has an attorney, Mr. Bauccorelli.

The claimant has a valid driver's license. She has never had her driver's license revoked or suspended. Her father drove her to the appointment. The claimant appeared her stated age. She is of average height and average build for her height. She had black hair and brown eyes. She was casually and neatly dressed. Hygiene appeared to be good. She does not wear glasses. Gait, posture and motor behavior appeared to be within normal limits. She was quite sad and cried for a good part of the interview. Eye contact was good and rapport was good.

HISTORY:
The claimant appeared to be a reliable historian. The claimant graduated from Mt. St. Charles Academy. She has an Associate's Degree from Community College of Rhode Island in Applied Science and Radiography. She was in regular education in school and never repeated any grades. She was not involved in any school extracurricular activities. She was never in trouble in school, never suspended or expelled. The claimant has never been in the military and has never had any problems with the police.

The claimant grew up in an intact home, that is her mother and father were married to each other and continue to remain married. Neither of her parents had a problem with substance abuse and neither ever sought psychiatric treatment. She reports that she has never been physically or sexually abused.

The claimant's primary care physician is Dr. Gupta. Dr. Gupta has her on the following medications: alprazolam for anxiety, Ambien for sleep, Excedrin for headaches, Zantac with the Excedrin because they upset her stomach, trazodone for sleep and depression and Zoloft for depression. She said in general, she

continued----

is medically healthy but psychiatrically she has some significant problems. She has been seeing a counselor, Susan Morin, since July 2004. She meets with her counselor approximately twice a week.

The claimant has worked at The Veterans' Administration Medical Center in Providence since 1989. She worked in different roles there but mostly in the Radiology department. She said a new administrator moved in about a year and a half ago. He, according to her, discriminated against women and tries to run most of the female staff off and has been successful in doing this. She said there have been a number of meetings with other hospital administrators complaining. She said the chief of the department resigned, the chief technician went out with a stress-related illness some time ago and the claimant, herself, is out on a stress-related illness and has a Worker's Compensation case going against The Veterans' Administration. She said the complaints began with this administrator in September 2003 so it is approximately two years. Five people have different law suits against the hospital because of this one individual.

The claimant said she has been depressed since she left work which was on June 25, 2004. She said, "I cry all the time. I actually get sick, I get nauseous and sometimes vomit. I have nightmares, I can't eat sometimes and I have lost interest in doing many things. I used to like to swim in the pool and I have been in the pool once in the last two summers. I don't go out, I don't feel like it. I don't like being around people." This is all different than the way she used to be. She said, "I have trouble concentrating and focusing. I have lower energy and don't feel like doing anything. I feel horrible about myself." Although quite depressed she reports she is not suicidal.

The claimant is also having panic attacks. She said, "I can wake up in the middle night in a cold sweat. I can't breathe, I get chest pains, my heart is racing, I start shaking and hyperventilate." She said these attacks can come at anytime but are more likely to come at night, either when she is sleeping or when she is awake but at nighttime she gets worse.

The claimant rarely drinks alcohol, maybe once or twice a year. She said, "sometimes if I go out with my girlfriends I might have one or two beers at the most. I tried marijuana once as a teenager," but that is the extent of her drug use. She said, "I used to smoke cigarettes but stopped smoking cigarettes two years ago and I am proud of that."

The claimant has been married once to David Auger at age 21. They were divorced when she was 30 years of age on the basis of irreconcilable differences. They have no children.

The claimant is currently in her parents' home with her mother and father and dog Niko. She said, "I do some work around the

continued----

house. I do my own laundry, help with the dishes and do some cleaning. I do spend time with my computers on E-Bay and also preparing my law suit. I used to like to do lots of things, I used to do creative woodworking, scrapbooking and was pretty active with friends and going places. Now, I don't do anything and have lost all interest and don't feel like it. I do watch football and television, I like the Patriots."

The claimant is not dating. She doesn't go out very much. She does have one good friend who she might visit once every six weeks. She said, "about once every six weeks I might go out with the girls from the hospital and we might go to a restaurant and complain about the administrator who has made it miserable for all of us."

The claimant has a good work since 1989, first as a student for two years and then worked at The Veterans' Administration Medical Center. She has worked as a diagnostic radiology technician. She specializes in lead angio as a technician. She is trained to do CT's and other diagnostic procedures.

MENTAL STATUS EXAMINATION:
The claimant's speech quality and quantity were within normal limits. She was quite emotional and cried for a good amount of the evaluation. She appeared both anxious and depressed; her hands were shaking at times. She looked very sad and depressed. There was no evidence of any thought disorder. She denied hallucinations and delusions. She knew the name of the President of the United States, Vice President of the United States and the Governor of Rhode Island. She was oriented to date and place. She had no trouble naming three large American cities. Interpretation of proverb was good. Insight and judgement both appeared to be good.

