**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND**

Eileen Ahern, Maureen Mastalerz,
Debra Auger, and Lynda Parker,
Plaintiffs,
v. C.A.NO. 05-117ML

Jim Nicholson, Secretary,
Department of Veterans Affairs,
Defendant.

**PLAINTIFF'S ANSWER TO DEFENDANT'S STATEMENT OF FACTS AS TO WHICH THERE IS "NO GENUINE DISPUTE"**

Now comes the Plaintiffs to hereby Answer and dispute selected facts which the Defendant asserts there is no genuine dispute:

13. Khatib, who had not previously worked in the VA system, sought to boost productivity and alter where he perceived to be a culture of inefficiency plaguing DIS and the CT Department in particular (Khatib ¶¶ 2,10.)

**Plaintiffs Answer**: Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin depo at 40). Khatib and Stokes purposely altered patient flow to make Lynda Parkers job difficult (Parker depo at 117)

14. In 2003, the CT Department routinely closed for preventive maintenance at least one afternoon each month for several hours, during which time patients were not scheduled. (Ex. 5 at 32:11-33:24.) During these preventive maintenance periods,

the CT technologists took "extended lunches," and Khatib often had difficulty locating them. (Ex. 3, at 56:10-57-15; see Khatib ¶ 12; Ex. 9 at 26:4-24.)

**<u>Plaintiffs Answer</u>**: Khatib treated the make techs differently than the female techs. (Parker depo at 110-113). He micromanaged the female techs, particularly the Plaintiffs and promoted the male contract techs (Parker depo at 108-120, memo of Schaefer to Joslin). Khatib would demand to know where the female techs were at all times and never cared about the whereabouts of the male techs. (Parker dep at 108-120)

15. In addition, prior to Khatib's arrival as Administrative Officer, the CT Department's practice was to leave four outpatient slots per day unfilled, ostensibly to allow for the completion of unscheduled emergency cases. (Ex. 5, at 35:2-22.) Khatib, however, viewed this practice as inefficient because these slots often went unused when unscheduled cases did not materialize. (Khatib ¶ 12; Ex. 4, at 44:14-19.)

**<u>Plaintiffs Answer</u>**: The Plaintiffs did not do the CT scheduling which was done by clerks in the DIS. (Plaintiffs exhibit 12)

18. In Khatib's view, the compressed tour created a number of inefficiencies. (Khatib ¶ 13.)

**<u>Plaintiffs Answer</u>**: Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib did not "notice" the compressed tours created inefficiencies until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) Khatib originally wanted all DIS to be on compressed schedules. (Plaintiffs exhibit 16)

19. Khatib expressed concern to the Chief technologist that the CT technologists frequently took sick leave to extend their regular days off. (Ex. 4, at 98:13-19.) When a CT technologist called in sick, the CT Department was left with only one technologist for the entire day, because there were only two technologists scheduled each day. (Khatib ¶¶ 13, 16; Ex. 10; Ex. 11.) In addition, under the compressed schedule, the CT technologists frequently collected overtime beginning at 5:30 p.m. because that was the end of their regularly scheduled shift. The day's cases, however, were often not completed by that time. (Ex. 9, at 74:5-75:7; Ex. 5 at 38 and 66:3-19; Khatib ¶ 14.)

**Plaintiffs Answer**: Khatib targeted the sick leave of Ahern and Mastalerz despite lax enforcement otherwise in DIS (Beaudoin depo at 98-99). Craig Polucha, Chief Human Resources acknowledged that there was not a significant issue with regard to OT in CT (Polucha dep. 68-69, Plaintiffs exhibits 14, 15) There was no issue with regard to excess overtime in CT in 2004. (Polucha dep. at 68-69, Plaintiffs exhibits 14, 15 )

20. Khatib attributed this backlog in part to the CT staff's compressed schedules which required that the last outpatient be scheduled by not later than 5:00 p.m. (Ex. 5, at 36:5-10; 38:17-20; and 54:7-19; Khatib ¶ 17).

**Plaintiffs Answer**: The DIS changed to the compressed schedule in 2000, removing the second shift because there were no patients except emergencies after 16:00. (Def. Ex. 32, Parker dep at 41) Khatib told Joan Beaudoin before March 2004 that he thought everyone in DIS should be on the compressed schedule. (Plaintiffs exhibit 16)

22. In early 2004, an audit of pending cases in each DIS modality revealed that the CT Department was also plagued with an alarming number of pending cases that

had been scheduled, but never performed. (Ex. 4 at 40:21-23; 42:1-2; Ex. 11; Ex. 12; Ex. 13; Khatib ¶ 15.)

**Plaintiffs Answer**: Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). The backlog consisted of duplicate exams, deceased patients and no shows (Beaudoin depo at 43, Plaintiffs exhibit 29). Khatib forbid Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz depo at 110). Later, Khatib hired Chris Stokes was hired on OT to delete duplicates (Plaintiffs exhibit 13). By June of 2004 there was not a significant backlog. (Auger dep. at 158) The Plaintiffs presented the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern depo at 158).

23. Khatib ordered a review of thousands of pending CT cases in DIS's computer tracking system, which revealed at 275 cases that were not duplicates and that had not been cancelled by the physician involved. (Ex. 14; Ex. 4, at 62:1-65:3; Ex. 15 at PSM00006; Khatib ¶ 18.) Included among these unperformed pending procedures was at least one critical needle biopsy that a physician had ordered to assess the malignancy of a tumor. (Ex. 4, at 64:10-65:3.)

**Plaintiffs Answer**: Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). The backlog consisted of duplicate exams, deceased patients and no shows (Beaudoin depo at 43, Plaintiffs exhibit 30). Khatib forbid Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz depo at 110). Later, Khatib hired Chris Stokes was hired on OT to delete duplicates (Plaintiffs exhibit 13). By

June of 2004 there was not a significant backlog. The Plaintiffs presented the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern depo at 158).

