**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Eileen Ahern, Maureen Mastalerz, Debra Auger, and Lynda Parker, Plaintiffs, | ) | |
| v. | ) | C.A. NO. 05-117ML |
| Jim Nicholson, Secretary, Department of Veterans Affairs, Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

## I. INTRODUCTION

Summary judgment is "the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003) (quoting Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999). To survive summary judgment, a nonmovant must offer more than conclusory allegations, improbable inferences, and unsupported speculation. Feliciano de la Cruz v. El Conquistador Resort, 218 F.3d 1, 5 (1st Cir. 2000). In this case, however, Plaintiffs rely on nothing but conclusory allegations that are unsupported by the record evidence and that do not give rise to any genuine issues of material fact.

Plaintiffs' claims of discriminatory hiring, pay and promotion fail as a matter of law because Plaintiffs cannot show that they suffered an adverse employment action, that similarly situated males were treated preferentially, or that the VA Hospital's nondiscriminatory rationales for its actions were pretextual. Unable to offer any evidence that could give rise to a genuine dispute as to any material issue, Plaintiffs abandon their previous allegations that contract

technologists in the Diagnostic Imaging Service ("DIS") were paid more than Plaintiffs, and resort to a new argument. Now, Plaintiffs claim that staff technologists, male and female, were not paid enough, regardless of what the contract technologists were paid. In support of this allegation, which is not set forth in the Second Amended Compliant and which is not cognizable under Title VII, Plaintiffs offer no evidence that similarly situated males were treated differently, and they impermissibly rely on Plaintiffs' uncorroborated speculation and suspicion.

With respect to their allegation that a contract worker, Christopher Stokes, was improperly promoted to the position of Chief Technologist, Plaintiffs do not dispute that three of them had already left DIS prior to his alleged promotion by Mehrdad Khatib. Moreover, Plaintiffs themselves have asserted that the role of Chief Technologist should have been assigned to the most senior staff technologist in DIS, and Plaintiffs concede that none of them was the most senior. Last, Plaintiffs do not dispute that a female staff technologist, Tenessa Karmozyn, was also given the same temporary duties as Stokes after the Chief Technologist departed. Because Plaintiffs can point to no evidence that the terms and conditions of their employment were negatively affected as a result of Stokes's role or that Khatib acted with discriminatory animus, Plaintiffs' claim cannot survive summary judgment.

As to Plaintiffs' claims of retaliation and harassment, Plaintiffs ignore the deposition testimony, declarations, and documentary evidence that Defendant cited in support of summary judgment. Instead, Plaintiffs continue to rely on their conclusory, unsupported assertions about perceived slights and management decisions with which they disagreed. Plaintiffs have abandoned many of their allegations of retaliation, and their remaining claims fail because they are based almost entirely on events that did not constitute adverse employment actions.

Moreover, Plaintiffs have adduced no evidence that Defendant's explanations for the allegedly improper actions were pretextual.

Plaintiffs' opposition memorandum also confirms that their hostile work environment claims are based on allegations that cannot survive summary judgment. For example, Plaintiffs continue to assert that a hostile work environment existed because "[Khatib] micromanged female techs" and told one of the Plaintiffs "that she should stop going over his head" to make complaints. (Pls.' Mem. at 9.) Plaintiffs refuse to accept that "Title VII does not provide a civility code for the American workplace," and Plaintiffs' claims should be dismissed as a matter of law. Burlington Northern & Santa Fe Railway Co. V. White 126 S. Ct. 2405, 2415 (2006).

## II. ARGUMENT

### A. Defendant Is Entitled to Summary Judgment on Count I Because Plaintiffs Have Adduced No Evidence that They Suffered an Adverse Employment Action.

Count I of Plaintiffs' Second Amended Complaint alleges that Khatib discriminated against the Plaintiffs by hiring male contract technologists. Count I is flawed because Khatib indisputably hired both men and women, and because Plaintiffs cannot show that Khatib's alleged hiring preferences constituted an adverse employment action with respect to Plaintiffs. In their opposition to Defendant's summary judgment motion, Plaintiffs do not dispute that Khatib hired a substantial number of female technologists. (See Def.'s Statement of Undisputed Facts, ¶ 47 (unopposed).) Plaintiffs also do not dispute that each of the Plaintiffs was already employed as a technologist at the VA Hospital when Khatib allegedly hired male contract technologists improperly. (See Pls.' Ans. to Def.'s Statement of Facts, ¶ 54.) Last, Plaintiffs

concede that, as tenured federal employees, they had no interest in these contract positions. (See Pls.' Ans. to Defendant's Statement of Facts, No. 60 and Defendant's Undisputed Statement of Fact, ¶ 47 (listing contract employees and unopposed by plaintiffs).)

In their opposition to Defendant's motion for summary judgment, Plaintiffs ignore the deposition testimony in which they admit that they suffered no adverse consequences as a result of Khatib's hiring of male contract technologists. For example, plaintiff Debra Auger testified that "the position itself and him filling that position meant nothing to me one way or the other." (Ex. 7, at 108:1-21.)[1] Plaintiffs also offer no explanation for Auger's unambiguous concession that Khatib's hiring of male contract technologists did not deprive her of any position that she was interested in at the VA Hospital:

> Q. You don't claim that Mr. Khatib hired a
> man for a position that you wanted, though;
> right?
>
> A. Correct.

(Ex. 9, at 51:7-10.)

Plaintiffs now contend that the percentage of male technologists in DIS increased over time to approximately sixty percent in June 2004, after Khatib allegedly stated that he wanted to begin hiring male technologists because there were very few males in DIS.[2] (Pls.' Mem. at 6 and

[1]Exhibits 1-90 are provided in the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment. Additional exhibits cited herein are included in the Supplemental Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment submitted with this memorandum.

[2]Plaintiffs cite International Brotherhood Teamsters v. United States, 431 U.S. 324 (1977), in support of their attempt to rely on the percentage of males in DIS as evidence of discrimination. In IBT, the United States brought suit alleging a systemic pattern and practice of purposeful discrimination by a union and a trucking company against African-Americans and

27.) Kahtib's alleged statement amounts to an observation that DIS was predominantly female in 2003, which it was, and that achieving a degree of gender balance in DIS through future hiring would be appropriate. In any event, it is undisputed that five of the fourteen contract technologists that Khatib hired in 2003-2004 were females. (Def.'s Statement, No. 47 (listing contract employees and unopposed by Plaintiffs).) Plaintiffs also ignore that in 2003 Khatib recommended plaintiff Lynda Parker for promotion and also later hired the female contract technologists Kim Liebert, Dana Gardner and Suzette Kennett as full time staff technologists. (See Def.'s Statement of Undisputed Facts, ¶¶ 47, 77.)

More importantly, regardless of Khatib's motives for his hiring decisions, Plaintiffs have adduced no credible evidence that they were harmed by the hiring of male (and female) contract technologists in 2003 and 2004. Rather than offer any colorable argument as to how the hiring of males alleged in Count I constituted an adverse employment action for them, Plaintiffs make three irrelevant arguments. First, Plaintiffs rely on the allegation that Khatib should have hired Laurie Crafts, a nonparty, for an entry-level staff position. (Pls.' Mem. at 27.) Plaintiffs, however, ignore that, according to plaintiff Eileen Ahern, none of the Plaintiffs had any interest in that position:

> Q: None of the plaintiffs in this case were interested in the entry level position that Ms.Crafts was seeking, correct?

---

Hispanics. In that case, the government showed that African-Americans and Hispanics held 0.4% and 0.3 % respectively of the jobs at issue. Id. at 337. The Supreme Court did not conclude that "hiring ratios compared to the normal ratio of an occupation" are relevant, as Plaintiffs now assert, and the unremarkable "statistics" upon which Plaintiffs rely are not, by any stretch, comparable to those in IBT. Moreover, IBT "concerned the appropriate prima facie test for a class action," which the instant case is not. Michell v. Baldridge, 759 F.2d 80, 85 (D.C. Cir. 1985).

