UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EILEEN AHERN, et al., | : | |
| Plaintiffs | : | |
| | : | |
| VS. | : | C.A. NO. 05-117ML |
| | : | |
| JIM NICHOLSON, SECRETARY, | : | |
| DEPARTMENT OF VETERANS | : | |
| AFFAIRS, | : | |
| Defendant | : | |

Deposition of DEBRA AUGER, a Plaintiff herein, taken on behalf of the Defendant, on THURSDAY, JULY 12, 2007, 9:30 A.M., at the offices of United States Attorney, 50 Kennedy Plaza, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064

(401) 885-0992

CONDENSED COPY

time.
Q. Just so we are clear, Mr. Khatib reports to Dr. Sta. Ines, right?
A. Yes.
Q. And that's the way it was throughout the time that Mr. Khatib was employed at the VA Hospital, correct?
A. In actuality, no, it didn't appear to be.
Q. Well --
A. Technically in the chain of command, I would say as the service chief that she was above him in the chain of command. He did not seem to report to her. He seemed more so to report to management above her.
Q. When you say it seemed that he didn't report to her, what do you mean?
A. She didn't seem to have authority over him maybe is the best way to say it. I would think that a service chief under the chain of command, the way I understood it, would have the authority to deal with any problems of anyone underneath her, the administrative officer included. She didn't have that authority. She always had to go to male superiors of hers if she wanted to do something about Mr. Khatib, which I never understood why but



that was the way that it would happen, so that's why I say, to me it seemed that he wasn't under her.
MR. MYRUS: Let's go off the record for one second.
(Off-the-record discussion.)
MR. MYRUS: I'm handing you what was previously marked as Exhibit 7. It's the second amended complaint in this case. Would you take a look at that, please. While she's looking at that, could we mark this as the next exhibit in order, please?
(Whereupon, Defendant's Exhibit No. 14 was marked.)
BY MR. MYRUS:
Q. Ms. Auger, I've handed you a document marked as Exhibit 14 and it's got your name at the top and it says, "Statement regarding employment related conditions and incidents causing my illness." Do you see that?
A. Yes.
Q. Is this a document that you created?
A. Yes, it is.
Q. Do you recall when approximately you created this document?
A. I would say August of 2004. This was when



I filed a claim with the Office of Workers' Compensation. This was part of that paperwork, so -- and that was done in August.
Q. In Exhibit 7, which is the second amended complaint I handed you a minute ago, you contend that you've been discriminated against based upon your sex, is that correct?
A. Yes.
Q. And also that you've suffered retaliation for certain activities which you engaged in at the VA Hospital, correct?
A. Yes.
Q. Who do you contend discriminated against you while you were an employee of the VA Hospital?
A. Mehrdad Khatib.
Q. Anyone else?
A. I hold the whole chain of command responsible even though they didn't carry it out so I'm not quite sure --
Q. Well, when you say --
A. -- what you're looking for.
Q. When you say that you hold the whole chain of command responsible, what do you mean?
A. For the acts of discrimination.
Q. Okay. So Mehrdad Khatib committed the



acts of discrimination that you are complaining about in your second amended complaint, correct?
A. Yes.
Q. No one else -- you don't contend that anyone else committed acts of discrimination against you other than Mehrdad Khatib, is that fair to say?
A. Yes.
Q. Is your answer the same with respect to the retaliation that you contend you suffered?
A. No.
Q. Okay.
A. No.
Q. Why is your answer different with respect to retaliation?
A. Because we -- we were retaliated against after exercising our rights complaining of discriminatory behavior by Mr. Khatib. We were retaliated against heavily by him for those things.
We were also retaliated against by management, having more to do with my exercising rights under EEO in 2000 because that was being held against me and I was labeled a troublemaker, they wouldn't even look into my concerns about Mr. Khatib and the discrimination happening in the department and the retaliation that he was engaging in.

