IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EILEEN AHERN, et al., :
Plaintiffs :
:
v. : C.A. NO. 05-117ML
:
JIM NICHOLSON, SECRETARY, :
DEPARTMENT OF VETERANS AFFAIRS, :
Defendant :

Deposition of JAMES PATRICK CURRAN, JR., Ph.D., a Witness herein, taken on behalf of the Defendant, on FRIDAY, SEPTEMBER 7, 2007, at Plaza Psychology & Psychiatry, 68 Cumberland Street, Suite 102, Woonsocket, Rhode Island, commencing at 4:00 p.m., before Diane J. DeStefano, RPR, a Notary Public in and for the State of Rhode Island.

Vivian S. Dafoulas & Associates
50 Fieldstone Drive
East Greenwich, RI 02818
(401) 885-0992



APPEARANCES:
FOR THE PLAINTIFFS:
FOLCARELLI LAW
BY: THOMAS FOLCARELLI, ESQUIRE
55 BRADFORD STREET, SUITE 203
PROVIDENCE, RHODE ISLAND 02903

FOR THE DEFENDANT:
OFFICE OF THE UNITED STATES ATTORNEY
BY: RICHARD B. MYRUS, ESQUIRE
FLEET CENTER, 50 KENNEDY PLAZA
PROVIDENCE, RHODE ISLAND 02903

COPY



I N D E X


| WITNESS | PAGE |
|---|---|
| JAMES P. CURRAN, Jr., Ph.D. | |
| Examination by Mr. Myrus | 4 |
| Examination by Mr. Folcarelli | 44 |


E X H I B I T S


CURRAN:

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Medical Evaluation Report | 19 |




FRIDAY, SEPTEMBER 7, 2007, 4:00 P.M.

JAMES PATRICK CURRAN, JR., Ph.D.,
called as a witness and having first been duly
sworn, testifies as follows:

THE REPORTER: Please state your full name for the record.

THE WITNESS: My name is James Patrick Curran, Jr.

EXAMINATION

BY MR. MYRUS:

Q. Good afternoon, Dr. Curran.

A. Good afternoon.

Q. It is Dr. Curran, right?

A. Yes, it is.

Q. My name is Rich Myrus. I am an Assistant United States Attorney and I represent the defendant in a litigation that is pending in Federal District Court.

A. Okay.

Q. Have you ever given a deposition before?

A. Yes, I have.

Q. So you generally have an understanding of the procedure; is that fair to say?

A. That's fair to say, yes.

Q. All right. I will just quickly summarize

Page 21

have to put that.
BY MR. MYRUS:
Q. When did you meet with Ms. Auger?
A. Auger. August 26th, 2005.
Q. Is Exhibit 1 in the format that -- strike that. How many Social Security evaluations roughly have you done in your career?
A. Good question. I would guess I do about a hundred a year, so a hundred -- and I've been doing the private practice for a long time. Probably 25 years I've been doing a private practice, so 25 times 100? 2500.
Q. Is Exhibit 1 in the form that you typically use for this type of a Social Security exam?
A. Yes. What I do is -- I developed this a long time ago. I have a working sheet -- which no one could ever read my writing -- but I did that about 25 years ago. I do that with everybody, ask certain questions, skip certain questions if it's a kid, as opposed to an adult, but my questions are stylistically pretty much the same.
Q. Is the information contained in your evaluation of Ms. Auger dictated by the Social Security Administration?

Page 22

A. They are looking for certain things, yes. I have a general idea what they're looking for, and I worked out this format that seems to satisfy them and what they're looking for.
Q. With respect to Exhibit 1 and your practice in connection with doing a Social Security exam, you take a psychiatric history of the patient? Is that how it works?
A. Yes, I do.
Q. That's a fairly standard step in any kind of evaluation of a patient's psychiatric state, right?
A. That's correct.
Q. Then the next section of your report I believe is entitled Mental Status Examination. Do you see that?
A. Yes, that's correct.
Q. In the second full paragraph under Mental Status Examination, you state, "The claimant meets the criteria for a diagnosis of Major Depressive Disorder, recurrent, moderate to severe"?
A. Yes.
Q. In your report, which is Exhibit 1, where you state "meets the criteria," that I just read, what criteria are you referring to?

Page 23

A. Well, her appetite is off. There are times when she can't eat. She gets nauseous at times. Sleep is poor. She wakes up with panic attacks, finds it difficult to go back to sleep, loss of interest in doing things, adhedonia.
Q. Adhedonia? Is that how you pronounce it?
A. Yes. A-D-H-E-D-O-N-I-A. It means basically you don't get a lot of pleasure in the things you used to do. Agitated easily, worthless and helpless, not a lot of energy, tires easily. She's depressed, but I think I mentioned she's not suicidal.
Q. And the criteria that you applied to Ms. Auger --
A. That was good, that was good.
Q. -- were they derived from the DSM-IV?
A. Yes.
Q. In Exhibit 1, you diagnose her as having Major Depressive Disorder, right?
A. Yes.
Q. And is Major Depressive Disorder a DSM-IV diagnosis?
A. Correct.
Q. Other than what Ms. Auger related to you during your session with her, you don't have any

Page 24

basis to reach any diagnosis about her condition, right?
A. I don't have any previous records or something like that. I may or may not have talked to Susan Morin. I really don't remember. I tried to find that out today but --
Q. So you didn't go and speak with her colleagues, correct?
A. No.
Q. And you didn't attempt to verify one way or the other what she was reporting to you, right?
A. Right. Most diagnoses in psychiatric basically is the patient self-reporting and my observations. I mean she was crying at several parts during the interview. Her dad was hovering like she was fragile. And she graduated from Mount St. Charles. She's a fairly smart kid and got her associate's degree. She was working at the VA at radiology. She wasn't always fragile was my best guess. She seemed nervous.
Q. And the purpose of the August 26th, 2005 evaluation was because Ms. Auger was seeking to obtain Social Security benefits, right?
A. Yes.
Q. So these kind of interviews that you do in

MR. MYRUS: Object to the form of the question.
Q. -- would be more stressful, wouldn't it?
MR. MYRUS: Object to the form of that question.
A. Yes.
Q. So with Miss Auger, as you stated, you have a pretty good clue about who is pretending to bring this --
A. I'm usually pretty savvy about that, yeah.
Q. So in your evaluation, as far as you remember, she seemed pretty genuine?
A. Yes, she did.
Q. You didn't believe she was making this up?
A. I did not believe she was making it up.
Q. And with her mental faculties you thought that she would be able to have a reasonable perception of the world around her?
MR. MYRUS: Object to the form of that question.
A. She did not seem to be delusional in any way, shape, or form.
MR. FOLCARELLI: Okay. That's it.
MR. MYRUS: Then we are done.
THE WITNESS: Okay.



MR. MYRUS: Off the record.
(Whereupon, the deposition was concluded at 5:05 p.m.)



C E R T I F I C A T E

I, Diane J. DeStefano, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of James P. Curran, Jr., Ph.D a witness in the above-entitled cause, was taken before me on behalf of the Defendant, at the offices of James P. Curran, Jr., Ph.D, Plaza Psychology & Psychiatry, 68 Cumberland Street, Suite 102, Woonsocket, Rhode Island, on Friday, September 7, 2007, at 4:00 p.m., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by the Defendant's attorney, Richard Myrus.

A correction and signature page was not requested.

IN WITNESS WHEREOF I hereunto set my hand this 25 Day of September, 2007.

Diane J. DeStefano, Notary Public

Diane J DeStefano RPR Notary Public