UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

EILEEN AHERN, et al.                        :
                                            :
        v.                                  :        C.A. No. 05-117ML
                                            :
JIM NICHOLSON, Secretary,                   :
Department of Veterans Affairs              :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Before the Court for a report and recommendation is Defendant's Motion for Summary Judgment. (Document No. 48). Plaintiffs object. (Document No. 54). A hearing was held on June 19, 2008.

### Background

This is an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Plaintiffs are four females who were employed during the relevant period as radiology technologists at the Department of Veterans Affairs Medical Center in Providence (the "VA Hospital"). Defendant is Jim Nicholson, Secretary of Veterans Affairs.[1] Plaintiffs allege gender discrimination, retaliation and constructive discharge. Their allegations are specifically directed at Mr. Mehrdad Khatib, a male supervisor, who was employed at the relevant time as the Administrative Officer in the VA Hospital's Diagnostic Imaging Service. Plaintiffs allege that Mr. Khatib violated Title VII when he:

---

[1] Mr. Nicholson resigned in 2007, and the current Secretary is Dr. James Peake.

1.     intentionally hired male employees rather than female employees;

2.     treated the male employees better than the female employees;

3.     paid the male employees more than the Plaintiffs for the same job;

4.     placed a temporary male employee in charge over the Plaintiffs who were all female and as permanent employees were all more qualified for the charge position; and

5.     engaged in reprisal and retaliation for the Plaintiffs' opposition and engagement in protected activities such as lodging internal and administrative complaints about discrimination.

(Document No. 10 at ¶ 5). Plaintiffs also claim that such discrimination resulted in their constructive discharge from employment. Id., ¶ 34.

**Facts**

The following undisputed facts are gleaned from the parties' Local Rule Cv 56(a) statements:

In 2003, the Diagnostic Imaging Service ("DIS") at the VA Hospital consisted of five areas: general x-ray/radiology, ultrasound, CT scan, nuclear medicine and specials/angiography/interventional. In addition to the technologists who performed the diagnostic procedures, DIS consisted of several radiologists and a clerical support staff. The technologists in DIS reported to the Chief Technologist, who in turn reported to the Administrative Officer. The Administrative Officer reported to the Chief of the DIS (a radiologist), who had ultimate responsibility for DIS.

The Chief Technologist was responsible for directly supervising the technologists, approving leave requests, authorizing overtime, disciplining technologists and providing performance reviews.

The Administrative Officer was responsible for all facets of DIS's operation, including personnel management, equipment operations and budgeting.

With respect to personnel management, the Administrative Officer's role was to address employee performance issues, staffing requirements and work assignments on a daily basis with the Chief Technologist and to keep the Chief of the DIS fully apprised. In addition, the Administrative Officer oversaw the day-to-day operations of DIS, and it was his or her responsibility to ensure that DIS provided the best possible patient care as efficiently as possible. In 2003, the Chief of the DIS was Dr. Casimira Sta Ines, a woman.

Mr. Khatib became the Administrative Officer in August 2002, filling a position that had been vacant for several months.[2] In December 2003, DIS employed fourteen staff technologists, two of whom were men. In addition, two male file clerks worked in DIS. The Chief Technologist was Joan Beaudoin, a long-time VA Hospital employee. Beaudoin left DIS in May 2004 on extended leave, at which time Khatib, her immediate superior, assumed her supervisory duties as Chief Technologist.

In 2003, the VA Hospital's Computer Tomography ("CT") Department consisted of two full-time technologists (Plaintiffs Mastalerz and Ahern) and one technologist who divided her time between CT Scan and Angiography (Plaintiff Auger). In 2003, the CT Department routinely closed for preventive maintenance at least one afternoon each month for several hours, during which time patients were not scheduled. In addition, prior to Khatib's arrival as Administrative Officer, the CT Department's practice was to leave four outpatient slots per day unfilled to allow for the completion

---

[2] Mr. Khatib worked at the VA Hospital until late 2004 when he left on an extended leave to return to California to tend to his ailing father. (Document No. 48-3, Khatib Aff., ¶ 8). He ultimately resigned in 2006 and currently lives and works in California. Id.

of unscheduled emergency cases. Khatib, however, viewed this practice as inefficient because these slots often went unused when unscheduled cases did not materialize.

The CT Department operated on a compressed tour-of-duty schedule during the period at issue in this case. Under this schedule, each of the technologists in CT worked four, ten-hour days (from 7:00 a.m. to 5:30 p.m.) per week. For example, during a typical week in 2003, Ahern worked Monday through Thursday, and Mastalerz worked Tuesday through Friday. Auger took Wednesdays off and divided her time during her four workdays between Angiography and CT. The following week, Mastalerz and Ahern typically switched days off, which enabled each of them to have a four-day weekend every other week. No other departments in DIS worked a compressed, four-day schedule.