The claimant meets the criteria for a diagnosis of Major Depressive Disorder, recurrent, moderate to severe. Her appetite varies, there are times when she can't eat and she gets nervous and nauseous and at times will vomit. Her sleep is poor and she said she wakes up with panic attacks and finds it difficult to go back to sleep. She has lost her interest in doing many things she used to like to do. She gets agitated very easily. She feels worthless and hopeless. She gets tired easily. In addition to these symptoms, when she gets panic attacks, she has choking sensation, shortness of breath, heart palpitations, chest pain and sometimes gets nauseous. She meets the criteria for both Major Depressive Disorder, recurrent, moderate to severe and Panic Disorder with some agoraphobia, moderate to severe. There was no evidence of any mania or Obsessive-Compulsive Disorder. There was no evidence of any Generalized Anxiety Disorder or simple phobias. There was no evidence of any Post Traumatic Stress Disorder. The claimant said that she has had seizures as an allergic reaction to medication such as antihistamines and Lexapro. She has never had blackouts.

continued----

Re: Auger, Debra

SUMMARY AND DIAGNOSIS:
The claimant meets the DSM-IV criteria for the following diagnoses:

Axis I: Major Depressive Disorder, recurrent, moderate to severe.
Panic Disorder with some agoraphobia, moderate to severe.

Axis II: High school graduate with an Associate's Degree, intelligence in the Average to High-Average range.

Axis III: Reports general good health.

Axis IV: Financial problems, occupational problems and access to health care with recent notification that because she has been out of work for a year her insurance has been cut off.

Axis V: GAF: 45, based on her psychiatric diagnosis of Major Depressive Disorder, recurrent and Panic Disorder.

If she is awarded funds, I would suggest they could be awarded to her directly as she would use them in her best interest.

James P. Curran, Ph.D.

9/8/05

Date

This transcription was made from the recording of the voice of:
James P. Curran, Ph.D.

DD: 08/26/05
DT: 09/05/05
MTC/634/#3877

## CERTIFICATION OF BUSINESS RECORDS

I, Mary Beth Ducharme, the undersigned, declare that I am employed by/associated with **JAMES CURRAN, M.D.**, in the position of receptionist and Custodian of Records, and by reason of my position am authorized and qualified to make this declaration.

I further declare that the documents attached hereto are original records or true copies of records that were:

1. made at or near the time of the occurrence of the matters described in the documents, by (or from information transmitted by) a person with knowledge of those matters;
2. kept in the course of regularly conducted business activity; and
3. made by the said business activity as a regular practice.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct.

Date of execution: 12/6/06

Place of execution: Woonsocket RI 02895

Signature: Mary Beth Ducharme

Print Name: Mary Beth Ducharme

**PLAINTIFFS EXHIBIT 34**

 Rec'd 11 Oct 05

Social Security Administration

# Retirement, Survivors and Disability Insurance

Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: October 7, 2005
Claim Number: 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HA

1003 MCS,PC7,I,BA,T083,058,153 000012011 03 MB 0.718
DEBRA A AUGER
195 CHERRY HILL AVE
WOONSOCKET, RI 02895-1705

You are entitled to monthly disability benefits beginning December 2004.

**What We Will Pay And When**

- You will receive $15,950.00 around October 13, 2005.
- This is the money you are due for December 2004 through September 2005.
- Your next payment of $1,595.00, which is for October 2005, will be received on or about the fourth Wednesday of November 2005.
- After that you will receive $1,595.00 on or about the fourth Wednesday of each month.
- These and any future payments will go to the financial institution you selected. Please let us know if you change your mailing address, so we can send you letters directly.

The day we make payments on this record is based on your date of birth.

**Other Social Security Benefits**

The benefit described in this letter is the only one you can receive from Social Security. If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

**Your Responsibilities**

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

Enclosure(s):
Pub 05-10153
Pub 05-10058

C

See Next Page

We have enclosed a pamphlet, "What You Need To Know When You Get Disability Benefits". It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A provider of employment or vocational rehabilitation services may contact you about getting help to go to work. The provider may be a State vocational rehabilitation agency or a provider under contract with the Social Security Administration.

If you go to work, special rules allow us to continue your cash payments and health care coverage. For more information about how work and earnings affect disability benefits, call or visit any Social Security office and ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).
- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

We will not reduce your benefit because of workers' compensation payments until a decision is made on your appeal of the claim. Please let us know when a final decision is made. At that time, we may collect any money that should not have been paid.

**Do You Disagree With The Decision?**

If you disagree with this decision, you have the right to appeal. We will review your case and consider any new facts you have. A person who did not make the first decision will decide your case. We will correct any mistakes. We will review those parts of the decision which you believe are wrong and will look at any new facts you have. We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.
- The 60 days start the day after you get this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.
- You must have a good reason for waiting more than 60 days to ask for an appeal.
- You have to ask for an appeal in writing. We will ask you to sign a Form SSA-561-U2, called "Request for Reconsideration". Contact one of our offices if you want help.

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your Social Security Claim". It contains more information about the appeal.

**If You Want Help With Your Appeal**

You can have a friend, lawyer or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-401-766-8423. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
PAVILION PLAZA
2168 DIAMOND HILL ROAD
WOONSOCKET, RI 02895

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Jo Anne B. Barnhart
Commissioner
of Social Security