24. To address the critical issue of pending cases, Khatib directed that DIS send lists of non-duplicate pending cases to each relevant physician for verification (Ex. 16; Khatib ¶ 18.)

**<u>Plaintiffs Answer</u>**: Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). The backlog consisted of duplicate exams, deceased patients and no shows (Beaudoin depo at 43). Khatib forbid Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz depo at 110). Later, Khatib hired Chris Stokes was hired on OT to delete duplicates (Def exhibit 14). By June of 2004 there was not a significant backlog. The Plaintiffs presented the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern depo at 158). The non-duplicates that Khatib sent to the Physicians were no shows (Plaintiffs exhibit 30)

25. In addition to the backlog in the CT Department, Khatib had become seriously concerned about work flow and unreliable reporting in the CT Department. (Ex. 17; Khatib ¶ 18.) In early April 2004, for example, Khatib advised the Chief Technologist:

> Wspeecoifitcianlulye, t[otrhee]c Seicvheedinuaeccdu Rreaqtuees tin Lcoogm isn ignac cduartaian gathned nmootr rneifnlge crteipnogr tw.hat is actually happening in CTand. .t hTehree fCoTre d ecpaaurstinmge ndte liasy nso ti nf usenrcvtiicoen ainngd a sin eift fsihcoieunldcies.

(Ex. 17.)

**Plaintiffs Answer**: Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib did not "notice" the compressed tours created inefficiencies until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin depo at 40).

26. The address the problems in the CT Department, Khatib submitted a detailed memorandum to the Chief of the Diagnostic Imaging Service on March 31, 2004. (Ex. 11.)

**Plaintiffs Answer**: Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib did not "notice" the compressed tours created inefficiencies until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin depo at 40).

27. In this memorandum, Khatib proposed that the tour of duty be changed so that each of the three technologists would work a regular eight-hour tour, five days per week. Under Khatib's initial proposal, these tours would be staggered such that the first technologist would begin work at 7:00 a.m. The second technologist would begin at 10:30 a.m., and the third would work from 3:00 p.m. to 11:00 p.m. (Ex. 11, at WMK0030.) The objective of this staggered tour proposal was to ensure that three CT technologists would be available Monday through Friday and that the department's regular hours of operation would be extended. (Ex. 11; Ex. 13) This schedule would eliminate substantial overtime and allow additional cases to be scheduled each afternoon. (Ex. 5 66:1-19; Khatib ¶ 17.)

**Plaintiffs Answer**: Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib did not "notice" the compressed tours created inefficiencies until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin depo at 40). Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65).

28. The Chief of Diagnostic Imaging, Dr. Sta Ines, endorsed a modified version of the change to the CT schedule and proposed it to the CT technologists on April 12, 2002. (Ex. 18; Ex. 19; Sta Ines ¶ 7.)

**Plaintiffs Answer**: Dr. Sta Ines, a woman, was powerless to stop Khatib. Khatib even prepared documents and signed her name for her. (Plaintiffs exhibits 1,2,3) Dr. Sta Ines knew that Plaintiffs had been harassed by Khatib (Parker Depo at 52, Plaintiffs exhibits 1) Sta Ines never protected the Plaintiffs from Khatib (Ahern depo at 191)

29. In addition, Khatib attempted to impose tighter reporting controls on the CT Department and directed that all patients be called the day before their scheduled appoint to avoid no-shows. (Ex. 4 at 53:5-7; Khatib ¶ ¶ 18-19.)

**Plaintiffs Answer**: Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib did not "notice" the compressed tours created inefficiencies until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin depo at 40). Khatib

created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65).

30. Khatib, in consultation with the Chief of Diagnostic Imaging, determined to implement training in CT procedures for all interested technologists and also sought to have the CT technologists trained in radiology procedures. (Ex. 20; Khatib ¶ 19; Sta Ines ¶ 8.)

**Plaintiffs Answer**: Rotating people in and out of CT is not even a rational solution to decreasing inefficiency in the CT department. It is clearly a pretext excuse for retaliation. Khatib was hired in August 2002. (Khatib Affidavit, Def. Summary Judgment Motion) Khatib did not "notice" the compressed tours created inefficiencies until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) Khatib created unreasonable workload for Ahern and Mastalerz in CT (Beaudoin depo at 40). Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). Dr. Sta Ines, a woman, was powerless to stop Khatib. Khatib even prepared documents and signed her name for her. (Plaintiffs exhibits 1, 2, 3) Dr. Sta Ines knew that Plaintiffs had been harassed by Khatib (Parker Depo at 52 , Plaintiff Exhibit 1) Sta Ines never protected the Plaintiffs from Khatib (Ahern depo at 191)

31. In early 2004, a number of problems were negatively impacting the efficiency of the CT Department and a constant backlog existed. (Ex. 22, at AH0243, Ex. 21, at AH0032.)

**Plaintiffs Answer**: Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). Khatib did not "notice" the backlog until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) The backlog consisted of duplicate exams, deceased patients and no shows (Beaudoin depo at 43, Plaintiffs exhibit 29). Khatib forbid Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz depo at 110). Later, Khatib hired Chris Stokes was hired on OT to delete duplicates (Def exhibit 13). By June of 2004 there was not a significant backlog. The Plaintiffs presented the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern depo at 158). The non-duplicates that Khatib sent to the Physicians were no shows (Plaintiffs exhibit 30)

32. The desire to increase efficiency in the CT Department motivated Khatib to change the technologists' schedule. (Ex. 22, at AH0249.)