A: Correct.

(Ex. 5, at 89:9-11.) Thus, Plaintiffs cannot show that this episode constituted an adverse employment action.

Second, Plaintiffs attempt to blur the issues by claiming that Khatib's "hiring helped create a hostile work environment . . . ." (Pls.' Mem. at 26.) This new assertion is a concession by Plaintiffs that Count I cannot stand on its own. Moreover, it does not bolster Plaintiffs' hostile work environment claim because the hiring of males is far from the type of severe, sexually objectionable conduct necessary to support a hostile work environment claim. See Farragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

Third, Plaintiffs now assert that "Khatib's preoccupation with hiring contract techs prevented the VA from improving the pay of regular employees at least by affecting their salary structure." (Pls.' Mem. at 9 (emphasis added).)[3] Plaintiffs' newly contrived allegation is: (1) not presented anywhere in Plaintiffs' Second Amended Complaint; (2) not cognizable under Title VII; and (3) inconsistent with the Plaintiffs' unambiguous deposition testimony.

Nothing in the Second Amended Complaint supports Plaintiffs' new claim with respect to Count I. From the outset of this case, the gravamen of Plaintiffs' disparate treatment claims has been that DIS hired male contract technologists and paid them more than the Plaintiffs, not

[3] Plaintiffs also assert that Khatib's hiring of contract technologists "precluded both his recruiting Federal employees, and getting a fair wage for the Plaintiffs." (Pls.' Mem. at 26.) Plaintiffs offer nothing but Auger's unsupported speculation on this issue, which is insufficient to generate a genuine dispute of material fact. Mariani-Colon v. Department of Homeland Security, 511 F.3d 216, 222 (1st Cir. 2007). Moreover, according to Tambra Holt of the Human Resources Department, the Human Resources Department, not Khatib, was responsible for reviewing employee salaries and, in 2003 the VA Hospital evaluated the salaries of radiology technologists as well as other groups of employees. (Declaration of Tambra Holt dated February 26, 2008, ¶¶ 2-3.)

that Plaintiffs were denied raises, as Plaintiffs now imply. (See Second Amended Compl. at ¶¶ 13, 17.)

Moreover, Title VII is directed to disparate treatment based on certain impermissible factors such as sex. Plaintiffs' new theory, however, is not cognizable under Title VII because it is based on the allegation that the hiring of contract technologists, both male and female, somehow adversely affected the salaries of federal staff technologists, both male and female. (Pls.' Mem. at 9.) Put differently, Plaintiffs do not assert, much less establish through the introduction of admissible evidence, that they were denied raises that male staff technologists received.

Last, even if Plaintiffs' failure to raise this new allegation in their Second Amended Complaint were excused, and even if this new allegation somehow stated a claim under Title VII, Plaintiffs' own admissions are fatal. Parker, for example, unequivocally testified at her deposition that she was never denied a raise.

> Q. You were never denied a raise because you are a woman at the Providence VA Medical Center; correct?
>
> A. Correct.

(Ex. 91, at 89:9-12.)

Auger also gave equally unambiguous testimony on this issue.

> Q. You don't contend that you were ever
> denied a raise because you are a woman, do you?
>
> A. No.
>
> Q. And you don't contend that you ever
> suffered a reduction in salary because you are a
> woman, do you?

A. No.

Q. You never suffered a reduction in salary at all, right?

A. Right.

(Ex. 92, at 83:18-84:2.)

**B. Defendant Is Entitled to Summary Judgment on Count II Because Plaintiffs Have Adduced No Evidence that Similarly Situated Males Were Treated More Favorably with Respect to Pay.**

In Count II, Plaintiffs allege only that "Khatib discriminated against Plaintiffs by paying male employees more than female employees for the same job." (Ex. 64, at ¶ 30.) Defendant, however, established that summary judgment is appropriate because:

(1) the contract technologist positions at issue included no employment benefits or tenure and thus were not comparable to the Plaintiffs' staff positions, (Def.'s Statement of Undisputed Facts, ¶ 42);

(2) the VA Hospital hired male and female contract technologists, (Def.'s Statement of Undisputed Facts, ¶ 41); and

(3) the VA Hospital paid the contract technologists salaries that the Contracting Department, not Khatib, set based on a competitive analysis of staffing agency rates, (Def.'s Statement of Undisputed Facts, ¶¶ 44–47).

In their opposition to Defendant's motion, Plaintiffs offer no evidence to create a genuine issue of material fact with respect to any of the foregoing. Plaintiffs simply have no evidence that any similarly situated male employees were paid more than Plaintiffs, and therefore Defendant is entitled to summary judgment as to Count II.

In their opposition memorandum, Plaintiffs completely abandon their discredited claim that contract technologists were paid "at a higher rate than the Plaintiffs," ( Ex. 64, at ¶¶ 13, 17, see id., ¶ 30), and for the first time assert that "Chris Stokes and Luchiano Capraras [sic], both

males, received substantial raises while working as contract techs at the VA." (Pls.' Mem. at 8.) Plaintiffs' new contention regarding Stokes and Caparas is flawed for several reasons. First, Plaintiffs failed to assert it in their Second Amended Complaint, which alleges only that contract technologists were paid more than Plaintiffs, not that they received improper raises. Second, Plaintiffs now fail to offer any explanation as to why Stokes's and Caparas's raises, which were vetted by the VA Hospital's Contracting Department, (see Def.'s Statement of Facts, ¶ 58), were improper or how these raises demonstrate that male employees were paid more than the Plaintiffs, as alleged in Count II. Third, these raises cannot constitute an adverse employment action with respect to the Plaintiffs given that the Plaintiffs had no interest in becoming contract technologists, even at the post-raise salary levels. For example, Auger admitted that she would not have been inclined to accept a contract technologist position for $45 per hour, which is the rate that Stokes was paid from December 2003 to October 2004, after receiving a raise. (Ex. 7, at 80:15-17.) Similarly, Ahern testified that she found the idea of becoming a contract technologist "ludicrous." (Ex. 5, at 101:4-14.)

### C. Defendant Is Entitled to Summary Judgment on Count III Because Plaintiffs Have Adduced No Evidence that They Suffered an Adverse Employment Action with Respect to Promotions.

In Count III, Plaintiffs allege that Khatib discriminated against them by hiring Stokes and later "placing [Stokes] in charge over them . . . ." (Ex. 64, at Count III.) In moving for summary judgment, Defendant established that Count III fails as a matter of law for several reasons. First, Auger, Ahern and Mastalerz were already on extended leave when Stokes was allegedly promoted to the position of Chief Technologist that Joan Beaudoin previously held. Therefore, none of them can claim to have been entitled to that role. Parker testified:

Q. Where was Ann Beaudoin (sic) when --

A. Joan Beaudoin.

Q. -- I'm sorry -- Joan Beaudoin when Mr. Khatib gave Stokes these responsibilities?

A. She was out on a medical leave.

Q. Where was Ms. Mastalerz?

A. On a medical leave.

Q. What about Ms. Auger?

A. Also on a medical leave.

Q. And what about Ms. Ahern?

A. On a medical leave.

(Def.'s Statement of Undisputed Facts, ¶ 69 (citing Ex. 1, at 116:1-13).)

Although in their opposition to Defendant's summary judgment motion Plaintiffs continue to assert that Stokes was given a promotion to which they were entitled, they fail to address the unambiguous testimony by Parker quoted above. Instead, Plaintiffs cite testimony that does not concern the timing of Stokes's alleged promotion and that is completely inapposite. (See Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 68.)[4] Therefore, at a minimum, Defendant is entitled to summary judgment regarding the claims of Auger, Ahern, and Mastalerz.