A. Lebert.
Q. Kim Lebert was originally a contract tech, is that right?
A. I don't know.
Q. Do you agree that the VA in late 2003 would have had difficulty filling staff radiology technologists' positions because the VA paid below market salary?
A. They may have.
Q. And that would have been true in 2004, correct?
A. Yes.
Q. Do you know what the hourly rate for a radiology technologist is on average in the northeastern United States?
A. No. For a diagnostic tech?
Q. Yes.
A. Or for -- no. I don't even know what the VA salary for a diagnostic tech is. I haven't done it for a long time.
Q. What about for an angio tech?
A. I can tell you that I was offered a job in Boston and just the base-pay-to-base-pay comparison was over $400 a week more.
Q. You would have gotten $400 a week more in



Boston, correct?
A. Yes. Just comparing my base salary at the VA, not looking at benefits, on-call pay or overtime or any of that, just my base salary at Providence VA, and what my base salary that I was offered was. That's one of the actual comparisons that I have for comparison.
Q. Mr. Khatib didn't hire only male technologists, correct?
A. Correct.
Q. You weren't fired from the VA Hospital, correct?
A. I consider myself to have been constructively terminated.
Q. Fair enough. But you were never told by anyone that you were terminated, correct?
A. Correct.
Q. You don't contend that you were ever denied a raise because you are a woman, do you?
A. No.
Q. And you don't contend that you ever suffered a reduction in salary because you are a woman, do you?
A. No.
Q. You never suffered a reduction in salary



at all, right?
A. Right.
Q. You were never denied leave, were you?
A. Khatib tried to deny my leave.
Q. Please explain.
A. When I initially went out, I had scheduled vacation which is why I was already taking vacation time and I kept it -- I had scheduled more than I normally take and with everything going on with him, I never scaled it back down to one week. I left it at two weeks.
My doctor wasn't available when the last incidents I could handle occurred because of his office hours, but I knew that I was scheduled on leave and I would contact him while I was out, which I did, and then I submitted my documentation and he put me on leave of absence at that time, which I believe was the first week of July, my second week of vacation. Because when I originally went out, my doctor was on vacation. I saw him as soon as he came back and I submitted my documentation.
I also called and spoke with Dr. Sta. Ines, explained to her what had happened since I had left the department and where things stood, all of that.
Sent copies of the doctor's notes, you know,



what she had asked me to do, and then Khatib decided that that medical documentation wasn't enough; he wanted more.
Q. Okay. We'll get into that but you weren't actually prevented from taking any leave, correct?
A. I took it.
Q. You weren't demoted at any point, were you?
A. No.
Q. Who is Suzette Kennett?
A. She is a diagnostic x-ray tech who was hired on contract. I don't know if she's still there. I've heard she's there and has taken a staff tech position. I don't know if that's true.
Q. Do you know when Suzette Kennett became a contract technologist at the VA Hospital?
A. I don't know exactly when, no. He didn't start hiring female contract techs until discrimination complaints escalated against him.
Q. And when did discrimination complaints escalate?
A. Starting in October of 2003 and then again in January of 2004 the staff got -- demanded a meeting with Dr. Sta. Ines. When the complaints started in 2003, things were not being addressed to

to me and I find out that he's only qualified to do diagnostic x-ray.
You bring another man around. Now he's a CT scan tech and you bring him back to CT scan and you introduce him to me, you know, this is Charles Clark, he's a CT scan tech, you know, and just his body language, his -- everything about him was like he could replace you today.
That kind of -- you know, that's how he made you feel and it was -- it was very present, that feeling. I mean, like I said, did he sit there and say that? No, but he didn't have to. You could tell by the -- his tone of voice, his -- the whole way in which he went about it and, as I said, the fact that he'd only introduce someone to you usually if he could say that they can do your job.
For instance, when he brought Chris around the department, I wasn't there I don't think. He told Joannie he was a supervisor, he told Lynda he did angio, and he told somebody else that he did CT scan which wasn't even true. That's the kind of stuff that would go on. Kind of bring up little red flags.
Q. Do you contend that Mr. Khatib harassed you because of your gender or do you contend that he



harassed you because you had previously complained about his treatment of you or both or --
A. Both.
Q. -- something else?
A. It started with me complaining that he was treating myself and other females differently than he was treating the males. You know, condescending, hostile, no respect. And as I would make those complaints, he would do whatever he was going to do to get back at me for that, so they became retaliatory and then it was just a vicious cycle after that, but initially my complaint was, you know, hey, I'm being treated differently than -- than males are being treated and he had worked with me for a time. He claimed initially that he didn't know Chris. My sources tell me different, but if he, in fact, did know him, he's a brand-new person. What makes him better than me? At the very least we should be equal. You should be equally as polite or respectful to both of us.
Q. Did he intimidate you, Mr. Khatib?
A. He tried to.
Q. What did he do to intimidate you?
A. It was his tone. He had this tone that he would use and it was -- like I said, the threats