In early 2004, Khatib advised the Chief Technologist:

> We continue to receive inaccurate or incomplete data during the morning report. Specifically, [the] Scheduled Request Log is inaccurate and not reflecting what is actually happening in CT....The CT department is not functioning as it should and therefore causing delays in service and inefficiencies.

(Def.'s Ex. 17). To address the problems in the CT Department, Khatib submitted a detailed memorandum to the Chief of DIS on March 31, 2004. (Def.'s Ex. 11). In this memorandum, Khatib proposed that the tour of duty be changed so that each of the three technologists would work a regular eight-hour shift, five days per week. Under Khatib's initial proposal, these tours would be staggered, such that the first technologist would begin work at 7:00 a.m. The second technologist would begin work at 10:30 a.m. and the third would work from 3:00 p.m. to 11:00 p.m. (Def.'s Ex. 11, at WMK0030). The objective of this staggered schedule was to ensure that three CT

technologists would be available Monday through Friday and that CT's regular hours of operation would be extended. (Def.'s Ex. 11).

The Chief of DIS, Dr. Sta Ines, endorsed a modified version of the change to the CT schedule and proposed it to the CT technologists on April 12 and 13, 2004. (Def.'s Exs. 18 and 19). In addition, Khatib directed that all CT patients be called the day before their scheduled appointment in order to avoid no-shows. (Document No. 48-3, Khatib Aff., ¶¶ 18-19). Khatib, in consultation with the Chief of DIS, also implemented cross-training in CT procedures for interested technologists. (Def.'s Ex. 20).

The CT technologists, Plaintiffs Ahern, Mastalerz and Auger, opposed the effort to switch the CT Department to a standard five-day per week schedule. (Def.'s Exs. 21 and 22 at AH0030-AH0032). They objected to Khatib's plan for a number of reasons, including: "we will no longer have a day off during the week to take care of personal business so we will now need to take days off to do these things." (Def.'s Ex. 22 at AH0247). Under Khatib's proposal, their overtime opportunities would also have been curtailed.

On April 22, 2004, approximately ten days after being notified of the plan to modify their work schedules, Plaintiffs and several other staff employees, two male and three female, sent a seventeen-page, single-spaced memorandum to Dr. Sta Ines (copied to other members of the VA Hospital Administration) complaining about Khatib's proposed change to the schedule and his treatment of the staff technologists. (Def.'s Ex. 21). In this memorandum, the staff members complain, among other things, that Khatib "places unreasonable and unrealistic expectations on all of us, seemingly setting us up to look and feel like failures." (Def.'s Ex. 21 at AH0028). The memorandum also indicated that Khatib was being disrespectful of a male doctor, Gregory Babigian,

and that he treated the male file room clerks "horribly." (Def.'s Ex. 21 at AH0034-AH0035). The memorandum concludes by accusing Khatib of engaging in workplace "bullying" of the entire staff. (Def.'s Ex. 21 at AH0041-AH0042).

On September 30, 2004, in response to complaints about Khatib, a review team commissioned by the Department of Veterans Affairs issued a report of its findings and recommendations regarding the situation in DIS at the Providence VA Hospital. (Def.'s Ex. 32.) In connection with this review, a team of five individuals from outside the Providence VA Hospital visited that site on September 22, 2004 to conduct interviews. Id. Among other things, the report concluded:

> 5.     There was no apparent discriminatory behavior on the part of Mr. Khatib. There were male and female employees of varying ages, who either supported him or were nonsupportive. There were allegations that he hired his male friends on contract, however, these allegations were not substantiated as he had hired three female employees, including contract, per diem, and student employees.
>
> * * *
>
> 8.     The employees with significant longevity in this department seemed to have grown accustomed to self managing. While there were males and females of various age groups that either endorsed his changes or opposed them, there was clearly a division between the longer-term employees and the newer ones with only one exception. The newer employees saw Mr. Khatib as having "an open door policy" and "cleaning up the department and making people accountable." They claimed that they were encouraged by the existing technologists to say negative things about Mr. Khatib and would be shunned if they did not support the current staff. However, clearly the newer employees were not invested in the old work structure, such as compressed tours of duty, and realistically had little to lose. There is no question that there is a serious morale issue among the majority of staff.

(Id. at AH0019.)  The reviewers also concluded that Khatib's "ineffective leadership skills have resulted in unrest among the staff" and recommended a mentor for Khalib who has experience in "change management."  (Id. at AH0019-AH0020).