**Plaintiffs Answer**: Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). Khatib did not "notice" the backlog until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) The backlog consisted of duplicate exams, deceased patients and no shows (Beaudoin depo at 43, Plaintiffs exhibit 30). Khatib forbid Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz depo at 110). Later, Khatib hired Chris Stokes was hired on OT to delete duplicates (Plaintiffs exhibit 13). By June of 2004 there was not a significant backlog. The Plaintiffs presented

the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern depo at 158). The non-duplicates that Khatib sent to the Physicians were no shows (Plaintiffs exhibit 30)

33. The CT technologists, Ahern, Mastalerz, and Auger, opposed the effort to switch the CT Department to a standard five-day-per-week schedule. (Ex. 22 and Ex. 21, at AH0030-32.) They objected to Khatib's plan for a number of reasons, including: "We will no longer have a day off during the week to take care of personal business so we will now need to take days off to do theses things." (Ex. 22, at AH0247.)

**Plaintiffs Answer**: Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). Khatib did not "notice" the backlog until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1) The backlog consisted of duplicate exams, deceased patients and no shows (Beaudoin depo at 43, Plaintiffs exhibit 30). Khatib forbid Ahern and Mastalerz from deleting duplicate CT exams in order to increase the backlog (Mastalerz depo at 110). Later, Khatib hired Chris Stokes was hired on OT to delete duplicates (Def exhibit 13). By June of 2004 there was not a significant backlog. The Plaintiffs presented the evidence to Sta Ines. Khatib who was at the meeting denied the backlog was decreased (Ahern depo at 158). The non-duplicates that Khatib sent to the Physicians were no shows (Plaintiffs exhibit 30)

34. Under Khatib's proposal, Ahern's, Mastalerz's, and Auger's overtime would have been significantly curtailed. (Ex. 5, at 66:12-19; 68:5-11, 70:17-71:2.)

**Plaintiffs Answer**: Craig Polucha, Chief Human Resources acknowledged that there was not a significant issue with regard to OT in CT (Polucha depo 68-69) There was no issue with regard to excess overtime in CT in 2004. (Plaintiffs exhibits 14,15) Khatib created the backlog because he wanted to progress in the VA system and he wanted to change the hours of the CT techs (Beaudoin depo at 65). Khatib did not "notice" the backlog until March 2004, after the February 2, 2004 memo fro Sta Ines to him about among other things, his disparate treatment toward women. (Plaintiffs Ex. 1)

35. On April 22, 2004, less than ten days after being notified of the plan to modify their work schedules, Plaintiffs and several other staff employees, male and female, sent a seventeen-page memorandum to the VA Hospital administration, complaining at length about Khatib's proposed change to the schedule and his treatment of the staff technologists. (Ex. 21.)

**Plaintiffs Answer**: The Plaintiffs complained in September 2003, January 22, 2004, and April 22, 2004 to Dr. Sta Ines about discrimination by Khatib (Def. exhibit 32) Such complaints constitute protected activity under Title VII. (Plaintiffs exhibit 31)

36. In this memorandum, the authors complain, among other things, that Khatib "places unreasonable and unrealistic expectations on all of us, seemingly setting us up to look and feel like failures." (Ex. 21, at AH0028). The memorandum also accuses Khatib of being disrespectful of male doctor, Gregory Babigian, and of treating the male file room clerks "horribly." (Ex. 21, at AH0035.) The memorandum concludes by accusing Khatib of engaging in workplace "bullying" of the entire staff. (Ex. 21, at AH0041-42.)

**Plaintiffs Answer**: Dr. Babigian and the file room clerks were singled out for abuse by Khatib because they were sympathetic to the female techs. There is no dispute that Khatib is a "bully." (Plaintiffs exhibit 2,3,4)

38. Historically, DIS had difficulty hiring experienced technologists because "[t[he VA Hospital has a lower pay scale than the rest of the state . . ." (Ex. 1, at 14:25-15:1.) In addition, "with the shortage of x-ray, CT, ultrasound and other techs in the country it is hard to hire techs." (Ex. 21, at AH0041.)

**Plaintiffs Answer**: 5 CFR 300.501 establishes that Federal Temporary Employees should be (1) used for brief or intermittent periods, (2) trained by the Temp agency, not the Federal agency, (3) used only for the temporary use of their skills when necessary, and (4) used only when there is a critical need. A critical need is defined as "a sudden or unexpected occurrence, emergency, a pressing necessity, an exigency. A recurring cyclical peak workload, by itself, is not a critical need. (Plaintiffs exhibit 5(b))

CFR 300.503 states in part that Temporary Employees may only be used when one of the following short term situations exist (1) an employee is absent for a short period of time for emergency, but that does not include vacations or other circumstances which are not shown to be compelling in the judgment of the agency, or the agency must carry out work for a temporary period which in the judgment of the agency cannot be delayed because of a critical need. In any case Temporary employees may not be used (1) in lieu of regular recruitment and hiring procedures under the civil service laws for permanent employees in the competitive civil service, (2) to displace a Federal employee, or (3) to circumvent controls on employment levels. (Plaintiffs exhibit 5(d))

Khatib hired Chris Stokes even though there was no vacant position posted at the VA (Auger depo 110) Khatib hired Gabe Ferreira, a male, as a contract tech rather than hire Laurie Crafts, a female, as a VA employee. They were both students, except that Crafts had more experience at the Providence VA than Ferreira. (Parker depo at 139). This was illegal decision making and is evidence of discrimination under the *McDonnell Douglas* standards. In addition, 5 CFR 4.3 states that "No person shall influence another person to withdraw from competition for any position in the competitive service for the purpose of either improving or injuring the prospects of any applicant for appointment." (Plaintiffs exhibit 5(a))

39. DIS solicited applications for a GS-647-8 CT technologist in December 2003-January 2004, which went unfilled. (Ex. 24; Khatib ¶ 22)

**Plaintiffs Answer**: Chris Stokes was hired September 15, 2003 as an x-ray/angio/CT technologist (Def exhibit 26). There was no posting for the position that Khatib hired Chris Stokes into ( Auger dep at 110) Khatib hired Chris Stokes even though there was no vacant position posted at the VA (Auger depo 110, Joslin Affidavit) Khatib did not properly requisition the position he hired Chris Stokes to under Federal Policy. He did not have enough time, and could not have shown the need in September 2003 that is contemplated by the Federal Contracting Regulations. (Auger Dep at 110, Plaintiffs exhibit 5)

41. During Khatib's tenure as Administrative Officer, DIS hired both male and female contract technologists. (Ex. 3, at 103:10-13; Sta Ines ¶ 4; Khatib ¶ 229.)