Second, by their own admission, none of the Plaintiffs was entitled to assume the

[4] Plaintiffs' Ans. to Defendant's Statement of Undisputed Facts is misnumbered in many sections. Paragraph No. 68 in Plaintiffs' Ans. to Defendant's Statement of Undisputed Facts corresponds to Paragraph No. 69 in Defendant's Statement of Undisputed Facts.

responsibilities of the Chief Technologist that Khatib allegedly delegated to Stokes. The Plaintiffs asserted at their depositions that Khatib should have assigned this role to the most senior staff technologist, Ray Kim, rather than to any of the Plaintiffs. For example, Ahern testified:

> Q. You don't contend that you, Ms. Ahern, should have been made acting chief technologist instead of Chris Stokes, right? You just contend that some staff member rather than a contract employee should have been, is that right?
>
> A. I believe a staff person should have been in charge, someone who knew, if it was I or someone else.
>
> Q. Well, there could only be one person put in charge, right? So who should it have been?
>
> A. Well, I believe I had the top seniority.
>
> Q. At what point?
>
> A. After -- no, wait a minute. Ray Kim. Ray Kim, me or Debi. Top three people.
>
> Q. Ray Kim, after Joan Beaudoin left, Ray Kim was the most senior staff employee in DIS, correct?
>
> A. Correct.

(See Def.'s Statement of Undisputed Facts, ¶ 69 (citing Ex. 5, 104:2-20.); Def.'s Mem. at 36.)

Plaintiffs now assert, without any support, that Elaine Apici was the most senior technologist. (See Pls.' Ans. to Defendant's Statement of Fact, ¶ 68.) Regardless, however, of whether the most senior technologist was Kim or Apici, it was not any of the Plaintiffs. By their own admission, Plaintiffs were not qualified on the basis of seniority for the alleged promotion at issue. Put differently, given Plaintiffs' assertion that Stokes's assignment should have gone to

the most senior technologist and their admission that none of them was the most senior, the Plaintiffs cannot claim to have suffered an adverse employment action when they were not given the temporary assignment. Plaintiffs have provided no evidence that would give rise to a genuine dispute on this point, and therefore Defendant is entitled to summary judgment.

Third, Plaintiffs have cited no evidence that Stokes, in fact, was promoted to the position of Chief Technologist. Plaintiffs do not dispute that Khatib, not Stokes, took over the supervisory responsibilities of the Chief Technologist after Beaudoin's departure. (See Pls.' Ans. to Def.'s Statement of Facts, ¶¶ 62-64 (unopposed).) Subsequently, because of his availability, Stokes was temporarily tasked with coordinating patient flow and other routine, daily duties. (Def.'s Statement of Undisputed Facts, ¶¶ 65-66.) Stokes never had the managerial authority to handle disciplinary issues, promotions, approval of time cards, or performance evaluations. (Id. at ¶ 64.) All of these managerial responsibilities were handled by Chief Technologist Beaudoin before her departure and by Khatib thereafter. (Id., ¶ 64 (unopposed).)

The temporary duties that Khatib assigned to Stokes did not result in more pay, a promotion, or any other actionable benefit. (See Pls.' Ans. to Def.'s Statement of Undisputed Fact, ¶ 66.) Plaintiffs have offered no evidence to refute the facts that Stokes remained a contract technologist and that his title did not change during the relevant period. (See Def.'s Statement of Undisputed Facts, ¶ 47.) Even if Plaintiffs could somehow demonstrate that they were entitled to Stokes's role (even though three of them were on long-term leave and none of them was the most senior staff technologist), Plaintiffs have adduced no evidence whatsoever that they suffered any specific harm to their future employment prospects as a result of not being assigned the temporary, unofficial responsibilities at issue. They therefore cannot make the

requisite showing that they were subject to an adverse employment action, and Count III fails. See Belgasem v. Water Pik Tech., 457 F. Supp.2d 1205, 1215 (D. Col. 2006) (Plaintiff failed to offer specific evidence of harm from alleged denial of training opportunity).

Last, Defendant established, and again Plaintiffs have not disputed, that in addition to Stokes, Tenessa Karmozyn, a female staff technologist, also handled the same responsibilities as Stokes during the period at issue. (See Def.'s Statement of Facts, ¶ 67 (unopposed) and Def.'s Mem. at 35.)[5] The undisputed fact that Karmozyn had the same additional responsibilities as Stokes demonstrates that Khatib was not motivated by any discriminatory animus and that Defendant is entitled to summary judgment.

Plaintiffs disregard almost entirely the arguments and evidence that Defendant presented in support of his motion for summary judgment. Instead, Plaintiffs assert that Stokes was improperly delegated managerial responsibilities in violation of 5 C.F.R. § 300.502. Plaintiffs, however, make no effort to establish the relevancy of this regulation to their Title VII allegations. Moreover, in support of their position, Plaintiffs only cite: (1) a May 2005 memorandum that has nothing to do with Stokes; (2) an inadmissible, anonymous hearsay statement; and (3) ambiguous deposition testimony by Parker that is clarified in her subsequent testimony. (Pls.' Mem. at 15 and 27.)

First, according to Plaintiffs, "[e]vidence that Khatib and Mark Schaefer [sic] intended to place Stokes in charge with managerial duties in contravention of Federal regulation is Mark

[5] Plaintiffs' Answers to Defendant's Statement of Undisputed Facts is misnumbered with respect to Defendant's Undisputed, ¶ 67. Plaintiffs have not addressed Defendant's Undisputed Fact, ¶ 67 and, in their opposition memorandum, they do not contest the fact that Karmozyn handled the same responsibilities as Stokes after the Chief Technologist departed.

Schaefer's Tuesday March 22, 2005 memo to Bob Joslyn [sic] requesting a raise for contract tech Lucino Capris [sic] because Capris [sic] was performing supervisory duties." (Pls.' Mem. at 15.) This memorandum, however, is irrelevant because Count III alleges that "Khatib discriminated against the Plaintiffs by placing Chris [Stokes] in charge over them . . . ." (Ex. 64, ¶ 31 (emphasis added).) Count III does not include any allegations of impropriety by Shafer regarding Luchino Caparas or any one else other than Stokes. The memorandum is not authored by, or addressed to, Khatib, and it makes no mention of Stokes. Moreover, by the time of the March 22, 2005 memo, all of the Plaintiffs had been long gone from the VA Hospital. (See Def.'s Statement of Undisputed Facts, ¶¶ 88, 102, 131, and 143 .)

Second, Plaintiffs contend that Parker overheard an unnamed "personnel from IRM" state that Stokes was "in charge" and that he/she was to "come to see you Chris." (Pls.' Mem. at 15.) Even if this anonymous hearsay statement were admissible,[6] it simply confirms, as Defendant previously acknowledged, that Stokes was responsible for interfacing with other departments as part of his temporary, additional duties. (Def.'s Statement of Undisputed Facts, ¶ 66.)

Third, Plaintiffs rely on Parker's statement that Stokes "did all the duties that our chief technologist did." (Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶¶ 65-66, citing Parker's deposition testimony.) In subsequent testimony, however, Parker clarified that, in fact, Stokes did not assume all of the Chief Technologist's responsibilities.

> Q. Both of those [handling performance evaluations and disciplinary matters] are responsibilities that Joan had, though, Joan Beaudoin, when she was in charge; right?

---

[6] See Pritchard v. Southern Company Services, 92 F.3d 1130, 1135 (11th Cir. 1996) ("[Plaintiff] cannot use inadmissible hearsay to defeat summary judgment when the hearsay will not be reducible to admissible form at trial.").

> A. Right. Marty [Khatib] took that aspect of it when Joan went out. He just had Chris [Stokes] doing the other things. Reprimanding, and stuff like that, Marty took care of.

(Ex. 1, at 123:18-23; see Ex. 3, at 23:11-17.) Thus, by Plaintiffs' own admission, Stokes was not promoted to, or performing the management responsibilities of, the Chief Technologist.