weren't blatant. For instance, there was a day that, you know, he didn't tell me he was going to hit me but I could just feel that when he had to walk away from me, he was mad enough to hit me. I don't think he would have done it in the department, I don't know, but you just -- you can just tell.
Q. He didn't say I'm going to hit you?
A. No. He walked away from me.
Q. He didn't raise his fist?
A. Count to 10 and -- no.
MR. MYRUS: Sorry. Did you get that?
Q. Mr. Khatib never raised his hand to you or anything like that?
A. No. The only thing he ever did to me was emotion, bring it on. Like he would be challenging someone to a fistfight. He did that to me.
Q. But you didn't understand that to actually be an invitation to fight, right?
THE WITNESS: To physically fight?
MR. MYRUS: Right.
A. No. I knew better. I wanted to give him what he asked for. I knew better. But it made me uncomfortable at this point because we didn't have that kind of -- you know, it's not like your best buddy going, come on, Debi, you know, kidding



around. We were having a hostile relationship at this point and we were having a very heated argument when he did that to me. It actually turned my stomach to have my supervisor do that to me. It was inappropriate.
Q. When do you contend that the -- that his harassment of you began? I'm just trying to nail down some of the dates here.
A. I don't know if he did probation or not. We usually -- I know the techs are on probation. You have a year probationary period. I don't know if management does that or not. But I'll tell you what it appeared to me, all hell broke loose when he got off probation because he had been there right around a year when things really started to get out of control there.
There were little things before that that kind of made me think, oh, God, you know, but he didn't seem brave enough to act on it maybe. Plus he needed us. He didn't know what he was doing when he came. He didn't know his way around. He didn't know the people. He didn't know our department. He wasn't familiar. He didn't know the equipment. He didn't know anything really so we were orienting him, orientating him. He needed me and Joan

June. It had to have been in June. I don't have the date but it is in my list of incidents, I got called into Dr. Sta. Ines' office. Marty was there, Dr. Shafer and Dr. Sta. Ines.

I don't remember who started the conversation, whether it was Marty or Dr. Shafer, but Dr. Shafer ended up taking over. They didn't want me to do it; it was inappropriate; it was too open for misinterpretation. Everything that I had said, all the reasons that I had given when Dr. Shafer -- Dr. Shafer hadn't been employed there at that time -- but all the reasons I had given Marty that I didn't feel it was appropriate and the arguments that I had with him about not doing it, they were now throwing in my face as to why they didn't want me to do it anymore.

I looked at Marty and I said, "This is your fault." I said, "You are the one who told me to do that." And he looked at me and he went, "I don't remember that."

And I said to him, "Well, we've already established that you have a very convenient memory," and at that point I was excused and I stopped -- gladly stopped immediately because I actually looked at that as permission to finally stop doing



something that I never agreed with in the first place.

MR. MYRUS: All right. It's a little before 4:00 o'clock. I'm not done with this deposition but under the circumstances I think -- and I take it you agree -- that we'll suspend this deposition and agree to continue it at a subsequent date.

MR. FOLCARELLI: Okay.

MR. MYRUS: We are off the record.

(Adjourned at 3:50 p.m.)



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
KENT, Sc.

CERTIFICATION

I, VIVIAN S. DAFOULAS, Registered Merit Reporter/Certified Realtime Reporter, Notary Public in and for the State of Rhode Island, do hereby certify that the witness was first duly sworn to tell the truth, the whole truth and nothing but the truth in the matter of EILEEN AHERN, et al., vs. JAMES NICHOLSON; that I am in no way related or have any interest in said matter and that the testimony of said witness was duly recorded by me in computerized stenotype and is a true and accurate transcription of my notes.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of July, 2007.

----------------------
Vivian S. Dafoulas, RMR-CRR
East Greenwich, RI 02818
(401) 885-0992



WITNESS SIGNATURE

EILEEN AHERN, et al.,
vs.
JIM NICHOLSON
DEPOSITION OF:
DEBRA AUGER
July 12, 2007

I hereby certify that I have read the foregoing transcript and the same contains a true and accurate recording of my answers to the questions therein set forth, subject to the change(s) and/or correction sheet(s) attached.

________________________
SIGNATURE OF DEPONENT

STATE OF______________

Subscribed and sworn to before me this_____day of______________, 2007.

________________________
NOTARY PUBLIC

(My commission expires:________________________)