### Summary Judgment Standard

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties.  Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case."  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)).  Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains."  Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party."  Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257, 106 S. Ct. 2505,

2514-2515, 91 L. Ed. 2d 202 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

### Analysis

### A.    Disparate Treatment Claims

Plaintiffs allege that Khatib discriminated against them due to their gender in regard to hiring (Count I), pay and benefits (Count II) and promotion (Count III). (Document No. 10 at ¶¶ 29-31). A plaintiff sustains a claim of disparate treatment by showing that: (1) she is a member of a protected class; (2) she was qualified and met her employer's expectations; (3) she was subject to adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment. Prescott v. Higgins, 538 F.3d 32, 41 (1st Cir. 2008).

As discussed more fully below, each of Plaintiffs' disparate treatment claims has a fatal legal flaw. The hiring claim fails because Plaintiffs never suffered any adverse employment action in hiring. The pay/benefits claim fails because Plaintiffs seek to compare themselves to "contract"

technologists who were not similarly-situated to Plaintiffs. Finally, the promotion claim fails because Plaintiffs cannot show any adverse employment action with regard to promotions.

As to hiring (Count I), Plaintiffs allege that Khatib discriminated against them "when he decided that he was going to hire more males than females because he liked working with males better, and then hired males." (Document No. 10 at ¶ 29). The flaw in Plaintiffs' hiring claim is that it is undisputed that Plaintiffs were all already employed by the VA Hospital as full-time radiology technologists at the time Khatib came on the scene as the Administrative Officer of DIS. There is no evidence that Plaintiffs applied for, and/or were denied, any employment opportunities. Plaintiffs' hiring claim is an alleged preference for engaging male contract technologists.

It is undisputed that the overwhelming majority of staff radiology technologists at the relevant time were female. It is also undisputed that the VA Hospital hired a number of "contract" technologists between 2003 and 2005. These "contract" technologists were independent contractors. They were not federal employees of the VA Hospital and thus did not receive any employment-related benefits such as health insurance, paid vacation or retirement. The VA Hospital engaged both male and female "contract" technologists during that period with a slight majority being male. See Document No. 48-6, Joslin Aff., ¶ 6. Even if Plaintiffs proffered competent evidence of gender discrimination in the engagement of "contract" technologists, Plaintiffs were already employed as staff technologists, and there is no evidence that they ever sought or even expressed interest in changing their status from employee to independent contractor. Thus, Plaintiffs' claim of disparate treatment in hiring fails as a matter of law.

As to pay and benefits (Count II), Plaintiffs allege that Khatib discriminated against them by "paying male employees more than female employees for the same job." (Document No. 10 at ¶ 30,

emphasis added). Plaintiffs' opposition to Defendant's Motion makes clear that this claim focuses on the undisputed fact that contract technologists were paid at a higher hourly rate than staff technologists. It is also undisputed that the contract technologists basically performed the "same job" as staff technologists – producing images of patients' body parts and/or functions for medical diagnostic purposes.

The issue, however, is not whether the contract and staff technologists performed the same job duties as Plaintiffs and at the same hospital. The issue in this Title VII case is whether the two groups of technologists were "similarly-situated" and thus whether the difference in pay rates supports a prima facie case of pay discrimination. Although Plaintiffs need not show that a comparator is identically situated, they must show that they are "similarly-situated" in all material respects. See McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2nd Cir. 2001) ("where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."). See also Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002).

Plaintiffs are attempting to compare apples to oranges. Plaintiffs were all employed directly by the VA Hospital as staff radiology technologists. They were full-time employees of a federal agency with fringe benefits, including paid vacation time, health benefits and retirement benefits. The "higher paid" contract technologists received a higher hourly pay rate. However, they were not employees. They had no rights under the federal personnel system, received no fringe benefits and served for temporary contract terms. (Document No. 48-6, Joslin Aff., ¶ 4). Further, there is no evidence that the alleged discriminator, Mr. Khatib, set the hourly rates paid to contract

technologists. (Document No. 48-3, Khatib Aff., ¶ 23). The rates were set by the VA's Contracting Department "after conducting an analysis of prices from federal supply schedule contractors." (Document No. 48-6, Joslin Aff., ¶ 7). Plaintiffs were simply not similarly-situated to the contract technologists. Thus, Plaintiffs' attempt as employees to base a pay discrimination claim solely on the rates paid to independent contractors fails as a matter of law on these undisputed facts.

As to promotion (Count III), Plaintiffs claim that Khatib discriminated against them by placing a contract technologist (Christopher Stokes) "in charge over them." (Document No. 10 at ¶ 31). The allegation relates to an extended leave commenced by the Chief Technologist, Ms. Beaudoin, in June 2004. Defendant indicates that this leave resulted in Mr. Khatib assuming Ms. Beaudoin's supervisory responsibilities, and Mr. Khatib then assigned Mr. Stokes, a contract technologist, to "coordinate patient care." (Document No. 48-4, Sta Ines Aff., ¶ 9). Mr. Khatib avers that he delegated "some of the responsibility for coordinating patient flow within the service" to Mr. Stokes "because he was a very experienced, professional technologist who had availability to serve in this capacity." (Document No. 48-3, Khatib Aff., ¶ 27). It is undisputed that Mr. Stokes did not receive any additional compensation for these duties and also that a female staff radiology technologist, Tanessa Karmozyn, was similarly assigned patient flow duties by Mr. Khatib in Ms. Beaudoin's absence. Id.