**Plaintiffs Answer**: Sometime in late 2003, Khatib said "This is crazy, a department full of women. I want to start hiring male techs." (Parker dep. at 92) In September 2003, the

DIS at the VA had 14 female techs and 2 male techs, or 88% female techs and 12% male techs. (Statistics compiled from figures reported in Joslin Affidavit attachment to Def. Summary Judgment memo.) The national average for radiology techs as of April 2004 was 70% female and 30% male. (Plaintiffs exhibit 24) Khatib and Marc Shaffer did all the hiring of contract techs, as evidenced by the fact it is only their names that appear on communications to the contracting officer at the VA. (Plaintiffs exhibit 28) In 2003 and 2004, prior to the April 22, 2004 memo to the VA where the techs complain that male contract techs are treated better than the rest of the staff, Khatib hires 5 males and 2 females, or 71% male and 28% female techs. . (Statistics compiled from figures reported in Joslin Affidavit attachment to Def. Summary Judgment memo.) Overall, the Khatib administration hires 11 male contact techs and 7 female contract techs, or 61% male and 39% female. (Statistics compiled from figures reported in Joslin Affidavit attachment to Def. Summary Judgment memo.) The greatest gain for female hiring is after the April 22, 2004 meeting between staff and the memo that resulted from that meeting. (Statistics compiled from figures reported in Joslin Affidavit attachment to Def. Summary Judgment memo.)

Only 2 females were ever hired in a capacity other than x-ray tech. Only two males were only hired as x-ray techs. (Plaintiffs exhibit 29) Three males were hired as x-ray tech / angio / CT tech. ( Plaintiffs exhibit 29) The three male contract techs hired x-ray tech / angio / CT tech were Chris Stokes, Wes Allen, and Luchiano Capraras. (Plaintiffs exhibit 29) Of those three hired as x-ray tech / angio / CT tech, two were give managerial or supervisory powers over regular employees in contravention of Federal Regulations. (Plaintiffs exhibit 6, Defendants Admissions in Statement of Facts 65, 66)

43. The standard contract expressly stated: "Both parties agree that [the contract technologist] is not considered an employee of the VAMC for any purpose." (See, E.G., Ex. 25, ¶ 10.) In addition, these contract technologists did not receive any benefits from the VA Hospital, such as health insurance, sick leave, paid vacation, or retirement plan contributions. (Joslin ¶ 4; Ex. 1, at 99:9-13.)

**Plaintiffs Answer**: Chris Stokes and Luchio Capraras both received substantial raises while working as contract techs at the VA. (Joslin Affidavit) Dr. Shafer lobbied for Capraras wage increase at least in part because he was performing supervisory duties. (Plaintiffs exhibit 6)

46. The Contracting Department assessed the rates established by the staffing agencies on the Federal Supply Schedule and then sought to acquire contract services at the best value obtainable. Specifically, the Contracting Department obtained comparative hourly rates for technologists from Staffing Now, Inc., Cirrus Medical Staffing LLC, and others. (Joslin ¶ 5.)

**Plaintiffs Answer**: Dr. Shafer lobbied for Capraras wage increase at least in part because he was performing supervisory duties. (Plaintiffs exhibit 13)

51. Khatib and the Chief of the Diagnostic Imaging Service, Dr. Sta Ines, interviewed Stokes to fill DIS's urgent need for an experienced radiology technologist. (Khatib ¶ 25; Sta. Ines ¶ 4.)

**Plaintiffs Answer**: Chris Stokes was hired September 15, 2003 as an x-ray/angio/CT technologist (Def exhibit 29). There was no posting for the position that Khatib hired Chris Stokes into ( Auger dep at 110) Khatib hired Chris Stokes even though there was

no vacant position posted at the VA (Auger depo 110) Khatib did not properly requisition the position he hired Chris Stokes to under Federal Policy. He did not have enough time, and could not have shown the need in September 2003 that is contemplated by the Federal Contracting Regulations. (Auger Dep at 110) Craig Polucha, Chief of Human Resources testified that there was no way that he could determine what jobs were posted at the VA in 2003. (Polucha dep. at 25) Bob Joslin, the contracting officer, he states that there was a job posted in only in December of 2003. (Joslin Affidavit) Chris Stokes was hired September 15, 2003 as an x-ray/angio/CT technologist (Def exhibit 26).

58. The VA Hospital subsequently renewed Stokes's contract for nine months on January 1, 2004 at $45 per hour. (Joslin ¶ 9.) In connection with this contract, the Contracting Department conducted another assessment of the hourly rates quoted by various staffing agencies and determined that Stokes's rate was $20 per hour lower than the lowest agency rate. After two subsequent contract renewals, Stokes became a staff technologist in 2007. (Joslin ¶ 9.)

**Plaintiffs Answer**: Chris Stokes and Luchio Capraras both received substantial raises while working as contract techs at the VA. (Joslin Affidavit) Dr. Shafer lobbied for Capraras wage increase at least in part because he was performing supervisory duties. (Plaintiffs exhibit 6)

60. None of the Plaintiffs ever sought to resign her staff position to pursue a contract position. (See, E.G., Ex. 7 at 79:7-17; Ex. 3, at 61:14-21.)