Stokes's role in the handling of routine, daily tasks regarding patient flow in DIS did not rise to the level of improper supervisory action under 5 C.F.R. § 300.502. See 5 C.F.R. § 300.501(defining a supervisor as one who has authority to hire, direct, assign, promote reward, transfer, furlough, layoff, recall, suspend discipline, remove employees, or to adjust their grievances, if that authority is not merely routine or clerical in nature).[7] More importantly, any issue regarding whether Stokes's temporary role violated section 300.502 is collateral and irrelevant to the allegations in Count III. Count III does not allege that Defendant violated section 300.502. This regulation has no relevance to Plaintiffs' Title VII claims and cannot give rise to a dispute of material fact at the summary judgment stage.[8] See Anderson v. Liberty

---

[7] Defendant notes that Subpart E of Part 300, which includes 5 C.F.R. § 300.502, concerns the use of "private sector temporaries." Section 300.501 defines a "temporary help service firm" as "a private sector entity which quickly provides other organizations with specific services performed by its pool of employees." Section 300.501 further defines "private sector temporaries" and "outside temporaries" as "employees of a temporary help service firm who are supervised and paid by that firm and whom the firm assigns to various client organizations who have contracted for the temporary use of their skills when required." 5 C.F.R. § 300.501. Stokes was employed under a direct contract with the VA Hospital. He was neither a private sector temporary, an outside temporary, nor a temporary help service firm. (See Def.'s Statement of Undisputed Facts, ¶ 47.) Therefore, the regulations upon which Plaintiffs rely are inapposite.

[8] Plaintiffs also argue that Stokes's initial hiring as a contract technologist was improper because DIS should have filled a vacant entry-level GS-6 position instead. (Pls.' Mem. at 6.) In support of this contention, Plaintiffs cite 5 C.F.R. §§ 300.501 et seq. Plaintiffs, however, have conceded that they held senior staff positions and had no interest in the GS-6 position. (See Ex. 7, at 108:1-21.) Moreover, Plaintiffs do not dispute that in September 2003, DIS had an urgent

Lobby, Inc., 477 U.S. 242 , 248 (1986) (Court need consider only disputes that might affect the outcome of the dispute).

### D. Plaintiffs Have Identified No Genuine Issues of Material Fact Regarding Their Claims of Retaliation, and Therefore Defendant Is Entitled to Summary Judgment on Count IV.

In moving for summary judgment, defendant sifted through the record in an attempt to identify Plaintiffs' alleged grounds for their retaliation claim in Count IV. Defendant then refuted each of these allegations on a plaintiff-by-plaintiff basis. (Def.'s Mem. at 37-64.) In their opposition to Defendant's motion for summary judgment, Plaintiffs almost entirely ignore the deposition testimony and other evidence that Defendant cited and instead rely on conclusory allegations and unsubstantiated speculation that does not establish the existence of any genuine issues of material fact.

#### 1. The Proposal To Change the CT Department's Schedule

Plaintiffs assert that Khatib's proposal to change the CT Department's work schedule from a compressed tour to a regular five-day-per-week tour was retaliatory and that his justifications for the proposal were a pretext for retaliation. Plaintiffs' reliance on the proposed schedule change as evidence of retaliation is unfounded for several reasons. First, Plaintiffs concede that, because of their opposition, the CT Department's schedule never changed while they remained at the VA Hospital. (See Def.'s Statement of Undisputed Facts, ¶ 37 (unopposed).) Given this undisputed fact, the Plaintiffs suffered no employment action at all and certainly no adverse employment action. See Valles-Hall v. Center for Nonprofit Advancement,

need for technologists and that the former Chief Technologist, who was a confederate of the Plaintiffs, proposed to Khatib that DIS hire contract technologists to address this issue. (Def.'s Statement of Facts, ¶ 40 (unopposed).)

481 F. Supp.2d 118, 144-45 (D.D.C. 2007) ("threat in and of itself is not an adverse employment action"). Plaintiffs do not respond to this point in their opposition memorandum, and their failure to offer any evidence that could give rise to a genuine issue of material fact justifies summary judgment in Defendant's favor.

Second, even if the Plaintiffs could somehow meet their prima facie burden, the Plaintiffs have not offered evidence sufficient to create a genuine issue of fact as to whether Khatib's reasons for seeking to change the schedule were a pretext for discrimination. Khatib, with the approval of the Chief of Diagnostic Imaging, proposed to return the CT Department to the same regular five-day-per week schedule as all the other departments in DIS in order to achieve more consistent staffing, reduce overtime, and reduce the backlog of pending CT cases that had arisen.[9] (Khatib Decl. dated Nov. 13, 2007, at ¶ 13; Sta Ines Decl. dated Nov. 9, 2007, at ¶ 7; Def.'s Ex. 11.) Plaintiffs do not dispute that under the compressed tour schedule, only two CT technologists were scheduled to work each day and that, therefore, the CT Department was left with only one technologist for the entire day whenever the other technologist called in sick. (See Defendant's Statement of Undisputed Fact, ¶ 19.) Under the proposed five-day-per week schedule, all three CT technologists would work each day and thereby minimize instances in which one technologist would have to work alone all day. (See Khatib Decl. Dated Nov. 13,

[9] Plaintiffs cite an email exchange between Khatib and Beaudoin as support for the assertion that Khatib had endorsed the compressed schedule at some point before March 2004. (Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 20.) To the contrary, however, these emails reflect Khatib's frustration over Beaudoin's changing position on this issue. To the extent that Plaintiffs seek to rely on the undated, handwritten notes added to this document by an unidentified author, such reliance is improper. Plaintiffs never sought to authenticate these notes, which purport to describe a conversation between to unidentified individuals. (See Pls.' Ex. 16.) Plaintiffs do not cite to any deposition testimony from Beaudoin, and they have not provided a declaration from her to address these notes.

2007, ¶15-17.)

Plaintiffs also do not credibly dispute that the compressed schedule in DIS led to substantial overtime in 2003. Specifically, for example, Plaintiffs admit that Auger recorded approximately fourteen hours each week in overtime and that her total income from overtime in 2003 was at least $15,000. (Def.'s Statement of Undisputed Fact, ¶ 99 (unopposed).)[10] Moreover, Auger agreed that Khatib's proposal would have eliminated overtime between 5:30 p.m. and 8:30 p.m. (Ex. 9, at 74:13-75:22; see Khatib Decl., ¶14.)

Last, there is no genuine dispute that a multi-week backlog in the scheduling of new CT cases had arisen, which Khatib attributed in part to the compressed schedule. (Def.'s Statement of Undisputed Facts, ¶ 20-21 (unopposed); Ex. 11.)[11] In addition, in early 2004, an audit revealed that the CT Department had a significant number of pending CT cases that had been scheduled, but not performed.

Plaintiffs assert that "Khatib created the backlog" and suggest that a backlog did not really exist in March 2004. (Pls.' Ans. to Def.'s Statement of Facts, ¶ 22.) However, in a March 12, 2004 email to Beaudoin, Khatib expressed his genuine concern over the situation:

---

[10] Plaintiffs assert that Craig Polucha, the Chief of the VA Hospital's Human Resources Department, stated that there was no issue with regard to overtime in the CT Department in 2004. (Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 19.) Plaintiffs mischaracterize Polucha's testimony regarding 2004. In response to counsel's assertion that "there was no overtime concern" with respect to 2004, Polucha testified: "Well, I would say there was to the extent that they were a little more than halfway through the year and there's $3,200 spent in overtime." (Ex. 23, 68:19-21.) Moreover, there is no dispute that in fiscal 2003, the CT Department generated more than $32,000 in overtime and that Khatib was seeking to avoid unnecessary overtime in 2004. (Khatib Decl. dated Nov. 13, 2007, at ¶ 14.)

[11] Plaintiffs' Answer to Defendant's Statement of Undisputed Facts is misnumbered and does not include any response to Defendant's Statement of Undisputed Fact, ¶ 20.)