Plaintiffs' promotion claim is also fatally flawed. Plaintiffs have simply not established that they were denied any promotional opportunity. The record establishes that Ms. Beaudoin's leave required Mr. Khatib to take on her responsibilities. Mr. Khatib was an Administrative Officer and did not deal directly with patients. Thus, it makes sense that he would delegate the "patient flow" part of Ms. Beaudoin's duties to a technologist. In this instance, it is undisputed that he delegated

-11-

the tasks to a male, Mr. Stokes, and a female, Ms. Karmozyn, and thus there is no evidentiary basis to infer gender discrimination regarding such assignment.

Rather than gender discrimination, the primary issue is the perceived slight of selecting a contract technologist over a staff technologist. For example, Plaintiff Parker's diary of "incidents for EEO" dated September 10, 2004, accused Mr. Khatib of "changing past practices" by not putting her as the "senior tech" in charge during Ms. Beaudoin's absence and instead having Ms. Karmozyn and Mr. Stokes "take turns carrying the phone and overseeing things." (Def.'s Ex. 30 at AH3560). Plaintiff Parker also stated that, if asked, Mr. Khatib would say he is "in charge" but "he is having them [Ms. Karmozyn and Mr. Stokes] do it." Id. Plaintiff Parker[3] also conceded at her deposition that Mr. Stokes had a "good background" and more experience as a technologist than her but claimed it was "irrelevant" because "experience has nothing to do with seniority in a hospital." (Def.'s Ex. 1 at pp. 125-126). While that may be true in certain contexts, such as a union seniority grievance, this is a Title VII case and the issue at this stage is whether Plaintiffs have proffered sufficient evidence to allow a jury to reasonably infer gender discrimination in promotion. Plaintiffs have failed to do so.

### B.    Reprisal and Retaliation Claim

In Count IV, Plaintiffs allege that they engaged in protected activities, i.e., "grievances [and] EEO complaints," and that Mr. Khatib initiated "employment actions disadvantaging the Plaintiffs" because of such protected activities. (Document No. 10 at ¶ 33). For purposes of this Motion, Defendant concedes that Plaintiffs engaged in protected activities but argues that they did not suffer

---

[3] Parker was the only Plaintiff potentially aggrieved by the alleged "promotion," as it is undisputed that Plaintiffs Auger, Ahern and Mastalerz were all out of work at the time. (Def.'s Ex. 1 at p. 116).

any materially adverse employment actions. Alternatively, Defendant contends that Plaintiffs have not presented evidence demonstrating the requisite causal relationship between any adverse actions and their protected activities.

"To establish a prima facie case of retaliation, [a plaintiff] must prove by a preponderance of evidence that '(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity.'" Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003) (quoting White v. N.H. Dep't of Corr., 221 F.3d 254, 262 (1st Cir. 2000)). If Plaintiffs meet this initial burden, the McDonnell Douglas test requires Defendant to articulate a legitimate, non-retaliatory reason for its employment actions. Enica v. Principi, 544 F.3d 328, 343 (1st Cir. 2008). If Defendant does so, the burden shifts back to Plaintiffs to establish that Defendant's articulated reason is a pretext and the disputed actions were motivated by retaliatory animus. Id. "The anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Id. at 68 (emphasis added). The Supreme Court adopted the "material adversity" standard to distinguish "significant from trivial harms" because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.

Plaintiffs allege that Mr. Khatib retaliated against them because they met with Dr. Sta Ines in September 2003 and January 2004 to complain about Mr. Khatib's allegedly hostile and discriminatory treatment of them. (Document No. 54-4 at pp. 11, 19 and 20; see also Def.'s Ex. 40

-13-

at AH3397).  They also point to their April 22, 2004 "Formal Letter of Complaints" about Khatib which was addressed to Dr. Sta Ines.  (Def.'s Ex. 21).  Again, for purposes of this Motion, Defendant does not dispute that these activities are protected under Title VII.