**Plaintiffs Answer**: 5 CFR 300.501 establishes that Federal Temporary Employees should be (1) used for brief or intermittent periods, (2) trained by the Temp agency, not

the Federal agency, (3) used only for the temporary use of their skills when necessary, and (4) used only when there is a critical need. A critical need is defined as “a sudden or unexpected occurrence, emergency, a pressing necessity, an exigency. A recurring cyclical peak workload, by itself, is not a critical need. (Plaintiffs exhibit 5(b))

CFR 300.503 states in part that Temporary Employees may only be used when one of the following short term situations exist (1) an employee is absent for a short period of time for emergency, but that does not include vacations or other circumstances which are not shown to be compelling in the judgment of the agency, or the agency must carry out work for a temporary period which in the judgment of the agency cannot be delayed because of a critical need. In any case Temporary employees may not be used (1) in lieu of regular recruitment and hiring procedures under the civil service laws for permanent employees in the competitive civil service, (2) to displace a Federal employee, or (3) to circumvent controls on employment levels. (Plaintiffs exhibit 5(d))

65. Subsequently, Khatib delegated to Stokes the responsibility for coordinating patient flow within DIS, because Khatib considered him an experienced, professional technologist, who had availability to take on this task. (Khatib ¶ 27.)

**Plaintiffs Answer**: This fact is an admission of illegal decision making. 5 CFR 300.502 states that Agencies may not use temporary help for the work of managerial or supervisory positions. (Plaintiffs exhibit 5(c)) Chris Stokes was placed in a supervisory position over Parker, Masterlez and Auger. (Parker Dep. at 34)

66. Stokes coordinated the assignment of cases, interfaced with other departments to ensure that their diagnostic imaging needs were being met, and handled other

routine tasks. Stokes had no supervisory authority, reported to Khatib, and did not receive additional compensation. (Khatib ¶ 27.)

**<u>Plaintiffs Answer</u>**: This fact is an admission of illegal decision making. 5 CFR 300.502 states that Agencies may not use temporary help for the work of managerial or supervisory positions. (Plaintiffs exhibit 5(c)) Chris Stokes was placed in a supervisory position over Parker, Masterlez and Auger. (Parker Dep. at 34)

67. Prior to giving the role to Stokes, Khatib conferred with the Chief of the Diagnostic Imaging Services and the Human Resources Department and obtained approval to assign theses responsibilities to a contract technologist. (Khatib ¶ 27; Sta Ines ¶ 9; Ex. 31, at AH3790(6:14-10:21)

**<u>Plaintiffs Answer</u>**: This fact is an admission of illegal decision making and ratification by Administration. 5 CFR 300.502 states that Agencies may not use temporary help for the work of managerial or supervisory positions. (Plaintiffs exhibit 5(c)) Chris Stokes was placed in a supervisory position over Parker, Masterlez and Auger. (Parker Dep. at 34)

68. At the time Khatib tasked Stokes with handling flow control, Mastalerz, Auger, and Ahern had all left DIS on extended medical leave. (Ex. 1, at 116:1-13.) In June 2004, the most senior technologist in DIS was Raymond Kim and not any of the Plaintiffs. (Ex 5, at 104:2-20; see 180:22-181:3.)

**<u>Plaintiffs Answer</u>**: Chris Stokes was placed in a supervisory position over Parker, Masterlez and Auger (Parker Dep. at 34) The most senior person in DIS was Elaine Apici, a female.

69. In January 2004, the Plaintiffs and others met with the Chief of the Diagnostic Imaging Service to complain about Khatib's management of the department and his treatment of female employees. (Ex. 7 at 167:21-24.)

**Plaintiffs Answer**: The Plaintiffs complained in September 2003, January 22, 2004, and April 22, 2004 to Dr. Sta Ines about discrimination by Khatib ( Def. exhibit 32) Such complaints constitute protected activity under Title VII. ( Plaintiffs exhibit 31)

70. The April 22, 2004 memorandum constituted a formal union grievance under the Plaintiffs' collective bargaining agreement. (Ex. 21, at AH0027.)

**Plaintiffs Answer**: The April 22, 2004 memo stated that it was being submitted to the union to consider it a formal grievance (Def. Exhibit 32.) Arthur Jordan, the union President testified in his deposition that it was not submitted by the union as a formal grievance and that to his recollection it was treated as in informal matter. ( Jordan dep.)

75. Among other things the report [ the September 30 VA DIS report ] concluded:

> 5. There was no apparent discriminatory behavior on the part of Mr. Khatib. There were male and female employees of varying ages, who either supported him or were non-supportive. There were allegations that he hired his male friends on contract, however, these allegations were not substantiated as he had hired three female employees, including contract, per diem, and student employees.
>
> 8. The employees with significant longevity seemed to have grown accustomed to self managing. While there were males and females of various age groups that either endorsed his changes or opposed them, there was clearly a division between the longer-term employees and

> the newer ones with only one exception. The newer employees say Mr. Khatib as having "an open door policy" and "Cleaning up the department and making people accountable." They claimed that they were encouraged by the existing technologists to say negative things about Mr. Khatib and would be shunned if they did not support the current staff. However, clearly the new employees were not invested in the old work structure, such as compressed tours of duty, and realistically had little to lose. There is no question that there is a serious morale issue among the majority of staff.

(Id. At AH0019.)