> I am extremely concerned that the Catscan backlog is at a level that could impact patient care causing actual harm to a patient who is waiting too long for their appointment. . . . This is a crisis and must be treated with the utmost sense of urgency.

(Ex. 12.) Moreover, Beaudoin, the Chief Technologist at the time, unambiguously confirmed that there was a backlog:

> Q. In March of 2004, there was a backlog of CT pending cases, correct?
>
> A. Yes.
>
> * * * *
>
> Q. A substantial backlog, right?
>
> A. Yes.

(Ex. 4, at 40:21-23; 42: 1-2.) Plaintiffs themselves stated in the their April 22, 2004 grievance letter: "CT is very busy and has a constant backlog."[12] (Ex. 21, at AH0032.)

Plaintiffs suggest that the backlog of pending cases was illusory because it consisted of duplicates and cancelled orders, which Khatib allegedly prevented them from deleting. There is no factual dispute, however, that at Khatib's direction, DIS technologists reviewed all of the pending CT cases that comprised the backlog. (Ex. 4, at 63:24-64:9.) Furthermore, there is no dispute that this review revealed 275 cases that were not duplicates or cancelled orders and that

[12] Plaintiffs argue that the April 22, 2004 "formal grievance" memorandum to their service chief, Sta Ines, does not constitute an election to pursue their claims through the negotiated grievance procedures of their collective bargaining agreement. Plaintiffs, however, concede that "the memo was in fact submitted to the union to be considered a grievance." (Pls.' Mem. at 24.) Plaintiffs allude to the deposition of Arthur Jordan, but do not cite to, or submit any, specific testimony as an exhibit. The Plaintiffs also fail to submit the collective bargaining agreement that they cite. In any event, the April 22 memorandum, titled Formal Letter of Complaints about Mehrdad Khatib, was plainly intended by its authors, and understood by its recipient, Dr. Sta Ines, to be a "formal grievance" under the collective bargaining agreement. (See Ex. 93 at DVA0741; Ex. 94.)

needed to be addressed. Indeed, Mastalerz, herself, admitted in her interrogatory responses that "the backlog went down to 275 . . . ." (Ex. 15, at PSM0006.) Thus, Plaintiffs cannot satisfy their burden to show that the backlog issue was somehow a pretext to mask retaliation.

**2. Lynda Parker**

Parker contends that Khatib retaliated against her by allegedly denying her the opportunity to cross-train; subjecting her to "scrutiny . . . with regard to her function as an x-ray student supervisor," and placing Stokes in charge. (Pls.' Mem. at 15.) Each of these allegations fails because, as a factual matter, they are without evidentiary support. Moreover, Plaintiffs have made no effort to demonstrate how these alleged events constitute actionable adverse employment actions or were causally linked to Parker's participation in a protected activity.

As to Parker's training , Parker admits that she had been "cross-training" twice weekly in angiography procedures since April 2003. (Def.'s Statement of Undisputed Facts, ¶¶ 77-78 (unopposed).) Parker also concedes that both Khatib and the Chief of Diagnostic Imaging, Dr. Sta Ines, repeatedly informed her that she would receive CT training in due course, but that because of her other responsibilities and ongoing angiography training, the CT training would be deferred until after Karmozyn had received CT training. (Def.'s Statement of Undisputed Facts, ¶¶ 81-82 (unopposed as ¶ 82).) Last, Plaintiffs do not dispute that it was appropriate for Sta Ines and Khatib to defer Parker's CT training based on the foregoing reasoning.

Parker now asserts for the first time that "Khatib trained Chris Stokes in CT before Lynda Parker," but offers no support for this claim. (Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 80.) The deposition testimony that Plaintiffs cite simply does not support Parker's contention that Stokes was trained in CT procedures before Parker. (See Pls.' Ans. to

Def.'s Statement, ¶ 80, citing Def.'s Ex.1, at 149.)

Parker also asserts that another technologist informed her that "Marty said he was not going to train [Parker]." (Id. citing Def.'s Ex. 1 at 146.) As Defendant previously explained, this double hearsay statement is inadmissible, and in any event it is consistent with Khatib's assurances to Parker that, although she was not going to be trained in August 2004, she would receive CT training after Karmozyn. (Def.'s Mem. at 39 n.11.)

The evidence demonstrates that Parker's cross-training was only deferred, and Parker has not cited any evidence that this delay in her cross-training constituted a material adverse employment action. Moreover, she has made no effort to rebut Defendant's explanation for the training sequence or demonstrate that her cross-training was deferred because of her participation in a protected activity.

Second, as to Parker's role as student coordinator, Parker asserts that Khatib subjected her to scrutiny and "harassed her about what she was doing with the students." (Pls.' Mem. at 15.) Although Parker contends that Khatib undermined her, Parker offers no evidence that she was unable to perform her duties satisfactorily or that she received unfavorable evaluations. Indeed, at her deposition, Parker testified that Khatib did nothing more than question her decision making: "he also was questioning my capabilities of training students, where I was going with that and if the school was happy with me." (Ex. 1, at 145:3-10; Ex. 1, at 129:11-18.) This increased scrutiny and management supervision, however, does not constitute a materially adverse employment action. See Burlington Norther & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2415 (2006); Gomez v. Laidlaw Transit, Inc., 455 F. Supp.2d 81, 89-90 (D. Conn. 2006) ("Plaintiff has not shown that [her supervisor's] criticizing her work, standing over her,

not letting her leave, or leaving her a stack of papers . . . were anything more than minor annoyances."). Moreover, Parker does not dispute that it was well within the scope of Khatib's duties to oversee her performance as the clinical training instructor. She also does not credibly dispute that in August 2004, she invited Khatib's heightened scrutiny by taking it upon herself to inform the Community College of Rhode Island that a hiring freeze at the VA Hospital was likely and that it would negatively impact the training program. (Def.'s Statement of Undisputed Facts, ¶ 84-85.)

Third, with respect to Stokes's role in DIS, as discussed above, Parker cannot establish that she was entitled to assume these duties rather than Raymond Kim or Elaine Apici, both of whom were senior to Parker. Parker also cannot identify any adverse consequence that resulted from not being given Stokes's temporary additional responsibilities.[13]

**3. <u>Debra Auger</u>**

As a threshold matter, in moving for summary judgment Defendant pointed out that Auger did not contact an EEO counselor until August 3, 2004, (Def.'s Statement of Undisputed Facts, ¶ 111), although she was aware of the obligation to do so within forty-five days of a retaliatory/discriminatory event. Indeed, Auger admitted in her interrogatory responses that "[m]ore than 45 days passed from the onset of incidents to the first contact with an EEO

---

[13] Parker also asserts that Khatib and Stokes "altered patient flow to make [Parker's] job difficult." (Pls.' Mem. at 14.) In support of this claim, Parker cites only one instance in which Stokes allegedly "waited until quarter to four . . . to tell me that they had an add-on special procedure and that I had to stay . . . ." (<u>Id.</u>) Parker, however, asserted at her deposition that Stokes's alleged conduct was "bullying me per se," and not motivated by any retaliatory or discriminatory animus. (Ex. 1, 117:16-118:9.) Moreover, there is no evidence that Khatib had any role in this minor episode or that Stokes acted improperly in endeavoring to ensure that Parker performed a necessary procedure.

counselor," (Ex. 66, at 115), and during the EEO process she stated, "I do understand that these claims are untimely." (Ex. 68, at AH2654.) Therefore, Defendant argued in his summary judgment motion that, pursuant 29 C.F.R. § 1614.105(a), Auger should be barred from alleging any specific acts of retaliation that occurred prior to June 19, 2004. (Def.'s Mem. at 42.) In their opposition to Defendant's summary judgment motion, Plaintiffs offer no response on this point.