Plaintiffs' retaliation claim focuses primarily on Mr. Khatib's March 31, 2004 proposal to eliminate the compressed four-day work schedule in the CT Department.  (Def.'s Ex. 11).  Plaintiffs claim that Mr. Khatib fabricated the existence of a case back log in CT and then used that fabricated back log to justify changing the CT staff's work schedule from four to five workdays.  They claim this was illegally motivated by the January 2004 meeting that Plaintiffs requested with Dr. Sta Ines (Khatib's supervisor) and Dr. Sta Ines' resulting memoranda of February 2 and 9, 2004 to Mr. Khatib reporting on that meeting.  (Document No. 54-7 at pp. 6-7, 9, Pls.' Exs. 1 and 2).  Defendant counters that a backlog, in fact, existed in CT and that Mr. Khatib's proposed schedule change was a legitimate effort to improve the efficiency and effectiveness of the CT Department.  (Def.'s Ex. 11).  Since Defendant has met its burden of articulating a legitimate, non-discriminatory reason for the proposal, the issue is whether Plaintiffs have adduced sufficient evidence to support a rational finding that Mr. Khatib's articulated reason was a pretext and that his real motive was retaliation. See Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 15 (1st Cir. 1998).  Plaintiffs have not done so.

The compressed four-day work schedule for the CT Department was initiated in December 2000.  (Def.'s Ex. 32).  CT was the only DIS Department on a "compressed" work schedule.  (Def.'s Ex. 23 at pp. 65-66).  On March 31, 2004, Mr. Khatib proposed to eliminate the "compressed" four-day work schedule in CT and implement a standard five-day work schedule.  (Def.'s Ex. 11).  He indicated that the "compressed" schedule was "not being utilized in the most efficient and effective manner possible" and that the impact of his proposed schedule change "should include a reduction

in wait time for CT appointments, an improved turnaround time for CT reports, and a decrease in the amount of staff overtime and shortage." Id. at WMK0029, WMK0031. Although Mr. Khatib's supervisor (Dr. Sta Ines) approved the schedule change, it is undisputed that the change was never actually implemented as to Plaintiffs. (Def.'s Ex. 18; Document No. 48-4, Sta Ines Aff. ¶ 7; and Def.'s Ex. 23 at pp. 65-66).

Plaintiffs claim that Mr. Khatib's proposal to eliminate the compressed schedule in CT was "illegally motivated retaliation only contemplated after the January 2004 meeting that [they] had with Dr. Sta Ines and the resultant February 2, 2004 Sta Ines memo to Khatib." (Document No. 54-2 at p. 28). As support for this claim, Plaintiffs contend that their protected activity caused Mr. Khatib to shift gears and propose eliminating a schedule which he previously supported.  In particular, Plaintiffs rely on an unauthenticated, handwritten note on an email exchange between Mr. Khatib and Ms. Beaudoin regarding the issue of the compressed four-day schedule in CT. Pls.' Ex. 16. The note states that "[h]e told me in beginning that he felt the whole department should be on ten hr. days." Id. Plaintiffs do not, however, provide any competent evidence, such as an affidavit or deposition testimony, to identify the author of the note or the declarant who allegedly made the hearsay statement. Thus, because the handwritten note is not admissible evidence on this record, it is not entitled to consideration under Rule 56(e), Fed. R. Civ. P.

Plaintiffs also claim that Mr. Khatib "created" or fabricated a backlog of CT procedures "partially to make himself look good, and partially as pretext for why he needed to change the tours of duty for the[m]."  (Document No. 54-2 at p. 29).  Plaintiffs' presentation fails to reveal the existence of a genuine issue of fact as to pretext or retaliatory motive.  First, Plaintiffs do not adequately explain how a backlog of CT procedures would reflect positively on Mr. Khatib in his

-15-

role as the Administrative Officer of DIS.   Second, in an email regarding the proposed schedule change, Ms. Beaudoin, the Chief Technologist, indicates that utilizing all appointment slots "will help to reduce the backlog" and concludes that "[i]t is possible to reduce the backlog and ensure that CT is fully booked with the present system." (Document No. 54-8 at p. 6, Pls.' Ex. 16).   While Ms. Beaudoin apparently disagreed with Mr. Khatib's approach to the problem, she identifies the existence of a backlog in CT and, as Chief Technologist, she would have personal knowledge as to the existence of a backlog in CT procedures.   Further, at her deposition, Ms. Beaudoin specifically testified to the existence of a substantial backlog of pending CT cases in March 2004. (Def.'s Ex. 4 at pp. 40-42).

Third, in an email dated March 23, 2004, Plaintiff Auger references a meeting with Dr. Sta Ines, Plaintiff Ahern and Ms. Beaudoin in which they "discussed the backlog of CT appointments." (Document No. 54-8 at p. 26, Pls.' Ex. 23).   Plaintiff Auger also filed a union grievance protesting the proposed schedule change in which she argued, in part, that management had not properly considered less drastic alternatives "because any ideas [she] attempted to put forward to help the problem causing management to make this decision were not seriously considered or implemented." (Document No. 54-7 at p. 30, Pls.' Ex. 9). (emphasis added).   It makes no sense that Plaintiff Auger, a CT technologist, would document the discussion of a backlog or refer to the existence of a problem if it was a fiction.