**Plaintiffs Answer**: The timeline in the report did not even consider the Plaintiffs complaints of September 2003 and January 22, 2004, and the Dr. Sta Ines February 2, 2004 memo about discrimination by Khatib ( Def. exhibit 32) Such complaints constitute protected activity under Title VII. ( Plaintiffs exhibit 31) This substantial evidence was apparently not contemplated by the DIS reviewers.( Def. exhibit 32) The recommendations of the September 30, 2004 were never implemented by the Providence VA (Polucha depo 49-51)

80. As part of the plan to alleviate staffing problems, Khatib and the Chief of Diagnostic Imaging sought to cross-train interested technologists in CT procedures. (Khatib ¶ 19; Sta Ines ¶ 8.) It was, however, only feasible to fully train one technologist at a time. (Ex. 1, at 150:2-4.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib trained Chris Stokes in CT before Lynda Parker (Parker depo at 149). Parker was never trained in CT. (Parker dep. at 149). Wes Allan told Lynda Parker that Khatib was not going to train her for CT (Parker at 146).

81. Khatib informed Parker that she would have an opportunity to receive CT training in due course, but that given her responsibilities as an angiography technologist and her prior commitment to angiography cross-training, she would be trained after Tenessa Karmozyn. (Khatib ¶ 30; Ex. 1, at 146:14-21; Ex. 33, at AH3773.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib trained Chris Stokes in CT before Lynda Parker (Parker depo at 149). Parker was never trained in CT. (Parker dep. at 149). Wes Allan told Lynda Parker that Khatib was not going to train her for CT (Parker at 146).

84. In early August 2004, Parker informed CCRI that a hiring freeze was likely to be imposed at the VA Hospital and that such a freeze would negatively impact the clinical training program. (Ex. 34.)

**Plaintiffs Answer**: Khatib harassed Parker on a day-to-day basis (Parker depo at 61) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62)

Khatib continuously threatened Parker, Ahern, Auger and Mastalerz jobs by bringing around male employees which he said could do their jobs (Parker depo at 78) Khatib treated the make techs differently than the female techs. (Parker depo at 110-113). He micromanaged the female techs, particularly the Plaintiffs and promoted the male contract techs (Parker depo at 108-120, memo to Joslin, memo of Schaefer to Joslin) Khatib undermined Parker by humiliating her in front of her students and trying to send her students to do things which were not appropriate at their level of education (Parker depo at 129).

85. Parker took this action without first discussing it with Khatib. (Khatib ¶ 31.) As a result of Parker's actions, Khatib expressed frustration and questioned her judgment: "I am still confused as to why you would not confirm the information with us before making the presentation to the school, since this would have significant impact of the department and would change the number of students who attend our program?" (Ex. 34.)

**Plaintiffs Answer**: Khatib harassed Parker on a day-to-day basis (Parker depo at 61) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib continuously threatened Parker, Ahern, Auger and Mastalerz jobs by bringing around male employees which he said could do their jobs (Parker depo at 78) Khatib treated the make techs differently than the female techs. (Parker depo at 110-113). He micromanaged the female techs, particularly the Plaintiffs and promoted the male contract techs (Parker depo at 108-120, memo to Joslin, memo of Schaefer to Joslin) Khatib undermined Parker by humiliating her in front of her students

and trying to send her students to do things which were not appropriate at their level of education (Parker depo at 129).

91. Nowhere in her exit interview statement did Parker state that she was forced to leave her position because of harassment based on her sex or retaliation for engaging in a protected activity. (Id. At 62; Ex. 1, 55:12-22.)

**Plaintiffs Answer:** Parker stated in her letter of resignation to Sta Ines that Sta Inez knew why she was leaving ( Plaintiffs exhibit 25) Dr. Sta Ines knew that Plaintiffs had been harassed by Khatib (Parker Depo at 52, Plaintiffs exhibit 1)

94. Khatib never demoted Parker, denied her a promotion, suspended her, reduced her salary, refused her leave requests, or negatively evaluated her. (Ex. 1, at 86:9-87:12.)

**Plaintiffs Answer**: Khatib harassed Parker on a day-to-day basis (Parker depo at 61) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib continuously threatened Parker, Ahern, Auger and Mastalerz jobs by bringing around male employees which he said could do their jobs (Parker depo at 78) Khatib treated the make techs differently than the female techs. (Parker depo at 110-113). He micromanaged the female techs, particularly the Plaintiffs and promoted the male contract techs (Parker depo at 108-120, memo to Joslin, memo of Schaefer to Joslin) Khatib undermined Parker by humiliating her in front of her students and trying to send her students to do things which were not appropriate at their level of education (Parker depo at 129).

95. Khatib never insulted, ridiculed, disparaged or threatened her. (Ex. 1, at 84:5-85:12.)

**<u>Plaintiffs Answer</u>**: Khatib harassed Parker on a day-to-day basis (Parker depo at 61) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib continuously threatened Parker, Ahern, Auger and Mastalerz jobs by bringing around male employees which he said could do their jobs (Parker depo at 78) Khatib treated the make techs differently than the female techs. (Parker depo at 110-113). He micromanaged the female techs, particularly the Plaintiffs and promoted the male contract techs (Parker depo at 108-120, memo to Joslin, memo of Schaefer to Joslin) Khatib undermined Parker by humiliating her in front of her students and trying to send her students to do things which were not appropriate at their level of education (Parker depo at 129).

100. On February 20, 2004, Auger received a memorandum from the Chief Technologist rebuking her for her role in improperly photographing two staff members from Roger Williams Medical Center who were visiting DIS on official business. (Ex. 39; Khatib ¶ 33-34.)