In addition, in opposition to Defendant's detailed motion for summary judgment, in which Defendant addressed nine allegedly retaliatory actions that Auger claimed to have suffered, Auger contests three. (Def.'s Mem. at 43 and Pls.' Mem. at 17-18 .) First, Auger claims that she received a "reprimand from Joan Beaudoin for taking [a] picture of Bruce Foster without permission." (Pls.' Mem. at 18.)[14] Contrary to this unsupported assertion, there is no genuine dispute that she received a counseling memorandum and not a formal reprimand, which did not become part of her personnel record and resulted in no loss of pay or benefits. (Decl. of Tambra Holt dated Nov. 13, 2007, ¶ 5.) As Defendant previously explained, a counseling memorandum is an unofficial, informal mechanism for addressing an improper action. (Id.) Auger's counseling memorandum does not constitute an adverse employment action because it would not have dissuaded a reasonable worker from pursuing EEO activity, and Auger does not argue to the contrary. See White, 126 S. Ct. at 2415.

More importantly, Auger has adduced no facts to rebut Defendant's legitimate

[14] Auger makes several completely unsupported and irrelevant claims regarding Bruce Foster's previous conduct, none of which have any bearing on the fact that Auger's actions warranted a counseling letter. (See Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 100.)

justification for the counseling memorandum.[15] (Ex. 39.) Auger previously admitted in a written statement during the EEO process that her "behavior was unprofessional" and that "she did not dispute the memorandum." (Def.'s Statement of Undisputed Facts, ¶101 (citing Ex. 40, at AH3398.) Auger reiterated at her deposition that she "acted inappropriately" with regard to this incident. (Ex. 7, at 66:15-17.) Because Auger offers no evidence to dispute that she deserved the February 20, 2004 memorandum, she cannot claim that it was a pretext for retaliation. (See Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 101, citing no evidence that Defendant's explanation was pretextual.)[16]

Second, Auger contends that Khatib "removed her from her position as lead Angio tech and assigned her to CT five days a week." (Pls.' Mem. at 18.) This assertion is false. The deposition testimony that Auger cites does not support her claim and, in fact, her subsequent testimony makes unambiguously clear that she was never removed from her angiography position and assigned to be a full-time CT technologist.

> Q. At the time you went out, were you a staff
> CT tech five days a week?
>
> A. No, because my replacement in angio wasn't

---

[15] Beaudoin was the Chief Technologist and a member of the management team, who reported directly to Khatib and took direction from him with respect to supervision of the technologists . (Def.'s Statement of Undisputed Facts, ¶ 3-7 (unopposed).) Plaintiffs complain that Khatib directed Beaudoin to issue various disciplinary letters to the Plaintiffs and that he issued certain letters on her behalf when she was absent, but Plaintiffs offer no basis for why this was in any way improper.

[16] Auger also cites a "report of contact" that she received in May 2004. (Pls.' Mem. at 18.) Defendant pointed out, and Auger continues to ignore, that a report of contact is not a form of discipline and that the report at issue acknowledged that Auger denied any direct involvement in the improper reporting procedure at issue. (Def.'s Mem. at 49.) Thus, Auger cannot establish that this report of contact was improper in any way or that it amounted to an adverse action.

trained.

Q. That would be Lynda Parker, right?

A. Yes, it would.

* * * *

Q. Before you left, your responsibilities were not reduced by Mr. Khatib though, is that fair to say?

A. Yes.

* * * *

Q. Mr. Khatib never actually altered your employment while you were still at the VA Hospital, correct?

A. Correct. He just told me that's what he was doing.

(Ex. 7, at 93:22-95:2.)

Khatib's unexecuted plan to move Auger from the Angiography Department to assist in the CT Department resulted in no materially adverse consequences or objectively tangible harm and is not actionable. See Valles-Hall v. Center for Nonprofit Advancement, 481 F. Supp.2d at 144-45. Moreover, Auger cannot establish that even if she had been reassigned to the CT Department, it would have resulted in a reduction in pay or that Khatib was motivated by anything other than a desire to regain control over the Angiography Department. (See Ex. 7, 192:1-7.) Last, Auger's claim of retaliation is discredited by her assertion that Khatib planned to replace her by promoting Parker, a co-plaintiff who was engaged in the same activities as Auger. (Ex. 7, at 93:22-94:2.)

Auger's third basis for claiming retaliation is that Khatib threatened to change the CT

Department's schedule to the same schedule as the rest of DIS. As discussed above, this allegation is without merit because the change never occurred and , even if it had, neither Auger's salary nor her responsibilities would have been impacted.

**4. Eileen Ahern**

Defendant established that, as a procedural matter, Ahern's claims are barred by her failure to comply with the requirement that she contact an EEO counselor within forty-five days of the allegedly retaliatory events. (See Def.'s Statement of Undisputed Facts, ¶128; Def.'s Mem. at 54.) Ahern does not dispute that she failed to contact an EEO counselor within the time required or that EEO flyers delineating the required procedure and emphasizing the need to contact an EEO counselor within forty-five days were posted throughout the VA Hospital in 2003 and 2004. (See Declaration of Steve Borden, dated February 22, 2008, at ¶ 3.) Rather, Ahern contends that it is improper to impute to her constructive knowledge of the 45-day requirement based on the presence of these EEO flyers and her participation in prior EEO activity.[17] (Pls.' Mem. at 23.) Ahern, however, cites no case law in support of this contention. In fact, constructive knowledge is properly attributed to an employee where, as here, the employer has conspicuously posted official EEO notices that are designed to inform employees of their rights and obligations. See Mercado v. Ritz-Carlton San Juan Hotel, 410 F.3d 31, 48-49 (1st Cir. 2005). Where a plaintiff knew, "actually or constructively," of her rights, there will be no equitable tolling based on excusable ignorance. See Kale v. Combined Insurance Co., 861 F.2d 746, (1st Cir. 1988) (addressing ADEA claims). Therefore, Ahern's claims are time barred.

---

[17] Plaintiffs' memorandum also makes a passing reference to Ben Werthan, but includes no explication of Ahern's position regarding him and cites no evidence in support of whatever point Ahern is seeking to make. (Pls.' Mem. at 23.)

See Velasquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000).

In response to Defendant's summary judgment motion, Ahern asserts that Khatib retaliated against her and Mastalerz by increasing their workload, temporarily assigning them to the x-ray department, reprimanding them, and "threatening to take administrative action against her while she was on leave." (Pls.' Mem. at 16-17.) First, in support of her claim that Khatib increased her workload, Ahern cites one, isolated instance in which Khatib directed her and Mastalerz to provide a daily, color-coded report of scheduled CT cases. (Pls.' Mem. at 16, citing Beaudoin at 40.) In the testimony upon which Ahern relies, however, Beaudoin conceded that, although she disagreed with Khatib's approach, it was "not unreasonable" for Khatib to request that Ahern prepare a separate color-coded report for him. (Ex. 4, at 40:13-20.) Moreover, Mastalerz testified that the color-coding of reports was a "silly" example of Khatib's tendency to micromanage, rather than an adverse employment action motivated by retaliatory animus. (Ex. 3, at 52:25-53:20.)

Second, Ahern asserts that when she returned from weeks of extended leave in October 2004, she was assigned to the x-ray department and not immediately added to the on-call overtime schedule. Ahern, however, fails to acknowledge that her assignment to the x-ray department was to enable her to receive x-ray, cross-training and that it lasted less than two weeks, after which she returned to the CT Department. (Def.'s Statement of Undisputed Facts, ¶129 (unopposed).) Moreover, Mastalerz, who returned from extended leave at approximately the same time, confirmed that it was reasonable for them to have a period of x-ray training at that point so that they would be available to perform x-ray procedures when needed. (Ex. 3, at 93:17-94:7.) Thus, Ahern's short, justified stint in the x-ray department does not rise to the level

of an adverse employment action.

Similarly, although Ahern complains that when she returned in October 2004 to DIS, Khatib "would not let her take call," (Pls.' Mem. at 16), Ahern does not dispute that she was added to the on-call schedule in November, (see Pls.' Ans. to Def.'s Statement of Unopposed Facts, ¶ 130.) Moreover, Beaudoin, the Chief Technologist, testified that the on-call schedule was typically filled out well in advance. (Ex. 4, at 159:24-160:12.) Thus, because the on-call schedule for October had already been set, it was not unreasonable for Ahern to be added in November. (See Khatib Decl., ¶ 38.)