Fourth, on or about May 19, 2004, Dr. Sta Ines sent out a generic memorandum to a number of health care providers regarding "pending CAT scans." See Document No. 54-9 at p. 21, Pls.' Ex. 30.   It stated that "[i]n an effort to address CAT scan procedures that are waiting to be completed within our system," the provider was being given a list of pending CT scan orders and asked to report

on the status. Id. It defies common sense that Dr. Sta Ines, the DIS Chief and Mr. Khatib's superior, would sign off on a memorandum asking a number of fellow doctors to take the time to review the status of old CT scan orders if there was not actually a backlog.

Finally, and most significantly, Plaintiffs themselves identified the existence of a CT backlog in their formal written complaint about Mr. Khatib dated April 22, 2004. While complaining about Mr. Khatib's desire for the flexibility to pull CT technologists to work in x-ray, they asserted that "CT is very busy and has a constant backlog." (Def.'s Ex. 21 at AH0032). (emphasis added). The fact that Plaintiffs directly contradict their primary theory of pretext, i.e., the fictitious backlog, in a document which they identify as evidence of their protected activity is very telling. (Document No. 54-2 at p. 29).

Plaintiffs also allege that they were subject to a retaliatory pattern of increased scrutiny of their work performance by Mr. Khatib and (other than Plaintiff Parker) were formally disciplined after February 2004. A thorough review of the record reveals, however, that Plaintiffs have failed to present sufficient evidence to support a reasonable inference of causal connection or to show that Defendant's proffered justifications are pretextual. In addition, the alleged incidents of retaliation by Khatib are additionally flawed in that they do not meet the Supreme Court's "materially adverse" standard. See Burlington N., 548 U.S. at 68. As noted above, Plaintiffs' claimed protected activity dates back to September 2003, but the bulk of the allegedly retaliatory actions took place in and after February 2004. Accordingly, Plaintiffs cannot rest upon a timing argument to establish a triable issue of causal connection. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) ("[t]hree and four month periods [are] insufficient to establish a causal connection based on temporal

proxmity" in a Title VII retaliation case); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-274 (2001) (temporal proximity must be "very close").

A few examples of Plaintiffs' claimed acts of retaliation are instructive. For instance, on February 20, 2004, Plaintiff Auger was reprimanded for engaging in inappropriate conduct. (Def.'s Ex. 39). The reprimand addressed an incident on the prior day where Plaintiff Auger took photographs without permission of "two staff members from Roger Williams Medical Center [who] were visiting DIS on official business." Id. In the EEO process, Plaintiff Auger admitted that she did not have permission to take the photos and that her "behavior was unprofessional" and she did not dispute the reprimand letter. (Def.'s Ex. 40 at AH3398). There is no evidence that the reprimand resulted in any tangible detriment to Auger, and she is hard-pressed to establish that the reprimand was retaliatory when she concedes that she acted inappropriately.

Plaintiff Parker alleges that Mr. Khatib retaliated against her by denying her the opportunity to cross-train in CT and angiography. (Document No. 54-2 at p. 14). Ms. Parker was hired by the VA Hospital as an entry-level staff technologist in 2001 working in x-ray. (Def.'s Ex. 1 at pp. 8-9). She was later promoted (with Mr. Khatib's recommendation) to the position of backup angio/clinical coordinator. Id. at pp. 8-9, 140. In this position, she was training to do "angio special procedures" and coordinated a clinical experience program for CCRI radiology students. Id.

Although Ms. Parker concedes that Mr. Khatib supported her effort to cross-train in angiography (Def.'s Ex. 1 at pp. 140-141), she alleges that he denied her the opportunity to cross-train in CT for retaliatory reasons. (Document No. 54-2 at p. 14). Parker's primary complaint appears to be that Khatib was responsible for delaying her cross-training in CT. In the Statement of Undisputed Facts, Defendant states that "Khatib informed Parker that she would have an opportunity

-18-

to receive CT training in due course, but that given her responsibilities as an angiography technologist and her prior commitment to angiography cross-training, she would be trained after Tenessa Karmozyn." (Document No. 49 at ¶ 81). Plaintiffs' Answer to this statement does not directly controvert Defendant's proffered facts.[4] In addition, Plaintiffs misrepresent the record. Plaintiffs cite page 149 of Parker's deposition for the statements that Khatib trained Chris Stokes in CT before Parker and that Parker was never trained in CT. (Document No. 54-4 at p. 21). However, page 149 of Parker's deposition does not provide evidentiary support for either statement. (Def.'s Ex. 1 at p. 149). Plaintiffs also failed to "answer" paragraph 82 of Defendant's Statement of Undisputed Facts which provides that "Khatib and Dr. Sta Ines selected Karmozyn [for CT training] because she was the only interested radiology technologist not involved in other cross-training." (Document No. 49 at p. 15). Thus, pursuant to Local Rule Cv 56(a)(3), it is "deemed admitted." Further, Parker conceded in her deposition that Khatib informed her that she would be cross-trained in CT after Karmozyn. (Def.'s Ex. 1 at p. 146).