**<u>Plaintiffs Answer</u>**: The photographs were of Bruce Foster, who was a former employee of the VA. He had been terminated from the Providence VA purportedly for falsifying records. The circumstance behind his falsifying records was that he was having a sexual relationship with a female tech at the VA hospital. In order to cover up the time they spent fornicating, he forged her name on x-ray slips to create a paper trail to account for her time. An EEO complaint was filed by Auger, Beaudoin, Ahern, and Masterlez,

among others, against Bruce Foster for sexually hostile work environment. The EEOC case was settled with a settlement agreement. The Plaintiffs believed the settlement agreement included that fact that Bruce Foster was not supposed to be on VA property. In February of 2004 Khatib, who must have known Foster previously, often mused to Beaudoin and Auger about what Bruce's ideas were about the VA DIS. On or about February 19, 2004 Khatib escorted Bruce Foster and another tech from Roger Williams Medical Center around DIS at the VA. Auger reported this event to Dr. Sta Inez who said she would look into it. A few days later Khatib again escorted Bruce Foster through DIS. At that time Auger took a picture of Bruce Foster in order to prove that he had been there. Auger received a reprimand from Joan Beaudoin for taking that picture without the permission of Bruce Foster. The reprimand was initiated by Khatib and like many of the reprimands and admonishments after February 2004 was coerced by Khatib to issue the adverse action. Khatib even went so far as to write up admonishments and reprimands and make Beaudoin sign them. At least once he didn't bother to have her sign a reprimand but, instead, signed for her. Some of these events which he coerced Beaudoin into issuing reprimands to the Plaintiffs occurred when Beaudoin was not present in the hospital at the time. Auger was disciplined in February 2004 for taking pictures of Foster (Auger depo at 65, Plaintiffs exhibit 27).

101. The actions documented in the February 20, 2004, memorandum were improper, and Auger did not dispute the memorandum. (Ex. 40, at AH3398.)

**Plaintiffs Answer**: Prior to February 2004 Auger had never received discipline at the VA (Auger dep. at 66). Khatib made Beaudoin discipline her (Auger at 65). This incident occurred after the February 2, 2004 memo from Sta Ines to Khatib. ( Plaintiffs exhibit 1)

103. On July 6, 2004, she submitted an excuse slip from her physician, stating only that she had been evaluated for stress and anxiety disorder and been advised to remain out of work until further evaluation on July 21, 2004. (Ex. 9, at 93; Ex. 41.)

**<u>Plaintiffs Answer</u>**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

104. Khatib, who was Auger's direct supervisor at that time, consulted with the Human Resources Department and sent Auger a letter on July 8, 2004, stating that her doctor's medical note did "not provide sufficient information to approve your request for sick leave." (Ex. 88, Khatib ¶ 35.) The letter further requested that she furnish "acceptable medical documentation that fully illustrates your incapacitation for duty." (Ex. 88, at PDA0172, Khatib ¶ 35.)

**<u>Plaintiffs Answer</u>**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was

on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

105. To assist Auger in providing the documentation necessary, Khatib included a copy of the approved Standard for Medical Documentation. (Ex. 88, at PDA0173, Khatib ¶ 35; Ex. 23, 52:21-54:10.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

106. The July 8, 2004 letter stated that Auger would receive provisional leave until July 16, 2004 and noted that if acceptable documentation was not received, the VA hospital would not grant Auger leave and would take appropriate administrative action. (Ex. 88, at PDA0172.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

107. In the past, DIS had made similar requests for verification of an employee's medical condition. For example, in February 2004, DIS pressed Dr. Gregory Babigian to obtain documentation from his physician justifying his week-long absence from work on medical leave and rejected the cursory emergency room discharge slip that he had presented. (Khatib ¶ 35.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

114. Khatib never denied Auger any benefits or reduced her work responsibilities. (Ex. 7, at 93:9-11; 94:12-15)

Plaintiffs Answer: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

116. Moreover, Khatib never threatened Auger, and he never insulted or disparaged Auger based on her gender. (Ex. 7, at 186:23-187:12; 119:7-20; 158:12-24.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib was completely hostile and disrespectful to Auger (Auger depo at 124). In her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib (Def exhibit 67).While Debra Auger was on leave, Khatib repeatedly threatened to take administrative action against her (Def exhibits 74,89)

117. Khatib never altered Auger's employment while she was at the VA Hospital. (Ex.7, at 94:23-95:2.)

**Plaintiffs Answer**: Khatib removed Auger from her position as lead Angio tech and assigned her to CT five days a week (Auger depo 93) A hostile work environment began in September 2003 where males were treated better than females (Auger depo at 161-162) Khatib's preoccupation with hiring contract techs affected the Plaintiffs salary structure (Auger depo at 110-112).

121. Khatib never threatened, insulted, or used profanities with Ahern. (Ex. 5, at 109:20-110:9; 189:24-190:13.)

**Plaintiffs Answer:** Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Ahern believed that Khatib was going to strike her but she moved before he did (Ahern depo at 189)Khatib continuously threatened Parker,

Ahern, Auger and Mastalerz jobs by bringing around male employees which he said could do their jobs (Parker depo at 78) Ahern went out on stress leave because of the environment that was created by Khatib in DIS (Ahern depo at 198). When Ahern returned from stress leave she was not restored to CT and was not allowed to take call (Ahern depo at 92-93).Marc Schaefer helped Khatib retaliate against the Plaintiffs (Ahern depo 110-112).Marc Schaefer was as cruel to the Plaintiffs as Khatib (Ahern depo at 113) Ahern, Auger and Mastalerz were reprimanded for leaving telephone messages to the call Radiologist was deliberate retaliation against them by Schaefer and Khatib (Ahern depo 115-116).Ahern was disciplined for patient advocacy (Ahern depo at 120).Ahern believed that Sta Ines never protected the Plaintiffs from Khatib (Ahern depo at 191)

122. On May 21, 2004, Ahern received a letter of counseling from the Chief Technologist, Beaudoin, regarding her treatment of two patients. The letter accurately described that Ahern encouraged a patient to complain about a delay that Ahern blamed on DIS policies, and the letter also chronicled how she initially refused to perform a CT procedure on another patient who did not have an appointment. (Ex. 49, Ex. 5, at 168:23-169:4.)