Third, Ahern claims that Khatib retaliated against her by issuing her discipline letters. Ahern, however, disregards the evidence cited by Defendant, which demonstrates that the letters she received were warranted and that Khatib consulted with the VA Hospital's Human Resources Department before issuing them. (Def.'s Mem. at 56-57; Def.'s Statement of Undisputed Facts, ¶ 126 (unopposed).)

On May 21, 2004, Ahern received a counseling letter, which, Ahern tacitly concedes, accurately described her conduct regarding the treatment of two patients on May 18. (Ex. 49; Pls.' Ans. To Def.'s Statement of Undisputed Facts, ¶ 122.) Moreover, this unofficial letter did not become part of her official personnel file. (Def.'s Statement of Undisputed Facts, ¶ 123 (unopposed).)

On June 18, 2004, Ahern received a letter of admonishment from Khatib for her serious mishandling of two CT scan procedures. Specifically, Ahern and Mastalerz failed to immediately contact the radiologist on duty after completing two emergency procedures and instead left voice mail messages. (Def.'s Statement of Undisputed Facts, ¶ 124 (unopposed).)

Ahern does not genuinely dispute that her conduct compromised patient safety and was unacceptable. Ahern asserts only that she was "disciplined for patient advocacy," but the deposition testimony that she cites in support of this vague and unfounded assertion has nothing to do with the events addressed in the June 18, 2004 letter of admonishment. (See Ex. 50; Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 125, citing testimony concerning Ahern's May 21, 2004 counseling letter.)

Fourth, Ahern contends that Khatib "threatened to take administrative action against her" while she was on medical leave.[18] (Pls.' Mem. at 17.) In support of this claim, Ahern cites only a July 8, 2004 letter from Khatib to Ahern in which Khatib sought corroboration of Ahern's basis for taking medical leave and provisionally granted her leave request, pending receipt of Ahern's response. (Id.; Ex. 81.) Ahern does not dispute that she subsequently submitted additional documentation and that her leave was granted without incident. (Ex. 5, at 177:12-178:1.) Moreover, Mastalerz, who received a similar letter, acknowledged at her deposition that Khatib's letter was not threatening or problematic. (See Ex. 73; Ex. 3, at 155:3-156:25.) Ahern provides no explanation as to how a reasonable jury could conclude that this letter constituted an adverse employment action, and she does not dispute that Khatib was justified in seeking confirmation of her medical status.[19]

---

[18] Auger previously made similar allegations regarding her leave status, which Defendant addressed in detail. (Def.'s Mem. at 49-51.) Plaintiffs' opposition memorandum does not respond as to Auger's claim, which she appears to have abandoned.

[19] Ahern also asserts that on one occasion she "believed Khatib was going to strike her but she moved before he did." (Pls.' Mem. at 17.) With respect to this incident, however, Ahern acknowledged at her deposition that Khatib never hit her, never verbally threatened to hit her, never raised his hand, and never touched her. Ahern's absurd allegation is based solely on her subjective view that Khatib "could have" struck her because they were "quite close," but that

**5. Maureen Mastalerz**

In opposition to Defendant's motion for summary judgment, Mastalerz makes several of the same arguments as Ahern. Specifically, Mastalerz contends that she was temporarily assigned to the x-ray department and not immediately added to the on-call schedule when she returned from medical leave. (Pls.' Mem. at 16.) In addition, like Ahern, Mastalerz asserts that she was unfairly reprimanded for the incident regarding CT readings. As addressed above as well as in Defendant's opening memorandum, these claims cannot survive summary judgment. (Def.'s Mem. at 59-64.)

Mastalerz also contends that she was "called into the office every week and harassed about her job performance" and that she worked "ten hour shifts without relief."[20] (Pls.' Mem. at 16.) First, with respect to weekly meetings, Mastalerz has conceded that these meetings concerned work-related performance issues, such as her handling of various medical procedures.

> Q. All of the discussions that you had when
> you were called into Dr. Shafer's office on a weekly
> basis were related to work performance, right?
>
> A. Uh-hum. Yes.

(Ex. 3, at 172:15-18; see Ex. 3, at 39:7-13.)[21] Specifically, Mastalerz acknowledged that Khatib

---

instead he left the room. (Ex. 5, 188:21-189:24.)

[20] Mastalerz does not address, and thus apparently has abandoned, her claims that Khatib retaliated against her by requesting medical documentation for her leave request and for her subsequent request to return from leave. (Def.'s Mem. at 61.) Mastalerz also does not address Defendant's evidence that the reprimand she received on November 15, 2007 was not retaliatory. (Id. at 62-63.)

[21] Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment at 77 inadvertently cited Ex. 3, at 115, rather than 172, which is the source of this quotation.

and others had identified problems with the way that she administered intravenous injections and conducted head CT scans. (Ex. 3, at 171:25-172:10.) Mastalerz offers no evidence that these meetings were unwarranted or that they were anything more than an annoyance to her. Other than perfunctorily asserting that she was "harassed about her job," (Pls.' Mem. at 16), Plaintiff's opposition memorandum provides no support for Mastalerz' claim that these meetings were retaliatory or unjustified.

Mastalerz (but none of the other Plaintiffs) also asserts that after she returned from leave, she "worked ten hour shifts" without lunch or breaks. (Pls.' Mem. at 16.) Of course, under the CT technologists' compressed schedule, ten-hour shifts were standard. (Defendant's Statement of Undisputed Facts, ¶ 17 (unopposed).) Moreover, Mastalerz conceded at her deposition that after her return from leave, the CT Department was short handed, which necessitated that she work long hours with reduced breaks.

> Q. Very good, but –
>
> A. Okay, yes, they were short-handed.
>
> Q. And the pace of the work in CT combined
> with the short staffing in CT required you to work
> long hours; is that fair to say?
>
> A. Yes.

(Ex. 3, 41:19-24.) Mastalerz also conceded that her allegations about not receiving assistance while working in the CT Department were inaccurate.

> Q. All right. Now, in Paragraph Q of your
> supplemental response, Interrogatory No. 2, you say,
> "When I did get back, I was constantly left alone."
> That's not entirely accurate; is that right?
>
> A. Yes. It is not entirely accurate. It

just felt like I was entirely along [sic].

Q. And, in fact, when you asked for help,
Mr. Khatib would come to the department to confirm
what the situation was, right?

A. Uh-hum, yes.

Q. And on at least one occasion, he sent
Brittany to help you when you needed it, correct?

A. I guess. I would have to see when she did
come.

(Ex. 3, at 168:15-169:3.)

**D. Plaintiffs Have Identified No Genuine Issues of Material Fact Regarding Their Hostile Work Environment Claims, and Therefore Defendant Is Entitled to Summary Judgment on Count V.**

In response to Defendant's summary judgment motion, Plaintiffs continue to rely on allegations that cannot support a hostile work environment claim. For example, Plaintiffs re-assert that Khatib "micromanaged the female techs," and that he "told Auger that she should stop going over his head to complain to Sta Ines." (Pls.' Mem. at 9.) Plaintiffs also cite conclusory testimony that Khatib was "condescending and rude." (Pls.' Mem. at 9.) Plaintiffs, however, fail to appreciate that Title VII "does not set forth a general civility code for the American workplace," White 126 S. Ct. at 2415. Plaintiffs' allegations, even if true, cannot establish that the atmosphere was so permeated with discriminatory or retaliatory animus as to affect the terms and conditions of Plaintiffs' employment. Indeed, Parker testified that Khatib's efforts to run a tight ship had no significant effect on the Plaintiffs' ability to do their jobs. (Ex. 1, at 131:16-132:5.)