Plaintiff Ahern asserts Khatib subjected her to retaliatory discipline in May and June 2004. In particular, on May 21, 2004, Ahern received a "Counseling Letter" from Ms. Beaudoin regarding her interactions with two patients. (Def.'s Ex. 49). Plaintiffs concede that the letter did not become part of Ahern's personnel file and point to no adverse action taken against Ahern as a result of the counseling letter. (Document No. 49 at ¶ 123). Plaintiffs do not dispute the substance of the counseling letter other than to generally assert that Ahern was disciplined for "patient advocacy." (Document No. 54-4 at p. 30). However, Ahern was not advocating on behalf of patients in either

---

[4] Pursuant to Local Rule Cv 56(a)(3), "any fact alleged in the movant's Statement of Undisputed Facts shall be deemed admitted unless expressly denied or otherwise controverted by a party objecting to the motion."

instance addressed in the letter.  In fact, one of them was an incident in which Ahern sought to turn away a patient who had no appointment due to a "scheduling error" rather than contact the Chief Technologist to try to remedy the problem.  (Def.'s Ex. 49).

The second letter was issued by Mr. Khatib on June 18, 2004 and admonished Ahern for mishandling two emergency CT scan procedures.  (Def.'s Ex. 50).  In particular, on May 18, 2004, Ahern completed two CT scans ordered by the Emergency Room and was aware that her co-worker, Mastalerz, failed to immediately contact the radiologist on duty for readings and instead left him voice mails.  Id.  Their failure to personally notify a radiologist that an emergency CT scan was waiting to be read caused a delay in the reading and potentially compromised patient care.  (Document No. 49 at ¶¶ 124-125).  Plaintiffs again fail to directly controvert Defendant's version other than to generally assert that Ahern was "disciplined for patient advocacy." (Document No. 54-4 at p. 31).  The failure to follow through and confirm that a radiologist was aware of an awaiting emergency read cannot reasonably be construed as "patient advocacy."

Plaintiff Mastalerz was also admonished along with Ahern for the emergency CT scan voice mail incidents of May 18, 2004.  (Def.'s Ex. 53).  Again, Plaintiffs fail to controvert the substance of the improper conduct that resulted in the discipline.  (Document No. 54-4 at p. 31).  Rather, they assert merely that "Mastalerz thought Khatib was creating a paper trail in order to terminate her." Id.  Such speculation is insufficient to establish the existence of a trial-worthy issue of workplace retaliation.  See Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 10 (1st Cir. 2007) (summary judgment cannot be defeated "by relying on improbable inferences, conclusory allegations or rank speculation.").

Mastalerz also contends that Khatib retaliated against her when she returned from a medical leave in October 2004. In particular, she claims that he unlawfully delayed her return to CT and kept her off the "on call" schedule. (Document No. 54-2 at p. 16). However, the delay was for a two-week period of training in x-ray (Def.'s Ex. 15 at PSM0008) and Mastalerz acknowledged that the training was consistent with Khatib's cross-training objective and that "it probably wasn't unreasonable." (Def.'s Ex. 3 at pp. 93-94). Her complaint was that the timing was inopportune and that she was ordered not asked. Id. With regard to the "on call" schedule, Mastalerz concedes that the October schedule was already set before she returned from leave and that Khatib informed her of this fact. Id. at pp. 41 and 163. Mastalerz returned to the "on call" schedule in November. (Def.'s Ex. 85). Plaintiffs have not presented sufficient evidence upon which a jury could reasonably infer that these incidents were retaliatory or, in any event, that they were materially adverse employment actions.

### C.      Constructive Discharge

In Count V, Plaintiffs alleged that they could not tolerate Mr. Khatib's "illegal discriminatory conduct" and were forced to leave the VA Hospital. None of the Plaintiffs were terminated. Two (Plaintiffs Parker and Mastalerz) resigned in September 2004 and January 2005 respectively and started working for other area hospitals. Two (Plaintiffs Auger[5] and Ahern) commenced leaves of absence in 2004 and remain out of work on what Plaintiffs describe as "stress leave." (Document No. 10 at ¶ 28).[6] Plaintiffs describe Mr. Khatib as "incompetent" (Def.'s Ex. 7 at p. 175) and an

---

[5] Plaintiff Auger was approved for Social Security Disability Insurance Benefits retroactive to December 2004. (Document No. 54-9 at pp. 58-60, Pls.' Ex. 34). However, her workers' compensation claim was denied due to the lack of evidence of a work-related emotional injury. (Def.'s Ex. 48).