Plaintiffs Answer: Ahern was disciplined for patient advocacy (Ahern dep. at 120). Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin dep. at 26-27).

125. Ahern's conduct, which came to light after an emergency room physician became concerned about the delay, compromised patient safety and was unacceptable. (Ex. 4, at 33:11-20; see Ex. 7, at 70:22-71:4; Sta Ines ¶ 14; Khatib ¶ 37; Ex. 51.)\

**Plaintiffs Answer**: Ahern was disciplined for patient advocacy (Ahern dep. at 120). Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin dep. at 26-27).

130. Because Ahern did not return to DIS until October 5, 2004, the CT Department's on-call schedule had already been set for that month. (Ex. 5, at 118:7-21; see Ex. 4, at 159:24-160:12 (call schedule typically filled out "a year in advance"); Khatib ¶ 38.) Ahern, however, was returned to the on-call schedule beginning in November. (Khatib ¶ 38; Ex. 5, at 119:2-5.)

**Plaintiffs Answer**: Beaudoin, who made out call schedules, stated that it would only take minutes to change a call schedule to include Ahern and Masterlerz.. ( Beaudoin dep.) Khatib, by denying Ahern and Mastalerz from taking call was displacing Federal employees with temporary employees. (Plaintiffs exhibit 5(d))

133. On June 21, 2004, Mastalerz, like Ahern, received a letter of admonishment for her improper conduct in connection with leaving voice mail messages for a radiologist about emergency CT scan procedures that required review. (Ex. 53.)

**Plaintiffs Answer**: Mastalerz thought Khatib was creating a paper trail in order to terminate her (Mastalerz depo at 104) Khatib retaliated against Parker, Orsini, Auger,

Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin depo at 26-27).

135. On September 26, 2004, she sent the VA Hospital a letter dated September 15 from her physician, stating that Mastalerz condition "had improved" and that she was able to return to work. (Ex. 55.)

**Plaintiffs Answer**: Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Mastalerz was called into the office every week and harassed about her job performance. (Mastalerz depo at 39) Mastalerz went out on stress leave because of the stress caused by Khatib in DIS (Mastalerz depo at 37-38). When Mastalerz came back from stress leave, Khatib would not put her back in CT and would not let her take call (Mastalerz depo at 41).

136. Following this letter, the VA Hospital's Human Resources Department requested confirmation of her full recovery. (Ex. 3, at 160:2-161:10.)

**Plaintiffs Answer**: Mastalerz had presented the VA with a Doctors note. ( Def. Ex. 55) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Mastalerz was called into the office every week and harassed about her job performance. (Mastalerz depo at 39) Mastalerz went out on stress leave because of the stress caused by Khatib in DIS (Mastalerz depo at 37-38). When Mastalerz came back from stress leave, Khatib would not put her back in CT and would not let her take call (Mastalerz depo at 41).

139. On November 15, 2004, Mastalerz received a letter of reprimand, the second lowest level of discipline, for being absent without permission. (lEx. 56.) Specifically, on November 3, 2004, Mastalerz sent Khatib an e-mail stating that she intended to take annual leave because she wanted to depart work an hour and a half early the following day. (Ex. 57.)

**Plaintiffs Answer**: Mastalerz thought Khatib was creating a paper trail in order to terminate her (Mastalerz depo at 104) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin depo at 26-27).

142. Consistent with VA Hospital discipline policy, Mastalerz received a letter of reprimand, but no suspension, loss of pay or other adverse action for leaving her job without proper permission. (See id.; Ex. 59.)

**Plaintiffs Answer**: Mastalerz thought Khatib was creating a paper trail in order to terminate her (Mastalerz depo at 104) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin depo at 26-27).

147. Khatib never insulted, ridiculed, or threatened Mastalerz, (Ex. 3, at 103:22-25; 104:6-16.) In addition, Khatib never terminated, suspended, or demoted Mastalerz, and he never reduced her responsibilities at the VA Hospital. (Ex. 3 at 100:19-24; 103:14-21.)

**<u>Plaintiffs Answer</u>**: Mastalerz thought Khatib was creating a paper trail in order to terminate her (Mastalerz depo at 104) Khatib retaliated against Parker, Orsini, Auger, Beaudoin, Ahern and Masterlez after the January 22, 2004 meeting in Sta Ines' office and finally ran each one out of the VA (Parker depo at 61-62) Khatib coerced Joan Beaudoin into disciplining Ahern and Mastalerz over trivial things (Beaudoin depo at 26-27). Mastalerz was called into the office with Khatib and Schaefer weekly for eight weeks and berated about her job performance. (Mastalerz depo at 172).Marc Schaefer helped Khatib retaliate against the Plaintiffs (Ahern depo 110-112). Schaefer was cruel to the Plaintiffs as Khatib (Ahern depo at 113).

Respectfully Submitted,
Plaintiffs
By Their Attorney,

<u>/S/ Thomas E. Folcarelli</u>

Thomas E. Folcarelli #6393
Attorney for the Plaintiff
55 Bradford Street, Suite 203
Providence, RI 02903
401.521.1828
Fax: 401.274.2480

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on this 7th Day of January, 2008, I caused a true copy of the within Assented-To Motion for Extension of Time to Answer the Defendant's Motion for Summary Judgment to be electronically filed with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System. The following participant has been noticed electronically:

Robert Clarke Corrente
United States Attorney; and:
Richard M. Myrus, Esq.
Assistant U.S. Attorney
Attorney for the Defendant
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
richard.myrus@usdoj.gov

/S/ Thomas E. Folcarelli