Unable to come forward with credible evidence that could give rise to a dispute of

material fact, Plaintiffs now rely on Parker's conclusory and unsupported testimony that "[Khatib] would harass me." (Pls.' Ans. to Def.'s Statement of Undisputed Facts, ¶ 95.) In addition, Plaintiffs assert that "[i]n her interrogatory answers, Debra Auger documented hundreds of incidents of harassment by Khatib." (Pls.' Mem. at 9.) Plaintiffs, however, cannot avoid summary judgment simply by claiming that somewhere in Auger's prolix interrogatory responses an issue of fact may be buried. Moreover, as Defendant previously demonstrated, Auger's interrogatory responses are a rambling chronicle of perceived snubs and other inane conduct that cannot salvage Plaintiffs' claims. (Def.'s Mem. at 67.)

Plaintiffs also make a number of additional, unsupported allegations in their opposition memorandum that do not give rise to any genuine issues of material fact. First, Plaintiffs allege that Khatib "detailed a female x-ray tech in the file room and made her reorganize the file room." (Pls.' Mem. at 9.) The technologist at issue was Helena Dacosta, not one of the Plaintiffs, and they have offered no rationale as to how Khatib's decision contributed to a hostile work environment for the Plaintiffs. (Ex. 1, 134:7-136:8.)[22] Second, Plaintiffs assert that Khatib

---

[22] Plaintiffs now accuse Dr. Marc Shafer, a radiologist in DIS, of contributing to a hostile work environment. (Pls.' Mem. at 21.) Plaintiffs, however, cite no support whatsoever for their new claim that they were "afraid to go to work because of the threatening behavior of Shafer . . . ." (Id.) Moreover, Counts I-V of the Second Amended Complaint name only Khatib, and the allegations in the Second Amended Complaint concern his alleged conduct exclusively. Shafer's name appears nowhere in the Second Amended Complaint. (Ex. 64.) In addition, Parker, Mastalerz, and Auger testified that Khatib, not Shafer, allegedly mistreated them. (Ex. 1, 85:17-86:2; Ex. 95, at 173:20-174:4; Ex. 92, at 48:13 -49:7). Ahern, upon whom Plaintiffs now rely, testified that Shafer "accused us of not doing injections correctly" and "passed gas." (Ex. 5, at 111:2-112:13.) In addition, according to Ahern, Shafer "didn't want to be bothered when we asked him questions. He didn't want anything to do with us." (Ex. 5, at 113:14-22.) Even if Plaintiffs had properly raised any allegations regarding Shafer's conduct in their Second Amended Complaint, Ahern's additional accusations cannot save Plaintiffs' hostile work environment or retaliation claims.

"beckoned Auger to fight," "almost hit Orsini," and "would have hit Ahern." (Pls.' Mem. at 21.) Plaintiffs cite no support for the allegations that Khatib beckoned Auger to fight or almost hit Anne Orsini, who, in any event, is not a party to this litigation. Moreover, Auger acknowledged that Khatib never intimidated her and did not physically confront her.

> Q. Did he intimidate you, Mr. Khatib?
>
> A. He tried to.
>
> Q. What did he do to intimidate you?
>
> A. It was his tone. He had this tone that he would use and it was -- like I said, the threats weren't blatant. For instance, there was a day that, you know, he didn't tell me he was going to hit me but I could just feel that when he had to walk away from me, he was mad enough to hit me. I don't think he would have done it in the department, I don't know, but you just -- you can just tell.
>
> Q. He didn't say I'm going to hit you?
>
> A. No. He walked away from me.

(Ex. 92, at 183:24-184:6.) Similarly, as discussed above, Ahern conceded that Khatib did not hit, or threaten to hit, her. (See footnote 19.)

Third, Plaintiffs repeatedly refer to a February 2, 2004, memorandum from Dr. Sta Ines to Khatib, in which Sta Ines described the complaints that a group of technologists raised during a prior meeting. According to the memorandum, these technologists complained about a litany of issues including staffing, training, scheduling, equipment acquisitions, salaries, workload, as well as Khatib's treatment of female technologists. This memorandum, as Sta Ines confirmed in a subsequent February 9, 2004, memorandum, was not drafted by her, and its purpose was to document the views of various staff members rather than her own views. (Pls.' Ex. 2.)

Last, Plaintiffs assert that they were all constructively discharged. Plaintiffs ignore, however, that in the Second Amended Complaint, they specifically alleged "the constructive discharge of two of the Plaintiffs." (Ex. 64, at ¶ 28 (emphasis added).) Indeed, consistent with the Second Amended Complaint, Mastalerz confirmed at her deposition that Plaintiffs alleged only that she and Parker were constructively discharged. (See Ex. 3, 86:11-23.)

Plaintiffs concede that Auger and Ahern "have not yet been terminated for the VA ," but strain to justify their constructive discharge claim by asserting that these two "linger in some type of VA limbo . . . ." (Pls.' Mem. at 21.) To the contrary, neither Ahern nor Auger is in limbo. Rather than resign, Ahern took leave in November 2004 and remains on leave without pay. (Def.'s Statement of Undisputed Facts, ¶131 (unopposed).) Similarly, Auger has not resigned, remains on leave without pay and, in fact, has continued to apply for promotions at the VA Hospital.[23] (See Def.'s Statement of Undisputed Facts, ¶¶ 109 and 113 (unopposed).)

As to Parker, Plaintiffs do not dispute that she began seeking a new job well before she resigned, and that prior to resigning she had secured higher paying employment at Women and Infants Hospital. (Def.'s Statement of Undisputed Facts, 89-90 (unopposed).) This admission is fatal to Parker's claim because the acceptance of another job at the time of her resignation demonstrates that she was not compelled to resign her employment at the VA Hospital as a result of Khatib's alleged harassment. See Taylor v. Fed. Deposit Ins. Corp.,132 F.3d 753, 766 (D.C.

[23] Auger asserts that she "is on Social Security Disability because of the hostile working environment in DIS." (Pls.' Mem. at 10.) In fact, Auger is receiving Social Security benefits because she was diagnosed as suffering from major depressive disorder and panic disorder with agoraphobia in August 2005. (See Pls.' Ex. 33, at JC00017.) Moreover, both Dr. James Curran, who evaluated her, and her primary care physician, Dr. Rajeev Gupta, testified that they had no first-hand knowledge of the factors causing Auger's emotional condition and relied on her recounting of events. (Ex. 96, at 23:24-24:20; Ex. 97, at 100:11-101:5.

Cir. 1997) (A constructive discharge "does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive."). Plaintiffs fail to address this issue in their opposition memorandum.

As to Mastalerz, Plaintiffs fail to address the undisputed fact that in her exit interview with the Human Resources Department, Mastalerz noted that she resigned because DIS was eliminating many of the "perks" of working at the VA Hospital, not because conditions had become intolerably hostile. (See Def.'s Statement of Undisputed Facts, ¶ 146 (undisputed).) Morever, Mastalerz testified that the episode that caused her to leave had nothing to do with any threats or harassment, but concerned an instance in which she felt shortchanged with respect to overtime. (See Ex. 3, 88:5-89:21.) Based on these admissions, which Plaintiffs ignore, no jury could conclude that Mastalerz' resignation constituted a constructive discharge.

## III. CONCLUSION

WHEREFORE, Defendant respectfully requests that the Court enter summary judgment in its favor with respect to each of the Plaintiffs.

Respectfully submitted,
JIM NICHOLSON, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS

By his attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Richard Myrus
RICHARD MYRUS
Assistant U.S. Attorney
United States Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: richard.myrus@usdoj.gov

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 25 th day of February, 2008, I caused the within **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT** and supporting exhibits to be electronically filed with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System. The following participant has received notice electronically:

Thomas Folcarelli, Esq.
55 Bradford Street, Suite 203
Providence, RI 02903
tfolc8@cox.net

/s/ Richard Myrus
RICHARD MYRUS
Assistant U.S. Attorney