[6] Plaintiffs also describe the employment status of Auger and Ahern as "linger[ing] in some type of VA limbo" (i.e., not resigned and not terminated). (Document No. 54-2 at p. 21).

intolerable "micromanager" (Def.'s Ex. 60) who treated "all the contract techs, men and women, better than he treated the VA employees." (Def.'s Ex. 3 at p. 38). It is apparent that Plaintiffs did not agree with Mr. Khatib's management approach and were unhappy under his supervision. That does not, however, meet the legal standard for constructive discharge set forth below.

Because they resigned, both Parker and Mastalerz provided exit interviews to the VA Hospital. Parker's stated reason for leaving was "poor treatment from [Khatib] – unfair conditions – preferential treatment towards contract techs." (Def.'s Ex. 37). Parker stated that there was "a whole department of unhappy VA employees" and that the "contract people are happy they make a lot of money." Id. In other words, she identified a conflict in contractor versus staff treatment. However, as noted earlier, both groups included males and females. Parker also complained about being passed over for cross-training in favor of Tanessa Karmozyn, a female co-worker. Id. Finally, Parker indicated that she "did not appreciate" Khatib putting a "contract tech" (Mr. Stokes) in "charge" of her. Id. She reasoned that "since I am a staff employee, past practice was senior tech in charge but [Khatib] did not do that since I was senior tech." Id. However, as discussed previously in connection with the promotion claim, Parker conceded that Mr. Stokes was more experienced than her and that both Mr. Stokes and Ms. Karmozyn were put "in charge" by Khatib.

In her exit interview, Plaintiff Mastalerz noted unfair working conditions as her "stated reason for separation." (Def.'s Ex. 60). She indicated that she "loved working 10 hr days" (i.e., the four-day compressed schedule) but had negative opinions about the pay level, workload and the "unfair treatment" she received from Mr. Khatib. Id. She said Mr. Khatib was a "micromanager," "treated the contract techs with more courtesy and respect than his VA employees," and "had his favorites, if you disagreed with him, he would get you back." Id. In her deposition, Mastalerz

outlined an incident where she "believed" that an overtime opportunity in CT was improperly given to another technologist named Brittany. (Def.'s Ex. 3 at pp. 87-89). She described this as "the kicker of why I really left...." Id. at p. 88.

In order to establish a constructive discharge under Title VII, "a plaintiff must usually 'show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign.'"[7] Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003) (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002)). "The standard is an objective one [and] [i]t is not enough that a plaintiff suffered 'the ordinary slings and arrows that workers routinely encounter in a hard, cold world.'" Id. (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)). The Supreme Court framed the objective inquiry as: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pa. State Police v. Suders, 542 U.S. 129, 141 (2004). The issue is not whether working conditions were difficult or unpleasant, but rather so intolerable as to make a resignation "void of choice or free will." Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008). Finally, the Supreme Court has also repeatedly emphasized that Title VII is not "a general civility code for the American workplace." Burlington, 548 U.S. at 68. Thus, the inquiry is not whether Plaintiffs left employment because they found Mr. Khatib's management style, actions or behavior to be intolerable. It is more specifically whether Mr. Khatib engaged in illegal discriminatory conduct and whether a reasonable person in Plaintiffs' shoes would have felt compelled to resign because of such unlawful conduct.

---

[7] The concept of constructive discharge has been applied in cases where intolerable conditions allegedly force an employee to take an unpaid medical leave but not formally resign. See, e.g., White v. Honeywell, Inc., 141 F.3d 1270, 1279 (8th Cir. 1998).

None of the Plaintiff have presented sufficient evidence from which a reasonable jury could return a verdict of constructive discharge. Plaintiffs devote only two sentences of their memorandum to the issue of constructive discharge. (Document No. 54-2 at p. 22). They argue that their decision to leave the VA Hospital was a "reasonable and foreseeable consequence of the Khatib discriminatory behaviors listed in this memorandum that had been ratified by the VA." Id. However, as discussed above, the standard for constructive discharge is not one of reasonable forseeability. It requires intolerable working conditions that would compel, "void of choice or free will," a reasonable person to resign. Torrech-Hernandez, 519 F.3d at 50. Plaintiffs' response to Defendant's Motion on this issue is wholly inadequate. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). As previously discussed in detail, this Court has thoroughly reviewed the extensive summary judgment record and has found no genuine issue of material fact as to either Plaintiffs' Title VII claims of disparate treatment or retaliation. Thus, it follows that Plaintiffs' constructive discharge claim also fails as such claim requires a showing of a Title VII violation, i.e., that a reasonable person in Plaintiffs' shoes would have felt compelled to resign because of conduct violating Title VII.

**Conclusion**

For the reasons set forth herein, I recommend that Defendant's Motion for Summary Judgment (Document No. 48) be GRANTED as to all claims in Plaintiffs' Second Amended Complaint and that final judgment enter in favor of Defendant.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


   /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
January 27, 2009

-25-